**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| TWANDA MARSHINDA BROWN;<br>SASHA MONIQUE DARBY;<br>CAYESHIA CASHEL JOHNSON;<br>AMY MARIE PALACIOS;<br>NORA ANN CORDER; and<br>XAVIER LARRY GOODWIN and<br>RAYMOND WRIGHT, JR., on behalf of<br>themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>    v.<br><br>LEXINGTON COUNTY, SOUTH CAROLINA;<br>GARY REINHART, in his individual capacity;<br>REBECCA ADAMS, in her official and individual<br>capacities as the Chief Judge for Administrative<br>Purposes of the Summary Courts in Lexington<br>County and in her official capacity as the Judge of<br>the Irmo Magistrate Court; ALBERT JOHN<br>DOOLEY, III, in his official capacity as the<br>Associate Chief Judge for Administrative Purposes<br>of the Summary Courts in Lexington County;<br>BRYAN KOON, in his official capacity as the<br>Lexington County Sheriff; and ROBERT MADSEN,<br>in his official capacity as the Circuit Public<br>Defender for the Eleventh Judicial Circuit of South<br>Carolina,<br><br>      Defendants. | Case No.<br>3:17-cv-01426-MBS-SVH<br><br>**CLASS ACTION**<br>**SECOND**<br>**AMENDED COMPLAINT**<br><br>(Violation of Rights under the<br>Fourteenth, Sixth, and Fourth<br>Amendments to the U.S. Constitution)<br><br>JURY TRIAL REQUESTED |

**INTRODUCTION**

1.  Defendant Lexington County ("the County") is home to a modern-day debtors'

prison. Impoverished people are routinely arrested and incarcerated for their inability to pay

fines and fees imposed by the County's magistrate courts in traffic and misdemeanor criminal

1

cases. Each year, hundreds, if not more than one thousand, of the poorest residents of the County and its surrounding areas are deprived of their liberty in the Lexington County Detention Center ("Detention Center") for weeks and even months at a time for no reason other than their poverty and in violation of their most basic constitutional rights.

2.      Plaintiffs Twanda Marshinda Brown, Sasha Monique Darby, Cayeshia Cashel Johnson, Amy Marie Palacios, Nora Ann Corder, Xavier Larry Goodwin, and Raymond Wright, Jr. are indigent people, who are victims of the ongoing and widespread constitutional violations occurring in Lexington County. Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright were arrested and incarcerated in the Detention Center for a period of time ranging from seven to 63 days because they could not afford to pay magistrate court fines and fees that provide revenue to the County. At the time they filed their respective claims in this action, Plaintiffs Goodwin and Wright faced an imminent threat of arrest and incarceration because they could not afford to pay fines and fees owed to Lexington County magistrate courts. Plaintiff Goodwin continues to face such an imminent threat because he remains unable to pay money owed to a Lexington County magistrate court.

3.      Ms. Brown was arrested on a Saturday morning at home, in front of her children, and was incarcerated for 57 days because she could not pay $1,907.63. Ms. Darby was arrested at her mother's house and incarcerated for 20 days because she could not pay $680. Ms. Johnson was arrested at a traffic stop and incarcerated for 55 days because she could not pay $1,287.50. Ms. Palacios was arrested at a traffic stop and incarcerated for 21 days because she could not pay $647.50. Mr. Goodwin was arrested at a traffic stop and incarcerated for 63 days because he could not pay $1,710. Ms. Corder was arrested when she went to court to challenge an eviction action stemming from her poverty and was incarcerated for 54 days because she could not afford

to pay $1,320.  Mr. Wright was arrested and was incarcerated for 7 days because he could not afford to pay $416.93.

4.    Plaintiffs' arrests and incarcerations were not isolated incidents.  Lexington County relies on the collection of fines and fees imposed on defendants in traffic and criminal cases in the County's magistrate courts as a critical source of General Fund revenue.  Year after year, the County projects it will collect substantial revenue in the form of magistrate court fines and fees despite the fact that the percentage of the County's population living in poverty increased 14.5% from 2012 to 2015, according to U.S. Census estimates.

5.    Over time, the generation of County revenue through magistrate court fines and fees has given rise to a system that routinely deprives indigent people of their rights under the U.S. Constitution.  This system was established and is perpetuated by the County and the following state officials: Defendant Rebecca Adams, the Chief Judge for Administrative Purposes of the Summary Courts in Lexington County; Defendant Albert John Dooley, III, the Associate Chief Judge for Administrative Purposes of the Summary Courts in Lexington County; Defendant Gary Reinhart, who served as Chief Judge for Administrative Purposes of the Summary Courts in Lexington County prior to June 28, 2017; Defendant Bryan "Jay" Koon, the Lexington County Sheriff; and Defendant Robert Madsen, the Circuit Public Defender for the Eleventh Judicial Circuit in South Carolina, who also acts on behalf of Lexington County.

6.    As the administrative policymakers for Lexington County magistrate courts, Defendants Adams and Dooley oversee, enforce, and sanction two unwritten policies and practices that are the standard operating procedure in these courts: the **Default Payment Policy** and the **Trial in Absentia Policy**.  Both of these policies and practices lead directly to the arrest and incarceration of indigent people, who cannot afford to pay magistrate court fines and fees,

without any pre-deprivation court hearing concerning their ability to pay and without court-appointed counsel to help defend against incarceration.  Prior to June 28, 2017, when Defendant Adams was appointed to replace Defendant Reinhart as the Chief Judge for Administrative Purposes of the Summary Courts in Lexington County, Defendants Reinhart and Adams oversaw, enforced, and sanctioned the Default Payment and Trial in Absentia Policies.

7.      Under the Default Payment Policy, Lexington County magistrate courts routinely order the arrest and jailing of people who cannot afford to make payments toward court fines and fees in traffic and misdemeanor criminal cases.  When an indigent person is unable to pay in full at sentencing, the magistrate court imposes a payment plan requiring steep monthly payments that are usually beyond the individual's financial means.  If the indigent person fails to pay in the amount of time required by the payment plan, the magistrate court issues a bench warrant that orders law enforcement to arrest and jail the individual unless the full amount owed is paid before booking in the Detention Center ("payment bench warrant").

8.      Similarly, under the Trial in Absentia Policy, Lexington County magistrate courts routinely order the arrest and jailing of indigent people who cannot afford to pay fines and fees imposed through trials and sentencing proceedings held in their absence.  The County's magistrate courts routinely ignore requests for continuances by indigent people who are ticketed for traffic or misdemeanor offenses and who contact the court to explain why they cannot appear on the date and time of their scheduled hearing.  Rather, regardless of the reason for the defendant's absence, Lexington County magistrate courts proceed without the defendant, impose a conviction in absentia, and sentence the defendant to a term of incarceration suspended on the payment of fines and fees.  Without affording the defendant notice of the sentence, magistrate

courts swiftly issue a bench warrant ordering law enforcement to arrest and jail the individual unless the full amount owed is paid before booking.

9.      Defendant Koon, the chief law enforcement officer of the Lexington County Sheriff's Department ("LCSD") and the chief administrator of the Detention Center, oversees and directs the arrest and incarceration of indigent people who are subjected to bench warrants issued under the Default Payment and Trial in Absentia Policies.  Under his direction and supervision, LCSD officers execute payment bench warrants at people's homes, during traffic and pedestrian stops, and elsewhere, including by enlisting other law enforcement agencies to locate debtors.  Defendant Koon oversees and enforces a standard operating procedure by which people arrested on bench warrants, including indigent people, are transported to the Detention Center and incarcerated there for weeks to months at a time unless they can pay the full amount of fines and fees owed before booking, such as by raising money through phone calls from the jail to family and friends.  Indigent people who are unable to pay remain in jail without ever seeing a judge, having a hearing, or receiving the advice of counsel.

10.     As the administrative leadership of Lexington County's magistrate courts, Defendants Adams and Dooley are aware, or should be aware, that the Default Payment and Trial in Absentia Policies result in the persistent, widespread, and routine arrest and incarceration of indigent people for nonpayment of court fines and fees without pre-deprivation ability-to-pay hearings or representation by counsel.  Defendants Adams and Dooley make a deliberate administrative decision not to correct this longstanding and pervasive practice through any written policy.  As an exercise of their administrative authority, Defendants Adams and Dooley also make a deliberate decision not to increase the size of magistrate court dockets, require additional hours of court operation, or request additional County funding for magistrate court

operations in order to ensure that magistrate courts conduct pre-deprivation ability-to-pay hearings before ordering the arrest and incarceration of indigent people who are unable pay outstanding fines and fees in full.  Finally, Defendants Adams and Dooley make a deliberate administrative decision not to require or permit indigent people booked in jail on bench warrants to be brought to the Bond Court located adjacent to the Detention Center or to the original magistrate court that issued the bench warrant for a post-deprivation ability-to-pay hearing and appointment of counsel to guard against continued unlawful incarceration.  Likewise, prior to June 28, 2017, while Defendants Reinhart and Adams served as the final administrative policymakers of Lexington County's magistrate courts, they engaged in the same acts and omissions detailed above in an exercise of their administrative authority.

11.     The Lexington County Council and Defendant Madsen, as the final policymakers for the provision of indigent defense in the County's magistrate courts, routinely and systemically deprive indigent people of the right to assistance of counsel when they face incarceration for nonpayment of magistrate court fines and fees.  Defendants Lexington County and Madsen make the deliberate decision to provide grossly inadequate funding for indigent defense in Lexington County magistrate courts.  Indeed, Defendants Lexington County and Madsen provide *less than half* the amount of funding provided for public defense by South Carolina counties of comparable population size.  Defendants Lexington County and Madsen also make the deliberate decision not to assign public defenders to represent indigent people facing incarceration for nonpayment; not to assign public defenders in magistrate court proceedings that lead to sentences of incarceration suspended on payment of fines and fees; not to assign public defenders to staff the Bond Court to represent indigent people arrested on bench warrants for nonpayment; and not to assign public defenders to meet with indigent people

6

incarcerated in the Detention Center under bench warrants.  Instead, Defendants Lexington County and Madsen acquiesce to the longstanding, persistent, widespread, and routine absence of public defenders in Lexington County magistrate courts, particularly in cases that may and do lead to the incarceration of indigent people for nonpayment of magistrate court fines and fees.

12.     The arrest and jailing of indigent people for nonpayment of court fines and fees they cannot afford, including Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright, is the result of deliberate decisions, actions, omissions, and longstanding policies, practices, customs, and standard operating procedures established, overseen, and sanctioned by Defendants Lexington County, Reinhart, Adams, Dooley, Koon, and Madsen.  Indigent people who lack the financial means to pay the full amount of fines and fees owed to Lexington County magistrate courts are routinely arrested and incarcerated for weeks and months at a time without being afforded a pre-deprivation ability-to-pay hearing, notice of the right to request counsel, or the assistance of a court-appointed attorney to help defend against incarceration.  None of the Plaintiffs who were arrested and incarcerated for nonpayment of court fines and fees were provided a hearing on their ability to pay, informed of their right to request court-appointed counsel, or appointed counsel before being arrested and jailed for nonpayment of court fines and fees despite prima facie evidence of their indigence.

13.     Through their deliberate acts and omissions, Defendants have established a system that relies on arrest and incarceration to elicit payment toward magistrate court fines and fees rather than providing people with notice of a failure-to-pay charge (for example, through an order to show cause), summoning them to magistrate court for an ability-to-pay hearing, providing notice of their right to request an attorney, and appointing counsel to represent those for whom there is prima facie evidence of indigence, including evidence of receipt of needs-

based public assistance and income around or below the relevant Federal Poverty Guideline. This unlawful system involves the routine misuse of bench warrants, which South Carolina law and the South Carolina Supreme Court have made clear are to be used for the sole purpose of bringing to court a defendant who previously failed to appear—not to coerce indigent people to pay fines and fees they cannot afford under the threat of lengthy incarceration.

14.    Defendants' conduct has violated, and continues to violate, rights that are clearly established by the U.S. Constitution.  The Fourteenth Amendment prohibits the incarceration of a person for nonpayment of court fines, fees, costs, assessments, or restitution without first holding a court hearing on the individual's ability to pay and the adequacy of readily available alternatives to incarceration and making a finding that nonpayment was willful.  The Sixth Amendment requires affording indigent defendants the assistance of court-appointed counsel when sanctioned with actual incarceration for nonpayment of a court-ordered legal financial obligation, when facing a sentence of incarceration suspended upon the payment of fines and fees, and when the incarceration term of a suspended incarceration sentence is enforced.  The Sixth Amendment also prohibits systemic deficiencies in the funding, staffing, and assignment of cases to public defenders that result in the denial of the right to counsel to indigent defendants. The Fourth Amendment prohibits arresting people based on warrants that are unsupported by probable cause of a criminal offense or probation violation, as is the case when a warrant is based solely on a report that the defendant has failed to pay a court-ordered legal financial obligation.

15.    The longstanding, routine, and widespread practice of arresting and jailing indigent people who owe fines and fees to Lexington County magistrate courts has instilled fear and panic among the poorest residents of the County and surrounding region.  Indigent people

who owe money to Lexington County feel pressured to divert funds for basic necessities—food, medication, utilities, rent, and transportation—to avoid jail and the devastating impact of incarceration on their families, loved ones, jobs, and housing.

16.     Defendants continue to engage in acts and omissions that directly and proximately cause the arrest and jailing of people who owe fines and fees to the County's magistrate courts despite their awareness of the longstanding, persistent, widespread, and routine deprivation of the constitutional rights of debtors, including indigent people.

17.     As a result, at the time they filed their respective claims in this action, Plaintiffs Goodwin and Wright, who were indigent and owed fines and fees to Lexington County magistrate courts, faced an imminent and substantial threat that they would be arrested and incarcerated for nonpayment of magistrate court fines and fees in violation of their Fourteenth, Sixth, and Fourth Amendment rights.  Even today, Plaintiff Goodwin continues to face such a threat because he remains unable to pay money owed to a Lexington County magistrate court. Plaintiffs Goodwin and Wright bring this action under 42 U.S.C. § 1983 to vindicate their constitutional rights and to seek declaratory and injunctive relief against Defendants on behalf of themselves and a class of similarly situated impoverished people.

18.     The actions, omissions, policies, practices, customs, and standard operating procedures of Defendants Lexington County, Reinhart, Adams, Dooley, and Koon directly and proximately caused Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright to be deprived of their liberty for extended periods of time, violated their Fourteenth, Sixth, and Fourth Amendment rights, and caused them to suffer humiliation, anxiety, stress, emotional distress, sleeplessness, disturbed sleep, hunger, loss of employment, physical pain, serious illness, hospitalization, and other irreparable injury from being incarcerated in unsanitary jail

conditions without adequate medical attention and separated from their families and loved ones. Accordingly, Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright bring this action under 42 U.S.C. § 1983 to vindicate their individual rights and to seek damages for the violations they suffered.

## PARTIES[1]

19.    Plaintiff Twanda Marshinda Brown is a 40-year-old indigent woman who resides in Columbia, South Carolina.  Ms. Brown is the mother of seven children and the sole provider for her three youngest children, who are in secondary school.  She also provides financial support to her two older sons.

20.    Plaintiff Sasha Monique Darby is a 27-year-old indigent woman who resides in Fall River, Massachusetts.  Ms. Darby is the mother of a four-year-old child for whom she provides financial support.

21.    Plaintiff Cayeshia Cashel Johnson is a 27-year-old indigent woman who resides in Myrtle Beach, South Carolina.  Ms. Johnson is the mother and principal provider for four young children, all of whom are under eight years old.

22.    Plaintiff Amy Marie Palacios is a 40-year-old indigent woman who resides in Lexington, South Carolina.  Ms. Palacios is the mother of three children and the principal provider for her two younger daughters.

23.    Plaintiff Nora Ann Corder is a 53-year-old indigent woman who resides in Lexington, South Carolina.  Ms. Corder is homeless.

---

[1] Plaintiffs make the allegations in this Complaint based on personal knowledge as to all matters in which they have had personal involvement and on information and belief as to all other matters.

24.     Plaintiff Xavier Larry Goodwin is a 31-year-old indigent man who resides in Columbia, South Carolina.  Mr. Goodwin and his wife have two young daughters, and he is the family's principal financial provider.  Mr. Goodwin is also the father of two sons for whom he provides financial support.

25.     Plaintiff Raymond Wright, Jr., is a 46-year-old indigent and disabled man who resides in Leesville, South Carolina.  Mr. Wright and his wife support a household of five, which includes his daughter and two granddaughters.

26.     Defendant Lexington County, South Carolina, is a municipal governmental entity whose policies, practices, and customs were, and continue to be, a moving force behind the constitutional violations described in this Complaint.  The County, through the Lexington County Council, adopts ambitious projections for County revenue generation through the collection of fines and fees in traffic and misdemeanor criminal cases in magistrate courts located in its territorial jurisdiction.  Furthermore, the County contracts with Defendant Madsen for public defense services in the County's magistrate courts, and has delegated to him final policymaking authority for the County's provision of indigent defense.  Defendants Lexington County and Madsen deliberately, systematically, and routinely deprive indigent people of the right to assistance of counsel to defend against unlawful incarceration for nonpayment of magistrate court fines and fees.  The County is also aware of and causes, authorizes, condones, ratifies, approves, participates in, or knowingly acquiesces to the longstanding, persistent, widespread, and routine absence of public defenders from Lexington County magistrate court proceedings that result in the imposition of actual or suspended incarceration sentences on indigent people.  Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright pursue individual damages claims against Defendant Lexington County.  Plaintiffs Goodwin and

Wright also sue the County for declaratory and injunctive relief on behalf of themselves and the proposed class.

27.     Defendant Gary Reinhart, a state actor, served as the Chief Judge for Administrative Purposes of the Summary Courts in Lexington County from as early as 2004 to June 27, 2017 by order of the Chief Justice of the Supreme Court of South Carolina.  In April 2015, the Governor of South Carolina reappointed, and the Senate confirmed, Defendant Reinhart to his current four-year term as a magistrate court judge.  During his tenure as Chief Judge, Defendant Reinhart's administrative responsibilities included establishing and instituting standard operating procedures applicable to all Lexington County magistrate courts, including procedures concerning the collection of fines and fees; designating the hours of operation of those courts and determining their nighttime and weekend schedules; assigning cases to magistrate court judges across the County; coordinating the planning of budgets for Lexington County magistrate courts; administering the County Bond Court; and requesting County funding for magistrate court operations.  Defendant Reinhart oversaw, enforced, and sanctioned the Default Payment Policy, the Trial in Absentia Policy, the policy of denying individuals arrested on bench warrants an ability-to-pay hearing in the Bond Court or the magistrate court that issued the bench warrant, and other written and unwritten policies, practices, and standard operating procedures that directly caused the arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees without any pre-deprivation ability-to-pay hearing or representation by court-appointed counsel to defend against unlawful incarceration.  Defendant Reinhart resides in this District and this Division.  Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright pursue damages claims against Defendant Reinhart in his individual capacity for actions taken in the exercise of his administrative authority.

28.    Defendant Adams, a state actor, serves as the Chief Judge for Administrative Purposes of the Summary Courts in Lexington County, a position to which she was appointed on June 28, 2017 by order of the Chief Justice of the Supreme Court of South Carolina.  From December 20, 2013 to June 27, 2017, Defendant Adams served as the Associate Chief Judge for Administrative Purposes of the Summary Courts in Lexington County by order of the Chief Justice of the Supreme Court of South Carolina, a position in which she exercised the administrative responsibilities of the Chief Judge in the event that Defendant Reinhart was absent or disabled.  In April 2015, the Governor of South Carolina reappointed, and the Senate confirmed, Defendant Adams to her current four-year term as a magistrate court judge.  As the Chief Judge, she oversees, enforces, and sanctions the Default Payment Policy, the Trial in Absentia Policy, the policy of denying individuals arrested on bench warrants an ability-to-pay hearing in Bond Court or the magistrate court that issued the bench warrant, and other written and unwritten policies, practices, and standard operating procedures that directly cause the arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees without any pre-deprivation ability-to-pay hearing or representation by court-appointed counsel to defend against unlawful incarceration.  Defendant Adams resides in this District and this Division. Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright pursue damages claims against Defendant Adams in her individual capacity for actions taken in the exercise of her administrative authority.  On behalf of themselves and the proposed class, Plaintiffs Goodwin and Wright sue Defendant Adams in her official capacity for declaratory and injunctive relief for ongoing constitutional violations resulting from the exercise of her administrative authority.

29.    Defendant Adams also serves as the judge of the Irmo Magistrate Court.  In her judicial capacity, Defendant Adams routinely sentences indigent people to pay fines and fees according to payment plan terms they cannot afford; routinely fails to inform people of their right to request court-appointed counsel and to seek waiver of the $40 public defender application fee on the basis of financial hardship; routinely fails to appoint counsel to represent indigent people incarcerated for nonpayment; and routinely fails to ensure that any waiver of the right to counsel is knowing, voluntary, and intelligent.  Defendant Adams also routinely issues bench warrants ordering the arrest and incarceration of indigent people for nonpayment of fines and fees without any pre-deprivation ability-to-pay hearing and without affording them court-appointed counsel.  Plaintiff Goodwin pursues a declaratory relief claim against Defendant Adams in her official capacity for her judicial actions.

30.    Defendant Dooley, a state actor, has served since June 28, 2017 as the Associate Chief Judge for Administrative Purposes of the Summary Courts in Lexington County by order of the Chief Justice of the Supreme Court of South Carolina.  On April 2015, the Governor of South Carolina reappointed, and the Senate confirmed, Defendant Dooley to his current four-year term as a magistrate court judge.  As the Associate Chief Judge, Defendant Dooley exercises the administrative responsibilities of the Chief Judge in the event that Defendant Adams is absent or disabled.  He oversees, enforces, and sanctions the Default Payment Policy, the Trial in Absentia Policy, the policy of denying individuals arrested on bench warrants an ability-to-pay hearing in Bond Court or the magistrate court that issued the bench warrant, and other written and unwritten policies, practices, and standard operating procedures that directly cause the arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees without any pre-deprivation ability-to-pay hearing or representation by court-appointed

counsel to defend against unlawful incarceration.  Defendant Dooley resides in this District and

this Division.  On behalf of themselves and the proposed class, Plaintiffs Goodwin and Wright

sue Defendant Dooley in his official capacity for declaratory and injunctive relief for ongoing

constitutional violations resulting from the exercise of his administrative authority.

      31.     Defendant Bryan Koon, a state actor, is the elected Lexington County Sheriff, the

chief law enforcement officer of the LCSD, and the chief administrator of the Detention Center.

In his administrative capacity, Defendant Koon oversees and enforces the execution of bench

warrants issued by Lexington County magistrate courts against people charged with nonpayment

of fines and fees.  Under his direction and supervision, LCSD officers execute bench warrants at

people's homes, during traffic and pedestrian stops, and elsewhere, including by enlisting other

law enforcement agencies to locate debtors.  Defendant Koon enforces a standard operating

procedure by which people, including indigent people, are arrested on bench warrants and

incarcerated in the Detention Center unless they can pay the full amount owed before booking,

such as by raising money through phone calls to family and friends.  Defendant Koon resides in

this District and this Division.  On behalf of themselves and the proposed class, Plaintiffs

Goodwin and Wright sue Defendant Koon in his official capacity for declaratory and injunctive

relief for ongoing constitutional violations connected to the exercise of his enforcement and

administrative authority.

      32.     Defendant Robert Madsen, who is both a state and local actor, is the Circuit

Public Defender for the Eleventh Judicial Circuit in South Carolina, which includes Lexington

County.  Under South Carolina law, Defendant Madsen contracts with Lexington County to

provide public defense services in the County's magistrate courts.  Defendant Madsen is

responsible for requesting County funding for the provision of indigent defense in Lexington

County's magistrate courts, General Sessions Court, and Family Court.  Defendant Madsen is also responsible for spending money appropriated by Lexington County, the state, and other sources to ensure the provision of public defense to indigent people in Lexington County magistrate courts.  The County has delegated to Defendant Madsen final policymaking authority for the County's provision of indigent defense.  Defendant Madsen deliberately, systematically, and routinely deprives indigent people of the right to assistance of counsel to defend against unlawful incarceration for nonpayment of magistrate court fines and fees in Lexington County.  Defendant Madsen is also aware of and causes, authorizes, condones, ratifies, approves, participates in, or knowingly acquiesces to the longstanding, persistent, widespread, and routine absence of public defenders from Lexington County magistrate court proceedings that result in the imposition of actual or suspended incarceration sentences on indigent people.  These actions can be fairly attributed to Lexington County; in the alternative, Defendant Madsen engages in this conduct as a state actor.  Defendant Madsen resides in this District and this Division.  On behalf of themselves and the proposed class, Plaintiffs Goodwin and Wright sue Defendant Madsen in his official capacity as a final County policymaker for damages and declaratory and injunctive relief.  In the alternative, on behalf of themselves and the proposed class, Plaintiffs Goodwin and Wright sue Defendant Madsen in his official capacity as a state actor for declaratory and injunctive relief.

33.    Defendants undertook all of the acts set forth in this Complaint under color of state law.

## JURISDICTION AND VENUE

34.    This is a Complaint under 42 U.S.C. § 1983 for damages and declaratory and injunctive relief based on past and ongoing civil rights violations committed by Defendants

Lexington County, Reinhart, Adams, Koon, and Madsen, in violation of the Fourteenth, Sixth, and Fourth Amendments to the U.S. Constitution.

35.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1343(a)(3).

36.     An actual, ongoing controversy exists within this Court's jurisdiction.  The Court is therefore authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

37.     Venue is proper in this Court under 28 U.S.C. § 1391(b), (c), and (d) because this judicial district is where a substantial part of the events or omissions giving rise to the claim occurred and where Defendants Lexington County, Reinhart, Adams, Koon, and Madsen reside.

## FACTUAL ALLEGATIONS

### A.  Lexington County's Reliance on Magistrate Court Fines and Fees for General Fund Revenue

38.     Recent years have witnessed a rise in poverty among residents of Lexington County and its surrounding areas.  According to U.S. Census figures, the County's poverty rate jumped 14.5% from 2012 to 2015.  U.S. Census figures also show that poverty rates increased in neighboring Richland County by 4% from 2012 to 2015.

39.     Black and Latino residents of the County have been hardest hit.  In 2015, 26.1% of Black residents and 27.7% of Hispanic and Latino residents lived in poverty compared to only 10.7% of white residents.  Similarly, in neighboring Richland County in 2015, 22.4% of Black residents and 24.1% of Hispanic and Latino residents lived in poverty compared to only 10.8% of white residents.

40.     Given these figures, a significant number of people living in and around Lexington County who are charged with traffic and misdemeanor criminal cases in the County's magistrate courts are likely to suffer from poverty, particularly if they are Black or Latino.

41.     Nevertheless, Lexington County relies heavily on magistrate court fines and fees from traffic and misdemeanor criminal cases as a critical source of General Fund revenue.

42.     Magistrate courts in South Carolina are courts of limited jurisdiction.  All magistrate judges located in Lexington County have county-wide territorial jurisdiction over certain categories of criminal and traffic offenses, and certain civil claims.

43.     Lexington County sets ambitious projections for General Fund revenue from the collection of fines and fees from defendants in traffic and misdemeanor criminal cases in the County's magistrate courts, which include the Central Traffic Court and six district magistrate courts—Irmo Magistrate Court, Lexington Magistrate Court, Swansea Magistrate Court, Cayce-West Columbia Magistrate Court, Oak Grove Magistrate Court, and Batesburg-Leesville Magistrate Court.

44.     The Lexington County Council is the County's final policymaker concerning the establishment of annual General Fund revenue projections and the appropriation of County funds.  Each year, the County Council considers requests for County funding and adopts the Lexington County annual budget.  The County's approved annual budget documents final decisions concerning the appropriation of funding for magistrate judge salaries, magistrate court operations, and public defender services in Lexington County courts.

45.     The County's annual budget also documents projected revenue from the collection of fines and fees from defendants in traffic and misdemeanor criminal cases in magistrate courts.  According to the Lexington County fiscal year 2017-2018 Requested Budget,

the Central Traffic Court "generates substantial revenue from traffic violations, criminal fines and weight violations," and the district magistrate courts are expected to "generate revenue from Criminal and Traffic cases."

46.     Together, the Central Traffic Court and district magistrate courts collected $1,420,154 in revenue from traffic and criminal fines for the County General Fund in fiscal year 2015-2016.  Of that amount, the Central Traffic Court alone generated over $1 million and the Irmo Magistrate Court generated more than $122,000.  Thus, the Central Traffic Court and Irmo Magistrate Court generate the lion's share of traffic and criminal fines and fees funneled into the County's General Fund.

### B.  Failure to Provide Public Defense to Indigent People in Lexington County Magistrate Court Traffic and Criminal Cases

47.     Defendants Lexington County and Madsen have a constitutional duty to operate a public defense system that provides the assistance of counsel to indigent people facing incarceration in cases handled by magistrate courts in Lexington County.

48.     Through their actions, omissions, practices, policies, standard operating procedures, and customs, the County and Defendant Madsen systemically and routinely deprive indigent people of the right to assistance of counsel to defend against unlawful incarcerations ordered by Lexington County magistrate courts for nonpayment of fines and fees.

49.     Under South Carolina law, Lexington County contracts with Defendant Madsen, the Circuit Public Defender for South Carolina's Eleventh Judicial Circuit, to provide public defender services for the County's magistrate courts, General Session Court, and Family Court.

50.     Under South Carolina law, Defendant Madsen is responsible for seeking, and the County is responsible for providing, resources for public defender services in the County's

magistrate courts. Defendant Madsen submits annual requests for funding to Defendant Lexington County and meets with County officials to justify budgetary requests.

51. Under South Carolina law, Defendant Madsen also exercises final decision-making authority over the expenditure of resources appropriated by Lexington County for public defender services. Defendant Madsen is the final decision-maker on whether public defenders are assigned to serve indigent defendants in magistrate court proceedings and in the Bond Court.

52. According to the South Carolina Commission on Indigent Defense website, "South Carolina's Public Defender System is a county-based system." County funding for public defense is critical to ensure that public defenders are appointed to represent indigent people in magistrate courts in each county.

53. Although the South Carolina General Assembly provides some annual funding for public defender services in each county, that amount is not intended to provide sufficient funding to ensure public defense in each county's General Sessions Court, Family Court, and magistrate courts. To the contrary, the South Carolina public defender funding scheme requires counties to provide additional funding to ensure assistance of counsel in those courts.

54. Moreover, Defendant Madsen remits to Lexington County any state money he receives for public defender services in Lexington County because all of the employees assigned by Defendant Madsen to perform public defender services in Lexington County magistrate courts are County employees under South Carolina law.

55. Defendants Lexington County and Madsen have made, and continue to make, the deliberate decision to inadequately fund public defender services for indigent people facing incarceration in magistrate court cases.

56.     Lexington County allocated only $514,306 for public defender services in fiscal year 2015-2016 and only $543,932 in fiscal year 2016-2017.  The amount of funding requested by Defendant Madsen and provided by Lexington County for public defense is entirely inadequate to provide public defense in Lexington County magistrate courts.

57.     Lexington County provides less than half of the funding for public defender services that counties of comparable population size provide, which demonstrates the gross inadequacy of the County's funding for public defender services in magistrate courts.

58.     According to U.S. Census estimates, Lexington County had a population of 273,843 in 2015, while York County had a slightly smaller population of 240,076 and Spartanburg County had a slightly larger population of 291,240.  Lexington County provided only $514,306 for public defender services in fiscal year 2015-2016, whereas both York County and Spartanburg County provided more than double that amount for the same time period: York County allocated $1,369,721 and Spartanburg County allocated $1,116,169.

59.     A comparison of the ratio of county to state funding for public defender services in Lexington County and counties of comparable size further underscores the gross inadequacy of Lexington County's funding for indigent defense.  In fiscal year 2015-2016, Lexington County provided only 50% of the amount received from the state for public defender services, while York County provided 155% of the amount received in state funding and Spartanburg County provided 101%.

60.     Defendants Lexington County and Madsen have made, and continue to make, a deliberate decision to prioritize the collection of public defender application fees over the provision of assistance of counsel to indigent people facing incarceration in magistrate court cases.  Defendants Lexington County and Madsen have established a county-wide policy,

practice, and custom of requiring indigent people to pay an up-front $40 fee at the time they apply for court-appointed representation and of failing to inform indigent people that they may seek a court waiver of the fee based on financial hardship.

61.     As a result, on those rare occasions that an indigent person requests court-appointed counsel at an initial appearance in a traffic or criminal case in Lexington County magistrate court, it is standard operating procedure that the individual is directed to leave court and to travel to the office of the Lexington County Clerk of Court or to the Lexington County Public Defender's Office in order to pay the $40 fee and submit the application for a public defender.  This practice dissuades indigent people from applying for a public defender to help defend against incarceration in magistrate court cases.

62.     As a result of the policies, practices, and customs of Defendants Lexington County and Madsen, only one public defender is assigned to represent indigent defendants in cases handled by the County's magistrate courts.  This level of staffing is entirely inadequate in light of the volume of magistrate court cases in which indigent people face incarceration, as discussed in paragraphs 331 to 336 below.

63.     As a result of the policies, practices, and customs of Defendants Lexington County and Madsen, no public defender is present in court, or otherwise available for appointment, to represent an indigent person when a Lexington County magistrate court conducts critical proceedings in which the Sixth Amendment affords a right to counsel.  Public defenders are entirely absent from magistrate court proceedings in which indigent people are sentenced to "fine or jail," or to incarceration suspended upon payment pursuant to a Scheduled Time Payment Agreement.  Public defenders are also entirely absent from any show cause

hearings that may occur in magistrate court, at which indigent people are sanctioned with incarceration for nonpayment of fines and fees.

64.     As a result of the policies, practices, and customs of Defendant Lexington County and the actions, omissions, policies, practices, customs, and standard operating procedures of Defendant Madsen, no public defender is present in the Bond Court to represent indigent people who have been booked on bench warrants because they could not pay the amount of fines and fees specified on the face of the warrant.  Nor is any public defender assigned to interview people booked in the Detention Center on magistrate court bench warrants, which would facilitate the identification of indigent people who have been incarcerated without the assistance of counsel or an ability-to-pay hearing.

65.     Defendants Lexington County and Madsen, through their officers, representatives, and employees, have known of the structural deficiencies of their public defense system for many years.

66.     In April 2016, the American Civil Liberties Union Foundation of South Carolina ("ACLU-SC"), the American Civil Liberties Union ("ACLU"), and the National Association of Criminal Defense Lawyers ("NACDL") catalogued the deficiencies with indigent defense in South Carolina summary courts and specifically highlighted the lack of counsel for indigent people facing incarceration for nonpayment of fines and fees in magistrate court cases.  *See* American Civil Liberties Union Foundation of South Carolina, et. al., Summary Injustice: A Look at Constitutional Deficiencies in South Carolina's Summary Courts 7, 13–14 (2016) ("Summary Injustice Report").

67.     The Summary Injustice Report received extensive media coverage in South Carolina and particularly in the Lexington County area.

68.     On April 2, 2016, *The Post and Courier* drew attention to the Summary Injustice Report, highlighting "[t]he dearth of lawyers for the indigent" in South Carolina summary courts.

69.     On April 4, 2016, *The State* reported that the Summary Injustice Report "paints a bleak picture of what can happen to poor and unrepresented defendants in the state's lower courts where often no lawyer is present, cases are sometimes prosecuted by police and thousands face criminal charges that can send them to jail for 30 days with a criminal record." *The State* also highlighted the finding that these courts "often fail to inform defendants of their right to counsel and refuse to provide counsel to the poor at all stages of the criminal process."

70.     On April 5, 2016, *South Carolina Radio Network* reported on the Summary Injustice Report's finding that summary courts "often rush[] through trials without allowing the state's poorest residents to understand their rights to an attorney or sometimes even disregarding those individuals when they do."

71.     That same day, the *Washington Post* covered the Summary Injustice Report and highlighted that "South Carolina's magistrate and municipal courts are often deprived of counsel, resulting in de facto debtors' prisons across the state."

72.     In January 2017, NACDL issued a follow-up report that further confirmed the findings of the Summary Injustice Report. *See* National Association of Criminal Defense Lawyers, et al., Rush to Judgment: How South Carolina's Summary Courts Fail to Protect Constitutional Rights (2017) ("Rush to Judgment Report").

73.     On January 21, 2017, the *Post and Courier* published an article detailing the findings of the Rush to Judgment Report as a "Top Story."

74.     Defendants Lexington County and Madsen know or should know that the inadequacies in the provision of indigent defense in South Carolina summary courts identified in the Summary Injustice Report and the Rush to Judgment Report apply to Lexington County magistrate courts.

75.     Despite knowing about deficiencies in their system for public defense in Lexington County magistrate courts, Defendants Lexington County and Madsen have failed, and continue to fail, to take reasonable steps to protect the constitutional right to counsel of indigent people.

76.     In 2016, Defendant Madsen presented a budget request to the County Council for a "jail attorney" to provide representation to inmates in the Detention Center on charges issued by the General Sessions Court.  That request did not seek funding to represent indigent people in Lexington County magistrate courts even though it was made after the Summary Injustice Report had exposed the lack of counsel for indigent defendants in South Carolina summary courts. Defendant Madsen has not requested any County funding for the representation of indigent people incarcerated in the Detention Center because they cannot afford to pay fines and fees specified on magistrate court bench warrants.

77.     The policies, practices, and customs described in the preceding paragraphs constitute the policy of Defendant Lexington County because the failure to adequately fund public defense in Lexington County magistrate courts is a decision of the Lexington County Council, the County's final policymaker with respect to budgeting decisions.

78.     The policies, practices, and customs described in the preceding paragraphs also constitute the policy of Defendant Lexington County because the failure to provide public defense to indigent people facing actual or suspended incarceration sentences in traffic and

criminal cases handled by Lexington County magistrate courts is longstanding, persistent, widespread, and so common and well-settled as to constitute a custom that fairly represents municipal policy.

79.     The policies, practices, and customs described in the preceding paragraphs also constitute the policy of Lexington County because the County has delegated to Defendant Madsen final policymaking authority for the County's provision of indigent defense.  Defendant Madsen is aware, or should be aware, that there is a longstanding, persistent, and widespread failure to provide public defense to indigent people facing incarceration for nonpayment of fines and fees in traffic and criminal cases handled by Lexington County magistrate courts, and that this is due to grossly inadequate County funding, the requirement that indigent people pay an up-front $40 fee with each public defender application, and the failure to staff public defenders in magistrate court proceedings.  Defendant Madsen causes, authorizes, condones, ratifies, approves, participates in, or knowingly acquiesces in these illegal policies, practices, and customs.  Defendant Madsen's actions and inactions were, and continue to be, deliberately indifferent to the clearly established Sixth Amendment rights of indigent people.

C. **Defendants Reinhart, Adams, Dooley, and Koon Oversee, Enforce, and Sanction the Widespread and Routine Arrest and Incarceration of Indigent People Who Cannot Afford to Pay Magistrate Court Fines and Fees**

80.     Defendants Adams, Dooley, and Reinhart are the current and former final administrative policymakers for Lexington County magistrate courts.

81.     From at least 2004 to June 27, 2017, Defendant Reinhart served as the Chief Judge for Administrative Purposes of the Summary Courts in Lexington County and Defendant Adams served as the Associate Chief Judge for Administrative Purposes of the Summary Courts in Lexington County.  Since June 28, 2017, Defendant Adams has served as Chief Judge, and Defendant Dooley has served as the Associate Chief Judge.

26

82.    On June 28, 2017, the South Carolina Supreme Court issued its most recent Order on Chief Judges for Administrative Purposes of the Summary Courts ("2017 Order").  The 2017 Order grants Defendant Adams significant administrative responsibility over magistrate court policy, procedure, and practice.

83.    The 2017 Order generally empowers Defendant Adams to convene quarterly meetings of the County's magistrate and municipal court judges to "formulate uniform procedures in the county summary court system."  It also explicitly tasks Defendant Adams with the responsibility to establish a county-wide procedure "to ensure that court generated revenues are collected, distributed, and reported in an appropriate and timely manner" and to "[r]eport to the Office of Court Administration any significant or repetitive non-compliance by any summary court judge in the county concerning the Chief Judge's execution" of this and other duties.

84.    The 2017 Order also requires Defendant Adams to administer the County's Bond Court, determine the nighttime and weekend schedules of county magistrate courts, designate the hours of operation of the County's magistrate courts, assign cases to magistrate court judges across the County, coordinate the planning of budgets for Lexington County magistrate courts, and request County funding for magistrate court operations.

85.    The 2017 Order requires Defendant Dooley to carry out all of the administrative responsibilities of the Chief Judge in the event she is absent or disabled and to accept any administrative duties assigned by Defendant Adams.

86.    The 2017 Order is substantively identical to prior orders of the South Carolina Supreme Court issued from 2014 to January 2017, which addressed Chief Judges for Administrative Purposes of the Summary Courts.  These prior orders granted Defendant Reinhart the same administrative responsibilities as those now held by Defendant Adams, and granted

Defendant Adams the same administrative responsibilities as those now held by Defendant Dooley.

87.     Together, Defendants Reinhart, Adams and Dooley have exercised, and Defendants Adams and Dooley continue to exercise, their administrative authorities to oversee, enforce, and sanction standard operating procedures across Lexington County magistrate courts that directly cause the arrest and incarceration of indigent people for nonpayment of fines and fees in violation of their basic constitutional rights.

### 1.  Default Payment Policy

88.     Prior to June 28, 2017, Defendants Reinhart and Adams oversaw, enforced, and sanctioned the Default Payment Policy, which has become an unwritten, standard operating procedure in Lexington County magistrate courts.  Defendants Adams and Dooley currently oversee, enforce, and sanction the Default Payment Policy.

89.     Lexington County magistrate courts routinely sentence people to the payment of hefty fines and fees for traffic and criminal cases.  When an indigent person cannot afford to pay in full at sentencing, the County's magistrate courts impose a payment plan, known as a Scheduled Time Payment Agreement, rather than reducing the sentence to an amount the individual can afford to pay or exploring other alternatives to payment and incarceration.

90.     Under the Default Payment Policy, magistrate court judges in Lexington County do not inquire into financial ability to pay when imposing fines and fees on an indigent defendant and setting the terms of a Scheduled Time Payment Agreement.  At most, a judge may ask if a defendant is employed.  But magistrate court judges routinely fail to ask whether the defendant appearing before them has steady employment, the amount of any income, household size, expenses, the needs of financial dependents, or other financial responsibilities, including child

support.  Many judges do not even ask whether a defendant is employed, disabled, or otherwise unable to work.  Instead, if a defendant cannot pay the full amount of fines and fees at sentencing, Lexington County magistrate court judges impose a Scheduled Time Payment Agreement that requires steep monthly payment amounts untailored to the needs of the individual and often entirely beyond the person's financial means.

91.    Under the Default Payment Policy, every indigent defendant whom the magistrate court places on a Scheduled Time Payment Agreement is charged an additional statutory court collection fee of three percent of the total amount of fines and fees for each offense.

92.    Under the Default Payment Policy, when an indigent person fails to pay in the time or amount required by the Scheduled Time Payment Agreement, magistrate courts routinely issue a bench warrant that orders law enforcement to arrest and incarcerate the individual unless the full amount owed, including the collection fee, is paid.

93.    Upon information and belief, Defendants Adams and Dooley are aware of, and sanction the use of, magistrate court forms and procedures that implement the Default Payment Policy.  Likewise, upon information and belief, Defendants Reinhart and Adams were aware of, and sanctioned the use of, magistrate court forms and procedures that implemented the Default Payment Policy while Defendant Reinhart served as Chief Judge.

94.    When imposing a Scheduled Time Payment Agreement, magistrate courts require the defendant to sign a form that sets forth the payment schedule and includes the following statement: "Failure to appear as directed or failure to comply with the terms set forth in this payment schedule will result in BENCH WARRANT/COMMITMENT being issued for my arrest and denial of any future requests for a scheduled time payment."

95.    The Scheduled Time Payment Agreement form does not explain that before being arrested and incarcerated for nonpayment of court fines and fees, all people have a constitutional right to an ability-to-pay hearing and indigent people also have the right to the assistance of court-appointed counsel to defend against incarceration.  Moreover, under the Default Payment Policy, Lexington County magistrate judges and court staff routinely fail to explain these rights to indigent people before requiring them to sign Scheduled Time Payment Agreements.

96.    At no point before issuing a bench warrant for the arrest and incarceration of a debtor under the Default Payment Policy does a magistrate court judge hold a hearing to inquire about the reasons for the defendant's nonpayment, the defendant's ability to pay, or the availability of alternatives to payment and incarceration that would adequately achieve the goal of punishment and deterrence.

97.    At no point before issuing a bench warrant for the arrest and incarceration of a debtor under the Default Payment Policy does a magistrate court judge notify the individual of the right to request court-appointed counsel or the right to request waiver of any public defender application fee.  Likewise, at no point before issuing such a bench warrant does a magistrate court judge appoint counsel to represent indigent people who face incarceration for nonpayment.

98.    Lexington County magistrate court judges routinely reference the Default Payment Policy when adjudicating individual traffic and criminal cases.

99.    For example, when imposing sentences as a judge in the Irmo Magistrate Court, Defendant Adams routinely threatens indigent defendants with arrest and jail if they do not pay court fines and fees according to payment plan terms imposed by the court.

100.    On one occasion, Defendant Adams sentenced a defendant to 30 days in jail suspended upon the payment of $500 for a breach of trust offense, ordered the defendant to make

monthly payments of $100, and threatened, "Make sure you pay that.  If not, I'll have a bench warrant in 30 days for your arrest."

101.    On another occasion, Defendant Adams ordered a defendant to pay a non-waivable court cost of $100 on two shoplifting charges and warned, "Don't make me send [the officer] to get you for $100.  Because I will."

## 2.   Trial in Absentia Policy

102.    Prior to  June 28, 2017, Defendants Reinhart and Adams oversaw, enforced, and sanctioned the Trial in Absentia Policy, which has become an unwritten standard operating procedure in Lexington County magistrate courts and leads to the routine conduct of trials and sentencing proceedings in traffic and criminal cases without even having defendants present in court.  Defendants Adams and Dooley currently oversee, enforce, and sanction the Trial in Absentia Policy.

103.    Lexington County magistrate courts routinely ignore or deny requests for a continuance when an indigent person who has been ticketed for a traffic or misdemeanor criminal offense contacts the court to request a new court date and to explain the reason for the request.  Instead, Lexington County magistrate courts proceed without the defendant, impose a conviction in absentia, and sentence the person in absentia to a term of incarceration suspended on the payment of fines and fees.

104.    Under the Trial in Absentia Policy, Lexington County magistrate courts do not ensure that the individual who has been tried and sentenced in absentia has actual notice of the conviction and sentence imposed.  Instead, within a week of the date on which the sentence was imposed, the magistrate court issues a bench warrant that orders law enforcement to arrest and incarcerate the individual for a specified number of days unless the full amount of fines and fees

owed is paid.  Significantly, the purpose of the bench warrant is not to secure the individual's appearance in court; rather, its purpose is to elicit payment or, if payment is not received, to incarcerate the person.

105.    At no point before issuing a bench warrant ordering the arrest and incarceration of a debtor under the Trial in Absentia Policy does a magistrate court judge hold a hearing to determine whether the individual can afford to pay the fines and fees imposed or whether there are alternatives to payment or incarceration that would serve the court's interest in punishment and deterrence.

106.    At no point before issuing a bench warrant ordering the arrest and incarceration of a debtor under the Trial in Absentia Policy does a magistrate court judge notify the individual of the right to request court-appointed counsel or the right to request waiver of any public defender application fee.  Likewise, at no point before issuing such a bench warrant does a magistrate court judge appoint counsel to represent indigent people who face incarceration for nonpayment.

107.    Magistrate court judges and court staff routinely reference the Trial in Absentia Policy.

108.    For example, at the end of a typical Central Traffic Court docket, court staff will call out each case in which a defendant has not appeared, hold a trial in absentia, and then announce that the defendant has been convicted and sentenced to a "fine or jail" sentence.  The court staff person announces that the absent defendant is expected to pay the full amount of fines and fees within a specific amount of time and that if payment is not received, the court will issue a bench warrant ordering the arrest and jailing of the individual.

109.    Upon information and belief, even when magistrate court staff fail to announce in open court that defendants in traffic and criminal cases will be tried and sentenced in absentia,

magistrate court judges and court staff routinely conduct such trials outside the presence of the public and sentence the absent defendants to pay the full amount of fines and fees within a specific amount of time.  If the payment is not received, the courts will issue a bench warrant ordering the arrest and jailing of the individual.

3.  **The Default Payment and Trial in Absentia Policies Result from the Exercise of Administrative Authority by Defendants Reinhart, Adams, and Dooley**

110.    Prior to June 28, 2017, Defendants Reinhart and Adams oversaw, enforced, and sanctioned the Default Payment and Trial in Absentia Policies through the exercise of their administrative responsibility for establishing uniform procedures in Lexington County magistrate courts, including a county-wide procedure for the collection of magistrate court fines and fees "in an appropriate and timely manner."

111.    Since June 28, 2017, Defendants Adams and Dooley oversee, enforce, and sanction the Default Payment and Trial in Absentia Policies through the exercise of those same administrative responsibilities.

112.    From at least 2004 to the first half of 2017, Defendant Reinhart, in his administrative capacity, exercised oversight authority over magistrate court judges and court staff who operated Lexington County magistrate courts.  During that time, under the direction and supervision of Defendants Reinhart and Adams, magistrate judges and court staff implemented the Default Payment and Trial in Absentia Policies.  Defendants Reinhart and Adams directed magistrate court staff to alert magistrate judges when people failed to pay pursuant to the terms of Scheduled Time Payment Agreements or did not appear in court on traffic or criminal charges, both of which triggered the issuance of bench warrants under the Default Payment and Trial in Absentia Policies.

113.     Since June 28, 2017, Defendants Adams and Dooley, in their administrative capacities, exercise oversight authority over approximately nine magistrate court judges and 24 court staff who operate Lexington County magistrate courts.  Under the direction and supervision of Defendants Adams and Dooley, magistrate judges and court staff implement the Default Payment and Trial in Absentia Policies.  Defendants Adams and Dooley direct magistrate court staff to alert magistrate judges when people have failed to pay pursuant to the terms of Scheduled Time Payment Agreements or have not appeared in court on traffic or criminal charges, both of which trigger the issuance of bench warrants under the Default Payment and Trial in Absentia Policies.

114.     Defendants Adams and Dooley have made, and continue to make a deliberate decision not to correct through any written policy the longstanding, pervasive, and widespread practice of arresting and incarcerating indigent people for nonpayment of fines and fees without pre-deprivation ability-to-pay hearings or representation by court-appointed counsel, which is the result of the Default Payment and Trial in Absentia Policies.

115.     The 2017 Order and prior, substantively identical orders concerning Chief Judges for Administrative Purposes of the Summary Courts require the Chief Judge and Associate Chief Judge for Lexington County magistrate courts to report significant or repetitive non-compliance by any magistrate court judge concerning policies and procedures overseen and enforced by the Chief Judge, including those relating to the collection of magistrate court fines and fees. Defendants Reinhart, Adams, and Dooley have not reported to the Office of Court Administration any noncompliance with any county-wide policies, practices, and standard operating procedures concerning the collection of magistrate court fines and fees "in an appropriate and timely manner."

34

116.    Defendants Reinhart and Adams exercised, and Defendants Adams and Dooley currently exercise, the administrative authority to increase the size of magistrate court dockets, to require additional hours of magistrate court operation, to require magistrate judges to work on evenings and weekends, and to request additional County funding for magistrate court operations.  They have made and/or continue to make a deliberate decision not to use any of these administrative powers to ensure that magistrate court judges and staff under their supervision expend the time and resources required to afford pre-deprivation ability-to-pay hearings and representation by court-appointed counsel to indigent people facing incarceration for nonpayment.

117.    The Default Payment and Trial in Absentia Policies squarely contradict South Carolina law and directives from the Supreme Court of South Carolina that permit the use of bench warrants only for the purpose of securing a defendant's appearance in court.  South Carolina Code Section 22-5-115 governs magistrate court criminal matters and provides: "If the defendant fails to appear before the court . . . a bench warrant may be issued for his arrest." South Carolina Code Section 38-53-70 further provides: "If a defendant fails to appear at a court proceeding to which he has been summoned, the court shall issue a bench warrant for the defendant."  A November 14, 1980 Order of the Supreme Court of South Carolina makes clear that "bench warrants . . . are to be used only for the purpose of bringing a defendant before a court which has already gained jurisdiction over that defendant by previous service of a valid charging paper."  Moreover, a Memorandum dated November 24, 1980 from John Patrick, the Assistant Director of the South Carolina Office of Court Administration, to Magistrate and Municipal Judges transmitted the South Carolina Supreme Court's Order concerning bench

warrants and stated that "bench warrants . . . are to be used only for the purpose of bringing a defendant before a court."

118.    Even the South Carolina Summary Court Judges Bench Book, which is promulgated by the South Carolina Office of Court Administration and used to train magistrate judges, defines a bench warrant as "a form of process to be used to bring a defendant back before a particular court on a particular charge for a specific purpose after the court has acquired jurisdiction over the defendant on that particular charge by virtue of a previously served proper charging paper."  The Bench Book makes clear that the purpose of a bench warrant is to bring a defendant to court, even when the warrant is issued against a defendant who, "under sentence, fails to properly pay a fine" or a defendant who did not appear in court, was tried in absentia, and "must now be brought before the court to comply with the sentence."  *See* South Carolina Judicial Department, Summary Judges Benchbook, "Criminal," Chapter C, "Warrants."

119.    As the administrative leadership responsible for coordinating between Lexington County magistrate courts and the Office of Court Administration, Defendants Adams and Dooley know, or should know, that the Default Payment and Trial in Absentia Policies involve the routine misuse of bench warrants to elicit fine and fee payments and to incarcerate indigent people rather than to bring defendants to court, contrary to South Carolina law and directives from the Supreme Court of South Carolina and the Office of Court Administration.  Likewise, during Defendant Reinhart's tenure as Chief Judge, Defendants Reinhart and Adams knew, or should have known, that the Default Payment and Trial in Absentia Policies involved such misuse of bench warrants.

120.    In their administrative capacities under South Carolina law, Defendant Reinhart remitted, and Defendant Adams currently remits, to the Lexington County Treasurer's Office the

fines and fees collected by the Central Traffic Court and six district magistrate courts.  Defendant

Reinhart was aware, or should have been aware, that the fines and fees he collected and remited

to the Lexington County Treasurer included payments made by indigent people who were under

duress because they faced arrest and incarceration for nonpayment of magistrate court fines and

fees under the Default Payment Policy or the Trial in Absentia Policy.  Likewise, Defendant

Adams is aware, or should be aware, that the fine and fees she collects and remits to the

Lexington County Treasurer includes payments made by indigent people who were under duress

because they faced arrest and incarceration for nonpayment of magistrate court fines and fees

under the Default Payment Policy or Trial in Absentia Policy.

    **4.**   **Defendant Koon Enforces the Arrest and Incarceration of Indigent People for Unpaid Fines and Fees**

121.    It is the standard operating procedure for Lexington County magistrate courts to

transmit to the Warrant Division of the LCSD all bench warrants issued under the Default

Payment and Trial in Absentia Policies.

122.    Defendant Koon is the chief law enforcement officer of the LCSD and the chief

administrator of the Detention Center.

123.    Under South Carolina law, Defendant Koon has the authority and ongoing

responsibility to execute bench warrants and to incarcerate people who have been arrested in the

Detention Center.  Rule 30(c) of the South Carolina Rules of Criminal Procedure grants

Defendant Koon "the continuing duty . . . to make every reasonable effort to serve bench

warrants and to make periodic reports to the court concerning the status of unserved warrants."

Under Section 23-15-50 of the South Carolina Code, "[t]he sheriff or his deputy shall arrest all

persons against whom process for that purpose shall issue from any competent authority

commanding such person to be taken into custody or requiring him to give bond, with security."

124.    Under Defendant Koon's direction and supervision, LCSD officers in the Warrant Division are required to locate and arrest the individuals named in bench warrants issued under the Default Payment and Trial in Absentia Policies.  LCSD officers are often tasked with going to the home address of the individual, which is identified on the face of the warrant.  They are also instructed to conduct bench warrant checks at traffic and pedestrian stops.

125.    Under Defendant Koon's direction and supervision, LCSD officers seek and obtain the assistance of other law enforcement agencies in South Carolina in locating people who are the subject of bench warrants.  Upon information and belief, the LCSD has an agreement with the Richland County Sheriff Department ("RCSD") by which RCSD officers go to the homes of Richland County residents who are the subject of Lexington County magistrate court bench warrants, execute those warrants, and detain the arrestees in the Richland County Jail for up to 72 hours before LCSD officers transport the arrestees to the Detention Center.  LCSD has a similar agreement with the Horry County Sheriff's Department.

126.    Under South Carolina Code Section 22-5-210, LCSD officers are required to provide an arrestee with the bench warrant used to effect the arrest.  Whether by providing the arrestee with a copy of the bench warrant and/or through verbal explanation, LCSD officers under the direction and supervision of Defendant Koon inform people arrested on bench warrants that the only way to avoid incarceration is to pay in full the fines and fees identified on the face of the warrant before booking.

127.    Under Defendant Koon's direction and supervision, when people arrested on a bench warrant are brought to the Detention Center, Detention Center staff explain to them that they must either pay the entire amount of the fines and fees identified on the bench warrant or serve the full term of incarceration identified on the bench warrant.  Detention Center staff

frequently serve a copy of the bench warrant on the arrested individual and explain that early release is possible for good time served at the rate of one day of credit for every two days in jail.

128.   Under Defendant Koon's direction and supervision, it is a Detention Center standard operating procedure that if a person arrested on a bench warrant is unable to pay the full amount of the balance due identified on the face of the bench warrant before being booked in jail, he or she is incarcerated for approximately two-thirds of the time listed on the bench warrant.  It is a standard operating procedure for Detention Center officers to begin the booking process as soon as they can verify that an arrestee is unable to pay the full amount of fines and fees identified on the face of the bench warrant.

129.   Any payments made toward magistrate court fines and fees at the Detention Center are forwarded by Detention Center staff to the magistrate court that issued the bench warrant.

> **5.   The Lack of Judicial Process After the Arrest and Incarceration of Indigent People for Nonpayment of Fines and Fees Results from the Exercise of Administrative Authority by Defendants Reinhart and Adams and the Actions of Defendant Koon**

130.   At no point after the issuance of a bench warrant and *before* an individual is booked in the Detention Center on a bench warrant does a Lexington County magistrate court hold a hearing to determine whether the individual's nonpayment of fines and fees was willful or the result of inability to pay, notify the individual of the right to counsel, or appoint counsel to represent the individual at no cost to assist in defending against incarceration for nonpayment.

131.   At no point *after* an individual is booked in the Detention Center on a bench warrant does a Lexington County magistrate court hold a hearing to determine whether the individual's nonpayment of fines and fees was willful or the result of financial inability to pay,

provide notice of the right to counsel to the individual, or appoint counsel at no cost to the individual to assist in defending against incarceration for nonpayment.

132.    Pursuant to South Carolina law, the 2017 Order, and prior orders of the South Carolina Supreme Court concerning Chief Judges for Administrative Purposes of the Summary Courts, Defendants Reinhart, Adams, and Dooley have determined, and/or currently determine the schedule, staffing, policies, procedures, and practices of the Lexington County Bond Court, which is located in a building adjacent to the Detention Center.

133.    In the exercise of their administrative authority over the Bond Court, Defendants Reinhart, Adams, and Dooley, have made, and continue to make, a deliberate decision not to require or even permit the Bond Court to review the cases of indigent people arrested and jailed on magistrate court bench warrants under the Default Payment and Trial in Absentia Policies. Defendants Reinhart, Adams, and Dooley have elected to understaff the Bond Court and limit its hours of operation such that the Bond Court does not have the resources to afford hearings to people arrested and jailed on magistrate court bench warrants under the Default Payment and Trial in Absentia Policies.

134.    In the exercise of their administrative authority over magistrate court case assignments and hours of operation, Defendants Reinhart, Adams, and Dooley have made, and/or continue to make, a deliberate administrative decision not to require or permit indigent people booked in jail on bench warrants to be brought to the original magistrate court that issued the bench warrant for a post-deprivation ability-to-pay hearing and appointment of counsel to guard against continued unlawful incarceration.

135.    Under the direction and supervision of Defendant Koon, neither LCSD officers who transport bench warrant arrestees to the Detention Center nor Detention Center staff who

40

book or detain these people bring them to the Bond Court (or any magistrate court) for an ability-to-pay hearing or inform them of their right to request the assistance of court-appointed counsel to defend against unlawful incarceration.

136.     As a result of the exercise of administrative authority by Defendants Reinhart, Adams and Dooley, and the deliberate acts of Defendant Koon, indigent people targeted for fine and fee collection through magistrate court bench warrants are jailed for weeks to months at a time simply because of their inability to pay the full amount of fines and fees identified on the bench warrant between the time of their arrest and before being booked in the Detention Center. Other indigent people are able to avoid incarceration only by forgoing basic necessities, begging their families and friends for money, and quickly selling their possessions in order to pay their debts in full.

### D.  The Effects of Defendants' Policies, Practices, Customs, Acts, Omissions and Standard Operating Procedures on the Named Plaintiffs

#### 1.  <u>Twanda Marshinda Brown</u>

137.     Twanda Marshinda Brown is a single mother of seven children, five of whom live with her.  She is the sole provider for her three youngest children, who are in secondary school, and also provides financial support to her two older sons.

138.     Ms. Brown lives in poverty.  She works whenever she can find employment, but struggles to earn enough money to pay for rent, electricity, food, clothing, transportation, and other necessities for herself and her family.

139.     Ms. Brown qualifies for needs-based public assistance in the form of Medicaid and Section 8, the federal housing subsidy program for low-income residents.  She has relied on housing obtained with Section 8 assistance since at least 2015.

140.    In 2016, Ms. Brown worked at Burger King and earned an annual income far below $24,250, the 2016 federal poverty guideline for a four-person household.

141.    On March 15, 2016, Ms. Brown borrowed her niece's car to drive a friend home even though she does not have a license to drive.  On her way home, Ms. Brown was stopped and ticketed by an LCSD officer for driving on a suspended license (DUS, 2nd offense) and for driving with "no tag light."  The tickets instructed Ms. Brown to appear in the Irmo Magistrate Court on April 12, 2016.

142.    On April 12, 2016, Ms. Brown appeared before Defendant Adams in the Irmo Magistrate Court.

143.    Ms. Brown did not know, and Judge Adams did not inform her, that she had the right to request the assistance of a court-appointed attorney before pleading guilty, and the right to seek a waiver of any public defender application fees due to financial hardship.

144.    Without being informed of her rights and without the assistance of counsel, Ms. Brown pled guilty to the charges of DUS, 2nd offense, and driving with no tag light.

145.    Judge Adams sentenced Ms. Brown to $237.50 in fines and fees for the driving with no tag light offense.  She also sentenced Ms. Brown to $2,100 in fines and fees for the DUS, 2nd offense, even though the maximum penalty under South Carolina law is $600, 60 days of imprisonment, or both.

146.    Judge Adams asked Ms. Brown if she had any money to pay that day.  When Ms. Brown responded that she did not, Judge Adams stated that Ms. Brown would be required to pay $100 each month toward her fines and fees.

147.    Ms. Brown was scared.  She knew that she could not afford to pay $100 each month to the court and still support her family.  Ms. Brown told Judge Adams that she could afford to pay only $50 a month.

148.    Judge Adams replied that a $50 monthly payment was not enough.  Ms. Brown recalls that Judge Adams said, "I don't care what happens.  Your payment is going to be on the 12th.  I want my money on the 12th."

149.    Ms. Brown tried to explain her financial responsibilities related to her children.  Judge Adams replied, "I don't care if you have 1, 2, 3, 4, 5, 6, or 7 kids."

150.    Judge Adams threatened to jail Ms. Brown for 90 days if she did not make a $100 payment each month to the Irmo Magistrate Court.

151.    Judge Adams did not ask Ms. Brown about her income, assets, expenses, dependents or other financial obligations.  Nor did Judge Adams ask whether Ms. Brown received any form of needs-based, means-tested public assistance.

152.    The conduct and statements of Judge Adams terrified Ms. Brown.  She left court fearing that if she missed a monthly payment to the court, she would be arrested and jailed.

153.    After the hearing, Ms. Brown went to the payment window outside the courtroom.  There she was given a "Trial Information and Plea Sheet."  Neither the judge nor any court staff explained the contents of the document to Ms. Brown.  Ms. Brown provided her current mailing address and phone number on the document.  Ms. Brown does not remember placing a check mark next to the appropriate statement on the Trial Information and Plea Sheet to indicate that she wished to plead guilty to the offenses charged or waive her right to counsel.

154.    At the payment window, a staff member of the Irmo Magistrate Court Clerk's Office also provided Ms. Brown with two Scheduled Time Payment Agreements.  The staff

43

person explained to Ms. Brown that a payment of $100 was due on the twelfth of each month and asked Ms. Brown to sign the documents.  The staff person did not explain the other contents of the documents to Ms. Brown or provide copies of the documents to take home.

155.    Ms. Brown signed the Scheduled Time Payment Agreements as instructed.

156.    According to the terms of the Scheduled Time Payment Agreement, Ms. Brown was required to pay $2,163 in fines and fees for the DUS, 2nd offense, and $244.63 in fines and fees for the driving with no tag light offense.  The total amount due for each offense included a three percent collection fee.

157.    Ms. Brown was not informed by the judge, court staff, or the Scheduled Time Payment Agreements that if her financial circumstances changed in the future and she was unable to pay the $100 required each month, she could request a court hearing on her ability to pay and alternatives to incarceration.  Rather, the Scheduled Time Payment Agreement included the following paragraph: "Failure to appear as directed or failure to comply with the terms set forth in this payment scheduled will result in a BENCH WARRANT/COMMITMENT being issued for my arrest and denial of any future requests for a scheduled time payment."

158.    After her hearing in the Irmo Magistrate Court, Ms. Brown faced difficulty making payments to the court while also financially supporting herself and her family.  Nevertheless, because she feared that Judge Adams would jail her if she missed a payment, Ms. Brown made payments to the Irmo Magistrate Court her highest priority.

159.    Ms. Brown made payments of $100 to the Irmo Magistrate Court on the following dates: May 12, 2016; June 13, 2016; July 12, 2016; August 30, 2016; and October 4, 2016.  These payments satisfied Ms. Brown's fines and fees for the offense of driving with no tag light and contributed toward her fines and fees for the DUS, 2nd offense.

160.     Despite her best efforts, Ms. Brown could not afford to make payments toward her court fines and fees after October 4, 2016.  Ms. Brown's income was diminished because she needed to reduce her hours at Burger King in order to take care of her son, who had an accident that required him to undergo a major surgery.

161.     Around the same time, the Burger King franchisee for whom Ms. Brown worked was not properly paying her.  On numerous occasions in 2016, Ms. Brown faced difficulty cashing her paychecks from the Burger King franchisee because they bounced.  The franchisee failed to correct the problem, and Ms. Brown left her job at Burger King in December 2016 to look for a new job that would provide consistent income.

162.     During January 2017, Ms. Brown made significant efforts to find a new job and requested an extension of time to pay her electricity bills, which she could not afford to pay.

163.     On January 12, 2017, Judge Adams issued a bench warrant ordering the arrest and jailing of Ms. Brown for nonpayment of fines and fees imposed for the DUS, 2nd offense.  The warrant stated that Ms. Brown had a "sentence imposed/balance due of $1,907.63 or 90 days" and that she would be jailed "until he/she shall be thereof discharged by due course of law."

164.     In early February 2017, Ms. Brown secured temporary employment at McIntyre Food Products, where she packaged food sent to fast-food restaurants.  Ms. Brown was grateful to have secured a job and hoped to resume her payments to the Irmo Magistrate Court after receiving her first paycheck on February 20, 2017.  She also expected to be promoted to a permanent position with an hourly rate increase on that day.

165.     On Saturday, February 18, 2017, at around seven o'clock in the morning, two RCSD officers came to Ms. Brown's home in the City of Columbia.  When Ms. Brown realized

45

the officers were there for her arrest, she sent her youngest child to take out the trash so that he would not see her being handcuffed and arrested.

166.    When Ms. Brown opened the front door, an officer informed her that there was a bench warrant for her arrest.

167.    The officers arrested Ms. Brown and transported her to the Alvin S. Glenn Detention Center in Richland County.  At the jail, Ms. Brown was served with the bench warrant issued by the Irmo Magistrate Court, which required her to pay $1,907.63 or serve 90 days in jail.

168.    Ms. Brown could not afford to pay $1,907.63 and did not know anyone who could lend her the money to secure her release.

169.    Ms. Brown was incarcerated for three nights in the Alvin S. Glenn Detention Center.  On February 21, 2017, she was transported to the Detention Center.

170.    At the Detention Center, a guard informed Ms. Brown that she would have to serve 63 days of a 90-day sentence.

171.    Ms. Brown was ultimately released on April 15, 2017.  She was incarcerated for a total of 57 days—three days in the Alvin S. Glenn Detention Center and 54 days in the Detention Center.  Ms. Brown believes she was released earlier than expected because she earned additional credit toward her time by cleaning the jail.

172.    Ms. Brown's incarceration was devastating for her and her children.  She was extremely distressed to be separated from her children, including her thirteen-year-old son.  Ms. Brown cried every day out of concern for her children.

173.    As a result of her 57-day-long incarceration, Ms. Brown was separated from her family, including her three teenage sons.  Ms. Brown also missed her son's seventeenth birthday

and her granddaughter's first birthday, could not be with her family when her cousin died, and spent her fortieth birthday in the jail, away from her family.

174.     While she was incarcerated, Ms. Brown suffered from a severe migraine which caused her eyelids and face to swell, but did not receive any medication.  Ms. Brown also lost her job at McIntyre Food Products, where she was supposed to be promoted to a permanent position with an hourly rate increase.

175.     Following her release from jail, Ms. Brown is struggling to find paid work and to pay bills incurred while she was incarcerated.

### 2.  <u>Sasha Monique Darby</u>

176.     Sasha Monique Darby is the single mother of a four-year old son for whom she provides financial support.

177.     Ms. Darby suffers from Post-Traumatic Stress Disorder ("PTSD") as a result of abuse and assault she experienced as a child.

178.     Ms. Darby lives in poverty.  While in Massachusetts in 2015, she received needs-based public assistance in the form of Medicaid, the Supplemental Nutrition Assistance Program ("SNAP"), and Temporary Assistance to Needy Families ("TANF").

179.     Ms. Darby and her son moved to South Carolina from Massachusetts in the spring of 2015 to be close to her mother and extended family.

180.     Following her move to South Carolina, Ms. Darby struggled to find employment and financially support herself and her son.  In 2016, she worked in several low-wage jobs, including as a forklift driver, but earned an annual income of around $11,770, the 2016 federal poverty guideline for a one-person household.

181.    At first, Ms. Darby's mother was able to help by providing child care for her son while Ms. Darby was looking for work or was at work.  After suffering complications related to diabetes, Ms. Darby's mother could no longer provide child care.

182.    Because Ms. Darby could not afford child care, in June 2015, she made the difficult decision to send her son to live with his paternal grandmother in Massachusetts.  Ms. Darby continued to provide financial support for her son after he moved back to Massachusetts.

183.    From January 2016 to early August 2016, Ms. Darby lived with a roommate in order to make ends meet, but the arrangement did not work out as she had hoped.

184.    On August 4, 2016, the day on which Ms. Darby was supposed to move out of the apartment, her roommate demanded an additional payment of $200, which Ms. Darby believed was unjustified.  Ms. Darby and her roommate got into a heated argument.  Ms. Darby saw her roommate raise a hand and thought her roommate was going to hit her.  Because she suffers from PTSD, Ms. Darby felt threatened.  Out of fear, Ms. Darby responded by hitting her roommate first.  Ms. Darby's roommate called the police in response.

185.    Two officers came to the apartment and issued Ms. Darby a ticket charging her with assault and battery in the third degree and requiring her to appear in the Irmo Magistrate Court on August 23, 2016.

186.    Ms. Darby appeared in the Irmo Magistrate Court on August 23, 2016.

187.    Before Ms. Darby entered the courtroom, an officer handed her a "Trial Information and Plea Sheet" and instructed her to "check a box."

188.    The Trial Information and Plea Sheet indicated that an application for a court-appointed attorney required a "$40 non-refundable fee."  Because she did not have $40, Ms. Darby placed a check mark next to the statement, "I waive my right to have an attorney present."

48

189.    The Trial Information and Plea Sheet also indicated that Ms. Darby could plead no contest, guilty, or not guilty.  Because there was no one to help her, Ms. Darby placed a mark next to the option for "Not guilty" and went into the courtroom.

190.    Ms. Darby provided her mother's permanent home address as her contact information on the Trial Information and Plea Sheet, along with her own personal cell phone number.  Ms. Darby had been staying with her aunt and her mother following the termination of her apartment share in August 2016 and received mail at her mother's home.

191.    When Ms. Darby's name was called, Judge Adams read the Trial Information and Plea Sheet and said, "So you didn't want a lawyer?  Trial's about to start now."

192.    Judge Adams did not inform Ms. Darby that she had the right to request the assistance of a court-appointed attorney and the right to seek waiver of any fees related to the application for a public defender due to financial hardship.

193.    Moreover, Judge Adams did not engage in a colloquy with Ms. Darby to determine whether any waiver of the right to counsel was knowing, voluntary and intelligent.  Judge Adams did not inform Ms. Darby of the benefits of being represented by counsel, the risks of proceeding pro se, or the potential penalties if she was found guilty.  As a result, Ms. Darby did not make a knowing, voluntary or intelligent waiver of the right to counsel.

194.    Judge Adams held a trial on the charge of assault and battery in the third degree.  Ms. Darby did not know how to cross-examine a witness or take other steps to represent herself.

195.    Judge Adams found Ms. Darby guilty of assault and battery in the third degree.

196.    Judge Adams asked Ms. Darby whether she wanted to serve 30 days in jail or pay a fine.  Because Ms. Darby did not want to go to jail, she stated that she would pay a fine.  Judge Adams did not, however, inform Ms. Darby of the amount that she would have to pay.

49

197.    Judge Adams asked Ms. Darby if she had the money to pay the fine.  Ms. Darby was confused because she did not know how much the fine would be.  She informed Judge Adams that she had some money.

198.    Judge Adams asked Ms. Darby where she worked, but asked no further questions about Ms. Darby's financial circumstances.

199.    At no point did Judge Adams tell Ms. Darby the amount of the fine imposed, ask whether Ms. Darby could pay that amount, or ask questions about Ms. Darby's income, assets, expenses, dependents, or other financial obligations.  Nor did Judge Adams ask whether Ms. Darby received any form of needs-based, means-tested public assistance.

200.    Ms. Darby left the courtroom and went to the payment window.  There, she was informed that she was sentenced to pay $1,000 in fines and fees.  Ms. Darby was shocked.  She could not afford to pay $1,000.

201.    Ms. Darby returned to the courtroom and waited for Judge Adams to speak with her.  When Judge Adams called her back to the bench, Ms. Darby requested a payment plan and indicated that she could afford to pay $100 to $120 a month.  Ms. Darby knew that paying more than $100 per month would be difficult for her, but she sought to show Judge Adams that she would try her best to pay the fine as soon as possible.

202.    Judge Adams said that the monthly payment amount Ms. Darby proposed was not enough and ordered Ms. Darby to pay $150 a month.

203.    At the payment window, Ms. Darby paid $200 toward the $1000 fine.  She signed a Scheduled Time Payment Agreement to pay the $800 balance and an additional three percent collection fee of $30.  According to the Scheduled Time Payment Agreement, Ms. Darby was

required to pay $150 each month from September 23, 2016 through January 23, 2017, and to make a final $80 payment on February 23, 2017.

204.     Ms. Darby was not informed by the judge, court staff, or the Scheduled Time Payment Agreement that if her financial circumstances changed in the future and she was unable to pay the $150 required each month, she could request a court hearing on her ability to pay and alternatives to incarceration.  Rather, the Scheduled Time Payment Agreement included the following paragraph: "Failure to appear as directed or failure to comply with the terms set forth in this payment scheduled will result in a BENCH WARRANT/COMMITMENT being issued for my arrest and denial of any future requests for a scheduled time payment."

205.     Following her trial and sentencing in the Irmo Magistrate Court, Ms. Darby had difficulty making the $150 payment due to the court on September 23, 2016.  Nevertheless, she made a $150 payment on October 4, 2016.

206.     Ms. Darby could not make further payments because she fell into significant financial distress in the fall of 2016.

207.     In November 2016, Ms. Darby found herself facing additional childcare costs. Starting that month, Ms. Darby was required to spend $180 every two weeks for her son's daycare.  She was also saving money to visit her son in Massachusetts because, at that time, she had not seen him since the Mother's Day weekend in May 2016 when she had last been able to afford a trip to Massachusetts.

208.     On December 8, 2016, Judge Adams issued a bench warrant ordering the arrest and immediate jailing of Ms. Darby for nonpayment of fines and fees on the offense of assault and battery in the third degree.

209.    On March 28, 2017, Ms. Darby went to her mother's house to help support a family member who was scheduled to be transported to a mental health facility.  Ms. Darby was pregnant at that time.

210.    The mental health facility personnel came to the house accompanied by two law enforcement officers.  One officer recognized Ms. Darby and asked for her identification.  The officer ran her name and informed Ms. Darby that there was a warrant for her arrest.

211.    Ms. Darby was surprised.  She had not received a notice from the Irmo Magistrate Court charging her with nonpayment, and her mother had not received any mail from the Irmo Magistrate Court addressed to Ms. Darby.

212.    The officers arrested Ms. Darby and transported her to the Detention Center.

213.    At the Detention Center, Ms. Darby was provided a copy of the bench warrant.  It indicated that she was required to pay a balance of $680 toward her sentence for assault and battery in the third degree or serve 20 days in jail.

214.    Ms. Darby could not afford to pay $680, and did not know anyone who could lend her the money to secure her release.

215.    Ms. Darby was ultimately released on April 17, 2017.  She was incarcerated in the Detention Center for 20 days.

216.    Ms. Darby's 20-day-long incarceration was devastating for her.  Ms. Darby missed her first prenatal care appointment and was extremely distressed that she could not talk to her four-year-old son who lives in Massachusetts during the entire duration of her incarceration.

217.    While she was incarcerated, Ms. Darby did not get enough food to eat or proper medical care related to her pregnancy.

218.    While incarcerated, Ms. Darby feared she would lose her job because she could not report to work.

219.    During her incarceration, Ms. Darby's landlord initiated eviction proceedings, which ultimately caused her to lose her home in May 2017.  Ms. Darby also lost her job as a forklift driver due to her inability to report to work while incarcerated.

220.    Because she would be homeless if she stayed in South Carolina, Ms. Darby moved to Massachusetts to live with family.

221.    Ms. Darby is struggling to find paid work and to pay bills incurred while she was incarcerated.

### 3.  Cayeshia Cashel Johnson

214.    Cayeshia Cashel Johnson is a single mother and the principal provider for her four children, all of whom are under the age of eight.

215.    Ms. Johnson lives in poverty.  She works multiple part-time jobs and struggles to earn enough money to pay for rent, electricity, food, clothing, transportation, and other necessities to support herself and her family.

216.    Ms. Johnson receives needs-based public assistance in the form of Medicaid and food assistance through SNAP.

217.    In 2016, Ms. Johnson's annual income was far below $28,410, the 2016 federal poverty guideline for a five-person household.

218.    On August 21, 2016, Ms. Johnson got into a minor car accident in Lexington County when driving her mother's car.  At the time, Ms. Johnson was driving from Columbia to Myrtle Beach with a friend.

219. Shortly after the accident, an LCSD patrol car arrived at the scene. The officer asked Ms. Johnson for her driver's license. Ms. Johnson answered truthfully that she had a valid driver's license but that it was not with her at the time.

220. The officer issued Ms. Johnson tickets charging her with five traffic offenses and one misdemeanor offense: (1) uninsured motor vehicle fee violation, 1st offense; (2) operating a motor vehicle without license in possession; (3) improper start of vehicle; (4) violation of beginner permit; (5) failure to return license plate and registration upon loss of insurance, 1st offense; and (6) simple possession of marijuana.

221. The tickets notified Ms. Johnson that she was required to appear in court on September 22, 2016, and provided the address of the Central Traffic Court.

222. When Ms. Johnson returned to Myrtle Beach, her mother was upset about the accident and would no longer allow Ms. Johnson to drive her car. Ms. Johnson could not arrange for transportation to travel to Lexington for her court hearing from Myrtle Beach, which is approximately three hours away by car.

223. About a week before the scheduled hearing, Ms. Johnson called the Central Traffic Court and spoke to a staff person. Ms. Johnson informed the court staff person that she could not attend the court hearing because she lives in Myrtle Beach and could not find transportation to get to and from Lexington in light of her childcare and employment responsibilities. Ms. Johnson explained that she had called everyone she knew to ask for help in traveling to Lexington, but had not been able to secure transportation.

224. The court staff person informed Ms. Johnson that lack of transportation was not a valid reason for missing a court hearing and that her case would be tried in her absence.

225.    Ms. Johnson asked the court staff person about arranging a payment plan for the fines on the tickets.  The court staff person told Ms. Johnson, "The only way to have a payment plan is to talk to the judge."

226.    The court staff person explained that the judge was in the middle of a hearing. Ms. Johnson provided the court staff person both her work number and cell phone number.  The court staff person assured Ms. Johnson that the court would contact her.

227.    No staff person or judge of the Central Traffic Court called Ms. Johnson to respond to her request for continuance and a payment plan.

228.    On September 22, 2016, the Central Traffic Court tried Ms. Johnson in her absence and found her guilty of all six charges.

229.    Ms. Johnson did not receive any notice that she had been tried in absentia, convicted of one misdemeanor and five traffic offenses, sentenced to serve jail time or pay fines and fees for three offenses, and sentenced to pay fines and fees for three offenses.

230.    On September 26, 2016, the Central Traffic Court issued a bench warrant ordering the arrest and immediate jailing of Ms. Johnson.  The bench warrant required Ms. Johnson to pay $1,287.50 or be jailed for 80 days for her conviction on the charges of uninsured motor vehicle fee violation, 1st offense, operating a motor vehicle without license in possession, and simple possession of marijuana.

231.    On February 13, 2017, Ms. Johnson was a passenger in a car driven by her cousin. They were near Ms. Johnson's mother's house in Myrtle Beach when local police stopped the car because of a broken taillight.

232.    The officer asked for Ms. Johnson's driver's license.  The officer informed her that there was a bench warrant for her arrest from Lexington County.

233.    The officer arrested Ms. Johnson immediately.  Ms. Johnson explained that her children were waiting for her at home with her mother.  The officer nevertheless handcuffed Ms. Johnson and took her to the local jail, the J. Reuben Long Detention Center in Horry County, where she was incarcerated for one night.

234.    The next morning, on February 14, 2017, two officers from Lexington County transported Ms. Johnson to the Detention Center.  At the Detention Center, Ms. Johnson was served with the bench warrant.

235.    The bench warrant was the first notice Ms. Johnson had received that she had been convicted of uninsured motor vehicle fee violation, 1st offense, operating a motor vehicle without license in possession, and simple possession of marijuana.  It was also the first notice she received regarding the requirement to pay the Central Traffic Court $1,287.50 or serve 80 days in jail.

236.    Ms. Johnson asked the officer who had given her the bench warrant, "Is this the amount I need to get out?"  Ms. Johnson recalls that the officer responded, "Yes, that's the amount or the days."

237.    Ms. Johnson could not afford to pay $1,287.50 and did not know anyone who could lend her the money to secure her release.

238.    Ms. Johnson was ultimately released on April 9, 2017.  She was incarcerated for a total of 55 days—one night in the J. Reuben Long Detention Center and 54 days in the Detention Center.

239.    Ms. Johnson's 55-day-long incarceration was devastating for her and her four children.  Ms. Johnson was extremely distressed to be separated from her four children for eight

long weeks.  Likewise, because Ms. Johnson's family was located hours away in Myrtle Beach, they were unable to visit her during the entire eight weeks of her incarceration.

240.    While she was incarcerated, Ms. Johnson also suffered from severe headaches for which she received insufficient medical attention.

241.    While incarcerated, Ms. Johnson feared that she would lose the three part-time jobs that she held before her arrest due to her inability to report to work.  Upon her release, Ms. Johnson discovered that she lost all three jobs, which had provided critical financial support to her and her children, as a result of her incarceration.

242.    Following her release from jail, Ms. Johnson struggled to find paid work and to pay bills incurred while she was incarcerated.  She ultimately found employment in low-wage jobs but still struggles to support her family financially.

243.    Upon her release from the Detention Center, Ms. Johnson discovered that she still owes Lexington County $905 for the charges of improper start of vehicle, violation of beginner permit, and failure to return license plate and registration upon loss of insurance.

244.    Ms. Johnson received a letter from the Central Traffic Court indicating that she also owes $100 "non-suspendable mandatory costs," which were due on May 15, 2017.

245.    Ms. Johnson does not have the money to pay $905 for the outstanding tickets or $100 in mandatory costs.

### 4.  Amy Marie Palacios

246.    Amy Marie Palacios is a single mother and the principal provider for herself and her two teenage daughters.

247.    In 2016, Ms. Palacios moved to South Carolina in order to live closer to her extended family.

248.    Ms. Palacios lives in poverty. She works whenever she can find employment but struggles to earn enough money to support herself and her family.

249.    In 2016, Ms. Palacios earned an annual income below $20,090, the federal poverty guideline for a three-person household in that year.

250.    Ms. Palacios' driver's license was suspended in or around June 2015 because she had neglected to pay the fine for a speeding ticket incurred that year. Shortly thereafter, Ms. Palacios moved to California.

251.    When Ms. Palacios returned to South Carolina in May 2016, she paid the fines on the 2015 speeding ticket, contacted the Department of Motor Vehicles ("DMV") to find out exactly how much she owed in reinstatement fees, and began saving money in earnest to pay those fees and reinstate her driver's license. Her ability to reinstate her license was delayed, however, in part because of miscommunication between different DMV offices.

252.    On October 28, 2016, Ms. Palacios was a passenger in a car driven by a friend who was pregnant. When her friend felt sick and could no longer drive, they pulled over and switched places. A few minutes later, Ms. Palacios was stopped by state troopers at a roadblock.

253.    The state troopers ran the names of Ms. Palacios and her friend for warrants. One of the troopers discovered that Ms. Palacios' driver's license was suspended. Ms. Palacios explained that she had driven only because her friend was pregnant and had suddenly become too ill to drive. Ms. Palacios also explained that she was working toward getting her driver's license reinstated but could not afford to pay the reinstatement fee.

254.    The officer ticketed Ms. Palacios for driving on a suspended license (DUS, 1st offense). The ticket notified Ms. Palacios that she was required to appear in court on November 10, 2016 and provided the address of the Central Traffic Court.

255.    Before her court date, Ms. Palacios discovered she would be unable to attend the hearing due to work.  Ms. Palacios worked twelve hours a day, five to six days a week, as a restaurant server with only one break between 3:00 p.m. and 5:00 p.m.

256.    On November 9, 2016, Ms. Palacios called the Central Traffic Court to ask how to request a different court date.  She explained to a court staff person that she could not attend the court hearing because she was scheduled to work at the restaurant during the time of the hearing and could not secure time off or find anyone to replace her during her shift.

257.    The court staff person explained to Ms. Palacios that her manager could fax an affidavit to the court explaining her situation.  Ms. Palacios asked what would happen if she did not attend the hearing.  The court staff person assured her, "As long as you fax that over, you should be ok."  The staff person said that the judge would review the papers and notify her of the decision.

258.    That same day, Ms. Palacios faxed to the Central Traffic Court an affidavit from her employer that explained that Ms. Palacios would not be able to attend court due to work. The affidavit stated: "I Jorge Gomez Manager @ El Jimador Mexican Restaurant state that Amy Palacios is scheduled to work on 11/10/2016 & cannot attend court date scheduled for 11/10/2016.  Ms. Palacios would like to request an extension for this date to avoid any future issues.  If you have any Questions, Please call me."  The affidavit provided Mr. Gomez's contact information.

259.    Neither Ms. Palacios nor her employer received a call or written notice from the court in response to her request for a new court date.  Because the court staff person of the Central Traffic Court had assured her that the court would follow up with her, Ms. Palacios did not check on the status of her case.

260.    On November 10, 2016, Ms. Palacios was tried in her absence in the Central Traffic Court and found guilty of DUS, 1st offense.

261.    Ms. Palacios did not receive any notice that she had been tried in absentia, convicted of a traffic offense, and sentenced to serve jail time or pay fines and fees for the offense.

262.    On November 15, 2016, the Central Traffic Court issued a bench warrant ordering the arrest and immediate jailing of Ms. Palacios.  The bench warrant required Ms. Palacios to pay $647.50 or be jailed for 30 days for her conviction on the charge of DUS, 1st offense.

263.    Around 1:00 a.m. on February 25, 2017, after work, Ms. Palacios had dinner with a close friend who was staying at a local motel.  Another friend who was at the dinner agreed to drive Ms. Palacios home.

264.    Several minutes after the friend pulled her car out of the parking lot of the motel, an LCSD patrol car stopped the vehicle for not having a proper, visible tag.

265.    Unbeknownst to Ms. Palacios, the driver's license of the friend who was giving her a ride had been suspended.  While the officers issued a ticket for driving on a suspended license to the friend, Ms. Palacios made calls to find someone who could drive her home.

266.    One of the officers asked Ms. Palacios for her identification.  When Ms. Palacios told the officer that her license had been suspended, the officer asked for another valid form of identification.  Ms. Palacios provided her South Carolina state identification card.

267.    The officer ran Ms. Palacios' name and discovered an outstanding bench warrant.

268.    The officers transported Ms. Palacios to the Detention Center.

269.    Before being booked in the Detention Center, Ms. Palacios asked why there was a bench warrant for her arrest.  An officer informed her that the bench warrant was related to the

October 2016 charge against her for DUS, 1st offense.  The officer explained, "So either you do 30 days in jail or you pay a fine of $647.50.  These are your options."

270.    Ms. Palacios was confused.  She asked, "So I can pay to get out?"  The officer responded that she was correct.

271.    This discussion of the bench warrant was the first notice Ms. Palacios received that she had been convicted of DUS, 1st offense.  It was also the first notice she received regarding the requirement to pay the Central Traffic Court $647.50 in fines and fees or serve 30 days in jail.

272.    Ms. Palacios could not afford to pay $647.50 and did not know anyone who could lend her the money to secure her release.

273.    Ms. Palacios was never served a copy of the bench warrant.

274.    When she arrived at the Detention Center, Ms. Palacios also asked the officer whether she would be seen in the Bond Court.  The officer responded, "No.  When you have a bench warrant, you don't go to the Bond Court.  Either you pay the fine or you sit for 30 days."

275.    Ms. Palacios was ultimately released on March 18, 2017, after serving 21 days in the Detention Center.

276.    Ms. Palacios' 21-day incarceration was devastating for her and her family.  Ms. Palacios was extremely distressed to be separated from her daughters, and missed the opportunity to take her fifteen-year-old daughter to the DMV for her driving test.

277.    While incarcerated, Ms. Palacios feared that she would lose her job as a server at El Jimador.  Upon her release, Ms. Palacios discovered that she lost her job, which had provided critical financial support for her and her daughters, as a result of her incarceration.

278.    While she was incarcerated, Ms. Palacios also suffered from high blood pressure, for which she received insufficient medical attention.

279.    Ms. Palacios continues to owe the Central Traffic Court a $25 non-suspendable cost related to her conviction for DUS, 1st offense.

### 5.  Nora Ann Corder

280.    Nora Ann Corder lives in poverty.  She works whenever she can find employment, but struggles to earn enough money to pay for housing, electricity, food, clothing, transportation, and other necessities.

281.    Ms. Corder receives needs-based public assistance in the form of food assistance through SNAP.

282.    In 2016, Ms. Corder's annual income was far below $12,060, the 2016 federal poverty guideline for a one-person household.  That year, Ms. Corder was unemployed for a significant period of time and incurred significant legal expenses related to housing.

283.    Due to financial hardship in 2016, Ms. Corder could not afford to pay for car insurance and her insurance policy lapsed.

284.    In July 2016, a South Carolina Highway Patrol Officer issued Ms. Corder a citation for failure to return her license plate and registration upon the loss of insurance. Ms. Corder removed the license plates from her car and surrendered her driver's license at the officer's request.

285.    The citation ultimately resulted in a $230 fine and the suspension of Ms. Corder's driver's license.

286.    Ms. Corder regained employment at a shipping warehouse, but could not afford to pay the $230 fine, the cost of reinstating car insurance, or the $100 driver's license reinstatement

fee required by the DMV. Ms. Corder could not seek reinstatement of her driver's license without paying these costs.

287.    As a consequence, Ms. Corder's driver's license remained suspended.  Ms. Corder continued to drive to work, however, in order to keep her job at a shipping warehouse, which was located around 18 miles from her rural home.

288.    Ms. Corder had no reasonable means of getting to work other than driving her car. She feared that she would be fired if she failed to report to work due to lack of transportation. Ms. Corder also feared that loss of her job—her only source of income—would lead her deeper into poverty and debt, and prevent her from ever paying her court fines and fees and the costs required to reinstate her driver's license.

289.    On January 27, 2017, Ms. Corder was pulled over by a Lexington County Sheriff's Deputy near her home and issued three separate citations: (1) DUS, 1st offense; (2) violation of temporary license plate for vehicle to be registered in another state; and (3) uninsured motor vehicle fee violation, 1st offense.  The citations required Ms. Corder to appear in the Lexington Magistrate Court on February 15, 2017.

290.    The deputy also impounded Ms. Corder's car.

291.    Ms. Corder could not afford to pay to release her car from impound. As a result, she lost her car, which was her sole source of transportation from her rural home to work and court.

292.    On February 15, 2017, Ms. Corder appeared in the Lexington Magistrate Court. Before the hearing began, the deputy who issued the tickets informed Ms. Corder that she owed a total of $1,320 in fines and fees.

293.     The deputy asked Ms. Corder what she had "gotten done."  Ms. Corder was unsure what the deputy was referring to, but she explained that she did not have the money to pay the tickets, get her license or automobile insurance reinstated, or to get her car out of impound.

294.     The deputy told Ms. Corder that he would "get a continuance" until the following month for her to "take care" of what she needed to take care of.  Ms. Corder did not request the continuance or understand what a continuance was, but she did not believe she could challenge the officer's handling of the case.  The deputy did not provide Ms. Corder explicit instructions concerning what she should do before the next hearing date.

295.     In February 2017, Ms. Corder lost her job because she could not arrange for transportation to and from work.  She had sought assistance from neighbors and acquaintances, but was unable to secure transportation, in part, because she worked the night shift and needed to be picked up at around five o'clock in the morning.

296.     On March 22, 2017, Ms. Corder appeared in the Lexington Magistrate Court as required.  Before the hearing began, the same deputy asked her what actions she had taken since she last came to court.

297.     Ms. Corder explained that she was unemployed and could not afford to reinstate her driver's license or car insurance.  She also explained that she had not obtained car insurance because she could not afford to get her car out of impound.  The deputy stated that if she could reinstate her driver's license and car insurance, he would drop certain charges or ask the court to reduce the amount Ms. Corder would have to pay in fines and fees.

298.     The deputy informed Ms. Corder that he would continue the hearing to the following month so she could reinstate her driver's license.  Ms. Corder told the deputy that she

did not know how she was going to do that because she was unemployed and in significant financial distress.  Nonetheless, the deputy continued the trial date a second time, rather than permitting the case to proceed before a magistrate judge.

299.    Ms. Corder did not request the continuance, but again did not believe she could challenge the deputy's decision.

300.    In late March 2017, Ms. Corder began working at a Waffle House.  The distance from her rural home to work was too far to walk and there was no public transportation, so Ms. Corder paid neighbors and acquaintances $10 to $15 per workday for rides to and from the restaurant..

301.    Although she worked full-time, Ms. Corder only earned around $290 each week, remained indigent, and faced difficulty paying for rent, utilities, and other basic necessities.

302.    From March 2017 to May 2017, Ms. Corder received needs-based public assistance in the form of SNAP food assistance.

303.    Due to her significant period of unemployment in 2017 and low wages from Waffle House, Ms. Corder earned a projected annual income far less than $12,060, the 2017 federal poverty guideline for a one-person household.

304.    Despite her poverty, Ms. Corder sought to pay the outstanding $230 court fine stemming from the 2016 ticket for failure to return her license plate and registration upon the loss of insurance.

305.    On April 19, 2017, Ms. Corder appeared in the Lexington Magisrate Court as required for a third time concerning the January 2017 traffic tickets.  At court, Ms. Corder paid the outstanding $230 fine.

306.     Before the hearing began, the same deputy questioned Ms. Corder about what actions she had taken since her last appearance in court.

307.     Ms. Corder informed the deputy that she still could not afford to reinstate her driver's license or car insurance, but that she had recently secured a job at Waffle House.  The deputy indicated that he would again continue the trial to the following month, but that it was the last time he would do so. The deputy informed Ms. Corder that her next court date would be May 17, 2017.  Again, Ms. Corder did not request the continuance.

308.     Ms. Corder had appeared in the Lexington Magistrate Court, as required, on three separate days for a court hearing on the January 2017 traffic citations.  At no point on any of these three days did any Lexington County magistrate court judge speak to Ms. Corder, instruct her on how to prepare for a continued court hearing, or inform her of her right to request the assistance of a court-appointed attorney, the right to seek waiver of any public defender application fees due to financial hardship, or the right to a jury trial on the charges against her.

309.     Likewise, the deputy, who repeatedly informed Ms. Corder that her court hearing would be continued to a subsequent date, did not instruct her on how to prepare for her continued court hearing.  Nor did he inform Ms. Corder of her rights concerning counsel or her right to a jury trial on any of the three occasions in which she appeared in court.

310.     On May 17, 2017, Ms. Corder was unable to secure transportation to attend the fourth Lexington Magistrate Court hearing concerning her January 2017 traffic tickets.  At the time, Ms. Corder lived around nine miles from court.  She could not walk to court from her home and did not have access to any reasonable means of public transportation to make the trip.

311.     That same day, the Lexington Magistrate Court tried Ms. Corder in her absence and found her guilty of all three charges.

312.    Ms. Corder did not receive any notice that she had been tried in absentia, convicted of three traffic offenses, and sentenced to serve jail time or pay fines and fees for the three traffic offenses.

313.    On or around May 17, 2017, the Lexington Magistrate Court issued a bench warrant ordering the arrest and immediate jailing of Ms. Corder.  Upon information and belief, the bench warrant required Ms. Corder to pay $1,320 or be jailed for 90 days for her conviction on the charges of DUS, 1st offense, violation of temporary license plate for vehicle to be registered in another state, and uninsured motor vehicle fee violation, 1st offense.

314.    Ms. Corder feared that she would be arrested for the three traffic citations, even though she had been unable to appear in court on May 17, 2017 due to lack of transportation. Several days after the scheduled hearing, Ms. Corder called the Lexington County Sheriff's Department and was informed that a bench warrant had been issued for her arrest.

315.    Ms. Corder called the Lexington Magistrate Court to explain that she had been unable to secure transportation to court and asked what she could do.  A clerk informed her that she was required to pay $1,320 or turn herself in for arrest.

316.    Ms. Corder explained to the clerk that she had only recently gained employment and could not afford to pay $1,320, but could pay the total amount due in five or six installments.

317.    The clerk informed Ms. Corder that she was not permitted to pay in installments. The clerk told Ms. Corder that she had to pay $1,320 in full or would be arrested.

318.    At the same time that Ms. Corder sought to prevent arrest and incarceration for unpaid magistrate court fines and fees, she faced eviction from her home because she could not afford to pay rent.

319.    On May 26, 2017, Ms. Corder went to the Lexington Magistrate Court to file forms to fight the eviction action.  Shortly after her arrival, a deputy of the Lexington County Sheriff's Department handcuffed and arrested Ms. Corder.

320.    Ms. Corder was transported to the Detention Center and booked.

321.    Ms. Corder could not afford to pay $1,320 prior to being booked and did not know anyone who could lend her the money to secure her release.

222.    Ms. Corder was ultimately released on July 19, 2017.  She was incarcerated for a total of 54 days.

223.    Ms. Corder's 54-day-long incarceration has been devastating for her. Because she was incarcerated, she was unable to report to work and lost her job. She suffered emotional distress from the loss of her physical liberty as well as the knowledge that she would be homeless and unemployed upon her release from jail.

### 6.  Xavier Larry Goodwin

322.    Xavier Larry Goodwin is the principal provider for a household of four people: his two teenage daughters, his wife, and himself.  He also pays $232 each week—around $12,000 a year—in child support for two sons with whom he does not live.

323.    Mr. Goodwin lives in poverty.  He struggles to financially support himself and his family through his work as a welder and machine operator.

324.    Mr. Goodwin qualifies for needs-based public assistance in the form of Medicaid.

325.    In 2016, Mr. Goodwin earned an annual income around $32,570, the federal poverty line for a six-person household.

326.    On July 15, 2016, Mr. Goodwin received five traffic tickets during a traffic stop: (1) DUS, 2nd offense; (2) uninsured motor vehicle fee violation, 1st offense; (3) seatbelt violation; (4) temporary license plate – time limit to replace; and (5) use of license plate other

than for vehicle which issued.  The tickets instructed Mr. Goodwin to appear in the Central

Traffic Court on August 9, 2016.

327.     On August 9, 2016, Mr. Goodwin was unable to appear in court due to work.  Mr.

Goodwin called the Central Traffic Court during his morning break.  Because he thought he had

already missed the court hearing, Mr. Goodwin asked the court staff person, "Is there anything

that can be done so I can reappear or reschedule the court date?"  The court staff person told Mr.

Goodwin, "It's best if you just come down here and see what can be done."  The Central Traffic

Court is open on Monday through Friday from 8:00 a.m. to 5:00 p.m.  Mr. Goodwin could not go

to the court that day because of his work schedule.

328.     On August 9, 2016, Mr. Goodwin was tried in his absence in the Central Traffic

Court and found guilty of all five charges.

329.     Mr. Goodwin did not receive any notice that he had been tried in absentia,

convicted of five traffic offenses, sentenced to serve jail or pay fines and fees for two of the

offenses, and sentenced to pay fines and fees for the other three offenses.

330.     On August 10, 2016, the Central Traffic Court issued a bench warrant ordering

the arrest and immediate jailing of Mr. Goodwin.  The bench warrant required Mr. Goodwin to

pay $1,710 or be jailed for a total of 90 days for his conviction on the charges of DUS, 2nd

offense and uninsured motor vehicle fee violation, 1st offense.

331.     On February 2, 2017, Mr. Goodwin was stopped by an LCSD patrol car a block

away from his home.

332.     One of the officers asked Mr. Goodwin for his driver's license, registration, and

proof of insurance.  Mr. Goodwin gave the officer the vehicle registration and proof of insurance

and explained that he did not have a driver's license.

333.    The officers discovered there was an outstanding bench warrant for Mr. Goodwin's arrest.  They returned to Mr. Goodwin's car and asked him to step out of the car and put his hands behind his back.

334.    The officers told Mr. Goodwin that he was being arrested on a bench warrant. They also issued him a ticket for DUS, 3rd offense.  The ticket notified him that he was required to appear in the Irmo Magistrate Court on April 4, 2017.

335.    Mr. Goodwin was transported to the Detention Center.  At the Detention Center, Mr. Goodwin was served with the bench warrant.  This bench warrant was the first notice Mr. Goodwin had received that he had been convicted of DUS, 2nd offense, and uninsured motor vehicle fee violation, 1st offense.  It was also the first notice he received regarding the requirement to pay the Central Traffic Court $1,710 in fines and fees or to serve 90 days in jail.

336.    The following morning, on February 3, 2017, Mr. Goodwin was taken to the Bond Court for a hearing on the DUS, 3rd offense charge from the previous day.  The Bond Court judge did not inform Mr. Goodwin of his right to request the assistance of court-appointed counsel or his right to seek waiver of any public defender application fee.  Nor did the judge appoint counsel to represent Mr. Goodwin as an indigent person facing incarceration for nonpayment of magistrate court fines and fees.  The Bond Court judge did not address the Central Traffic Court bench warrant that was the basis for his arrest and incarceration.

337.    On April 4, 2017, the officer who had issued Mr. Goodwin the DUS, 3rd offense ticket on February 2, 2017 came to the Detention Center and transported Mr. Goodwin to the Irmo Magistrate Court for a hearing.

338.    On their way to court, Mr. Goodwin asked the officer whether he could request a public defender.  The officer suggested that the screening process could take a long time and that

Mr. Goodwin's incarceration in the Detention Center could be extended as a result.  Mr. Goodwin feared the prospect of spending additional time in jail and did not ask any further questions about requesting a public defender.

339.    Judge Adams of the Irmo Magistrate Court heard Mr. Goodwin's case.

340.    Mr. Goodwin did not know, and the judge did not inform him, that he had the right to request the assistance of a court-appointed attorney before pleading guilty and the right to seek a waiver of any fees related to the application for a public defender due to financial hardship.

341.    Without being informed of his rights and without the assistance of counsel, Mr. Goodwin pled guilty to the charge of DUS, 3rd offense.

342.    Judge Adams sentenced Mr. Goodwin to 90 days in jail and $2,100 in fines and fees.  The judge credited the time Mr. Goodwin had already spent incarcerated in the Detention Center toward the jail portion of the sentence.  She also said something to the effect of: "You are not gonna make a payment, which I think will happen.  I'm gonna issue a bench warrant faster than you can turn your head."

343.    Judge Adams instructed Mr. Goodwin to return to court to set up a payment plan within 30 days of his release from jail.  She threatened to have him arrested and incarcerated if he failed to do so.

344.    Mr. Goodwin was transported back to the Detention Center after the court hearing.

345.    Mr. Goodwin was ultimately released from the Detention Center on April 6, 2017 and transported to the Alvin S. Glenn Detention Center in Richland County to serve time on a bench warrant issued by the Upper Township Magistrate Court in Richland County.

346.     On April 26, 2017, Mr. Goodwin was released from the Alvin S. Glenn Detention Center.

347.     Mr. Goodwin was incarcerated for a total of 63 days in the Detention Center for nonpayment of fines and fees to the Central Traffic Court.  His incarceration was devastating for him and his family.  Mr. Goodwin was extremely distressed to be separated from his family.  He was unable to be with his daughter on her eleventh birthday or with his wife on their wedding anniversary.

348.     Mr. Goodwin was housed in a dorm in the Detention Center that was very hot and had significant mold growth on the walls due to a leaky roof and ceiling.  Mr. Goodwin suffered from a cold and severe headaches as a result of the fans used to circulate air in the dorm because the air conditioner was broken.

349.     While incarcerated, Mr. Goodwin feared that he would lose the job he had held for thirteen years and his home.  Upon his release, he discovered that he had lost both.

350.     Following his release from the Alvin S. Glenn Detention Center, Mr. Goodwin has struggled to find a job he can get to without driving and to earn enough money to get himself and his family back on their feet.

351.     On May 5, 2017, Mr. Goodwin went to the Irmo Magistrate Court to establish a payment plan for the $2,100 fine owed to the Irmo Magistrate Court.  The court staff person at the payment window gave Mr. Goodwin a piece of paper and said, "This is your copy. I need for you to sign and date this back copy.  Your first payment will start in June."  The Scheduled Time Payment Agreement was already completed and required Mr. Goodwin to make a monthly payment of $100 starting on June 5, 2017.  It also indicated that Mr. Goodwin was being charged a three percent collection fee.

352.    Mr. Goodwin explained to the court staff person that he had just been released from jail and did not have a job.  Nevertheless, she required him to sign the Scheduled Time Payment Agreement, which required Mr. Goodwin to pay $100 each month.

353.    Mr. Goodwin signed the Scheduled Time Payment Agreement.

354.    Mr. Goodwin eventually obtained a job as a heavy machine operator earning about $280 weekly.

355.    Even with this job, however, Mr. Goodwin remains indigent.  He and his family do not have a home and struggle financially to pay for basic necessities.  Mr. Goodwin incurred significant debts during his incarceration, which he is obligated to repay.  On top of the fines and fees he owes to the Irmo Magistrate Court for the DUS, 3rd offense, Mr. Goodwin owes fines and fees for three additional traffic charges for which he was tried and convicted in absentia by the Central Traffic Court in July 2016, court costs on all five offenses adjudicated in that court, and more than $10,000 for past due child support.

356.    Despite his best efforts, Mr. Goodwin remains unable to pay according to the terms of the Scheduled Time Payment Agreement and constantly fears that he will again be arrested and incarcerated.

357.    Mr. Goodwin could not afford to pay his first installment of $100 by June 5, 2017 as required by the Scheduled Time Payment Agreement.  He ultimately was able to pay $100 by June 23, 2017 only by prioritizing payment to the Irmo Magistrate Court over paying child support.

358.    Mr. Goodwin could not afford to pay $100 on July 5, 2017 as required by the Scheduled Time Payment Agreement because of his limited income and significant debts, including child support and court debt.  He has still not been able to make this $100 payment.

359.    Mr. Goodwin faces an imminent and substantial risk that the Irmo Magistrate Court will issue a bench warrant ordering law enforcement officers to arrest and book him in the Detention Center unless he can pay $2,063—the entire balance owed for the DUS, 3rd offense.

### 7.  Raymond Wright, Jr.

360.    Raymond Wright, Jr., is a disabled man.  Along with his wife, he provides for a household of five, which includes his daughter and two granddaughters.

361.    Mr. Wright lives in poverty.  He has been disabled and largely unemployed since a 1991 workplace accident required his left leg to be amputated.  Mr. Wright's sole source of income is Social Security Disability Insurance ("SSDI") in the amount of $547 per month. Although his wife had been steadily employed, her unemployment from July 2016 to June 2017 caused their household to experience even greater financial hardship.

362.    Mr. Wright's driver's license was suspended in or around 2014 because he could not afford to pay court fines and fees.

363.    On July 1, 2016, Mr. Wright was pulled over by a South Carolina Highway Patrol officer and ticketed for DUS, 1st offense, which instructed him to appear in the Central Traffic Court on July 26, 2016.

364.    On July 26, 2016, Mr. Wright appeared in the Central Traffic Court as required.

365.    Mr. Wright did not know, and the judge did not inform him, that he had the right to request the assistance of a court-appointed attorney before pleading guilty and the right to seek a waiver of any fees related to the application for a public defender due to financial hardship.

366.    Without being informed of his rights and without the assistance of counsel, Mr. Wright pled guilty to the charge of DUS, 1st offense.  The judge sentenced him to pay $666.93 in fines and fees.

367.     The judge asked Mr. Wright if he could pay in full that day.  Mr. Wright explained that his only income was from SSDI and that he could not afford to pay.

368.     Mr. Wright informed the judge that he had brought bills and other documents showing his inability to pay with him to court.  The judge did not look at these documents, inquire about their contents, or ask Mr. Wright any other questions about his income, assets, expenses, dependents or other financial obligations.  Nor did the judge ask whether Mr. Wright received any form of needs-based, means-tested public assistance.  At the time of the hearing, however, Mr. Wright received needs-based, means-tested public assistance in the form of food assistance through SNAP.

369.     Instead, the judge required Mr. Wright to pay $50 per month toward the full amount due, and informed Mr. Wright that if he did not make these payments, he would be jailed.

370.     Mr. Wright faced difficulty paying $50 each month to the Central Traffic Court while supporting his family on his SSDI income.  With great effort, he made payments of $50 to the Central Traffic Court on the following dates: July 26, 2016; August 29, 2016; October 3, 2016; October 28, 2016; and December 7, 2016.

371.     In order to make these payments, however, Mr. Wright was forced to cut back on buying groceries and other basic necessities for himself, his wife and granddaughters.  During this time, Mr. Wright's wife was unemployed.

372.     Despite his best efforts, Mr. Wright could not afford to make payments toward fines and fees owed to the Central Traffic Court after December 7, 2016.

373.     In April 2017, Mr. Wright received a letter summoning him to appear before the Central Traffic Court for a show cause hearing.

374.    On April 19, 2017, Mr. Wright appeared in the Central Traffic Court as required.

375.    Before hearing Mr. Wright's case, the Central Traffic Court judge made a general announcement that all defendants had a right to an attorney.  The judge did not, however, inform Mr. Wright that he had the right to request the assistance of a court-appointed attorney and the right to seek waiver of any fees related to the application for a public defender due to financial hardship.

376.    Nor did the judge engage in a colloquy with Mr. Wright to determine whether any waiver of the right to counsel was knowing, voluntary, and intelligent. The judge did not inform Mr. Wright of the benefits of being represented by counsel, the risks of proceeding pro se, or the potential penalties if he was found guilty.  As a result, Mr. Wright did not make a knowing, voluntary or intelligent waiver of the right to counsel.

377.    He explained to the judge that he was not able to make further payments to the court due to financial hardship, that his only income was a limited amount of SSDI, and that his wife was unemployed.  Mr. Wright also explained that he had just lost his home because he could not afford to pay the mortgage and that he owed taxes, had additional bills to pay, and needed to buy groceries to feed his family of four.

378.    The judge informed Mr. Wright that he would be jailed if he did not pay the full $416.93 balance due to the court within ten days.

379.    The judge did not ask Mr. Wright any questions about his financial circumstances. Although Mr. Wright brought documentation to demonstrate his inability to pay with him to court, the judge told Mr. Wright that he did not want to see any of the documents.

380.    Mr. Wright asked if he could make partial payments until he fully paid the outstanding fines and fees. The judge informed him that the court would only accept payment of the full amount owed.

381.    Despite his best efforts, Mr. Wright was unable to pay his balance of $416.93 to the Central Traffic Court by April 29, 2017, which was ten days after the show cause hearing.

224.    On May 2, 2017, the Central Traffic Court issued a bench warrant ordering the arrest and immediate jailing of Mr. Wright for nonpayment of fines and fees imposed for the DUS, 1st offense.  The bench warrant alleged that Mr. Wright had failed to comply with the court's order to pay $100 by April 28, 2017.  The bench warrant ordered law enforcement to arrest and jail Mr. Wright for 10 days unless he paid $416.93—the entire balanced owed for the DUS, 1st offense.

382.    In June 2017, Mr. Wright's wife obtained employment after being out of work for ten months.  But Mr. Wright remained indigent.  His SSDI income and his wife's wages together were insufficient to support the couple's five-person household.  Mr. Wright and his wife struggled to provide housing, utilities, food, transportation, and other basic necessities for themselves and his daughter and two granddaughters.

383.    Mr. Wright suffered significant stress and illness from living in fear that he would be arrested and incarcerated for his inability to pay fines and fees to the Central Traffic Court. Mr. Wright experienced panic attacks and shortness of breath.  He was eventually hospitalized for two days because he unexpectedly lost consciousness due to stress and anxiety from fear that he would be imminently arrested and jailed because he could not afford to pay money owed to the Central Traffic Court.

384.    On the morning of July 25, 2017, Mr. Wright was arrested pursuant to the Central Traffic Court bench warrant for failure to pay.  Because Mr. Wright was unable to pay $416.93, which was the entire amount of his debt to the Central Traffic Court, he was booked in the Detention Center.

385.    When Mr. Wright was booked in jail, Detention Center staff confiscated medication in his possession.  Mr. Wright informed the staff that he needed to take the medication before every meal to treat a stomach condition.

386.    Despite being on notice that Mr. Wright required his medication before meals, Detention Center staff failed to properly provide Mr. Wright his medication from July 25 through July 27 2017.  As a result, Mr. Wright experienced severe stomach pain, acid reflux, diarrhea, high blood pressure, and loss of consciousness from July 27 through July 31, 2017.

387.    While incarcerated in the Detention Center, Mr. Wright also requested help from jail staff to treat pain he was experiencing from a cracked tooth.  But Detention Center staff did not provide adequate or proper medication to treat his pain.  Mr. Wright also developed a rash on his skin from the extremely hot water with which he was required to shower.

388.    On the evening of July 31, 2017, Mr. Wright experienced severe pain, diarrhea and blood in his stool due to the failure of jail staff to provide him proper medication for his stomach condition over the previous days.  Mr. Wright was so ill, he blacked out twice.  On one occasion, he hit his head and face on the brick wall and concrete floor after passing out due to illness.  Mr. Wright suffered large, painful contusions on his head as a result.

389.    Mr. Wright was subsequently transported to the Lexington Medical Center emergency room.  He was treated for dangerously low blood pressure and provided a blood

transfusion because he had lost so much blood in his stool. Mr. Wright received his medical care while restrained to his hospital bed in handcuffs and chains.

390.    On August 1, 2017, a Lexington County Sheriff's Department officer informed Mr. Wright, who remained in the Lexington Medical Center emergency room, that he was released from the jail. Mr. Wright had been incarcerated for seven days.

391.    Mr. Wright was admitted to the hospital, and continued to suffer from stomach pain, acid reflux, diarrhea, blood in his stool, and pain from contusions on his head.

392.    Mr. Wright remained hospitalized for three more days. Mr. Wright's treating physician informed him that he was suffering from severe intestinal inflammation.

393.    As a result of his 7-day long incarceration, Mr. Wright suffered from severe illness and serious health complications, including intestinal inflammation, stomach pain, acid reflux, diarrhea, blood in his stool, high and low blood pressure, and painful contusions on the head because Mr. Wright was incarcerated in the Detention Center, rather than at liberty to take needed stomach medication as required. Furthermore, because of his 7-day-long incarceration, Mr. Wright was separated from his wife and family and suffered severe emotional distress and anxiety from the loss of his physical liberty.

### 8. Allegations Common to Numerous Plaintiffs

394.    Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright would not have been booked in the Detention Center if they had been able to pay the entire amount of the court fines and fees identified on the face of the magistrate court bench warrants used to arrest them before being booked in the Detention Center.

395.    Likewise, at the time they filed their respective claims, in this action Plaintiffs Goodwin and Wright would not have faced an imminent and substantial risk of arrest and incarceration in the Detention Center for nonpayment of magistrate court fines and fees if they

could have afforded to pay the entire amount of fines and fees they owed to Lexington County magistrate courts.  Moreover, Plaintiff Goodwin continues to face an imminent and substantial risk of arrest and incarceration for money owed to a Lexington County magistrate court, and would not face such a threat if he could pay his outstanding debt to the Irmo Magistrate Court in full.

396.    Plaintiffs were not afforded ability-to-pay hearings when their fines and fees were imposed by Lexington County magistrate courts.

397.    No Lexington County magistrate court inquired into the financial ability of Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright to pay the fines and fees identified on the bench warrants used to arrest them, their efforts to secure resources, or alternatives to incarceration.  No Lexington County magistrate court determined that Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright willfully failed to pay court fines; that these Plaintiffs made inadequate efforts to secure resources to pay; or that alternatives to incarceration and payment were inadequate—whether before issuing the bench warrants, after these Plaintiffs were arrested, or after these Plaintiffs were booked in the Detention Center.

398.    At no point after being arrested on the bench warrants were Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright taken to appear before a Lexington County magistrate judge in the Bond Court located adjacent to the Detention Center or in the original magistrate court that issued the bench warrant for a determination as to the propriety of incarceration.

399.    At no point before or after being incarcerated in the Detention Center under magistrate court bench warrants were Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright notified of their right to request the appointment of counsel to defend

against incarceration for the underlying offense charged or noncompliance with a court order to pay fines and fees. Likewise, at no point before or after being incarcerated were Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright informed of the right to request waiver of the $40 public defender application fee. And at no point did any of the Lexington County magistrate court judges engage in a colloquy with Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright to ensure that any waiver of the right to request appointment of counsel, whether written or oral, was knowing, voluntary, and intelligent.

400.    At no point before or after being incarcerated in the Detention Center under magistrate court bench warrants were Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright afforded representation by court-appointed counsel in order to defend against incarceration despite prima facie evidence of their indigence.

401.    Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright suffered humiliation, anxiety, stress, emotional distress, disturbed sleep and other irreparable injury from being handcuffed, arrested, jailed, separated from their families and loved ones, and incarcerated for periods of time ranging from seven to 63 days.

402.    Plaintiffs Brown, Darby, Johnson, and Palacios were incarcerated in a very cold dorm in the Detention Center. Detention Center staff provided insufficient clothing for each Plaintiff and only a thin blanket despite the very low temperature.

403.    Plaintiffs Goodwin, Corder, and Wright were subjected to discomfort from hot and unsanitary jail conditions.

404.    As a direct result of their unlawful incarceration, Plaintiffs Brown, Darby, Johnson, Palacios, Corder, and Goodwin lost needed income and employment.

405.    At the time they filed their respective claims in this action, neither Plaintiff Goodwin nor Plaintiff Wright had any ongoing or pending proceedings in any Lexington County magistrate court. Although Mr. Goodwin owes fines and fees to the Irmo Magistrate Court, that court has entirely concluded proceedings concerning the DUS, 3rd offense for which Mr. Goodwin was convicted and sentenced to fines and fees.  Similarly, although at the time he filed his claim, Mr. Wright owed fines and fees to the Central Traffic Court, that court had entirely concluded proceedings concerning the DUS, 1st offense for which Mr. Wright was convicted and sentenced to fines and fees.

406.    No Lexington County magistrate court inquired into the financial ability of Plaintiffs Goodwin and Wright to pay the fines and fees they owed to Lexington County magistrate courts at the time they filed their respective claims in this action, their efforts to secure resources, or alternatives to incarceration.  No Lexington County magistrate court has determined that Plaintiffs Goodwin and Wright willfully failed to pay these court fines and fees, that these Plaintiffs made inadequate efforts to secure resources to pay, or that alternatives to incarceration and payment are inadequate.

407.    Likewise, no Lexington County magistrate court has inquired into the financial ability of Plaintiff Goodwin to pay the fines and fees he currently owes to the Irmo Magistrate Court, his efforts to secure resources, or alternatives to incarceration.  No Lexington County magistrate court has determined that Plaintiff Goodwin willfully failed to pay these court fines and fees, that he made inadequate efforts to secure resources to pay, or that alternatives to incarceration and payment are inadequate.

408.    With respect to the magistrate court fines and fees he owed at the time he filed his claims in this action, Plaintiff Wright had not been informed by any Lexington County

82

magistrate court of his right to request the appointment of counsel to defend against incarceration for the underlying offenses charged or noncompliance with a court order to pay fines and fees. Nor had he been appointed counsel by any Lexington County magistrate court judge for such a defense. Likewise, no Lexington County magistrate court judge informed Plaintiff Wright of the right to request waiver of the $40 public defender application fee, or engaged in a colloquy with him to ensure that any waiver of the right to request appointment of counsel, whether written or oral, was knowing, voluntary, and intelligent.

409.    With respect to the magistrate court fines and fees he currently owes, Plaintiff Goodwin has not been informed by any Lexington County magistrate court of his right to request the appointment of counsel to defend against incarceration for the underlying offenses charged or noncompliance with a court order to pay fines and fees. Nor has he been appointed counsel by any Lexington County magistrate court judge for such a defense. Likewise, no Lexington County magistrate court judge has informed Plaintiff Goodwin of the right to request waiver of the $40 public defender application fee, or engaged in a colloquy with him to ensure that any waiver of the right to request appointment of counsel, whether written or oral, was knowing, voluntary, and intelligent.

410.

### E.  Evidence of Widespread Arrest and Jailing of Indigent People for Nonpayment of Magistrate Court Fines and Fees

411.    Magistrate court records obtained through public records requests and available on the South Carolina Judicial Department's online Case Records Search system ("Public Index") demonstrate the widespread use of bench warrants by Lexington County magistrate courts to coerce fine and fee payments.

412.     The Public Index allows public searches for information concerning traffic and criminal cases handled by Lexington County magistrate courts, including the Central Traffic Court, Irmo Magistrate Court, Lexington Magistrate Court, Swansea Magistrate Court, Cayce-West Columbia Magistrate Court, Oak Grove Magistrate Court, and Batesburg-Leesville Magistrate Court.  A Public Index case record provides, among other information, the name of the defendant, case number, the name of the court and judge handling the case, the date on which the case was filed, a description of the offense charged, the date on which the case was disposed, and the type of disposition.

413.     A Public Index case record also includes an "Action" tab that contains information about whether the defendant is on a Scheduled Time Payment Agreement and the date of any required payments.  A court may notate the "Action" tab with the term "Failure to Comply" or the term "Archived Bench Warrant," among other things.

414.     A Public Index case record also includes a "Financials" tab that identifies whether any fines and fees imposed as part of the sentence for an offense remain outstanding.  It also provides the date(s) and amount(s) of any payments that have been made.

415.     A review of the Central Traffic Court bench warrants and corresponding Public Index case records pertaining to Plaintiffs Johnson, Palacios, Goodwin, and Wright shows that the date of the bench warrant issued against each of these Plaintiffs corresponds with the date of a "Failure to Comply" or "Archived Bench Warrant" notation in the "Action" tab of the applicable Public Index case record.

416.     Similarly, a review of the Irmo Magistrate Court bench warrants and corresponding Public Index case records pertaining to Plaintiffs Brown and Darby shows that the

date of each bench warrant corresponds with the date of a "Failure to Comply" notation in the "Action" tab of the applicable Public Index case record.

417.    Consequently, the issuance of a bench warrant by the Central Traffic Court, Irmo Magistrate Court, or any other Lexington County magistrate court is documented by the entry of a "Failure to Comply" or "Archived Bench Warrant" notation with the date of the bench warrant in the applicable Public Index case record.

418.    A search of Public Index case records for Lexington County magistrate courts reveals that between February 1, 2017 and March 31, 2017, the courts entered a "Failure to Comply" or "Archived Bench Warrant" notation in 204 cases corresponding to 183 different individuals.  Therefore, between February 1, 2017 and March 31, 2017, around 183 people were at risk of being arrested, or ultimately were arrested, under a bench warrant issued for nonpayment of fines and fees owed to a Lexington County magistrate court.

419.    If bench warrants are issued at the same rate throughout the year, this two-month estimate suggests that bench warrants are issued against more than 1,000 people each year for nonpayment of fines and fees owed to a Lexington County magistrate court.

420.    A review of online Detention Center records demonstrates that the use of bench warrants to coerce payments toward magistrate court fines and fees results in the widespread arrest and incarceration of indigent people.

421.    The Detention Center produces a daily list of all inmates.  This online list identifies the name of each inmate, the "Primary Charge," the "Arrest Date," and the "Booking Agency."  Individual records associated with each inmate are also available online and provide more detailed information, including any additional charges and any outstanding "FINES AND COSTS."

422.    A review of these records for the period beginning May 1, 2017 and ending May 28, 2017 shows that, over the course of those four weeks, 95 people were incarcerated for a primary charge listed as either "Magistrate Court Bench Warrant" or "Magistrate/Municipal Court Bench Warrant."  The largest total number of people incarcerated under either primary charge on any given day was 63, and the average daily total was 43.  The inmates for whom the unpaid balance of fines and costs were posted on the Detention Center's online record owed between $232.50 and $3,470.00, with an average debt amount of $960.60.

423.    It is fair to estimate that hundreds of indigent people, if not more than one thousand, are incarcerated each year on bench warrants issued for nonpayment of fines and fees imposed by Lexington County magistrate courts.  On average, the number of people jailed under such warrants on any given day during the four-week period amounted to 7.22% of the total inmate population.  In 2015, the total number of people booked in the Detention Center was 12,100, and in 2016 the total number was 10,980.  Assuming that 10,000 people in total are booked in the Detention Center in 2017, it is highly likely that more than 700 will be incarcerated on a bench warrant issued for nonpayment of magistrate court fines and fees.

424.    As a result of the policies, practices, and customs of Defendants Lexington County and Madsen, and the failures, acts, omissions, policies, practices, and standard operating procedures of Defendants Reinhart, Adams, Dooley, Koon and Madsen, indigent people are routinely arrested and jailed for nonpayment of fines and fees owed to Lexington County magistrate courts in violation of their most basic constitutional rights.

425.    At the time Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright were arrested and jailed, Defendants were on notice that indigent people were routinely arrested and incarcerated in the Detention Center for nonpayment of magistrate court fines and

86

fees without first being afforded pre-deprivation ability-to-pay hearings or representation by counsel, in violation of the Sixth and Fourteenth Amendments.

426.    Defendants were also on notice that Lexington County magistrate court judges, including Defendant Adams, routinely sought to obtain written waivers of the right to counsel from indigent people before a plea proceeding or trial on standard forms without adequately informing them of their rights or engaging in any colloquy to determine whether any waivers were knowing, voluntary, and intelligent.

427.    Defendants Lexington County and Madsen were also on notice that their underfunding of public defense in magistrate courts and staffing decisions had led to the absence of public defenders from Bond Court proceedings and magistrate court proceedings leading to incarceration or the imposition of suspended incarceration sentences.

428.    Defendants were also on notice that indigent people were routinely arrested and incarcerated in the Detention Center on bench warrants unsupported by probable cause of criminal conduct in violation of the Fourth Amendment.

## CLASS ALLEGATIONS

429.    Plaintiffs Goodwin and Wright bring this case as a class action on behalf of themselves and all others similarly situated for the purpose of asserting declaratory and injunctive relief claims on a common basis.

430.    A class action is a superior means, and the only practicable means, by which Plaintiffs Goodwin and Wright and the proposed class members can challenge Defendants' common courses of conduct in relation to the routine and widespread incarceration of indigent people for nonpayment of fines and fees in Lexington County magistrate court cases.

431.    This action is brought, and may properly be maintained, as a class action under Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

432.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

433.    Plaintiffs Goodwin and Wright seek to represent the following defined class (the "Class"): "All indigent people who currently owe, or in the future will owe, fines, fees, court costs, assessments, or restitution in cases handled by Lexington County magistrate courts."

434.    The Class is sufficiently numerous such that joinder of all members is impracticable.  Hundreds, if not thousands, of indigent people currently owe fines, fees, court costs, assessments, or restitution in cases handled by Lexington County magistrate courts, and these numbers will continue to grow.

435.    Class members are subjected to the ongoing policies, practices, customs, standard operating procedures, acts, and omissions of Defendants discussed in this Complaint.  To the extent they are not currently incarcerated, Class members (including Plaintiff Goodwin currently, and Plaintiff Wright, at the time he filed his claims) face a substantial and imminent threat of being arrested and incarcerated for nonpayment of magistrate court fines and fees without a pre-deprivation ability-to-pay hearing, notice of the right to request court-appointed counsel to defend against incarceration, notice of the right to request a waiver of the $40 public defender application fee, or the assistance of counsel.

436.    As discussed above, a search of online court records indicates that Lexington County magistrate courts collectively issued 204 bench warrants charging at least 183 people with nonpayment of fines and fees between February 1, 2017 and March 31, 2017.  It is estimated that hundreds, if not thousands, of indigent people have been the subjects of bench warrants issued under the Default Payment and Trial in Absentia Policies during the past few years.  Many of these warrants likely remain unexecuted, placing hundreds of indigent people, if

not thousands, at substantial and imminent risk of arrest and incarceration for nonpayment without the notice and process required by law.

437.    Defendants maintain records with the names, case numbers, and bench warrant dates of those who owe fines, fees, court costs, assessments, or restitution in cases handled by Lexington County magistrate courts.

438.    Joinder of all Class members is also impracticable because many members are unaware that their rights under the U.S. Constitution have been violated or that they are entitled to seek redress in court.  Members of the Class also lack the means to retain an attorney to represent them in a civil rights lawsuit.  Finally, many Class members are likely to avoid bringing individual claims because they fear retaliation and reprisal, including arrest and incarceration, by one or more Defendants.  There is no appropriate avenue for the protection of the Class members' constitutional rights other than a class action.

439.    The class members share a number of common questions of law and fact, including, but not limited to:

   a.   Whether Defendant Koon, his deputies, and officers of cooperating law enforcement agencies routinely arrest members of the Class on payment bench warrants;

   b.   Whether Defendant Koon and his deputies routinely incarcerate for extended periods of time members of the Class who are arrested on payment bench warrants when they cannot pay all fines and fees identified on the faces of those warrants;

   c.   Whether Defendant Koon and his deputies routinely fail to bring members of the Class before Lexington County magistrate court judges after executing payment bench warrants, even when members are jailed for extended periods of time;

   d.   Whether members of the Class are routinely denied the assistance of counsel before being incarcerated in the Detention Center on payment bench warrants;

e.  Whether Defendant Adams is a state actor in her capacity as Chief Judge for Administrative Purposes of the Summary Courts in Lexington County;

f.  Whether Defendant Adams is sufficiently connected to and responsible for ongoing violations of the constitutional rights of Class members to due process and equal protection of the law;

g.  Whether Defendant Adams is sufficiently connected to and responsible for ongoing violations of the constitutional right of Class members to assistance of counsel;

h.  Whether Defendant Adams is sufficiently connected to and responsible for ongoing violations of the constitutional right of Class members to be free from unreasonable seizures;

i.  Whether Defendant Dooley is a state actor in his capacity as Associate Chief Judge for Administrative Purposes of the Summary Courts in Lexington County;

j.  Whether Defendant Dooley is sufficiently connected to and responsible for ongoing violations of the constitutional rights of Class members to due process and equal protection of the law;

k.  Whether Defendant Dooley is sufficiently connected to and responsible for ongoing violations of the constitutional right of Class members to assistance of counsel;

l.  Whether Defendant Dooley is sufficiently connected to and responsible for ongoing violations of the constitutional right of Class members to be free from unreasonable seizures;

m.  Whether Defendant Koon is a state actor in his capacity as Lexington County Sheriff;

n.  Whether Defendant Koon is sufficiently connected to and responsible for ongoing violations of the constitutional rights of Class members to due process and equal protection of the law;

o.  Whether Defendant Koon is sufficiently connected to and responsible for ongoing violations of the constitutional right of Class members to assistance of counsel;

p.  Whether Defendant Koon is sufficiently connected to and responsible for ongoing violations of the constitutional right of Class members to be free from unreasonable seizures;

q.  Whether Defendant Koon sanctions the misuse of payment bench warrants against members of the Class;

r.  Whether Defendant Lexington County has a practice of inadequately funding public defense for people charged with traffic and other misdemeanor offenses handled in the County's magistrate courts;

s.  Whether Defendant Lexington County's practice of inadequately funding public defense for indigent people facing incarceration for nonpayment of magistrate court fines and fees is the result of a deliberate decision by the Lexington County Council as the County's final policymaker for budgetary appropriations for public defense in the County's magistrate courts;

t.  Whether Defendant Lexington County's practice of inadequately funding public defense for indigent people facing incarceration for nonpayment of magistrate court fines and fees is so pervasive and well-settled as to constitute Lexington County custom with the force of law;

u.  Whether Defendant Lexington County's policymakers have actual or constructive knowledge of the County's custom of failing to adequately fund public defense and acquiesce in that custom;

v.  Whether Defendant Madsen is a state actor in his capacity as Circuit Public Defender;

w.  Whether Defendant Madsen is sufficiently connected to and responsible for ongoing violations of the constitutional right of Class members to assistance of counsel;

x.  Whether Defendant Madsen is a final policymaker concerning Lexington County's provision of indigent defense in magistrate courts;

y.  Whether Defendant Madsen fails to adequately fund public defense for indigent people who face the threat of incarceration in the County's magistrate courts;

z.  Whether Defendant Madsen fails to adequately allocate resources for the public defense of Class members being incarcerated in the Detention Center for failure to pay court fines and fees;

aa. Whether the right to be free from unreasonable seizures is routinely violated in relation to the arrest and jailing of Class members on payment bench warrants;

3:17-cv-01426-MBS     Date Filed 10/19/17     Entry Number 48     Page 92 of 122

bb. Whether members of the Class are routinely deprived of their right to an ability-to-pay hearing before or after being arrested on payment bench warrants;

cc. Whether the right to assistance of counsel is routinely violated in relation to the arrest and jailing of Class members on payment bench warrants;

dd. Whether the right to due process is routinely violated in relation to the arrest and jailing of Class members on payment bench warrants; and

ee. Whether the right to equal protection of the law is routinely violated in relation to the arrest and jailing of Class members on payment bench warrants.

440.    Plaintiffs Goodwin and Wright's claims are typical of the claims of the Class because all claims arise from the same common courses of conduct by Defendants.  Like the other Class members, at the time their filed their respective claims in this action, Mr. Goodwin and Mr. owed fines and fees to at least one Lexington County magistrate court, could not afford to pay according to the terms of their Scheduled Time Payment Agreements, and faced a substantial and imminent risk of being arrested and incarcerated for nonpayment.  Mr. Wright was subsequently arrested and incarcerated for nonpayment of fines and fees owed to the Central Traffic Court.  Additionally, Mr. Goodwin continues to owe money to the Irmo Magistrate Court, cannot afford to pay, and faces a substantial and imminent risk of being arrested and incarcerated for nonpayment.  Indeed, Mr. Goodwin has been previously arrested and incarcerated for nonpayment of fines and fees owed to the Central Traffic Court.

441.    Plaintiffs Goodwin and Wright seek declaratory and injunctive relief under legal theories that are the same as those on which all members of the Class will rely.

442.    At the time they filed their respective claims in this action, Plaintiffs Goodwin and Wright suffered and faced a substantial and imminent risk of continuing to suffer harms that are typical of the harms Class members have suffered and are continuing to suffer.  Moreover,

Plaintiff Goodwin continues to face a substantial and imminent risk of continuing to suffer harms that are typical of the harms experienced by Class members.

443.    Plaintiffs Goodwin and Wright have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Class, and will fairly and adequately protect the interests of the Class.

444.    By developing and maintaining policies, practices, standard operating procedures, acts, and omissions that result in the routine and widespread arrest and incarceration of people for nonpayment of fines and fees owed in Lexington County magistrate court cases, Defendants have acted or refused to act on grounds that apply generally to the Class, and final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

445.     The named Plaintiffs are represented by the American Civil Liberties Union Foundation, the American Civil Liberties Union Foundation of South Carolina, and Terrell Marshall Law Group PLLC ("Terrell Marshall").  All counsel are experienced civil rights attorneys who have litigated a range of complex class action lawsuits and have knowledge of the relevant constitutional and statutory law.

446.    Plaintiffs' counsel also have extensive knowledge of the widespread constitutional violations occurring in Lexington County and outlined in this Complaint based on a months-long investigation involving court observation, review of public records, and numerous interviews with witnesses, inmates, and families.  Plaintiffs' counsel have studied Lexington County budget documents, court records from numerous Lexington County magistrate courts, and Detention Center online records in order to understand Defendants' policies, practices, standard operating procedures, and customs as they relate to federal constitutional requirements.

447.    Plaintiffs' counsel at the ACLU have served as lead counsel in similar federal lawsuits bringing constitutional challenges to revenue generation and debt-collection systems in violation of the rights of indigent people to notice, process, and counsel.  *See Kennedy v. Biloxi*, 1:15-cv-348-HSO-JCG (S.D. Miss. Oct. 21, 2015); and *Thompson v. DeKalb County*, No. 1:15-cv-280 (N.D. Ga. Jan. 29, 2015).  Plaintiffs' counsel at Terrell Marshall served as lead counsel, with the ACLU Foundation as co-counsel, in a state lawsuit bringing similar constitutional claims.  *See Fuentes v. Benton County*, No. 15-2-02976-1 (Wash. Superior Court, Yakima Cty. Oct. 7, 2015).  Plaintiffs' counsel at Terrell Marshall have also served as lead counsel in a federal lawsuit bringing constitutional challenges to inadequate public defense.  *Wilbur v. Mount Vernon*, No. C11-1100RSL (W.D. Wash. April 15, 2014).

448.    Plaintiffs' counsel have the resources, expertise, and experience to prosecute this action.  Plaintiffs' counsel know of no conflicts among members of the Class or between the attorneys and members of the Class.

449.    Defendants have acted or refused to act on grounds generally applicable to the Class such that final injunctive relief and corresponding declaratory relief are appropriate to the Class as a whole.

**DEMAND FOR JURY TRIAL**

450.    Plaintiffs request a trial by jury.

**CLAIM ONE**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**
Incarceration Without Pre-deprivation Ability-to-Pay Hearing
(in violation of the Due Process and Equal Protection Clauses of the
Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983,
by Plaintiffs Goodwin and Wright against Defendants Adams, Dooley,
and Koon, in their official capacities)

451.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

452.    This claim is brought by Mr. Goodwin and Mr. Wright on behalf of themselves and the members of the Class.

453.    The Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution have long prohibited the imprisonment of people for nonpayment of court-imposed fines or restitution without a pre-deprivation inquiry by a judge into the person's ability to pay, efforts to secure resources to pay and, if the person lacks the ability to pay despite having made reasonable efforts to acquire resources, the adequacy of any alternatives to incarceration. Courts are prohibited from jailing people for nonpayment without conducting such an inquiry and making at least one of the following findings: (1) the individual's nonpayment was willful; (2) the individual failed to make sufficient efforts to acquire the resources to pay; or (3) the individual was unable to pay, despite having made sufficient efforts to acquire resources, but alternative methods of achieving punishment or deterrence are inadequate.

454.    Plaintiff Goodwin suffered a violation of his clearly established right to a pre-deprivation ability-to-pay hearing when he was arrested and incarcerated in the Detention Center for 63 days because he could not afford to pay fines and fees owed to the Central Traffic Court. Before his lengthy incarceration, Mr. Goodwin was not afforded a pre-deprivation judicial inquiry into, or findings of fact on, his ability to pay, his efforts to secure resources, or the adequacy of readily available alternatives to incarceration.

455.    Plaintiff Goodwin is indigent and owes $2,063 in fines and fees to the Irmo Magistrate Court, a Lexington County magistrate court under the administrative supervision of Defendants Adams and Dooley.  Mr. Goodwin is unable to pay the $100 payment due on July 5, 2017 as required by the Scheduled Time Payment Agreement imposed on him.  Mr. Goodwin faces a substantial and imminent risk that, without being afforded a pre-deprivation ability-to-

pay hearing, a bench warrant for nonpayment will be issued and Defendant Koon will arrest and incarcerate him in the Detention Center on that warrant.

456.     At the time he filed his claims in this action, Plaintiff Wright was indigent and owed $416.93 in fines and fees to the Central Traffic Court, a Lexington County magistrate court under the administrative supervision of Defendants Adams and Dooley.  A Lexington County magistrate judge ordered Mr. Wright to pay in full by April 29, 2017, and threatened Mr. Wright with incarceration if he did not do so.  But that judge did not first consider or make factual findings concerning Mr. Wright's ability to pay, his efforts to secure resources, and the adequacy of alternatives to incarceration in achieving punishment and deterrence.  Mr. Wright was unable to pay $416.93 by the date imposed by the judge and remains unable to pay.  A bench warrant was issued to order his incarceration unless he could pay the full amount due.  At the time he filed his claims in this action, Mr. Wright faced a substantial and imminent risk that, without being afforded a pre-deprivation ability-to-pay hearing, Defendant Koon would arrest and incarcerate him in the Detention Center. Indeed, just days after filing his claims, Mr. Wright was arrested and incarcerated in the Detention Center for nonpayment of money owed to the Central Traffic Court.

457.     For all relevant purposes, all individuals processed for commitment to the Detention Center for unpaid fines, fees, costs, assessments or restitution imposed by Lexington County magistrate courts are similarly situated with respect to their right to due process of law. There exists no legitimate governmental reason to jail individuals who are unable to pay the full amount of outstanding monetary penalties for traffic or misdemeanor criminal offenses, while permitting individuals who have the financial means to pay fines, fees, costs, assessments, and restitution to avoid being jailed for the same offenses.

458.    In their official, administrative capacities, Defendants Adams and Dooley are sufficiently connected to, and responsible for, ongoing violations of the rights of Plaintiffs Goodwin and Wright, and members of the Class, to due process and equal protection of the law. In their exercise of administrative responsibility for the establishment of uniform policies and procedures for the timely and appropriate collection of court fines and fees in Lexington County, Defendants Adams and Dooley oversee, enforce, and sanction the Default Payment and Trial in Absentia Policies.  The Default Payment and Trial in Absentia Policies have become unwritten standard operating procedures in Lexington County magistrate courts, and directly and proximately lead to the routine and widespread use of bench warrants to arrest and incarcerate indigent people for nonpayment of court fines and fees without any pre-deprivation ability-to-pay hearing.  Moreover, Defendants Adams and Dooley have failed, and continue to fail, to exercise their administrative authority to correct the Default Payment and Trial in Absentia Policies.

459.    In his official capacity as Lexington County Sheriff and chief administrator of the Detention Center, Defendant Koon is also sufficiently connected to, and responsible for, ongoing violations of the constitutional rights of Plaintiffs Goodwin and Wright, and members of the Class.  By supervising, controlling, and directing LCSD officers and Detention Center staff who execute bench warrants issued under the Default Payment and Trial in Absentia Policies, Defendant Koon effects the arrest and incarceration of people for nonpayment of fines, fees, costs, assessments, or restitution without necessary pre-deprivation ability-to-pay hearings and judicial findings concerning the reasons for nonpayment.  Mr. Goodwin, Mr. Wright, and members of the Class face a substantial and imminent risk of being arrested and incarcerated

under bench warrants for nonpayment of fines and fees.  Defendant Koon is responsible for executing and enforcing any such bench warrants.

460.    The ongoing conduct of Defendants Adams, Dooley and Koon places Plaintiffs Goodwin and Wright at continuing and foreseeable risk of being arrested and incarcerated for nonpayment of fines and fees without any pre-deprivation court hearing on their ability to pay despite prima facie evidence of their indigence.  Mr. Goodwin and Mr. Wright seek prospective declaratory and injunctive relief on behalf of themselves and members of the Class because they and the members have no plain, adequate, or complete remedy at law to prevent future injury caused by confinement in jail in violation of their constitutional rights.

461.    The ongoing conduct of Defendants Adams, Dooley and Koon violates 42 U.S.C. § 1983.  Defendants Adams, Dooley and Koon act under color of state law and their conduct creates a real, imminent, and substantial threat that Plaintiffs Goodwin and Wright, and members of the Class will be arrested and jailed in violation of their due process and equal protection rights.

**CLAIM TWO**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**
<u>Failure to Afford Assistance of Counsel</u>
(in violation of the Sixth Amendment to the U.S. Constitution and
42 U.S.C. § 1983, by Plaintiffs Goodwin and Wright against Defendant
Lexington County and Defendants Madsen, Adams,
Dooley, and Koon, in their official capacities)

462.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

463.    This claim is brought by Plaintiffs Goodwin and Wright on behalf of themselves and the members of the Class.

464.    The Sixth Amendment to the U.S. Constitution affords all indigent people a right to the assistance of court-appointed counsel at no cost when they face actual incarceration for nonpayment of fines, fees, court costs, assessments, or restitution, regardless of whether incarceration is imposed through criminal contempt procedures or the implementation of a sentence of incarceration previously suspended upon the condition of payment of monetary penalties.

465.    Plaintiff Goodwin suffered a violation of his clearly established right to counsel when he was arrested and incarcerated in the Detention Center for nonpayment of fines and fees owed to the Central Traffic Court without being informed of his right to request counsel, informed of his right to request waiver of the $40 public defender application fee, and appointed counsel as an indigent person facing incarceration for nonpayment, despite prima facie evidence of his indigence.

466.    Plaintiff Goodwin is indigent and owes $2,063 in fines and fees to the Irmo Magistrate Court, a Lexington County magistrate court under the administrative supervision of Defendants Adams and Dooley.  Mr. Goodwin is unable to pay the $100 payment which was due on July 5, 2017 as required by the Scheduled Time Payment Agreement imposed by Defendant Adams.  Mr. Goodwin faces a substantial and imminent risk that without being afforded the assistance of counsel, Defendant Adams will issue a bench warrant ordering his arrest and incarceration for nonpayment and Defendant Koon will arrest and incarcerate him in the Detention Center on that warrant.

467.    At the time he filed his claims in this action, Plaintiff Wright was indigent and owed $416.93 in fines and fees to the Central Traffic Court, a Lexington County magistrate court under the administrative supervision of Defendants Adams and Dooley.  The Central Traffic

Court issued a bench warrant ordering the immediate arrest and incarceration of Mr. Wright, and did not afford him counsel prior to issuing the warrant. At the time he filed his claims Mr. Wright faced a substantial and imminent risk that without being afforded the assistance of counsel, the Central Traffic Court would enforce the warrant and Defendant Koon would arrest and incarcerate him in the Detention Center on that warrant. Indeed, just days after filing his claims, Mr. Wright was arrested and incarcerated in the Detention Center for nonpayment of money owed to the Central Traffic Court.

468.    The policies, practices, customs, standard operating procedures, acts and omissions of Defendants Lexington County and Madsen directly and proximately cause ongoing violations of the right to counsel, and Plaintiffs Goodwin and Wright, and members of the Class face an imminent and substantial threat of having that right violated.

469.    As the County's final policymakers for the provision of public defense in Lexington County magistrate courts, the Lexington County Council and Defendant Madsen routinely and systematically deprive indigent people of the right to court-appointed counsel at no cost when facing incarceration for nonpayment of court fines and fees by providing grossly inadequate funding for indigent defense in Lexington County magistrate courts. The Lexington County Council and Defendant Madsen either know, or should know, when making final decisions to inadequately fund public defense in these courts that public defenders are routinely not assigned to provide any representation to indigent people facing suspended or actual incarceration for nonpayment of magistrate court fines and fees. Defendant Lexington County and Defendant Madsen's policy of grossly underfunding public defense in Lexington County magistrate courts therefore reflects deliberate indifference to the Sixth Amendment rights of Plaintiffs Goodwin and Wright, and members of the Class.

470.    Defendant Madsen also makes deliberate decisions when requiring the payment of an up-front $40 fee with each application for a public defender; when failing to assign public defenders to represent indigent people facing incarceration for nonpayment; when failing to assign public defenders to represent indigent people sentenced by magistrate courts to incarceration suspended on payment of fines and fees; when failing to assign public defenders to staff the Bond Court to represent indigent people arrested on bench warrants for nonpayment; and when failing to assign public defenders to meet with indigent people incarcerated in the Detention Center under bench warrants.  As the County's final policymaker for the provision of indigent defense, Defendant Madsen is aware, or should be aware, that such decisions result in the longstanding, persistent, and widespread failure to provide public defense to indigent people facing incarceration for nonpayment of fines and fees in traffic and criminal cases in Lexington County magistrate courts.  Defendant Madsen causes, authorizes, condones, ratifies, approves, participates in, or knowingly acquiesces in these illegal policies, practices, and customs. Defendant Madsen's actions and inactions are deliberately indifferent to the clearly established Sixth Amendment rights of Plaintiffs Goodwin and Wright, and members of the Class.

471.    The failure to provide public defense to indigent people facing actual or suspended incarceration sentences in traffic and misdemeanor criminal cases in Lexington County magistrate courts is so longstanding, persistent, widespread, common, and well-settled as to constitute a custom with the force of law.  Lexington County has acquiesced to this custom, and it fairly represents municipal policy.

472.    In their official, administrative capacities, Defendants Adams and Dooley are sufficiently connected to, and responsible for, ongoing violations of the right to counsel of Plaintiffs Goodwin and Wright, and members of the Class.

473.    In their exercise of administrative responsibility for the establishment of uniform policies and procedures for the timely and appropriate collection of magistrate court fines and fees in Lexington County, Defendants Adams and Dooley oversee and enforce the Default Payment and Trial in Absentia Policies as standard operating procedures in Lexington County magistrate courts.  These policies routinely lead to the arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees without notice of the right to request counsel, without notice of the risk of proceeding without counsel, without notice of the right to request waiver of the $40 public defender application fee, and without affording court-appointed counsel to defend indigent people from incarceration for nonpayment of fines and fees.  The enforcement of the Default Payment and Trial in Absentia Policies by Defendants Adams and Dooley places Plaintiffs Goodwin and Wright, and members of the Class, at substantial and imminent risk of arrest and incarceration for nonpayment of magistrate court fines and fees without the assistance of counsel in violation of the Sixth Amendment.

474.    Moreover, Defendants Adams and Dooley make deliberate decisions to exercise their administrative authority to enforce, oversee, and sustain a standard operating procedure by which judges accept so-called written "waivers" of the right to counsel through the use of Trial Information and Plea Sheets without engaging in the colloquy necessary to ensure that any waiver of the right to counsel is knowing, intelligent, and voluntary.  These deliberate decisions place Plaintiffs Goodwin and Wright, and members of the Class, at substantial and imminent risk of violation of the Sixth Amendment right to counsel.

475.    In his official capacity, Defendant Koon is sufficiently connected to, and responsible for, ongoing violations of the right to counsel of Plaintiffs Goodwin and Wright, and members of the Class.  By supervising, controlling, and directing LCSD officers and Detention

Center staff who execute bench warrants issued under the Default Payment and Trial in Absentia Policies, Defendant Koon effects the arrest and incarceration of indigent people for nonpayment of fines, fees, costs, assessments or restitution without the assistance of counsel. Mr. Goodwin, Mr. Wright, and members of the Class face a substantial and imminent threat of being subjected to bench warrants for nonpayment of fines and fees, and Defendant Koon is responsible for executing and enforcing any such bench warrants.

476. The ongoing policies, practices, customs, standard operating procedures, acts, and omissions of Defendants Lexington County, Madsen, Adams, Dooley and Koon place Plaintiffs Goodwin and Wright, and members of the Class, at a continuing and foreseeable risk of being arrested and incarcerated in the Detention Center for nonpayment of fines and fees without the benefit of representation by court-appointed counsel. Mr. Goodwin and Mr. Wright seek prospective declaratory and injunctive relief on behalf of themselves and members of the Class because they and the members have no plain, adequate, or complete remedy at law to prevent future injury caused by confinement in jail in violation of their Sixth Amendment rights.

477. The conduct of Defendants Lexington County, Madsen, Adams, Dooley, and Koon violates 42 U.S.C. § 1983. Defendants act under color of state law and their conduct creates a real, imminent, and substantial threat that Plaintiffs Goodwin and Wright, and members of the Class will be arrested and jailed in violation of their Sixth Amendment right to counsel.

### CLAIM THREE
### FOR DECLARATORY AND INJUNCTIVE RELIEF
<u>Unconstitutional Seizure</u>
(in violation of the Fourth Amendment to the U.S. Constitution and
42 U.S.C. § 1983 by Plaintiffs Goodwin and Wright against
Defendants Adams, Dooley, and Koon, in their official capacities)

478. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

479.     This claim is brought by Mr. Goodwin and Mr. Wright, on behalf of themselves and members of the Class.

480.     The Fourth Amendment prohibits unreasonable seizures, including arrest and incarceration without probable cause or legal authority.

481.     In their official, administrative capacities, Defendants Adams and Dooley are sufficiently connected to, and responsible for, ongoing violations of the rights of Plaintiffs Goodwin, Wright, and members of the Class to freedom from unreasonable seizures.

482.     Defendants Adams and Dooley are sufficiently connected to, and responsible for, ongoing violations of the constitutional right of Class members, including Mr. Goodwin and Mr. Wright, to be free from unreasonable seizures.  In their exercise of administrative authority, Defendants Adams and Dooley place Plaintiffs Goodwin and Wright, and members of the Class at substantial and imminent risk of violation of their right to be free from unreasonable seizures. Defendants Adams and Dooley oversee, enforce, and sanction the Default Payment Policy, which directly and proximately causes the issuance of bench warrants against people solely because they failed to make payments toward magistrate court fines and fees according to the terms of a Scheduled Time Payment Agreement.  Those bench warrants are routinely used to arrest and incarcerate people even though they are unsupported by probable cause that the subject of the warrant has committed a crime.  This was the case, for example, with Plaintiffs Brown and Darby, both of whom were arrested and incarcerated solely for nonpayment of magistrate court fines and fees.

483.     In his official capacity, Defendant Koon is sufficiently connected to, and responsible for, ongoing violations of the constitutional right of Class members, including Plaintiffs Goodwin and Wright, to be free from unreasonable seizures.  Defendant Koon places

Plaintiffs Goodwin and Wright, and members of the Class at substantial and imminent risk of violation of their right to be free from unreasonable seizures because he directs and oversees LCSD officers who execute bench warrants issued against people under the Default Payment Policy solely because they have failed to pay according to the terms of a payment plan.

484.    The ongoing conduct of Defendants Adams, Dooley, and Koon places Plaintiffs Goodwin and Wright, and members of the Class at a substantial and imminent risk of being arrested and incarcerated under a bench warrant lacking legal authority or probable cause.  Mr. Goodwin and Mr. Wright seek prospective declaratory and injunctive relief on behalf of themselves and members of the Class because they and the members have no plain, adequate, or complete remedy at law to prevent future injury caused by confinement in jail in violation of their Fourth Amendment rights.

485.    The ongoing conduct of Defendants Adams, Dooley, and Koon violates 42 U.S.C. § 1983.  Defendants Adams, Dooley and Koon act under color of state law and their conduct creates a real, imminent, and substantial threat that Plaintiffs Goodwin and Wright, and members of the Class will be arrested in violation of their Fourth Amendment right to be free from unreasonable seizures.

**CLAIM FOUR**
**FOR DAMAGES**
<u>Incarceration Without Pre-deprivation Ability-to-Pay Hearing</u>
(in violation of the Due Process and Equal Protection Clauses of the
Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983by
Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright
against Defendants Reinhart, Adams, and Koon,
in their individual capacities)

486.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

487.    This claim is brought by Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright.

488.    The Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution have long prohibited the imprisonment of people for nonpayment of court-imposed fines or restitution without a pre-deprivation inquiry by a judge into the person's ability to pay, efforts to secure resources to pay and, if the person lacks the ability to pay despite having made reasonable efforts to acquire resources, the adequacy of any alternatives to incarceration. Courts are prohibited from jailing people for failure to pay without conducting such an inquiry and making at least one of the following findings: (1) the individual's nonpayment was willful; (2) the individual failed to make sufficient efforts to acquire the resources to pay; or (3) the individual was unable to pay, despite having made sufficient efforts to acquire resources, but alternative methods of achieving punishment or deterrence are inadequate.

489.    Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright suffered a violation of the clearly established right to a pre-deprivation ability-to-pay hearing when they were arrested and incarcerated in the Detention Center for periods of time ranging from seven to 63 days, or suffered the imminent threat of incarceration, because they could not afford to pay fines and fees owed to Lexington County magistrate courts.  Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright were not afforded any pre-deprivation judicial inquiry into or findings of fact on, their ability to pay, their efforts to secure resources, or the adequacy of readily available alternatives to incarceration.

490.    For all relevant purposes, all individuals processed for commitment to the Detention Center for unpaid fines, fees, costs, assessments, or restitution imposed by Lexington County magistrate courts are similarly situated with respect to their right to due process of law.

There exists no legitimate governmental reason to jail individuals who are unable to pay the full amount of outstanding monetary penalties for traffic or misdemeanor offenses, while permitting individuals who have the financial means to pay fines, fees, costs, assessments and restitution to avoid being jailed for the same offenses.

491.    In their individual capacities and as an exercise of their administrative responsibility for the establishment of uniform policies and procedures for the timely and appropriate collection of magistrate court fines and fees in Lexington County, Defendants Reinhart and Adams directly and proximately caused violations of the named Plaintiffs' right to a pre-deprivation ability-to-pay hearing.  Defendants Reinhart and Adams oversaw, enforced, and sanctioned the Default Payment and Trial in Absentia Policies.  Both policies directly and proximately led to the routine and widespread issuance of bench warrants that were used to arrest and incarcerate the named Plaintiffs without any pre-deprivation judicial inquiry into or findings of fact on ability to pay, efforts to secure resources, or the adequacy of readily available alternatives to incarceration.

492.    In his individual capacity as the chief law enforcement officer of the LCSD and the chief administrator of the Detention Center, Defendant Koon directly and proximately caused violations of the named Plaintiffs' right to a pre-deprivation ability-to-pay hearing.  Defendant Koon oversees and directs LCSD officers and Detention Center staff who arrest and incarcerate people subjected to bench warrants issued under the Default Payment and Trial in Absentia Policies.  Defendant Koon enforces a standard operating procedure by which people arrested on bench warrants, including indigent people, are transported to the Detention Center and incarcerated unless they can pay the full amount of fines and fees owed before booking.  This standard operating procedure established, enforced and sanctioned by Defendant Koon directly

and proximately led to the arrests and incarceration, or the imminent threat of arrest and incarceration, of the named Plaintiffs without any pre-deprivation judicial inquiry into, or findings of fact on, their ability to pay, efforts to secure resources, or the adequacy of readily available alternatives to incarceration.

493.    The actions and conduct of Defendants Reinhart, Adams, and Koon in violating the rights of Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright to a pre-deprivation ability-to-pay hearing also constitute violations of 42 U.S.C. § 1983. Defendants Reinhart, Adams, and Koon were acting under color of state law when they violated these Plaintiffs' rights to due process and equal protection of the law.

494.    Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright seek damages from Defendants Koon, Reinhart, and Adams, in their individual capacities for the humiliation, anxiety, stress, emotional distress, hunger, sleeplessness, disturbed sleep, physical pain, serious illness, hospitalization, and other irreparable injury they suffered for being jailed, forcibly separated from their family and loved ones, and detained in unsanitary jail conditions without enough food to eat for periods ranging from seven to 63 days, or from the imminent threat of being jailed under such conditions.

**CLAIM FIVE**
**FOR DAMAGES**
<u>Failure to Afford Counsel</u>
(in violation of the Sixth Amendment to the U.S. Constitution and
42 U.S.C. § 1983, by Plaintiffs Brown, Darby, Johnson, Palacios, Corder,
Goodwin, and Wright against Defendants Lexington County;
Defendant Madsen, in his official capacity as a County official;
and Defendants Reinhart and Adams, in their individual capacities)

495.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

496.     This claim is brought by Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright.

497.     The Sixth Amendment to the U.S. Constitution affords all indigent people a right to the assistance of court-appointed counsel at no cost when they face actual incarceration for nonpayment of fines, fees, court costs, assessments, or restitution, regardless of whether incarceration is imposed through criminal contempt procedures or the implementation of a sentence of incarceration previously suspended upon the condition of payment of monetary penalties.

498.     Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright suffered a violation of the Sixth Amendment right to counsel when they were arrested and incarcerated in the Detention Center for nonpayment of magistrate court fines and fees without being informed of the right to request counsel, informed of the right to request waiver of the $40 public defender application fee, and appointed counsel as an indigent person facing incarceration for nonpayment, despite prima facie evidence of indigence.

499.     Defendant Lexington County directly and proximately caused the violation of the right of Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright to counsel by developing and maintaining a policy, practice, and custom of grossly underfunding public defense that demonstrated deliberate indifference to the right to counsel of indigent people facing incarceration for nonpayment of magistrate court fines and fees.  As the County's final policymakers for the provision of public defense in Lexington County magistrate courts, the Lexington County Council and Defendant Madsen made the deliberate decision to provide grossly inadequate funding for indigent defense in Lexington County magistrate courts during the time period relevant to the incarceration of Plaintiffs without counsel.  The Lexington County

Council and Defendant Madsen already knew, or should have known, when they made final decisions to inadequately fund public defense in these courts that public defenders would not be assigned to represent indigent people facing suspended or actual incarceration sentences for nonpayment of magistrate court fines and fees.  Defendants Lexington County and Madsen's policy of grossly underfunding public defense in Lexington County magistrate courts therefore reflects deliberate indifference to Plaintiffs' right to counsel under the Sixth Amendment.

500.    Through policy, practice, and custom, Defendant Lexington County also directly and proximately caused the violation of the right of Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright to counsel by adopting, and acquiescing to, the following policies, practices, and customs that demonstrate deliberate indifference to the right to counsel of indigent people facing incarceration for nonpayment of magistrate court fines and fees: (1) requiring an up-front $40 application fee from indigent people seeking public defenders; (2) making a deliberate decision not to assign public defenders to represent indigent people facing incarceration for nonpayment in magistrate court cases; (3) making a deliberate decision not to assign public defenders to represent indigent people sentenced by magistrate courts to incarceration suspended on payment of fines and fees; (4) making a deliberate decision not to assign public defenders to represent indigent people when the incarceration portion of a suspended sentence is implemented in a magistrate court case; (5) making a deliberate decision not to assign public defenders to staff the Bond Court to represent indigent people arrested on bench warrants for nonpayment; and (6) making a deliberate decision not to assign public defenders to meet with indigent people incarcerated in the Detention Center under bench warrants.  As the County's final policymaker for the provision of indigent defense, Defendant Madsen was aware, or should have been aware, that such decisions have led to the longstanding,

persistent, and widespread failure to provide public defense to indigent people facing incarceration for nonpayment of fines and fees in traffic and misdemeanor criminal cases in Lexington County magistrate courts.  On behalf of Lexington County, Defendant Madsen caused, authorized, condoned, ratified, approved, participated in, or knowingly acquiesced in these illegal policies, practices, and customs.  Defendant Madsen's actions and inactions were deliberately indifferent to the clearly established Sixth Amendment rights of indigent people.

501.    In their individual capacities and as an exercise of their administrative responsibility for the establishment of uniform policies and procedures for the timely and appropriate collection of magistrate court fines and fees in Lexington County, Defendants Reinhart and Adams directly and proximately caused the violation of the right of Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright to counsel under the Sixth Amendment.  Defendants Reinhart and Adams oversaw and enforced the Default Payment and Trial in Absentia Policies.  Both policies directly and proximately led to the routine and widespread issuance of bench warrants that were used to incarcerate the named Plaintiffs for nonpayment of fines and fees to Lexington County magistrate courts without notice of the right to request counsel, without notice of the right to request waiver of the $40 public defender application fee, and without being afforded court-appointed counsel as people who faced incarceration, despite prima facie evidence of indigence.  Additionally, in their administrative capacities, Defendants Reinhart and Adams endorse the use of Trial Information and Plea Sheets that encourage, sanction, and ratify a standard operating procedure by which magistrate court judges accept so-called written "waivers" of the right to counsel without engaging in a colloquy to ensure that any waiver of the right to counsel is knowing, intelligent, and voluntary.

502.    The actions and conduct of Defendants Lexington County, Madsen, Reinhart and Adams in violating Plaintiffs' right to counsel under the Sixth Amendment also constitute a violation of 42 U.S.C. § 1983.  Each of these Defendants was acting under color of state law when their policies, practices, customs, standard operating procedures, and omissions violated Plaintiffs' right to counsel.

503.    Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright seek damages from Defendants Lexington County, Madsen (in his official capacity as a County official), Reinhart (in his individual capacity for his administrative conduct), and Adams (in her individual capacity for her administrative conduct) for the humiliation, anxiety, stress, emotional distress, hunger, sleeplessness, disturbed sleep, physical pain, serious illness, hospitalization and other irreparable injury they suffered for being jailed, forcibly separated from their family and loved ones, and detained in unsanitary jail conditions without enough food to eat for periods ranging from seven to 63 days.

**CLAIM SIX**
**FOR DAMAGES**
<u>Unreasonable Seizure</u>
(in violation of the Fourth Amendment to the U.S. Constitution and
42 U.S.C. § 1983, by Plaintiffs Brown, Darby, and Wright against
Defendants Reinhart, Adams,
and Koon, in their individual capacities)

504.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

505.    This claim is brought by Plaintiffs Brown, Darby and Wright.

506.    The Fourth Amendment prohibits unreasonable seizures, including arrest and incarceration without probable cause or legal authority.

507.    The arrests and incarceration of Plaintiffs Brown, Darby, and Wright violated their Fourth Amendment right to freedom from unreasonable seizures because the arrests and incarceration were carried out under bench warrants based solely on nonpayment of fines and fees, which were unsupported by probable cause that Ms. Brown, Ms. Darby, or Mr. Wright had committed a crime.

508.    Neither Ms. Brown nor Ms. Darby were arrested and jailed following a show cause hearing or contempt proceeding at which a court considered information other than the fact that Ms. Brown and Ms. Darby missed payments required by the Scheduled Time Payment Agreements in their cases.

509.    Despite the fact that Mr. Wright appeared at a show cause hearing in the Central Traffic Court concerning his nonpayment of court fines and fees, the court failed to inquire into, or make findings of fact on, his ability to pay, efforts to secure resources, or the adequacy of readily available alternatives to incarceration.  Mr. Wright was ultimately arrested and incarcerated pursuant to the court's directive that he be jailed for ten days unless he paid the full amount of money owed to the Central Traffic Court.

510.    As a result, the LCSD officers who arrested and transported Ms. Brown, Ms. Darby, and Mr. Wright to the Detention Center had no particularized and objective basis to believe that Ms. Brown, Ms. Darby, or Mr. Wright had committed any criminal offense.

511.    The arrests that led to the incarceration of Plaintiffs Brown, Darby, and Wright were arrests for which probable cause was required.

512.    The detentions of Plaintiffs Brown, Darby, and Wright following their arrest for nonpayment of magistrate court fines and fees were unreasonable seizures under the Fourth Amendment.

513.    The seizures of Plaintiffs Brown, Darby, and Mr. Wright were excessive and unreasonable in their duration and scope.

514.    It was clearly established before the arrest and incarceration of Plaintiffs Brown, Darby, and Darby that seizing and detaining Ms. Brown, Ms. Darby, and Mr. Wright simply because they did not have money to pay fines and fees would violate their clearly established rights.  Defendants Reinhart and Adams had fair warning that their conduct would violate the Fourth Amendment and no reasonable officer could have believed that the seizures or incarceration of Ms. Brown, Ms. Darby, and Mr. Wright were reasonable.

515.    In their individual capacities and in an exercise of their administrative authority, Defendants Reinhart and Adams directly and proximately caused violations of Plaintiffs Brown Darby, and Wright's right to freedom from unreasonable seizures.  Defendants Reinhart and Adams oversaw, enforced, and sanctioned the Default Payment Policy, and that conduct directly and proximately caused the issuance of bench warrants against Ms. Brown, Ms. Darby, and Mr. Wright for nonpayment of magistrate court fines and fees when they did not pay according to the terms of their Scheduled Time Payment Agreements.  Those bench warrants were used to arrest and incarcerate Ms. Brown, Ms. Darby, and Mr. Wright, but were unsupported by probable cause that Ms. Brown, Ms. Darby, or Mr. Wright had committed a crime.

516.    Moreover, Defendants Reinhart and Adams have failed to exercise their administrative authority to correct the longstanding and pervasive Default Payment Policy through any written policy and to train Lexington County magistrate judges on how to ensure respect for the Fourth Amendment right when issuing bench warrants for the collection of magistrate court fines and fees.

517.     In his individual capacity as the chief law enforcement officer of the LCSD and the chief administrator of the Detention Center, Defendant Koon directly and proximately caused violations of the rights of Plaintiffs Brown, Darby, and Wright to freedom from unreasonable seizures.  Defendant Koon oversaw and directed LCSD officers who arrested Plaintiffs Brown, Darby, and Wright on payment bench warrants issued under the Default Payment Policy, which were not supported by probable cause of criminal activity.  This standard operating procedure established, enforced, and sanctioned by Defendant Koon directly and proximately led to the arrests and incarceration of Plaintiffs Brown, Darby, and Wright without probable cause of criminal activity.

518.     The actions and conduct of Defendants Reinhart, Adams, and Koon in violating the rights of Plaintiffs Brown, Darby, and Wright to be free from unreasonable seizures under the Fourth Amendment also constitute a violation of 42 U.S.C. § 1983.  Defendants Reinhart, Adams and Koon were acting under color of state law when they violated Plaintiffs' Fourth Amendment rights.

519.     Plaintiffs Brown, Darby, and Wright seek damages from Defendants Reinhart, Adams, and Koon in their individual capacities for the humiliation, anxiety, stress, emotional distress, hunger, sleeplessness, disturbed sleep, and other irreparable injury they suffered for being jailed, forcibly separated from their family and loved ones, and detained in unsanitary and cold jail conditions without enough food to eat for periods ranging from  seven to 57 days.

## CLAIM SEVEN
## FOR DECLARATORY RELIEF
Incarceration Without Pre-deprivation Ability-to-Pay Hearing
(in violation of the Due Process and Equal Protection Clauses of the
Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983,
by Plaintiff Goodwin against Defendant Adams, in her official capacity)

520.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein the

allegations in all preceding paragraphs.

521.     This claim is brought by Mr. Goodwin.

522.     The Due Process and Equal Protection Clauses of the Fourteenth Amendment to

the U.S. Constitution have long prohibited the imprisonment of people for nonpayment of court-

imposed fines or restitution without a pre-deprivation inquiry by a judge into the person's ability

to pay, efforts to secure resources to pay and, if the person lacks the ability to pay despite having

made reasonable efforts to acquire resources, the adequacy of any alternatives to incarceration.

Courts are prohibited from jailing people for nonpayment without conducting such an inquiry

and making at least one of the following findings: (1) the individual's nonpayment was willful;

(2) the individual failed to make sufficient efforts to acquire the resources to pay; or (3) the

individual was unable to pay, despite having made sufficient efforts to acquire resources, but

alternative methods of achieving punishment or deterrence are inadequate.

523.     Plaintiff Goodwin is indigent and owes $2,063 in fines and fees to the Irmo

Magistrate Court.  Mr. Goodwin is unable to pay the $100 payment that was due on July 5, 2017

as required by the Scheduled Time Payment Agreement imposed on him by Defendant Adams.

Mr. Goodwin faces a substantial and imminent risk that without affording him a pre-deprivation

ability-to-pay hearing, Defendant Adams will issue a bench warrant ordering his arrest and

incarceration for nonpayment and Defendant Koon will arrest and incarcerate him in the

Detention Center on that warrant.

524.    For all relevant purposes, all individuals processed for commitment to the Detention Center for unpaid fines, fees, costs, assessments or restitution imposed by Lexington County magistrate courts are similarly situated with respect to their right to due process of law. There exists no legitimate governmental reason to jail individuals who are unable to pay the full amount of outstanding monetary penalties for traffic or misdemeanor criminal offenses, while permitting individuals who have the financial means to pay fines, fees, costs, assessments, and restitution to avoid being jailed for the same offenses.

525.    As a judge on the Irmo Magistrate Court, Defendant Adams is sufficiently connected to, and responsible for, ongoing violations of Plaintiff Goodwin's right to due process and equal protection of the law.  In her official capacity and in an exercise of her judicial authority, Defendant Adams routinely orders the arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees without affording them any pre-deprivation ability-to-pay hearings, just as she did in the cases of Plaintiffs Brown and Darby.  Moreover, Defendant Adams sentenced Plaintiff Goodwin to pay fines and fees according to a Scheduled Time Payment Agreement, and Mr. Goodwin is unable to afford the required payments.  Mr. Goodwin thus faces a substantial and imminent risk of being arrested and incarcerated for nonpayment of the magistrate court fines and fees that he owes without a pre-deprivation ability-to-pay hearing.

526.    The ongoing conduct of Defendant Adams places Plaintiff Goodwin at continuing and foreseeable risk of being arrested and incarcerated for nonpayment of fines and fees without any pre-deprivation court hearing on his ability to pay despite prima facie evidence of hisindigence.  Mr. Goodwin seeks prospective declaratory relief because he has no plain,

adequate, or complete remedy at law to prevent future injury caused by confinement in jail in violation of his constitutional rights.

527.    The ongoing conduct of Defendant Adams violates 42 U.S.C. § 1983.  Defendant Adams acts under color of state law and her conduct creates a real, imminent, and substantial threat that Plaintiff Goodwin will be arrested and jailed in violation of his due process and equal protection rights.

**CLAIM EIGHT**
**FOR DECLARATORY RELIEF**
Failure to Afford Assistance of Counsel
(in violation of the Sixth Amendment to the U.S. Constitution
and 42 U.S.C. § 1983, by Plaintiff Goodwin
against Defendant Adams, in her official capacity)

528.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

529.    This claim is brought by Plaintiff Goodwin.

530.    The Sixth Amendment to the U.S. Constitution affords all indigent people a right to the assistance of court-appointed counsel at no cost when they face actual incarceration for nonpayment of fines, fees, court costs, assessments, or restitution, regardless of whether incarceration is imposed through criminal contempt procedures or the implementation of a sentence of incarceration previously suspended upon the condition of payment of monetary penalties.

531.    Plaintiff Goodwin is indigent and owes $2,163 fines and fees to the Irmo Magistrate Court.  Mr. Goodwin is unable to pay the $100 payment that was due on July 5, 2017 as required by the Scheduled Time Payment Agreement imposed by Defendant Adams.  Mr. Goodwin faces a substantial and imminent risk that without affording him the assistance of counsel, Defendant Adams will issue a bench warrant ordering his arrest and incarceration for

nonpayment and Defendant Koon will arrest and incarcerate him in the Detention Center on that warrant.

532.     As the judge of the Irmo Magistrate Court, Defendant Adams is sufficiently connected to, and responsible for, ongoing violations of Plaintiff Goodwin's right to counsel.  In her official capacity and in an exercise of her judicial authority, Defendant Adams routinely fails to notify indigent people of the right to request counsel and the risks of proceeding without counsel, fails to notify them of the right to request waiver of the $40 public defender application fee, and fails to appoint counsel to represent them at no cost before ordering their arrest and incarceration for nonpayment of fines and fees, despite prima facie evidence of their indigence. Finally, Defendant Adams routinely fails to engage in any colloquy to ensure that the act of signing a Trial Information and Plea Sheet confirms a knowing, voluntary, and intelligent waiver of the right to counsel.

533.     The ongoing policies, practices, customs, standard operating procedures, acts, and omissions of Defendant Adams place Plaintiff Goodwin at a continuing and foreseeable risk of being arrested and incarcerated in the Detention Center for nonpayment of fines and fees without the benefit of representation by court-appointed counsel.

534.     Mr. Goodwin seeks prospective declaratory relief because he has no plain, adequate, or complete remedy at law to prevent future injury caused by confinement in jail in violation of his Sixth Amendment rights.

535.     The conduct of Defendant Adams violates 42 U.S.C. § 1983.  Defendant Adams acts under color of state law and her conduct creates a real, imminent, and substantial threat that Plaintiff Goodwin will be arrested and jailed in violation of his Sixth Amendment right to counsel.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

- Assume jurisdiction over this action;

- Certify the Class under Rule 23 of the Federal Rules of Civil Procedure;

- Award the following relief:

  o A declaration that Defendants Adams and Dooley, acting in their administrative capacities, and Defendant Koon are violating Class members' Fourteenth Amendment right to due process and equal protection of the law by sustaining policies, practices, and standard operating procedures that result in the arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees without a pre-deprivation judicial inquiry into, and findings of fact on, ability to pay, efforts to secure resources, and the adequacy of readily available alternatives to incarceration.

  o A declaration that Defendants Adams and Dooley, acting in their administrative capacities, and Defendant Koon are violating Class members' Sixth Amendment right to counsel by sustaining policies, practices, and standard operating procedures that result in the arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees without notice of their right to request the appointment of counsel to defend against incarceration for nonpayment; without notice of the right to request waiver of any $40 public defender application fee; without ensuring that any waiver of these rights is knowing, voluntary, and intelligent; and without providing assistance of counsel.

  o A declaration that Defendants Lexington County and Madsen are violating Class members' Sixth Amendment right to counsel by routinely and systematically depriving indigent people of the right to court-appointed counsel when they face incarceration for nonpayment of magistrate court fines and fees, including through the failure to adequately fund indigent defense in Lexington County magistrate courts and the failure to assign public defenders to staff magistrate courts proceedings.

  o A declaration that Defendant Adams violates Plaintiff Goodwin's Fourteenth Amendment right to an ability-to-pay hearing by ordering or effecting the arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees without first affording a pre-deprivation judicial inquiry into, and findings of fact on, ability to pay, efforts to secure resources, and the adequacy of readily available alternatives to incarceration.

120

     ○  A declaration that Defendant Adams violates Plaintiff Goodwin's Sixth Amendment right to counsel by ordering or effecting the arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees without affording notice of the right to request appointment of counsel to defend against incarceration and notice of the right to request waiver of the $40 public defender application fee; without ensuring that any waiver of these rights is knowing, voluntary, and intelligent; and without appointing counsel to defend Plaintiff Goodwin as an indigent person facing incarceration for nonpayment.

     ○  A declaration that Defendants Adams and Dooley, acting in their administrative capacities, and Defendant Koon are violating Class members' Fourth Amendment right to freedom from unreasonable seizure by sustaining policies, practices, and standard operating procedures that result in indigent people being arrested and incarcerated on bench warrants based on nonpayment of magistrate court fines and fees and without probable cause of criminal activity.

     ○  An order and judgment permanently enjoining Defendants Adams, Dooley, Koon, Lexington County, and Madsen from enforcing the above-described unconstitutional policies and practices.

- Award compensatory damages to the Plaintiffs Brown, Darby, Johnson, Palacios, Goodwin, and Wright in an amount to be determined at trial, including damages for deprivation of liberty, mental anguish, emotional distress, hunger, sleeplessness, disturbed sleep, illness, and loss of income;

- Award Plaintiffs attorneys' fees, costs, and expenses of all litigation pursuant to 42 U.S.C. § 1988; and

- Afford any such other and further relief as the Court may deem just and proper.


DATED this 17th day of October, 2017.

Respectfully submitted by,


s/ Susan K. Dunn
_____

SUSAN K. DUNN (Fed. Bar #647)             NUSRAT J. CHOUDHURY*
American Civil Liberties Union Foundation of     American Civil Liberties Union Foundation
    South Carolina                                  125 Broad Street, 18th Floor
P.O. Box 20998                                        New York, New York 10004
Charleston, South Carolina 29413-0998      Tel.: (212) 519-7876
Tel.: (843) 282-7953                              Fax: (212) 549-2654
Fax: (843) 720-1428                              nchoudhury@aclu.org
sdunn@aclusc.org

121

TOBY J. MARSHALL*
ERIC R. NUSSER*
Terrell Marshall Law Group PLLC
936 N 34th Street, Suite 300
Seattle, Washington 98103
Tel.: (206) 816-6603
Fax: (206) 319-5450
tmarshall@terrellmarshall.com
eric@terrellmarshall.com


*Admitted pro hac vice.