**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| TWANDA MARSHINDA BROWN, *et al.*;<br><br>Plaintiffs,<br><br>v.<br><br>LEXINGTON COUNTY, SOUTH CAROLINA, *et al.*;<br><br>Defendants. | Case No. 3:17-cv-01426-MBS |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................1

STATEMENT OF FACTS ...........................................................................3

I.    Plaintiffs were arrested and incarcerated because of unconstitutional
policies and procedures of jailing people for nonpayment of court fines
and fees without a pre-deprivation hearing on ability to pay and without
access to counsel ...............................................................................3

II.   The practice of automatically issuing nonpayment bench warrants led to
widespread arrests and incarceration of indigent people within
Lexington County Magistrate Courts....................................................9

      A.    Defendants were on notice that these policies and procedures
are contrary to longstanding Supreme Court precedent and
South Carolina law.............................................................11

      B.    The cumulative impact of these policies and procedures resulted in
the widespread jailing of indigent people without pre-deprivation
hearings to determine willfulness and without the
assistance of counsel ..........................................................13

III.  Defendants are collectively responsible for widespread violations of the
Sixth and Fourteenth Amendments in Lexington County
Magistrate Courts...........................................................................15

      A.    The Chief and Associate Chief Judge for Administrative Purposes
are responsible for exercising administrative, policymaking, and
supervisory authority over Lexington County Magistrate Courts .......15

            1.    As administrators, policymakers, and supervisors, the Chief
and Associate Chief Judges are required to monitor other
magistrate judges to ensure indigent defendants'
constitutional rights are upheld ...............................16

            2.    As administrators, policymakers, and supervisors, the Chief
and Associate Chief Judges are responsible for establishing
and overseeing uniform procedures for revenue collection......17

            3.    As administrators, policymakers, and supervisors, the Chief
and Associate Chief Judges formulate uniform policies and
procedures in Lexington County magistrate courts .................18

B.    Lexington County is responsible for adequately funding the public defender system that serves Lexington County Magistrate Courts ..................................................................... 19

1.    Lexington County Council is the final policymaker when it comes to the funding of public defense in Lexington County ..................................................................... 21

2.    Lexington County has failed, and continues to fail, to provide adequate funding for indigent defense despite Madsen's repeated requests for additional funding ................................... 22

3.    Through inadequate funding, Lexington County has failed, and continues to fail, to ensure indigent defendants in magistrate courts have adequate access to counsel .................. 27

STANDARD OF REVIEW ................................................................ 28

ARGUMENT ................................................................................. 29

I.    Section 1983 standard ......................................................... 29

II.    Plaintiffs and Class Members are entitled to summary judgment on their denial of counsel claim under the Sixth Amendment (Claim Two) ................. 30

A.    Lexington County is liable under Section 1983 for its failure to provide adequate funding for public defense in Lexington County Magistrate Courts ..................................................... 31

1.    Lexington County controls the creation and funding of all positions in the Lexington County Public Defender's Office ... 31

2.    Lexington County has failed, and continues to fail, to provide adequate funding for indigent defense ........................ 35

3.    Comprehensive equitable relief is appropriate to remedy Lexington County's failure to provide counsel to indigent defendants in the Lexington County Magistrate Court ............ 39

B.    The Chief and Associate Chief Judges are liable under Section 1983 for the uniform debt collection policies and procedures within Lexington County Magistrate Courts ..................................... 39

III.    Plaintiffs and Class Members are entitled to summary judgment on their Fourteenth Amendment claim under *Bearden v. Georgia* (Claim One) ........... 41

A.    *Bearden v. Georgia*'s constitutional requirements under the Fourteenth Amendment are long-standing and well known ................41

B.    The Chief and Associate Chief Judges are liable under Section 1983 for causing violations of Plaintiffs' and Class Members' Fourteenth Amendment rights ...............................................................43

1.    The Chief and Associate Chief Judges are liable in their roles as policymakers for sanctioning and implementing debt collection policies that caused Constitutional injuries..............43

2.    The Chief and Associate Chief Judges are liable in their supervisory capacities for causing Bearden violations .............46

IV.    Prospective declaratory and injunctive relief against the Chief and Associate Chief Judges is necessary to prevent future violations of the Sixth and Fourteenth Amendments (Claims One and Two) ......................................50

V.    Plaintiffs are entitled to summary judgment and monetary damages on their Sixth and Fourteenth Amendment claims (Claims Four and Five) ..........51

VI.    Plaintiff Goodwin is entitled to summary judgment and prospective declaratory relief on his Sixth and Fourteenth Amendment claims against Defendant Adams, in her official capacity as Irmo Magistrate Judge (Claims Seven and Eight) ................................................................52

CONCLUSION ....................................................................................................53

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*,
    139 F.3d 419 (4th Cir. 1998) ...................................................................52

*Alabama v. Shelton*,
    535 U.S. 654 (2002)..........................................................................13, 30

*Alexander v. Johnson*,
    742 F.2d 117 (4th Cir. 1984) ...................................................................41

*Alkire v. Irving*,
    330 F.3d 802 (6th Cir. 2003) ...................................................................41

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................29

*Argersinger v. Hamlin*,
    407 U.S. 25 (1972)............................................................................13, 30

*Avery v. Alabama*,
    308 U.S. 444 (1940)..................................................................................30

*Bearden v. Georgia*,
    461 U.S. 660 (1983)...........................................................................*passim*

*Bairefoot v. City of Beaufort, S.C.*,
    312 F.Supp.3d 503 (D.S.C. 2018).......................................................37, 38

*Brown v. Crawford*,
    906 F.2d 667 (11th Cir. 1990) ..................................................................46

*Carnaby v. City of Houston*,
    636 F.3d 183 (5th Cir. 2011) ....................................................................43

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................28, 29

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988)............................................................................32, 33

*Clay v. Conlee,*
    815 F.2d 1164 (8th Cir. 1987) ...................................................................44

*Coleman v. Alabama,*
    399 U.S. 1 (1970) ...................................................................................30

*Dodds v. Richardson,*
    614 F.3d 1185 (10th Cir. 2010) ...............................................44, 45, 46

*Ex parte Young,*
    209 U.S. 123 (1908) ...............................................................................50

*Faretta v. California,*
    422 U.S. 806 (1975) ...............................................................................13

*Foster v. Fisher,*
    2016 WL 900654 (W.D.N.C. Mar. 9, 2016) .............................................47

*Forrester v. White,*
    484 U.S. 219 (1988) ...............................................................................50

*Foster v. Fisher,*
    694 F. App'x 887 (4th Cir. 2017) .......................................................46, 47

*Gideon v. Wainwright,*
    372 U.S. 335 (1963) ...........................................................................1, 30

*Gordon v. Schilling,*
    937 F.3d 348 (4th Cir. 2019) ...........................................29, 43, 49

*Hamilton v. Alabama,*
    368 U.S. 52 (1961) .................................................................................30

*Harley v. Wilkinson,*
988 F.3d 766 (4th Cir. 2021) ......................................................................28

*Hunter v. Town of Mocksville, N.C.,*
897 F.3d 538 (4th Cir. 2018) ........................................................32, 33, 34

*Jett v. Dallas Indep. Sch. Dist.,*
    491 U.S. 701 (1989) .........................................................................32, 44

*Lafler v. Cooper,*
    566 U.S. 156 (2012) ...............................................................................30

*Los Angeles Cnty. v. Humphries*,
562 U.S. 29 (2010) .................................................................................31

*Lytle v. Doyle*,
326 F.3d 463 (4th Cir. 2003) .................................................................32

*Meyers v. Baltimore Cnty, Md.*,
713 F.3d 723 (4th Cir. 2013) .................................................................29

*Miranda v. Clark Cnty.*,
319 F.3d 465 (9th Cir. 2003) .................................................................36

*Missouri v. Frye*,
566 U.S. 134 (2012) .................................................................................30

*Missouri v. Jenkins*,
515 U.S. 70 (1995) .................................................................................39

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) .........................................................................29, 32

*Morrison v. Lipscomb*,
877 F.2d 463 (6th Cir. 1989) .................................................................50

*McMillian v. Monroe Cnty., Ala.*,
520 U.S. 781 (1997) .................................................................................32

*N.C. State Conf. of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) .................................................................39

*OSU Student All. v. Ray*,
699 F.3d 1053 (9th Cir. 2012) .................................................................44

*Padilla v. Kentucky*,
559 U.S. 356 (2010) .................................................................................30

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) .........................................................................32, 35

*Philips v. Pitt Cnty Mem'l Hosp.*,
572 F.3d 176 (4th Cir. 2009) .................................................................29

*Ratte v. Corrigan*,
989 F. Supp. 2d 550 (E.D. Mich. 2013) .................................................50

*Riddick v. Sch. Bd.,*
    238 F.3d 518 (4th Cir. 2000) ................................................................32

*Rothgery v. Gillespie Cnty, Tex.,*
    554 U.S. 191 (2008).........................................................................30

*St. Jude Med., S.C., Inc. v. Biosense Webster, Inc.,*
    994 F. Supp. 2d 1033 (D. Minn. 2014),
    *aff'd* in part, 818 F.3d 785 (8th Cir. 2016)................................52

*Scott v. Illinois,*
    440 U.S. 367 (1979).........................................................................13

*Shaw v. Stroud,*
    13 F.3d 791 (4th Cir. 1994) ................................................................29

*Slakan v. Porter,*
    737 F.2d 368 (4th Cir. 1984) ....................................................29, 46, 49

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.,*
    28 F.4th 529 (4th Cir. 2022) ........................................................31, 32

*Tate v. Short,*
    401 U.S. 395 (1971).........................................................................41

*Taylor v. Mich. Dep'. of Corr.,*
    69 F.3d 76 (6th Cir. 1995) ................................................................43

*United States v. Cronic,*
    466 U.S. 648 (1984).........................................................................30

*United States v. Diebold, Inc.,*
    369 U.S. 654 (1962).........................................................................29

*Valentino v. Vill. of South Chicago Heights,*
    575 F.3d 664 (7th Cir. 2009) ................................................................33

*White v. Maryland,*
    373 U.S. 59 (1963)...........................................................................30

*Wilbur v. City of Mount. Vernon,*
    989 F. Supp. 2d 1122 (W.D. Wash. 2013)............................................*passim*

*Wilkins v. Montgomery,*
    751 F.3d 214 (4th Cir. 2014) ....................................................46, 48, 49

## STATE CASES

*Dangerfield v. State*,
    656 S.E.2d 352 (S.C. 2008) ........................................................................42

*Hurrell-Harring v. State*,
    15 N.Y.3d 8 (N.Y. 2010) .........................................................................36

*Kuren v. Luzerne Cnty.*,
    146 A.3d 715 (Pa. 2016) ..........................................................................36

*Tucker v. State*,
    394 P.3d 54 (Idaho 2017).....................................................................30, 36

## FEDERAL RULES

Fed. R. Civ. P. 41(a)(1)(A)(ii) ........................................................................24

Fed. R. Civ. P. 56(a) ........................................................................................28

## FEDERAL STATUTES

42 U.S.C. § 1983.......................................................................................29, 50

## STATE STATUTES

S.C. Code Ann. § 4-9-25.................................................................................33

S.C. Code Ann. § 4-9-140...............................................................................33

S.C. Code Ann. § 4-9-310...............................................................................33

S.C. Code Ann. § 17-3-540(A) .......................................................................34

S.C. Code Ann. §§ 17-3-550, 560...................................................................35

S.C. Code Ann. § 17-3-550........................................................................19, 21

S.C. Code Ann. § 17-3-540(A) .......................................................................20

S.C. Code Ann. § 17-3-540(B) .......................................................................20

S.C. Code Ann. §§ 22-5-11 to 38-53-70 ........................................................12

## STATE RULES

S.C. App. Ct. R. 502.1 ....................................................................................11

S.C. Const. art. V, § 4 ...........................................................................................15

## OTHER AUTHORITIES

S.C. Judicial Dep't, Summary Court Judges Benchbook, "General," ch. C § 1 ......................11

Arthur W. Pepin, *The End of Debtors' Prisons:*
    *Effective Court Policies for Successful Compliance*
    *with Legal Financial Obligations* 27 (2016) ..............................................................42

## INTRODUCTION

In 2017, Plaintiffs filed suit to challenge two fundamental constitutional violations in Lexington County: (1) that the County was violating the Sixth Amendment by refusing to provide adequate access to counsel for indigent defendants in the Lexington County Magistrate Courts (LCMC); and (2) that the County's Chief and Associate Chief Magistrate Judges were violating the Sixth and Fourteenth Amendments by overseeing and sanctioning uniform, county-wide debt collection practices that required the jailing of indigent defendants for nonpayment of fines and fees—without appointment of counsel and without any determination that their nonpayment was willful. Five years and countless pages of discovery later, no doubt remains: these practices have long existed, they violate the Constitution, and they demand relief.

Lawyers in criminal cases are necessities, not luxuries. As *Gideon v. Wainwright* established almost six decades ago, the Sixth Amendment requires access to counsel for every criminal defendant who faces the possibility of incarceration; and if the defendant is indigent, counsel must be appointed free of charge. Despite these clear demands, undisputed evidence shows that Lexington County—the entity responsible for funding indigent defense in the LCMC—has utterly failed to answer *Gideon*'s call.

In the last twelve years, the Lexington County Council has either completely denied or substantially underdelivered on nearly every funding request made by the head Public Defender. This is most acute in the LCMC, where the Council has repeatedly refused to fund indigent defense. For example, until 2013, there was not a single public defender available in the LCMC. And although there is now funding for three, their capacity can only cover appointments for approximately 20% of eligible cases. Thus, thousands of indigent defendants are left to fend for themselves without counsel. This appointment rate pales in comparison to the 70% appointment rate in the County's General Sessions Court and simply cannot be explained by a disinterest in free counsel. In light of this evidence, summary judgment is appropriate against Lexington County on Plaintiffs' Sixth Amendment claims. Providing counsel for a fraction of eligible cases

is grossly inadequate. Injunctive relief is necessary to ensure Plaintiffs' and Class Members' rights to counsel are preserved and protected.

Plaintiffs' Sixth and Fourteenth Amendment claims against the Chief and Associate Chief Judges are similarly beyond dispute. Defendants admit that for decades, the LCMC had a practice of arresting and jailing indigent criminal defendants on bench warrants issued for nonpayment of fines and fees. And despite the clear demands of *Gideon* and *Bearden v. Georgia*, Defendants admit this routinely occurred without the provision of counsel and without a hearing to determine that nonpayment was willful. Evidence shows the practice was widespread, uniform, and designed as a mechanism for ensuring the LCMC collected the fines and fees it imposed. The practice led to the unconstitutional incarceration of thousands of individuals— including Plaintiffs—who were detained for periods of time ranging from seven to sixty-three days, all because they could not afford to pay their court debts.

Importantly, Plaintiffs do not press a theory of liability that relies on a judicial act by a named Defendant. Instead, the evidence shows that the Chief and Associate Chief Judges caused Plaintiffs and Class Members to suffer constitutional injuries in two ways: (1) by administratively sanctioning, implementing, and failing to remediate the LCMC's unconstitutional policies and procedures for the collection of fines and fees; and (2) by failing to adequately supervise the other magistrate judges in Lexington County.

During their tenures, the Chief and Associate Chief Judges were responsible, by order of the Chief Justice of the South Carolina Supreme Court, for monitoring all summary court judges, establishing uniform procedures, and setting county-wide policies for the collection of court generated revenues. Despite their familiarity with these responsibilities, Defendants Reinhart and Adams testified that until Adams implemented the Setoff Debt Program in 2018, they eschewed their administrative authority to implement new policies and procedures for collecting fines and fees in the LCMC. Instead, they chose to continue longstanding unconstitutional policies and procedures like the Default Payment Policy and Trial in Absentia Policy. Likewise, they testified

that they rarely, if ever, exercised their supervisory authority and elected instead to allow other magistrate judges to operate without oversight.

Because their administrative acts and omissions caused Plaintiffs' unconstitutional incarcerations, Defendants Reinhart and Adams are liable in their individual capacities under Section 1983 for damages. Similarly, because Defendants Johnson and Morgan have authority as the current Chief and Associate Chief Judges to abandon the Setoff Debt Program and revert to debt-collection policies and procedures that violate the Sixth and Fourteenth Amendments, prospective injunctive relief is appropriate against them in their official capacities to prevent future constitutional violations. Finally, prospective declaratory relief against Defendant Adams, in her official capacity, is appropriate because Plaintiff Xavier Larry Goodwin faces a real and immediate threat of future arrest and incarceration, without access to counsel or a hearing, for his inability to pay fines and fees to the Irmo Magistrate Court, where Defendant Adams currently sits.

On these claims, the facts are undisputed and the law well settled. Plaintiffs therefore ask the Court to order summary judgment on their claims against Defendant Lexington County, Defendants Reinhart and Adams in their individual capacities, and Defendants Johnson, Morgan, and Adams in their official capacities.

## STATEMENT OF FACTS

**I.    Plaintiffs were arrested and incarcerated because of unconstitutional policies and procedures of jailing people for nonpayment of court fines and fees without a pre-deprivation hearing on ability to pay and without access to counsel.**

Plaintiffs were arrested and jailed for periods of time ranging from seven to sixty-three days because they could not afford to pay debts owed to the Lexington County Magistrate Courts (LCMC). The Lexington County Sheriff's Department made these arrests pursuant to standard bench warrants issued by the LCMC. After arrest, Plaintiffs were transported to jail and then given the option to pay all fines and fees owed or, if they could not afford to do so, serve a fixed period of jail time. No court hearings were held to determine whether the failure to pay was

willful, and no public defenders were offered to assist Plaintiffs in demonstrating their indigence. Plaintiffs could not afford to pay the imposed fines and fees. As a result, each was incarcerated without a pre-deprivation ability-to-pay hearing, without any notice of the right to request counsel, and without the assistance of a court-appointed attorney to defend against their unlawful jailing. ECF No. 66-1 ¶¶ 3–7, 13–14 (Brown); ECF No. 66-2 ¶¶ 13–17, 26–27 (Darby); ECF No. 66-3 ¶¶ 19–20 (Palacios); ECF No. 66-4 ¶¶ 17–20 (Corder); ECF No. 66-5 ¶¶ 10–14 (Goodwin); Decl. of Cayeshia Cashel Johnson in Supp. of Pls.' Mot. For Summ. J. ¶¶ 13–16 (Johnson Decl.); Decl. of Raymond Wright, Jr. in Supp. of Pls.' Mot. For Summ. J. ¶¶ 8–10 (Wright Decl.).

Plaintiff Twanda Marshinda Brown is a single working mother. ECF No. 66-1 ¶¶ 1–2. In April 2016, the Irmo Magistrate Court sentenced Brown to pay $2,337.50 in fines and fees for traffic tickets. ECF No. 29-2 ¶ 3a; ECF No. 66-1 ¶ 3. Brown was unable to pay the amount owed in full, and she was placed on a payment plan ordering her to make $100 monthly payments despite her informing the court she could not afford this. ECF No. 66-1 ¶¶ 4–5. The court—without assessing her ability to pay—sentenced her and placed her on the payment plan. *Id*. Brown made the first five payments but was unable to pay more. *Id*. ¶ 8; ECF No. 29-2 ¶ 3a.

On February 18, 2017, Brown was arrested and jailed at the Lexington County Detention Center. ECF No. 66-1 ¶¶ 10–11. There, she was served with a nonpayment bench warrant ordering her to pay $1,907.63 in fines or serve ninety days in jail. *Id*.; ECF No. 21-9. Unable to pay the fines, she was jailed for fifty-seven days, the minimum amount of time required with credits for good behavior. ECF No. 66-1 ¶ 12; ECF No. 29-2 ¶ 3a. While jailed, Brown was separated from her children, and she lost her job. ECF No. 66-1 ¶¶ 12, 15–16. Upon release, Brown had difficulty finding new employment. *Id*. ¶ 17.

Plaintiff Sasha Monique Darby is a single working mother who suffers from Post-Traumatic Stress Disorder. ECF No. 66-2 ¶¶ 1–3. On August 23, 2016, Darby appeared without counsel in Irmo Magistrate Court and was convicted of assault and battery in the third degree. *Id*. ¶¶ 10–16. The court imposed $1,000 in fines and fees, but Darby was unable to pay the full amount at sentencing. *Id*. ¶¶ 17–19. She was placed on a plan requiring $150 monthly payments

4

without any assessment of her ability to pay, even though this was beyond what she had said she could afford. *Id*. After making some of the payments, Darby was unable to pay more. *Id*. ¶¶ 21–22; ECF No. 21-8 ¶ 8.

On March 28, 2017, Darby, who was pregnant at the time, was arrested and taken to the Detention Center. ECF No. 66-2 ¶¶ 23–25; ECF No. 29-2 ¶ 3d. There, she was served with a nonpayment bench warrant ordering her to pay $680 or spend twenty days in jail. ECF No. 66-2 ¶¶ 23–25; ECF No. 21-11. Unable to pay, she was jailed for twenty days. ECF No. 66-2 ¶¶ 23–25; ECF No. 29-2 ¶ 3d. She did not get sufficient food or medical care for her pregnancy while in jail, and she missed her first prenatal doctor's appointment. ECF No. 66-2 ¶¶ 28–30. Her incarceration caused her to lose her job and home. *Id*.

Plaintiff Cayeshia Cashel Johnson is a single working mother. Johnson Decl. ¶ 1. In August 2016, Johnson was ticketed for five traffic tickets and one misdemeanor offense in Lexington County, three hours away from her home in Myrtle Beach, South Carolina. *Id*. ¶¶ 3, 5; ECF No. 29-2 ¶ 3c. The tickets required her to appear in the Central Traffic Court on September 22, 2016. ECF No. 29-2 ¶ 3c. Before her hearing, Johnson called to inform the court she could not secure transportation to the courthouse on that date. Johnson Decl. ¶ 7. Nonetheless, on September 22, 2016, Johnson was tried in absentia, convicted, and sentenced to $1,287.50 in fines or eighty days in jail. ECF No. 29-2 ¶ 3c. Four days later, the court issued a nonpayment bench warrant ordering her arrest and jailing. *Id*.; ECF No. 21-13.

On February 13, 2017, Johnson was arrested during a traffic stop in Myrtle Beach and transported to the Detention Center. Johnson Decl. ¶¶ 11–13. In jail, she was served the nonpayment bench warrant. *Id*. This was the first notice Johnson received that she had been tried in absentia. *Id*. Johnson was unable to pay $1,287.50, so she was jailed for fifty-five days with good time credit. *Id*. ¶ 14; ECF No. 29-2 ¶ 3c. During her two months in jail, Johnson was separated from her children, lost all three part-time jobs she held before her arrest, and suffered emotional distress and severe headaches. Johnson Decl. ¶¶ 17–19.

Plaintiff Amy Marie Palacios is a single working mother. ECF No. 66-3 ¶¶ 1. In October 2016, Palacios was ticketed for driving with a suspended license, and was required to appear in the Central Traffic Court on November 10, 2016. *Id*. ¶ 5. Before her hearing, Palacios called the court to say she could not appear on that date due to a work conflict and submitted an affidavit to that effect from her employer. *Id*. ¶¶ 6–10, Ex. A. Despite this, on November 10, 2016, Palacios was tried in her absence, convicted, and sentenced to $647.50 in fines or thirty days in jail. ECF No. 29-2 ¶ 3b. Five days later, the court issued a nonpayment bench warrant ordering her arrest and jailing. *Id.*; ECF No. 21-15.

On February 25, 2017, Palacios was arrested during a traffic stop pursuant to that warrant. ECF No. 66-3 ¶¶ 12–17. This was the first notice Palacios received that she had been tried in absentia. *Id*. Palacios was unable to pay $647.50, so she was jailed for twenty-one days with good time credit. *Id*. ¶ 18; ECF No. 29-2 ¶ 3b. While in jail, Palacios was separated from her children, lost her job, and suffered emotional distress and ill health without access to proper medical care. ECF No. 66-3 ¶¶ 21–23.

Plaintiff Nora Ann Corder was ticketed for three traffic offenses during the same stop in January 2017. ECF No. 66-4 ¶ 7. Corder appeared in the Lexington Magistrate Court on three separate dates between February and April 2017 to answer for the tickets, but her case was continued each time. *Id*. ¶ 12. Corder was directed to return to court again on May 17, 2017, but she could not appear on this date due to lack of transportation. *Id*. ¶¶ 13–14. On May 17, 2017, Corder was tried in absentia, convicted, and sentenced to $1,320 in fines or ninety days in jail. ECF No. 29-2 ¶ 3e. She found out about her sentence after she called the court herself. ECF No. 66-4 ¶¶ 15–17.

Around this time, Corder was facing eviction from her home because she could not afford to pay her rent. *Id*. ¶¶ 18–19. On May 26, 2017, she went to the court to file forms in defense of her eviction proceeding. *Id*. Corder was arrested at the courthouse pursuant to a nonpayment bench warrant. *Id.*; ECF No. 29-2 ¶ 3e. She was unable to pay $1,320, so she was jailed for fifty-

four days with good time credit. ECF No. 66-4 ¶¶ 17–20; ECF No. 29-2 ¶ 3e. As a result, Corder lost her home and her job. ECF No. 66-4 ¶ 21.

Plaintiff Xavier Larry Goodwin, a class representative in this case, ECF No. 227 at 22, is an indigent man and the principal provider for six dependents. ECF No. 35-1 ¶¶ 1–2; ECF No. 66-5 ¶ 1. In July 2016, Goodwin was ticketed for five traffic offenses and directed to appear in the Central Traffic Court on August 9, 2016. ECF No. 66-5 ¶¶ 3–4. He informed the court that he could not appear that date due to work. *Id*. ¶ 5. Despite this, on August 9, 2016, Goodwin was tried in absentia, convicted, and sentenced to $1,710 in fines or ninety days in jail. ECF No. 21-17; ECF No. 21-18. The next day, the court issued a nonpayment bench warrant for Goodwin's arrest and jailing. ECF No. 21-17.

On February 2, 2017, Goodwin was ticketed for driving under a suspended license, 3rd offense (DUS-3), and arrested pursuant to a nonpayment bench warrant issued after his conviction on August 9, 2016. ECF No. 66-5 ¶¶ 7–8. In jail, he was served with the nonpayment bench warrant, his first notice that he had been tried in absentia for the July 2016 tickets. *Id.*; ECF No. 21-17. Goodwin was unable to pay $1,710, so he was incarcerated for sixty-three days with good time credit. ECF No. 66-5 ¶¶ 9, 12; ECF No. 29-2 ¶ 3g. Although Goodwin was taken to Bond Court the day after his arrest for the new DUS-3 ticket, the judge did not address his incarceration on a nonpayment bench warrant and did not inquire into his ability to pay the $1,710. ECF No. 66-5 ¶ 10. While he was incarcerated, Goodwin lost his home and the job he had held for thirteen years, was separated from his family, and suffered emotional distress and headaches. *Id*. ¶¶ 15–18.

On April 4, 2017, while Goodwin was still in jail, he was transported to the Irmo Magistrate Court for a hearing in front of Defendant Adams on his DUS-3 ticket. *Id*. ¶ 14; ECF No. 35-1 ¶¶ 6; Ex. 1.[1] Goodwin pleaded guilty to DUS-3 and was sentenced to ninety days in jail

---

[1] Unless otherwise noted, all exhibits are attached to the Declaration of Toby J. Marshall in Support of Plaintiffs' Motion for Summary Judgment.

and the payment of $2,100 in fines and fees, with credit for time served on his jail sentence. ECF No. 35-1 ¶¶ 7–9. Defendant Adams, without any assessment of his ability to pay, directed Goodwin to return to court and set up a payment plan within thirty days of his release from jail. *Id*. ¶ 10. Defendant Adams also threatened to have Goodwin arrested and incarcerated again if he failed to set up a payment plan. *Id*. On May 5, 2017, Goodwin went back to the Irmo Magistrate Court to establish the payment plan and was required to make $100 monthly payments, despite his explanation that he had just been released from jail and did not yet have a job. *Id*. ¶¶ 14–16.

Goodwin remains indigent and still owes fines and fees to the Irmo Magistrate Court for his DUS-3 offense. *Id*. ¶¶ 18, 21–24; Ex. 1. Goodwin and his family do not have a home and continue to face great difficulty paying for even basic necessities. ECF No. 35-1 ¶ 18. Goodwin also owes fines, fees, and court costs for other traffic court charges and more than $10,000 in past due child support. *Id*. ¶ 19. Despite his best efforts, Goodwin remains unable to make payments on his court debt. *Id*. ¶¶ 20–24. He lives in fear that he will be arrested and incarcerated again for failure to pay fines and fees to the Irmo Magistrate Court. *Id*. He currently has an outstanding balance of $2,163 for his DUS-3 offense. *Id*.; Ex. 1.

Plaintiff Raymond Wright, Jr., a class representative in this case, ECF No. 227 at 22, is disabled and unemployed. ECF No. 35-2 ¶¶ 1, 6. In July 2016, Wright appeared in the Central Traffic Court and pleaded guilty to DUS-1. *Id*. ¶¶ 3–4. He was sentenced to pay $666.93 in fines and fees. *Id*.; ECF No. 29-2 ¶ 3f. The judge asked Wright if he could pay in full, and Wright explained that he could not. ECF No. 35-2 ¶¶ 4–5. The judge ordered him to pay $50 monthly without any assessment on his ability to pay. *Id*. The judge told Wright that he would be arrested and jailed if he did not make the monthly payments. *Id*. Wright faced difficulty making the $50 monthly payments. *Id*. ¶¶ 6–7. After five payments, he was unable to pay any more. *Id*.

On April 19, 2017, Wright appeared in the Central Traffic Court for a show cause hearing. *Id*. ¶ 8; ECF No. 29-2 ¶ 3f. Wright explained to the judge that he was unable to pay due to financial hardship. ECF No. 35-2 ¶¶ 9–11. Still, the judge told Wright that he would be jailed unless he paid $416.93 in full within ten days. *Id*. The judge did not ask him about his ability to

pay and refused to see the bills and other documents Wright brought to court to show he was unable to pay. *Id*. Wright asked the judge if he could make partial payments, but the judge informed him that the court would only accept payment in full. *Id*. ¶¶ 12–13. Wright was unable to pay $416.93 by April 29, 2017. *Id*.

On July 25, 2017, Wright was arrested pursuant to a nonpayment bench warrant. Wright Decl. ¶ 2. Because he could not pay $416.93 at booking, he was jailed. *Id*. ¶ 3. While incarcerated, Wright suffered severe intestinal bleeding. *Id*. ¶ 4. He was taken to the Lexington Medical Center where he received medical treatment while handcuffed and chained to his hospital bed. *Id*. ¶ 5. He was incarcerated for seven days. *Id*. ¶ 7. Wright was never taken to Bond Court or any magistrate court in Lexington County for an ability-to-pay hearing for his fines and fees, either before or after being booked into jail. *Id*. ¶ 8. Nobody offered to connect him with an attorney. *Id*. ¶ 9.

## II.     The practice of automatically issuing nonpayment bench warrants led to widespread arrests and incarceration of indigent people within Lexington County Magistrate Courts.

Defendants Matthew A. Johnson and Gary S. Morgan currently administer the LCMC as, respectively, the Chief and Associate Chief Judge for Administrative Purposes of the Summary Courts in Lexington County, South Carolina. Ex. 2; ECF No. 278. Defendant Rebecca Adams served as Chief Judge from July 1, 2017, to July 1, 2021, and as the Associate Chief Judge from January 1, 2014, to July 1, 2017. Exs. 3, 4, and 5 at 24:6–25:8. Defendant Adams currently serves as the Judge of the Irmo Magistrate Court, a position she has held throughout her tenure with the LCMC. Ex. 5 at 24:6–25:8; Ex. 6 at 270:25–271:5. Defendant Gary Reinhart served as Chief Judge from January 1, 2005, to July 1, 2017. Ex. 7 at 24:23–25:14; Exs. 8, 9. Defendant Reinhart currently serves as an at-large magistrate, a position he has held throughout his tenure with the LCMC. Ex. 7 at 19:19–20:11, 24:16–22.

The Chief and Associate Chief Judges of the LCMC have administrative duties that include establishing "a procedure with all summary court judges and appropriate public officials

to ensure that court-generated revenues are collected, distributed, and reported in an appropriate and timely manner." Ex. 3 ¶ 17. It is undisputed that for decades, the standard operating procedure in the LCMC for addressing nonpayment of court debt was to automatically issue bench warrants—and arrest and incarcerate people—without conducting pre-deprivation ability-to-pay hearings and without waiver of the right to counsel. Ex. 5 at 159:12–23, 170:9–17, 215:16–20; Ex. 10 at 130:24–132:3. This procedure stemmed from two unwritten, county-wide policies: the "Default Payment Policy" and "Trial in Absentia Policy." *See* Ex. 5 at 159:12–23, 170:9–17, 215:16–20; Ex. 10 at 130:24–132:3. Both involved the use of nonpayment bench warrants, and both resulted in thousands of people in Lexington County being unconstitutionally jailed. Ex. 5 at 159:12–23, 170:9–17, 215:16–20; Ex. 10 at 130:24–132:3; Ex. 11.

Under the Default Payment Policy, indigent people who pleaded guilty or were otherwise convicted in the LCMC—but could not pay the full amount of fines and fees imposed at sentencing—were placed on payment plans without consideration of their ability to pay, income, or financial situation. *See supra* Statement of Facts (SOF) Part I; Ex. 5 at 239:1–19; Ex. 7 at 143:2–145:11. When indigent people could not afford to keep up with their payment plans, they were arrested and incarcerated without a pre-deprivation ability-to-pay hearing to determine whether the nonpayment was willful. *See supra* SOF Part I; Ex. 5 at 239:1–19; Ex. 7 at 143:2–145:11. Moreover, they were not given an opportunity to speak with a public defender. *See supra* SOF Part I.

Under the Trial in Absentia Policy, indigent people who failed to appear in the LCMC for a traffic or other misdemeanor charge—regardless of the reason for nonappearance—were automatically tried in absentia, convicted, and sentenced to jail time suspended on payment of fines and fees. *See supra* SOF Part I; Ex. 5 at 186:25–188:9. Typically, within a week of the sentence being imposed, a nonpayment bench warrant was automatically issued, requiring arrest and jailing without a hearing to determine whether nonpayment was willful. *See supra* SOF Part I. The Central Traffic Court, for example, issued a nonpayment bench warrant ordering the arrest and jailing of Plaintiff Goodwin the day after his trial in absentia. ECF No. 21-17; ECF No. 66-5

10

¶¶ 3–11. Plaintiff Johnson's nonpayment bench warrant was issued four days after her trial in absentia. ECF No. 21-13; ECF No. 29-2 ¶ 3c. Plaintiff Palacio's nonpayment bench warrant was issued five days after her trial in absentia. ECF No. 21-15; ECF No. 29-2 ¶ 3b. When a person was arrested on one of these warrants, they were not taken before a judge or provided an opportunity to speak with a public defender. *See supra* SOF Part I.

A.    <u>Defendants were on notice that these policies and procedures are contrary to longstanding Supreme Court precedent and South Carolina law.</u>

South Carolina magistrate judges take the same judicial oath of office as every other member of the South Carolina Unified Judicial System. Within that oath is the promise to "preserve, protect and defend the Constitution . . . of the United States." S.C. App. Ct. R. 502.1. The South Carolina Summary Court Judges Bench Book (Bench Book), which is promulgated by the South Carolina Office of Court Administration (SCCA) and used to train magistrate judges, states:

> The Constitution of the United States and South Carolina are the fundamental law of our judicial system. All other laws, regardless of their source, must not conflict with the U.S. Constitution; and all state laws, regulations, and ordinances must not conflict with the S.C. Constitution. All magistrates and municipal judges must strictly heed the provisions of the Constitutions.[2]

All South Carolina magistrate judges are required to attend a two-week training and pass an exam, based on the contents of the Bench Book, before they can hear cases. *See* Ex. 6 at 313:15–315:2 ("[W]e rely on [the bench book] to do just about anything . . . . And in our initial training we go through that entire bench book and then have to take exams on it."); Ex. 7 at 129:20–131:22. The Bench Book contains information and directives on, among other things, state and federal statutes and case law, court rules, and judicial orders handed down by the SCCA. Ex. 12.

---

[2] S.C. Judicial Dep't, Summary Court Judges Benchbook, "General," ch. C § 1, "The Constitution," https://www.sccourts.org/summaryCourtBenchBook/displaychapter.cfm?chapter=GeneralC#C1 (last visited April 10, 2022).

On March 14, 2016, the United States Department of Justice issued a "Dear Colleague" letter emphasizing "basic constitutional principles relevant to the enforcement of fines and fees." Ex. 13 (emphasizing that due process and equal protection principles require that "[c]ourts must not incarcerate a person for nonpayment of fines and fees without first conducting an indigency determination and establishing that failure to pay was willful"). The SCCA sent this letter to all South Carolina magistrate judges in March 2016. *Id*. at 16711. Defendant Reinhart read the letter at the time it was sent. Ex. 7 at 162:19–25. Based on his knowledge of practices in the LCMC, he saw similarities between the way the LCMC collected fines and fees and the descriptions of unconstitutional behavior outlined in the letter. *Id*. at 167:22–168:12. Despite making these connections, Defendant Reinhart did nothing as Chief Judge to change administrative policies or practices in the LCMC to deviate from these unconstitutional practices. *Id*. at 165:2–14. Indeed, he did not even discuss the letter with anyone else in the LCMC or the SCCA, nor did he conduct any research on any of the U.S. Supreme Court cases cited in the letter. *Id*. at 165:16–167:12.

No South Carolina law authorizes the use of bench warrants to automatically arrest and jail people for nonpayment of court fines and fees without first determining whether nonpayment was willful. *See* S.C. Code Ann. §§ 22-5-11 to 38-53-70. In fact, the South Carolina Attorney General's Office construes state law as *prohibiting* the use of bench warrants as commitment papers. Ex. 14 (advising Defendant Koon's predecessor that a bench warrant "should not be considered as authority to incarcerate an individual for the purpose of serving any sentence of imprisonment imposed by a magistrate"). The Bench Book takes a similar stance, advising: "A Bench warrant, regardless of its form . . . may *not* be used to initiate a criminal action. It is a form of process to be used to bring a defendant back before a particular court on a particular charge for a specific purpose." Ex. 12 (Chapter C, "Warrants") (emphasis added). Nowhere does the Bench Book instruct judges that they can issue a bench warrant to arrest a person for failure to pay fines and fees and then incarcerate them *without a hearing* unless they pay the full amount listed on the face of the bench warrant. *See generally id*.

B.     The cumulative impact of these policies and procedures resulted in the widespread jailing of indigent people without pre-deprivation hearings to determine willfulness and without the assistance of counsel.

Under both the Default Payment and Trial in Absentia Policies, the automatic issuance of nonpayment bench warrants led to the jailing of thousands of indigent people without a pre-deprivation hearing to determine whether the failure to pay was willful and without the assistance of counsel. *See supra* SOF Part I. Court records demonstrate the impact of these practices. ECF No. 21-8 ¶¶ 4–12. For each nonpayment bench warrant that issued, a notation of "Failure to Comply" or "Archived Bench Warrant" was entered into the case records. *Id*. Online records from the two months between February 1 and March 31, 2017, show that the LCMC recorded such notations in 204 cases corresponding to 183 separate individuals. *Id*. ¶ 17; ECF No. 21-19. Similarly, online Detention Center records show that in just four weeks from May 1 to May 28, 2017, Lexington County incarcerated at least fifty-seven people on nonpayment bench warrants issued by the LCMC. ECF No. 21-5 ¶¶ 4–11. And between September 15 to October 19, 2017, Lexington County incarcerated at least another fifty-seven people on nonpayment bench warrants. ECF No. 43-1 ¶¶ 9–13.

The prevalence of these practices is further evidenced by a memorandum that South Carolina Supreme Court Chief Justice Donald W. Beatty issued on September 15, 2017, titled "Sentencing Unrepresented Defendants to Imprisonment" (Memorandum). ECF No. 40-1. The Chief Justice started by stating that "[i]t has continually come to my attention that defendants, who are neither represented by counsel nor have waived counsel, are being sentenced to imprisonment." *Id*. The Memorandum reiterated to all South Carolina magistrates and municipal judges that this is "a clear violation of the Sixth Amendment right to counsel and numerous opinions of the Supreme Court of the United States." *Id.* at 2 (citing *Argersinger v. Hamlin,* 407 U.S. 25 (1972); *Scott v. Illinois,* 440 U.S. 367 (1979); *Alabama v. Shelton,* 535 U.S. 654 (2002); *Faretta v. California,* 422 U.S. 806 (1975)).

LCMC magistrate judges reacted by commenting on the "mess" they believed the Memorandum caused, despite the longstanding nature of the cases and principles cited within it.

*See, e.g.*, Ex. 15. In fact, Defendant Adams testified that the practice of automatically issuing nonpayment bench warrants was so common and widespread that during the annual mandatory program for summary court judges held in November 2017 (2017 Mandatory Meeting), a room full of magistrate judges "erupted" in surprise upon learning that these practices were unconstitutional, and Justice Beatty "had to calm everybody down and tell [them] to pay attention." Ex. 5 at 158:19–159:2; *see also* Ex. 6 at 331:19–332:3 ("Q. Do you remember anything that was particularly confusing to the judges . . . [?] A. It kind of all was. I mean, those were some major changes and a lot of us have been judges for . . . 15 years or more."). Staff members within the LCMC also reacted with confusion. Ex. 16.

Shortly after Justice Beatty made this announcement and while the 2017 Mandatory Meeting was ongoing, Defendant Adams directed Ed Lewis, Chief Court Administrator of the LCMC, to coordinate with the County Sheriff's Department to "have all Lexington County Magistrate Court Bench Warrants temporarily recalled." Ex. 17; *see also* Ex. 5 at 209:16–24; Ex. 6 at 326:16–24; Ex. 10 at 198:2–13. This bench warrant recall was not a state-wide directive— the LCMC did this, at the direction of Defendant Adams. Ex. 5 at 209:16–24. Indeed, in an email in which Captain Mark W. Joyner of the Sheriff's Department asks whether the changes to bench warrants "affect [magistrate bench warrants] state wide or just [in Lexington County]," Lewis responds, "I cannot speak on behalf of other counties." Ex. 18; *see also* Ex. 19.

Nearly 6,000 bench warrants, spanning almost four decades, were recalled by the LCMC, illustrating the pervasiveness of Defendants' illegal practices. Ex. 11; Ex. 5 at 215:15–23; Ex. 7 at 182:15–183:8 ("When we recalled bench warrants, I saw bench warrants that went back to when I was in high school . . . I graduated in '84 from high school."). Of these, 1,118 bench warrants were from Irmo Magistrate Court, where Defendant Adams is the only magistrate, a figure significantly higher than the number recalled in relation to other courts within the LCMC. Ex. 11 (Lexington: 463; Batesburg: 104; Swansea: 537; Oak Grove: 199; Cayce: 408). Defendant Adams testified that as a whole, "very few" bench warrants were reissued after an evaluation of their constitutionality. Ex. 5 at 213:20–214:10.

14

III.    **Defendants are collectively responsible for widespread violations of the Sixth and Fourteenth Amendments in Lexington County Magistrate Courts.**

   A.    <u>The Chief and Associate Chief Judge for Administrative Purposes are responsible for exercising administrative, policymaking, and supervisory authority over Lexington County Magistrate Courts.</u>

Under Article V, Section 4 of the South Carolina Constitution, the Chief Justice of South Carolina is responsible for appointing the Chief and Associate Chief Judges for Administrative Purposes of the Summary Courts in each county.[3] The Chief Justice makes these appointments through orders that grant the Chief and Associate Chief Judges explicit administrative authority to make policies and provide supervision over magistrate courts, and the Judges are expected to carry out those responsibilities. *See, e.g.*, Exs. 2, 3. This includes administrative authority to:

- "Monitor all summary court judges within the county to ensure . . . the constitutional and statutory rights of defendants and victims are being upheld";

- "Establish within the county a procedure . . . to ensure that court-generated revenues are collected, distributed, and reported in an appropriate and timely manner";

- Convene judges on a "quarterly basis . . . to formulate uniform procedures in the county summary court system";

- Report to the SCCA "any significant or repetitive non-compliance" by magistrate judges concerning the provisions of the order;

- "Coordinate the planning of budgets for the magistrates in the county";

- "Provide for the orderly assignments of any case within the jurisdiction . . . to any magistrate of the county"; and

- "Designate the hours of operation of each magistrate's court office."

Ex. 3 ¶¶ 5, 7–8, 11–12, 17, 19; *see also* Ex. 2.

_____

[3] S.C. Const. art. V, § 4 ("The Chief Justice of the Supreme Court . . . shall appoint an administrator of the courts and such assistants as he deems necessary to aid in the administration of the courts of the State.").

In her transition to Chief Judge in 2017, Defendant Adams "read the order so [that she] knew those responsibilities." Ex. 6 at 291:24–292:4. And in the transition meeting between her and Defendant Johnson, who was taking over as Chief Judge, Defendant Adams advised him to "read the [order appointing Chief Judges]" and to keep attendance of judges who do not come to the quarterly meetings "because it clearly states in the order that it's mandatory that all the judges participate in that quarterly meeting." Ex. 6 at 271:10–276:23.

Defendant Adams also noted the extensive responsibilities the Chief Judge role entailed. In testifying that she was thankful to step down from her position as Chief Judge, she stated that the position "takes a lot of time" and that Chief Judges "get pulled into other things," including "deal[ing] with the budget for all the magistrates," "attend[ing] county council meetings," and dealing with "reports . . . if something's not going right at the detention center . . . [as] the contact point for other department heads in the county." Ex. 6 at 278:17–279:5. A part of her responsibility as Chief Judge included supervising "the staff for all of the central courts and do[ing] their evaluations." *Id*.; *see id*. at 291:9–14 ("[t]here was a lot to do . . . meetings to go to and other staff to supervise"). Defendant Reinhart likewise testified that as Chief Judge, he "set the central court schedules, created the weekend bond court schedule, supervised . . . Ed Lewis . . . [and was] ultimately . . . responsible for the central courts and central court staff, serv[ing] as a liaison for the magistrate's court to the county." Ex. 7 at 94:10–23.

      1.     *As administrators, policymakers, and supervisors, the Chief and Associate Chief Judges are required to monitor other magistrate judges to ensure indigent defendants' constitutional rights are upheld.*

The Chief and Associate Chief Judges of Lexington County are obligated to monitor all magistrate judges to ensure that the constitutional and statutory rights of indigent defendants are upheld. Ex. 3 ¶ 5. But they have failed to do this for decades. *See, e.g.*, Ex. 5 at 56:14–23, 170:9–17, 215:15–17; Ex. 7 at 143:2–145:11; Ex. 10 at 80:5–12, 130:24–132:3, 131:7–15; Ex. 11. Indeed, Lewis testified that to his knowledge, the LCMC does not "have any policies in place to

ensure that magistrate judges are complying with the [United States] [C]onstitution." Ex. 10 at 133:21–134:2.

The Chief and Associate Chief Judges are also obligated to report to the SCCA "any significant or repetitive non-compliance" by magistrate judges concerning the provisions of the order. Ex. 3 ¶ 19. Defendant Adams testified that if an instance of noncompliance involved something "as serious as violating somebody's constitutional rights or not holding a *Bearden* hearing when they needed to, then . . . [she] would go directly to the [SCCA]." Ex. 6 at 344:6–10. But Defendants Reinhart and Adams both admit that during their respective tenures as Chief Judges, they did not understand *Bearden* or any of the U.S. Supreme Court's most seminal holdings interpreting the Sixth Amendment's guarantee of right to counsel for defendants appearing in the LCMC. Ex. 7 at 126:19–129:2; Ex. 5 at 191:25–192:24; Ex. 6 at 340:13–341:7 ("Q. And did you do anything to monitor compliance with *Bearden* in your courts? A. Well, in my own individual court, I just don't think I was taught that and understood that. After Chief Beatty's instructions then that changed because we knew."). When asked whether a person arrested for nonpayment of fines and fees was provided access to a public defender after their arrest, Defendant Reinhart merely responded, "[t]hey weren't *prevented* access." Ex. 7 at 148:11–17 (emphasis added).

> 2.   *As administrators, policymakers, and supervisors, the Chief and Associate Chief Judges are responsible for establishing and overseeing uniform procedures for revenue collection.*

The Chief and Associate Chief Judges are assigned responsibility for establishing and overseeing procedures "to ensure that court generated revenues are collected, distributed, and reported in an appropriate and timely manner." Ex. 3 ¶ 17. As noted above, the Chief and Associate Chief Judges in the LCMC have utilized nonpayment bench warrants to enforce the payment of fines and fees for decades. *See supra* SOF Part II.

In July 2017, shortly after this lawsuit was filed, Defendant Adams and Ed Lewis began discussing the option of implementing the "Setoff Debt Program" (SDP) in the LCMC. Ex. 20.

The SDP is a program that many South Carolina counties use to collect outstanding fines and fees by garnishing refunds issued on state and federal tax filings. Ex. 10 at 24:6–15, 48:8–15; *see also*, *e.g.*, Ex. 5 at 107:19–108:1; Ex. 20; Ex. 21 at 261:7–21; Ex. 22. There was nothing preventing the Chief and Associate Chief Judges from implementing this program before 2017. *See*, *e.g.*, Ex. 6 at 306:10–13; Ex. 23 ("We . . . talked about [the SDP] for years but never took any action."); Ex. 24. Indeed, Defendant Adams testified that she was aware the LCMC could participate in the SDP at least as early as April 2015, but she was unable to state why the LCMC chose not to implement the SDP between April 2015 and July 2017. *See* Ex. 6 at 302:9–303:14; Ex. 24.

As Chief Judge, Defendant Adams directed Lewis and other court staff to look into the program. Ex. 6 at 294:7–295:3, 352:8–10 ("Q. Did you ask Ed Lewis and Carlie Woods to head that up? A. Yes."); *see also* Ex. 25 (Defendant Adams asking magistrate judge to investigate implementation of SDP). Defendant Adams organized staff and allocated work in relation to the SDP so that the LCMC could handle its operations. Ex. 6 at 352:23–353:7. She also appointed the hearing officer for the SDP, who bears responsibility for handling protests from debtors participating in the program. *Id*. at 354:4–20; Ex. 23.

3.    *As administrators, policymakers, and supervisors, the Chief and Associate Chief Judges formulate uniform policies and procedures in Lexington County magistrate courts.*

The Chief and Associate Chief Judges have the authority to convene all magistrate judges within the county "on a quarterly basis . . . to formulate uniform procedures in the county summary court system." Ex. 3 ¶ 7. Indeed, in addition to the Setoff Debt Program, Default Payment Policy, and Trial in Absentia Policy, the Chief and Associate Chief Judges in Lexington County promulgated and implemented numerous other policies and procedures to oversee administrative operations in the LCMC. *See*, *e.g.*, Ex. 6 at 366:18–368:5; Ex. 7 at 81:25–87:25 (Defendant Reinhart directing Lewis to draft payment policy); Ex. 26 (coordinating with Sheriff's Department on procedures for discharges to Bond Court); Ex. 27 (coordinating

development and implementation uniform civil procedures); Ex. 28 (inclement weather policy); Ex. 29 (courtroom media policy); Ex. 30 (court payment policy); Ex. 31 (emergency restraining order procedure for holidays and weekends).

The Chief and Associate Chief Judges have long held the supervisory authority to establish county-wide administrative procedures for the lawful and efficient operation of the LCMC. In 2019, for example, Defendant Adams exercised her authority as Chief Judge to create a procedure to screen defendants in Bond Court for public defender eligibility. Ex. 6 at 366:18–368:5; Ex. 32 at 14; Ex. 33; Ex. 34 at 120:1–17, 154:6–19 ("[S]he called me up and told me we are going to do this . . . . I told her we were on board. And so she set a date, and we went through."). A procedure to bring a defendant either back to the traffic court or to the Bond Court within 24 hours of being served with a bench warrant was *not* in place in 2017—but it could have been. Ex. 21 at 242:8–246:22 ("Q. Is there any reason that you can think of that this procedure could not have been implemented in January of 2017? A. No."); Ex. 35 at 3823.03.

B. Lexington County is responsible for adequately funding the public defender system that serves Lexington County Magistrate Courts.

The public defender system in South Carolina is a "county-based system," whereby counties are grouped within the state's sixteen judicial circuits.[4] The South Carolina Indigent Defense Act of 2007 requires each county to appropriate annual funding for indigent defense at no less than the amount it provided the immediate previous fiscal year. *See* S.C. Code Ann. § 17-3-550. Robert Madsen is the Public Defender for the Eleventh Judicial Circuit of South Carolina, which includes the Lexington County Public Defender's Office (LCPDO). Ex. 34 at 8:22–9:6. Under the Indigent Defense Act, circuit public defenders must "enter into an agreement with the appropriate county within the judicial circuit to administer the funds provided" for indigent defense in that county. S.C. Code Ann. § 17-3-560. The Act also provides that "the circuit public

_____

[4] S.C. Comm'n on Indigent Def. (SCCID), SCCID Public Defenders, https://sccid.sc.gov/about-us/circuit-public-defenders (last visited March 30, 2022).

defender in each judicial circuit may maintain offices and employ . . . staff as necessary to provide adequate and meaningful representation of indigent clients within the counties." S.C. Code Ann. § 17-3-540(A). "These employees are employees of the administering county. . . . All personnel costs . . . must be paid by the administering county, but must be reimbursed to the administering county from operational funds provided to the circuit public defender office from county and state appropriated funds." S.C. Code Ann. § 17-3-540(B).

On June 24, 2009, Madsen entered into an "Intergovernmental Agreement" with the County, which explicitly states:

- "The Public Defender shall comply with *all* Lexington County budget and financial policies, procedures, and ordinances";

- "The Public Defender agrees to follow the policies and procedures adopted by the County for the purpose of processing applications for employment and extending offers of employment";

- "The County shall fund the Public Defender Department in it[s] annual budget process as it does with County departments";

- "If there are insufficient funds in the P.D. Fund in the County's sole discretion, the County may terminate employee positions and make any other cuts that are necessary";

- "*All* State funds shall be deposited into the County bank account or accounts created for the Public Defender. The Public Defender shall account for all state funds that it receives and shall direct that all state funds be deposited into the County P.D. Fund"; and

- "*All* funds from other counties within the Eleventh Judicial Circuit shall be deposited with Lexington County. The Public Defender shall be responsible for obtaining written agreements with such counties that are satisfactory to the County."

Ex. 36 ¶¶ 4, 6, 8–11 (emphasis added). This operative agreement is the only one that has been in place between Lexington County and the Eleventh Circuit Public Defender since 2009. Ex. 34 at 29:19–30:1.

1.    *Lexington County Council is the final policymaker when it comes to the funding of public defense in Lexington County.*

The LCPDO serves the magistrate, general sessions, and family courts within Lexington County. Ex. 34 at 14:10–15. Funding for the LCPDO comes from two sources: the state and Lexington County. *Id.* at 34:8–22; Ex. 36. State funding is largely determined by the County's population according to the 2010 census, but funding from the County is based solely on budgeting decisions made by the Lexington County Council. Ex. 34 at 47:12–50:3, 169:24–171:5. Lexington County has never audited the LCPDO to determine whether it was "appropriately staffed for the public defense needs of all Lexington County court systems." *Id*. at 39:9–24; *see also* Ex. 58 at 75:8–76:10. Discussions about appropriate staffing for the County's public defense needs have only come up through the County's budget process, which requires Madsen to apply to the County Council for funding each year. Ex. 34 at 39:9–24 ("Q. So no one's come to you affirmatively to just have that discussion; it only comes up when you're making budget requests for additional staffing? A. Correct."); *see also id*. at 47:12–50:3.

Despite his role as the Eleventh Judicial Circuit Public Defender, Madsen lacks discretion to hire new staff as necessary "to provide adequate and meaningful representation of indigent clients within the counties." *See* S.C. Code Ann. § 17-3-540(A); Ex. 34 at 8:22–9:6, 51:22–52:15. Randolph Poston, the Finance Director of Lexington County, testified that the County Council is the final decisionmaker when it came to amounts appropriated for the County's various departments. Ex. 58 at 41:16–43:18. Any funding the County allocates for public defense is generally tied to a specific employment position and if the request by Madsen is not approved, "that position is not created" at all. Ex. 34 at 51:22–52:15; *see also* Ex. 58 at 145:14–22. This leads to staffing shortages, Madsen says, and "it takes longer to get cases resolved[,] which results in people sitting in jail longer." Ex. 34 at 78:19–23.

2.      *Lexington County has failed, and continues to fail, to provide adequate funding for indigent defense despite Madsen's repeated requests for additional funding.*

Lexington County has historically funded, and continues to fund, indigent defense at a fraction of the funding that other South Carolina counties with similar populations provide—and at a fraction of what it spends to fund its Solicitor's Office. Ex. 37 at 4, 7. As noted below, Madsen has repeatedly made funding increase requests to the County Council for nearly all of the past twelve years, but the Council has denied or substantially reduced amounts allocated for nearly all of these requests. *See* Ex. 34 at 55:3–56:16.

In 2010, for example, Madsen asked the County to increase its funding for the LCPDO from $286,500 to $500,000. Ex. 38 at 16 (Madsen's 2010 letter to County); Ex. 39 at 19 (Office of Indigent Defense Chart showing total County funding for 2009 to 2010). In doing so, he pointed out his office handles 70% of all General Sessions cases and almost all juvenile criminal cases in Lexington County but receives only 11.3% of the funding the County provides for the Solicitor's Office. Ex. 38 at 16. He also informed the County it had only increased funding for the LCPDO by 0.018% over the previous seven years, despite a 100% increase in the number of clients his office had seen during that same period. *Id*.

That same year, Madsen provided the Council with a chart compiled by the state Office of Indigent Defense (OID), showing county contributions for their public defenders' offices across the state. Ex. 39. Madsen noted that even if Lexington County approved the "substantial" increase he requested, it would still be much smaller than the funding provided by other counties. Ex. 38 at 16. Madsen informed the Council that the caseloads of the attorneys in the Public Defender's Office already "greatly exceed[ed]" the maximum set by the American Bar Association. *Id*. Despite Madsen's presentation, the County denied his request for additional funding. *See* Ex. 40 at 42 (Madsen's 2011 letter stating the County's funding increase over previous eight years was still only 0.018%, indicating no increase was provided in 2010). Because of the County's failure to adequately fund indigent defense in 2010, Madsen had to lay off some of his attorneys, necessarily leaving the remaining attorneys with even greater

caseloads. Ex. 34 at 85:17–86:4. Despite the economic recession at that time affecting the County and its agencies more broadly, the LCPDO was the only County agency that year to lay off attorneys to cover its funding shortfall. *See id.*

In 2011, Madsen requested an increase in funding to $627,597, again citing the County's disparate funding in comparison to other counties and the Solicitor's Office. Ex. 40 at 42. Madsen noted that Lexington County ranked 37th out of 46 counties in per capita funding of public defenders' offices. *Id.*; *see also* Ex. 41. He emphasized that due to the historical lack of funding which left him with minimal staff, another year without increased funding would force him to let go of attorneys and lead to a "catastrophic" effect on the County's jail population. Ex. 40 at 43. The County only granted $386,500 in public defense funding, nearly $242,000 less than Madsen's request. Ex. 42 at 77. As he predicted in the budget request, Madsen was forced to lay off two additional employees. Ex. 43 at 63 (2012 letter indicating Madsen "had to layoff [sic] two employees . . . severely hinder[ing] [their] ability to provide appropriate representation for [their] clients"); Ex. 40 at 43.

In 2012, Madsen requested an increase in funding to $620,410. Ex. 43 at 63. Madsen informed the Council that despite the funding increase from the prior year, the LCPDO's budget was still just 15% of the funding the Solicitor's Office received. *Id*. Madsen again provided the Council with a chart showing that, even with the previous year's increase, Lexington County ranked 36th out of 46 counties in per capita funding of their indigent defense systems. *Id.*; Ex. 44 at 72. Madsen also provided the County with a report from OID showing Lexington County had the highest average caseload per attorney out of the sixteen judicial circuits in the state—more than double the ABA standard. Exs. 45, 46. Despite the evidence Madsen provided to the Council to demonstrate it was underfunding indigent defense, the Council denied his request entirely. Ex. 47 at 2 (indicating budget of $368,500, the same as in the previous year).

In 2013, Madsen requested a funding increase to $514,806. *Id.* at 1. As part of this increase, Madsen asked the County to fund two new attorney positions, one to practice in the Magistrate Courts and the other to practice in Family Court representing juveniles, because

"neither area has received the Constitutionally mandated representation or attention they deserve." *Id*.; *see also* Ex. 34 at 62:8–64:15. The Council approved nearly all the funds Madsen requested, allocating $514,306. Ex. 34. at 62:8–64:15. This marked the *first* time in Lexington County's history that a public defender was available to Magistrate Court defendants. *Id*.

In 2014, Madsen requested a substantially smaller budget increase of $26,990 to cover County-mandated pay raises. Ex. 48 at 2. The County denied Madsen's request. *Id*.; *see also* Ex. 34 at 70:12–72:22. In 2015, Madsen requested the same increase of $26,990 which was again denied. Ex 34. at 72:25–73:3; Ex. 48 at 1.

In 2016, Madsen asked for an increase of $29,626 to cover County-mandated pay raises and $188,905 to fund three new attorney positions. Ex. 49 at 1–2; *see also* Ex. 34 at 79:4–21. Madsen informed the Council that he needed these new positions because the LCPDO had seen General Sessions caseloads increase by more than 600 new clients per year, which equaled the caseload of four attorneys under the ABA standard of 150 felony cases per attorney annually. Ex. 49 at 1. Madsen went on to say these increases had caused problems with the current infrastructure, causing significant increases in the jail population and the length of time to resolve cases. *Id*. The County approved the small funding increase for County-mandated pay raises but denied Madsen's request for three new attorney positions entirely. Ex. 34 at 79:4–21.

In 2017, Madsen did not request a funding increase, and the County allocated the same amount as in 2016. Ex. 50; Ex. 51 at 259.

In February 2018, during the first budget request cycle after Plaintiffs filed this lawsuit, Madsen asked for $1,129,538—more than double the budget approved in 2017. Ex. 52 at 1. When asked why this request was so much higher than previous years, Madsen testified it was partly a reaction to being sued for not asking for enough money from the County.[5] Ex. 34 at

---

[5] Madsen was originally named as a defendant in this lawsuit, ECF No. 1, but the claims against him were voluntarily dismissed by stipulation in 2018 pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. ECF No. 100.

89:15–90:2. But when asked whether he thought his request was an appropriate amount for what the LCPDO needed to provide services to indigent people in Lexington County courts, Madsen answered:

> Well, I would say . . . that number was even low, but I thought that [it] was potentially relatively realistic and palatable. Like I said, if I go in and ask for $5 million, I know that I am just going to get laughed out of there, and it's—they just would not consider that realistic, *even if that's what we needed to do our job*. And so, like I said, I'm trying to kind of toe that line a little bit to what I think is potentially palatable and to kind of move the funding in our office forward.

Ex. 34 at 91:1–11 (emphasis added).

Madsen again told the Council that Lexington County had historically underfunded the LCPDO and that it was currently receiving only 19% of the funding the Solicitor's Office received. Ex. 52 at 1. He reiterated, as with prior years, that the substantial increase was necessary to bring the office in parity with similarly populated counties. *Id*. As part of the funding request, Madsen asked the County to create three new attorney positions, one of which would become the second attorney available to represent indigent defendants in the LCMC. *Id*.; Ex. 59 at 299. Notwithstanding the pending litigation against Lexington County for its failure to adequately fund the LCPDO, the County Council completely denied Madsen's request for increased funding. Ex. 34 at 95:18–96:11.

In 2019, Madsen asked the County to increase indigent defense funding from $543,932 to $1,024,531, with yet another reminder that Lexington County had historically underfunded the LCPDO relative to similarly populated counties and the Solicitor's Office. Ex. 53 at 1. As part of the funding increase, Madsen again asked the County to create three new attorney positions, including one to represent indigent defendants in LCMC and one to represent juveniles in Family Court. *Id*. The County reduced by nearly half the request for an additional $480,599 over the previous year and granted a total of $785,614. Ex. 34 at 124:4–18. As a result, Madsen was only able to hire one attorney to be split between the Magistrate and Family Courts. *Id*. This was only the second attorney to be appointed to represent defendants in the LCMC—albeit on a part-time

basis—since the first attorney was appointed six years earlier. *See id*.; *see also* Decl. of Edward C. Monahan in Supp. of Pls.' Mot. For Summ. J. (Monahan Decl.), Ex. A at 20 ("A second public defender [for the LCMC] began September 23, 2019.").

In 2020, Madsen asked for a funding increase to $920,390 and the addition of an investigator for the LCPDO. Ex. 54 at 357. The County denied his request, and the investigator position was not created. Ex. 34 at 125:1–16. In 2021, Madsen asked for another funding increase to $1,229,198, which was also denied in full. Ex. 55 at 94.

Despite Madsen's request for an increase in funding for the LCPDO in eleven out of the last twelve years and his repeated provision of evidence showing that Lexington County was underfunding indigent defense, the County has either denied Madsen's requests entirely or substantially reduced the increase granted for indigent defense in ten out of those eleven years.

As Plaintiffs' expert Edward C. Monahan[6] found, "Lexington County is substantially underfunding the public defender office" compared both to similarly populated counties statewide and to the funding the County provides to the Solicitor's Office. Monahan Decl., Ex. A at 2, 32. Monahan found that "[g]iven the comparisons to other South Carolina counties, the data is clear that the [LCPDO] is underfunded . . . mean[ing] that the [LCPDO] is not receiving the minimally adequate financial resources to provide meaningful representation to all eligible clients in [the LCMC]." *Id*. at 32.

Lexington County provides roughly half the amount of funding for public defender services provided by the comparably populated South Carolina counties of York and Horry. *Id*. at 33.[7] For fiscal year 2017, Lexington County allocated only $543,932 for public defender

---

[6] Monahan served 38 years as a public defender and led Kentucky's state-wide public defender system from 2007 to 2017. He also currently serves as the chair-elect of the Government and Public Sector Lawyers Division Counsel of the American Bar Association. Monahan Decl. at 1.

[7] According to 2020 U.S. Census estimates, Lexington County has a population of 293,991, while York County has a slightly smaller population of 282,090 and Horry County has a slightly larger population of 351,029. U.S. Census Bureau, Lexington County, S.C., QuickFacts,

services. *Id.* at 32; Ex. 49 at 2. York and Horry Counties provided more than double that amount for public defender services the same year, allocating $1,353,465 and $1,092,214 respectively. ECF No. 66-6, Ex. B at 2. For fiscal year 2020, Madsen requested $1,129,538 in funding—but only received $785,614—which is 24% of the funding the County provided to the Solicitor's Office that same year. Monahan Decl., Ex. A at 32. According to Madsen, public defense funding in Lexington County is still "not . . . equal to other counties [of similar] size." Ex. 34 at 53:8–16 ("[A]t the last census we [had] 260,000 residents. Aiken County [had] 160,000 residents . . . . They get $1.9 million from their county, and we're [$785,000] and change.").

> 3.    *Through inadequate funding, Lexington County has failed, and continues to fail, to ensure indigent defendants in magistrate courts have adequate access to counsel.*

Each year, thousands of indigent people face charges in the LCMC that carry the possibility of a jail sentence. Monahan Decl., Ex. A at 18–19. Monahan found that there were 8,725 cases in the LCMC with charges for which incarceration was a possible sentence. *Id.* at 15–17. Monahan then applied percentages of cases involving indigent defendants in General Sessions and other comparable courts to cases in the LCMC. *Id.* at 17–18. Based on these values, Monahan concluded that between 6,107 and 6,980 of the cases pending in the LCMC in 2019 involved indigent defendants facing incarceration as a possible sentence. *Id.* But only 795 cases involved a public defender—an appointment rate of 9%—which is substantially lower than the 70% appointment rate in Lexington County General Sessions Court. *Id.* From this, Monahan estimated there were approximately 5,312 to 6,185 cases where indigent defendants were prosecuted in the LCMC without the assistance of counsel on charges carrying incarceration as a possible outcome. *Id.* Monahan also concluded that this 9% appointment rate "result[s] in 91% of [LCMC] cases prosecuted with the defendant not being afforded a lawyer," pointing to a "tragic picture of the pattern and practice of systemic denials of constitutional rights in [the LCMC]."

---

https://www.census.gov/quickfacts/fact/table/horrycountysouthcarolina,yorkcountysouthcarolina, lexingtoncountysouthcarolina/POP010220#POP010220 (last visited April 8, 2022).

Monahan Decl., Ex. A at 37; *see also* Ex. 34 at 127:15–25 ("Q. Do you have any reason to dispute the [9% appointment rate] that he put in his report . . . ? A. No.").

Due to the Council repeatedly denying Madsen's requests for increasing the LCPDO's budget, there are currently only two public defenders assigned to represent all indigent defendants in cases handled by the LCMC, though funding has recently been made available for a third. Monahan Decl., Ex. A at 20–21; Ex. 21 at 337:23–338:3. Back in 2013, when the County provided funding for its first public defender to represent indigent defendants in the LCMC, that public defender's caseload quickly exceeded the ABA standard of 400 misdemeanor cases annually. Ex. 56 at 216. And in 2019, when the County provided funding for a second, part-time public defender in the LCMC, both public defenders had average caseloads that exceeded the ABA maximum within the first year. Ex. 57 at 7. Madsen testified that the two public defenders are still over the ABA standard. Ex. 34 at 129:19–130:7; *see also* Monahan Decl., Ex. A at 19–26. Indeed, in 2020, these two public defenders handled "over 1,300 cases" combined, which is far more than the ABA allows for three full-time defenders handling misdemeanor cases and far less than the total number of indigent defendants being prosecuted in the LCMC. Ex. 34 at 130:13–15; Monahan Decl., Ex. A at 25 (noting "between 5,312 to 6,185 persons were likely indigent but were not appointed counsel in 2019 cases in [the LCMC]"). An increase in dedicated staffing for the LCMC would mean public defenders could represent more individuals. Ex. 34 at 129:14–18. But in the absence of more funding from the County, the LCPDO cannot do anything more to "meet[] the rights of people accused in the [LCMC]" with respect to their Sixth Amendment right to counsel. *Id*. at 153:1–9.

## STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Harley v. Wilkinson*, 988 F.3d 766, 768 (4th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). The party seeking summary judgment bears the initial burden of demonstrating there are no genuine issues of material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). If this showing is made, the nonmoving party must demonstrate specific, material facts that give rise to a genuine issue. *Id.* at 324. Evidence presents a genuine issue of material fact when "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Any inference drawn from the facts should be viewed in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## ARGUMENT

### I.    Section 1983 standard.

Each of Plaintiffs' claims is brought under 42 U.S.C. § 1983. To obtain relief under Section 1983, a plaintiff "must prove that the charged state actor (1) deprived plaintiff of a right secured by the Constitution," and "(2) that the deprivation was performed under color of . . . state law." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

To establish causation under Section 1983, a plaintiff must show an "affirmative causal link" between acts or omissions of the culpable actor and the constitutional injury. *Slakan v. Porter*, 737 F.2d 368, 376 (4th Cir. 1984). Causation can be established in a variety of ways, including by evidence that the defendant violated the constitution through direct intervention, *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 735 (4th Cir. 2013) (defendant liable for repeatedly tasing unarmed arrestee), by implementing or failing to remediate an unconstitutional policy, *Gordon v. Schilling*, 937 F.3d 348, 360 (4th Cir. 2019) (defendant "fail[ed] to rescind . . . Guidelines for eleven months after assuming the role of Chief Physician"), or by failing to adequately train or supervise a subordinate officer, *Shaw v. Stroud*, 13 F.3d 791, 800 (4th Cir. 1994) ("[Plaintiff's] death was a natural and foreseeable consequence of [Defendant's] failure to investigate, or even to address, the pervasive violent propensities of one of his officers.").

A local governmental entity can be held liable as a person under Section 1983 when its "policy or custom" is the "moving force of the constitutional violation." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

**II.    Plaintiffs and Class Members are entitled to summary judgment on their denial of counsel claim under the Sixth Amendment (Claim Two).**

The United States Constitution guarantees every criminal defendant the fundamental right to effective assistance of counsel. U.S. Const. amend. VI; *Gideon v. Wainwright*, 372 U.S. 335 (1963) (extending the right to counsel to indigent defendants in state court). The right to counsel extends to all criminal proceedings that involve incarceration, whether for felonies or misdemeanors. *Argersinger v. Hamlin*, 407 U.S. 25, 36-37 (1972) (actual incarceration); *Scott v. Illinois*, 440 U.S. 367, 373–74 (1979) (same); *Alabama v. Shelton*, 535 U.S. 654, 674 (2002) (suspended incarceration). And it applies with equal force to defendants prosecuted in municipal and magistrate courts. *See Wilbur v. City of Mount. Vernon*, 989 F. Supp. 2d 1122, 1134 (W.D. Wash. 2013) ("Having chosen to operate a municipal court system . . . defendants are obligated to comply with . . . the Sixth Amendment."); *Tucker v. State*, 394 P.3d 54, 62–63 (Idaho 2017) ("[I]t is the State's obligation to provide constitutionally adequate public defense at critical stages of the prosecution.").

A criminal defendant's right to counsel attaches at their initial appearance, *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 212 (2008), and extends to all critical stages of the criminal prosecution. *United States v. Cronic*, 466 U.S. 648, 654–56 (1984); *see also Avery v. Alabama,* 308 U.S. 444, 446 (1940). Critical stages include, *inter alia*, certain arraignments, *Hamilton v. Alabama*, 368 U.S. 52, 53–54 (1961); *White v. Maryland*, 373 U.S. 59, 60 (1963); preliminary hearings, *Coleman v. Alabama,* 399 U.S. 1, 9–10 (1970); plea negotiations, *Lafler v. Cooper*, 566 U.S. 156 (2012); *Missouri v. Frye*, 566 U.S. 134 (2012); *White,* 373 U.S. at 60; *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010); and when the incarceration portion of a suspended sentence is enforced against a defendant. *Argersinger*, 407 U.S. at 37; *Shelton*, 535 U.S. at 673–74. If a defendant is denied the actual assistance of counsel at any critical stage, there can be no conclusion other than that representation was not provided. *Cronic*, 466 U.S. at 659. In short, "[l]awyers in criminal cases 'are necessities, not luxuries.'" *Id*. at 653 (quoting *Gideon*, 372 U.S. at 344).

30

Undisputed facts demonstrate that Lexington County and the Chief and Associate Chief Judges are liable under Section 1983 for violating the Sixth Amendment rights of Plaintiffs and Class Members (Claim Two). *See supra* Statement of Facts (SOF) Part III. Plaintiffs and Class Members were, and continue to be, systemically denied their constitutional right to counsel because of Lexington County's failure to adequately fund indigent defense within the Lexington County Magistrate Courts (LCMC). *See supra* SOF Parts I–II. Additionally, Plaintiffs and Class Members were, and could in the future again be, deprived of their right to counsel at critical stages of their criminal proceedings because of the Chief and Associate Chief Judges' failure to appoint counsel prior to the imposition of jail for nonpayment of fines and fees. *Id*. This Court should fashion comprehensive equitable relief to protect the Sixth Amendment rights of Plaintiffs and Class Members.

      A.    <u>Lexington County is liable under Section 1983 for its failure to provide adequate funding for public defense in Lexington County Magistrate Courts.</u>

Lexington County has engaged in policies, procedures, and customs that cause systemic deficiencies in funding, staffing, and assignment of cases to public defenders with the result that indigent people in the LCMC are deprived of court-appointed counsel. *See supra* SOF Part III.B. *See, e.g.*, *Wilbur*, 989 F. Supp. 2d at 1133 ("The Court finds that the combination of contracting, funding, legislating, and monitoring decisions . . . caused the truncated case handling procedures that have deprived indigent criminal defendants [of Sixth Amendment rights]."). *Monell* has long established that a Section 1983 suit against a municipality covers *all* forms of relief. 436 U.S. at 690; *see also Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 36 (2010). Thus, injunctive relief is appropriate.

           1.    *Lexington County controls the creation and funding of all positions in the Lexington County Public Defender's Office.*

A "policy or custom for which a municipality may be held liable can arise . . . through the decisions of a person with final policymaking authority," or "through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Starbuck*

*v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)). *Monell* liability applies with equal force even where there is only "a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body . . . because even a single decision by such a body unquestionably constitutes an act of official government policy."); *Hunter v. Town of Mocksville, N.C.*, 897 F.3d 538, 554 (4th Cir. 2018) (finding "*a single decision* regarding a course of action in response to particular circumstances" is sufficient to meet the official policy requisite of municipal liability, "so long as that governmental unit possessed 'final authority to create official policy'"). "Relying on this precedent, [the Fourth Circuit] has held that a government policy or custom need not have received formal approval through the municipality's official decisionmaking channels to subject the municipality to liability." *Hunter*, 897 F.3d at 554 (quoting *Riddick v. Sch. Bd.*, 238 F.3d 518, 522 (4th Cir. 2000)).

In determining municipal liability under Section 1983, courts look to "whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 (1997); *see also Pembaur*, 475 U.S. at 480–81. The identification of which local "official has final policymaking authority" is a legal question to be determined by state law. *Starbuck*, 28 F.4th at 533 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). To answer this question, the Fourth Circuit looks to "the relevant legal materials, including state and local positive law, as well as the custom or usage having the force of law." *Hunter*, 897 F.3d at 555 (quoting *Riddick*, 238 F.3d at 523). Relevant to this analysis is whether "an official's discretionary decisions are constrained by policies not of that official's making." *Id.* at 555 (quoting *Praprotnik*, 485 U.S. at 127). When a decision is "subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies." *Id.* at 555

32

(quoting *Praprotnik*, 485 U.S. at 127) ("In other words, there is a marked difference between the authority to make final *policy* and the authority to make final implementing *decisions*.") (internal citations, quotations, and alternations omitted); *see also Valentino v. Vill. of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (in determining who is the final decisionmaker, courts look to "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.").

Under both South Carolina law and the "custom or usage having the force of law," the final policymaker on funding decisions for indigent defense in Lexington County is the Lexington County Council. *Hunter*, 897 F.3d at 555 (citations omitted); *see also* S.C. Code Ann. § 4-9-310 ("[T]he responsibility for policy making and administration of county government shall be vested in the county council."); S.C. Code Ann. § 4-9-140 ("County council shall adopt annually and prior to the beginning of the fiscal year operating and capital budgets for the operation of county government."); S.C. Code Ann. § 4-9-25 ("All counties of the State . . . have authority to enact regulations, resolutions, and ordinances, not inconsistent with the Constitution and general law of this State . . . . The powers of a county must be liberally construed in favor of the county . . . .").

Although the Lexington County Public Defender's Office (LCPDO) is overseen by Robert Madsen, the Public Defender for the Eleventh Judicial Circuit of South Carolina, funding for the LCPDO comes from just two sources: the State of South Carolina Commission on Indigent Defense and Lexington County. Ex. 34 at 8:22–9:6, 34:8–22; Ex. 36. The State determines funding based primarily on the County's population, following the same formula used for all 46 counties. Ex. 34 at 169:24–171:5. Funding from Lexington County, on the other hand, is based solely on budgeting decisions made by the Lexington County Council. *Id*. at 47:12–50:3. Despite his role as the Eleventh Judicial Circuit Defender, Madsen does not have *any* discretion to create a new attorney position—even if he feels it is necessary. *See* S.C. Code

33

Ann. § 17-3-540(A); Ex. 34 at 8:22–9:6, 51:22–52:15. Only the County Council and County Administrator have that power. Ex. 34 at 8:22–9:6, 51:22–52:15; Ex. 58 at 41:16–43:18. If the County Council turns down the Circuit Defender's request to create a new position in the LCPDO, no new position is created. Ex. 58 at 145:14–22; Ex. 34 at 51:22–52:15. Thus, the Council is responsible for the very existence of attorneys who provide constitutionally required public defense services within the LCPDO. Ex. 58 at 145:14–22; Ex. 34 at 51:22–52:15; *see also* Ex. 40 at 42–43; Ex. 43 at 63; Ex. 34 at 79:4–21; 95:18–96:11, 125:1–16. This is demonstrated by the fact that Madsen has repeatedly emphasized the historical and systematic underfunding of the LCPDO in comparison to both similarly populated counties in South Carolina and the Solicitor's Office in his budget requests to the County Council. Ex. 37 at 4, 7; Ex. 38 at 16; Ex. 39; Ex. 40 at 42–43; Ex. 41; Ex. 44 at 72; Ex. 45; Ex. 46; Ex. 52 at 1; Ex. 53 at 1. Still, the County has denied entirely or reduced substantially the funding increases Madsen has requested in ten out of the eleven years he has requested an increase.

In *Hunter*, the Fourth Circuit found that the Town Manager was a final municipal policymaker for purposes of Section 1983, as authority over the town's employment decisions was delegated without constraint and "hold[ing] otherwise would insulate the Town from liability in virtually every case—a result contrary to the principles underlying Section 1983." 897 F.3d at 558. Municipal liability is even clearer here because the County Council never even delegated that authority to Madsen. To the contrary, because public defense funding allocated by the County is generally tied to a *specific* employment position, the County Council *is* the sole final decisionmaker when it comes to the creation of new attorney positions for the LCPDO. Ex. 40 at 42–43; Ex. 43 at 63; Ex. 34 at 79:4–21, 95:18–96:11, 125:1–16. To hold otherwise would mean that Lexington County had *no* policymakers with respect to the funding of indigent defense in the LCMC, and "such a conclusion would sanction and encourage egregious attempts by local governments to insulate themselves from liability for unconstitutional policies . . . . This cannot be so." *Hunter*, 897 F.3d at 558 (internal citations and quotation marks omitted).

2. *Lexington County has failed, and continues to fail, to provide adequate funding for indigent defense.*

As final policymakers, the Lexington County Council has chosen to systematically underfund public defense needs for indigent defendants in the LCMC for nearly a decade. This reflects "a deliberate choice . . . to follow a course of action" amongst "various alternatives." *Pembaur*, 475 U.S. at 483; *see also* Ex. 40 at 42 (Madsen's 2011 letter to Council noting County had increased LCPDO funding by only 0.018% over previous eight years and indicating no increase was provided in 2010); Ex. 34 at 85:17–86:4 (Madsen testifying that he had to lay off attorneys in 2010 due to funding shortfall); Ex. 42 at 77 (granting $386,500 in public defense funding for fiscal year 2012, nearly $242,000 less than Madsen's request); Ex. 47 at 2 (denying request of increased funding for fiscal year 2013 entirely); Ex. 48 at 2 (denying request for fiscal year 2015 entirely); Ex. 34 at 72:25–73:3 (same for fiscal year 2016); Ex. 34 at 79:4–21 (denying request for three new attorney positions for fiscal year 2017 entirely); Ex. 34 at 95:18–96:11 (denying request for fiscal year 2019 entirely); Ex. 34 at 124:4–18 (granting nearly half the requested amount for fiscal year 2020); Ex. 34 at 125:1–16 (denying request for fiscal year 2021, resulting in no investigator position being created for LCPDO); Ex. 55 at 94. By consistently denying Madsen's budget requests, the Council has chosen a course of action that results in chronic underfunding of indigent defense within the County. In so doing, Lexington County has abdicated its statutory obligation to provide for public defense within the County under the Indigent Defense Act. *See* S.C. Code Ann. §§ 17-3-550, 560. And it has done this despite the clear provisions of the Intergovernmental Agreement between the Eleventh Circuit Public Defender and the County, which grants the County—not Madsen—the sole authority over budget and financial policies, employment procedures, and employee benefits. Ex. 36 ¶¶ 4, 6, 8–11; Ex. 34 at 29:19–30:1; Ex. 58 at 41:16–43:18, 145:14–22.

Lexington County is violating the Sixth Amendment through a deliberate and continuing failure to provide sufficient funding to ensure indigent criminal defendants receive adequate access to court-appointed counsel. Both federal and state courts have found local governments

liable for violating the Sixth Amendment by failing to invest enough resources and attorneys or by failing to implement adequate case assignment policies. *See, e.g., Miranda v. Clark Cnty.*, 319 F.3d 465, 471 (9th Cir. 2003) (holding county and municipal policymaker could be liable under Section 1983 for case assignment policy that was "deliberate[ly] indifferen[t] to the requirement that every criminal defendant receive adequate representation"); *Wilbur*, 989 F. Supp. 2d at 1133 ("The Court finds that the combination of contracting, funding, legislating, and monitoring decisions . . . caused the truncated case handling procedures that have deprived indigent criminal defendants [of Sixth Amendment rights]."); *Tucker*, 394 P.3d at 63 (finding standing for Sixth Amendment right to counsel claim based on allegations of systemic inadequacies in public defense); *Kuren v. Luzerne Cnty.*, 146 A.3d 715, 718 (Pa. 2016) (recognizing prospective cause of action for indigent defendants alleging "systemic violations of the right to counsel due to underfunding"); *Hurrell-Harring v. State*, 15 N.Y.3d 8, 22–23 (N.Y. 2010) (alleged "inadequate funding and staffing of indigent defense providers" sufficiently states Sixth Amendment claim).

The *Wilbur* case, which held municipalities liable under Section 1983 for operating a public defense system with "systemic flaws that deprive indigent criminal defendants of their Sixth Amendment right to the assistance of counsel," is instructive. 989 F. Supp. 2d at 1131. There the court found that because of "deliberate choices of City officials charged with the administration of the public defense system," the defendant cities made "[i]ntentional choices . . . while negotiating the public defender contracts and allocating funds to the public defender system." *Id*. at 1132. The court further observed that "[l]egislative and monitoring decisions made by the policymaking authorities of the Cities ensured that any defects in the public defense system would go undetected or could be easily ignored." *Id*. It found the cities liable due to "the combination of contracting, funding, legislating, and monitoring decisions made by the[ir] policymaking authorities," which led to the systematic deprivation of indigent defendants' rights guaranteed by the Sixth Amendment. *Id*. at 1133.

This Court should likewise find Lexington County liable for causing systematic deprivations of indigent defendants' right to counsel. Until 2013, Lexington County failed to

provide even a single public defender to the thousands of people prosecuted in the LCMC each year, despite the U.S. Supreme Court's longstanding precedent that public defenders must be made available to indigent defendants facing misdemeanor charges with a potential for incarceration. Ex. 47 at 1; Ex. 34 at 62:8–64:15. From 2013 to 2019, only *one* public defender was assigned to the LCMC, and that attorney could handle only a fraction of the cases being prosecuted in that jurisdiction. Ex. 47 at 1; Ex. 34 at 62:8–64:15, 124:4–18.

Plaintiffs' expert Monahan found that as a *conservative* estimate, only 9% of cases pending in the LCMC in 2019 involved a public defender, which is substantially lower than the 70% appointment rate for public defenders in the County's General Sessions Court. Monahan Decl., Ex. A at 17–18. Due to the Council's repeated denial of Madsen's requests for additional funding, there are currently only two public defenders assigned to represent indigent defendants in the LCMC and only enough funding for three. *Id*. at 20–21; Ex. 21 at 337:23–338:3. Every public defender to take cases in the LCMC has had an average caseload well in excess of the ABA standard of 400 misdemeanor cases. Ex. 56 at 216; Ex. 57 at 7; Ex. 34 at 129:19–130:7; *see also* Monahan Decl., Ex. A at 24–25. Without more funding from the County, the current public defenders can only handle a small fraction of the total caseload, and thousands of indigent people each year continue to go without access to court-appointed counsel. Ex. 34 at 130:13–15; Monahan Decl., Ex. A at 25 (noting "between 5,312 to 6,185 persons were likely indigent but were not appointed counsel in 2019 cases in [the LCMC]").

In *Bairefoot v. City of Beaufort, S.C.*, the court relied on *Wilbur* to find that "Plaintiffs have shown that the constitutional deprivations at issue . . . were the direct and predictable result of the deliberate choices of City officials charged with the administration of the public defense system." 312 F.Supp.3d 503, 511 (D.S.C. 2018) (quoting *Wilbur*, 989 F. Supp. 2d at 1132). This Court has already found the reasoning in *Bairefoot* persuasive to its analysis of *Heck v. Humphrey* and the *Rooker-Feldman* doctrine, and the Court cited *Bairefoot* for the proposition that "the municipalities' failure to provide counsel is actionable under federal law." *See* ECF No. 107 at 17 (quoting *Bairefoot*, 312 F.Supp.3d at 511). Here, as in *Bairefoot*, "it was foreseeable

that Defendants' failure to provide for indigent defense" would result in systemic violations of the Sixth Amendment. *Bairefoot*, 312 F.Supp.3d at 512. The *Bairefoot* court noted that the defendants in that case were "on notice that they had a duty to provide counsel . . . [when] in 2013 . . . the ACLU brought the issue to Defendants' attention." *Id.*

Lexington County was similarly on notice both of its duty to provide counsel under the Sixth Amendment and of its systemic failure to do so. As set forth above, Supreme Court precedent—spanning across decades—has made clear that indigent defendants facing incarceration for misdemeanor violations have the right to an attorney. And almost every budget request that Madsen submitted to the Council was accompanied by a series of reminders and supporting evidence that the County was failing to adequately fund the LCPDO. *See* Ex. 38 at 16 (informing Council that the caseloads of attorneys in the Public Defender's Office already "greatly exceed[ed]" the maximum caseload set by the ABA); Ex. 49 at 1 (informing Council that caseloads increased by more than 600 new clients per year and that there were significant problems with current infrastructure); Ex. 45 (informing Council that Lexington County had the highest average caseload per attorney out of the sixteen judicial circuits in the state, more than double the ABA standard); Ex. 40 at 42–43 (informing Council that the County ranked 37th out of 46 counties in per capita funding of public defenders' offices, and that another year without increased funding would have a "catastrophic" effect on the County's jail population); Ex. 53 at 1 (2019 letter noting that the County historically failed to fund public defense LCPDO relative to similarly populated counties and the Solicitor's Office). Madsen testified that an increase in dedicated staffing for the LCMC would mean public defenders could represent more individuals—but in the absence of more funding from the County, the LCPDO cannot do anything more to "meet[] the rights of people accused in the magistrate court." Ex. 34 at 130:13–15, 153:1–9.

Because the uncontested facts demonstrate that Lexington County has systematically underfunded the LCPDO and caused the systematic deprivation of counsel to indigent defendants, the Court should hold that Lexington County is violating the Sixth Amendment.

3.      *Comprehensive equitable relief is appropriate to remedy Lexington County's failure to provide counsel to indigent defendants in the Lexington County Magistrate Court.*

When the Constitution is violated, trial courts have "*virtually boundless* discretion in crafting remedies." *Missouri v. Jenkins*, 515 U.S. 70, 124–25 (1995) (Thomas, J., concurring) (emphasis added); *accord N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 239 (4th Cir. 2016). In cases similar to the one brought by Plaintiffs here, the chosen remedy has taken the form of sweeping injunctive relief accompanied by compliance monitoring. *See*, *e.g.*, *Wilbur*, 989 F. Supp. 2d at 1334–37 (requiring, *inter alia*, re-evaluation of public defender contracts, hiring of public defense supervisor, and three years of monitoring). Similar relief is necessary here.

Plaintiffs and Class Members ask the Court to order Lexington County to hire an independent consultant to determine the resources necessary to fulfill *Gideon*'s promise in the LCMC and to take immediate steps to gain compliance with those recommendations. Until Lexington County can meet this constitutional requirement, Plaintiffs ask the Court to prohibit the LCMC from jailing any defendant for whom a public defender cannot be assigned.

B.      <u>The Chief and Associate Chief Judges are liable under Section 1983 for the uniform debt collection policies and procedures within Lexington County Magistrate Courts.</u>

In South Carolina, Chief and Associate Chief Magistrate Judges are responsible for fulfilling certain administrative duties. As recounted in the Statement of Facts, *see supra* SOF Part III.A, and discussed in greater detail below in Part III.B, these duties include establishing uniform practices for collecting court-imposed financial obligations—responsibilities which are characterized by the South Carolina Supreme Court as "administrative" in nature.

Plaintiffs were denied the assistance of counsel under uniform debt collection policies and procedures overseen by the Chief and Associate Chief Judges, resulting in violations of their rights under the Sixth Amendment. *See supra* SOF Parts I–II. Specifically, the Chief and Associate Chief Judges administratively sanctioned and implemented a practice of arresting and

jailing indigent defendants on bench warrants for nonpayment of fines and fees—and this *routinely* occurred without the provision of counsel. *Id.* Plaintiffs Twanda Brown, Sasha Darby, and Raymond Wright, Jr. were each deprived of their Sixth Amendment right to counsel under the Default Payment Policy. ECF No. 66-1 ¶¶ 3–7, 13–14 (Brown); ECF No. 66-2 ¶¶ 13–17, 26–27 (Darby); Wright Decl. ¶¶ 2–3, 8–10. These three Plaintiffs appeared in the Lexington County Magistrate Court in 2016 without assistance of counsel, were found guilty on misdemeanor charges, and received sentences of incarceration suspended on the payment of fines and fees ranging from $666.93 to $2,337.50; none could afford to pay the total fines and fees at the time of sentencing, so they each entered into a scheduled time payment agreement with the court. ECF No. 66-1 ¶¶ 3–7, 13–14 (Brown); ECF No. 66-2 ¶¶ 13–17, 26–27 (Darby); Wright Decl. ¶¶ 2–3, 8–10.

Plaintiffs Cayeshia Johnson, Amy Palacios, Nora Corder, and Xavier Goodwin were each deprived of their Sixth Amendment right to counsel under the Trial in Absentia Policy. Johnson Decl. ¶¶ 13–16; ECF No. 66-3 ¶¶ 19–20 (Palacios); ECF No. 66-4 ¶¶ 17–20 (Corder); ECF No. 66-5 ¶¶ 10–14 (Goodwin). These four Plaintiffs were tried in their absence in 2016 or 2017 without the assistance of counsel, found guilty on misdemeanor charges, and received sentences of incarceration suspended on the payment of fines and fees ranging from $647.50 to $1,710. Johnson Decl. ¶¶ 13–16; ECF No. 66-3 ¶¶ 19–20 (Palacios); ECF No. 66-4 ¶¶ 17–20 (Corder); ECF No. 66-5 ¶¶ 10–14 (Goodwin).

When Plaintiffs were unable to pay the fines and fees they owed, whether under the Default Payment Policy or the Trial in Absentia Policy, the Lexington County Magistrate Courts issued bench warrants ordering their arrest and incarceration unless they could pay the fines and fees listed on the face of the bench warrant. ECF No. 66-1 ¶¶ 8–12 (Brown); ECF No. 66-2 ¶¶ 17–19, 23–25 (Darby); Wright Decl. ¶¶ 2–3; Johnson Decl. ¶¶ 11–14; ECF No. 66-3 ¶¶ 12–18 (Palacios); ECF No. 66-4 ¶¶ 17–20 (Corder); ECF No. 66-5 ¶¶ 9–14 (Goodwin). Each Plaintiff was arrested on such a bench warrant and transported to the Lexington County Detention Center; none could afford to pay the total amount of fines and fees listed on the face of the bench

warrant, so they were incarcerated for periods of time between seven and sixty-three days. ECF No. 66-1 ¶¶ 8–12 (Brown); ECF No. 66-2 ¶¶ 17–19, 23–25 (Darby); Wright Decl. ¶¶ 2–3; Johnson Decl. ¶¶ 11–14; ECF No. 66-3 ¶¶ 12–18 (Palacios); ECF No. 66-4 ¶¶ 17–20 (Corder); ECF No. 66-5 ¶¶ 9–14 (Goodwin).

Evidence shows that these Sixth Amendment violations are typical of other criminal defendants who were subject to Lexington County's Default Payment and Trial in Absentia Policies. *See* ECF No. 21-5 ¶¶ 4–11; ECF No. 21-8 ¶¶ 4–12, 17; ECF No. 40-1; ECF No. 43-1 ¶¶ 9–12; Ex. 17; Ex. 11; Ex. 7 at 148:11–17. Thus, prospective declaratory and injunctive relief is necessary to guard against future violations of the Sixth Amendment by the Chief and Associate Chief Judges.

**III.  Plaintiffs and Class Members are entitled to summary judgment on their Fourteenth Amendment claim under *Bearden v. Georgia* (Claim One).**

> A.  *Bearden v. Georgia*'s constitutional requirements under the Fourteenth Amendment are long-standing and well known.

The Supreme Court has long held that a state cannot "impose a fine as a sentence and then automatically convert it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." *Bearden v. Georgia,* 461 U.S. 660, 667 (1983) (quoting *Tate v. Short,* 401 U.S. 395, 398 (1971)). To prevent this injustice, the Fourteenth Amendment requires that, before a court imposes a jail sentence for an individual's failure to pay court fines or fees, it must conduct a meaningful inquiry into the individual's reasons for failing to pay. *Alkire v. Irving*, 330 F.3d 802, 816 (6th Cir. 2003) (citing *Bearden*, 461 U.S. at 672). At that hearing, the court must consider the following factors: (1) the debtor's income and assets (i.e., ability to pay); (2) the debtor's efforts to secure resources to pay; and (3) the existence and adequacy of alternative punishments to incarceration for those who made reasonable efforts and still could not afford to pay. *Bearden*, 461 U.S. at 672. The Fourteenth Amendment's prohibition on jailing indigent people is well established in both the Fourth Circuit and the South Carolina Supreme Court. *See, e.g.*, *Alexander v. Johnson*, 742 F.2d 117, 126 (4th Cir. 1984) (applying *Bearden* to

probation violations); *Dangerfield v. State*, 656 S.E.2d 352 (S.C. 2008) (requiring notice and hearing to determine whether defendant's nonpayment of restitution was willful).

The requirements of *Bearden* are widely known, and both state and federal entities have pursued initiatives to rectify violations of those requirements. For example, the Conference of State Court Administrators issued a policy paper explaining that *Bearden* has long prohibited courts from jailing individuals who are unable to pay their legal financial obligations:

> *Three decades ago*, the United States Supreme Court in *Bearden* held it is unlawful to incarcerate an offender for court debt absent proof of willful failure to pay. Today the members of COSCA dedicate our efforts to assisting the judges and court staff we support to achieve routinely what is stated in *Bearden*.

Arthur W. Pepin, *The End of Debtors' Prisons: Effective Court Policies for Successful Compliance with Legal Financial Obligations* 27 (2016) (emphasis added).

Similarly, the U.S. Department of Justice (DOJ) issued a "Dear Colleague" letter emphasizing "basic constitutional principles relevant to the enforcement of fines and fees." Ex. 13 at 1. In the letter, the DOJ emphasized that "[c]ourts must not incarcerate a person for nonpayment of fines and fees without first conducting an indigency determination and establishing that failure to pay was willful." *Id.* South Carolina Court Administration sent this letter to all state court judges, including then-Chief Judge Reinhart, in 2016 via its email distribution list. *Id*.

Despite these firmly rooted principles, it is undisputed that, for *decades,* the LCMC routinely and automatically issued nonpayment bench warrants that called for the arrest and immediate jailing of individuals with unpaid court debts without providing a constitutionally required pre-deprivation hearing on ability to pay. *See supra* SOF Part II; *see also* Ex. 10 at 130:24–132:3; Ex. 5 at 159:12–23, 170:9–17, 215:16–20; Ex. 11; Ex. 7 at 182:18–183:8 ("When we recalled bench warrants, I saw bench warrants that went back to when I was in high school . . . . I graduated in '84 from high school."). Defendants Reinhart and Adams both testified that during their tenures as Chief and Associate Chief Judges of Lexington County,

spanning almost two decades, this was the standard operating procedure across the LCMC. *See supra* SOF Part II; *see also* Ex. 10 at 130:24–132:3; Ex. 5 at 159:12–23, 170:9–17, 215:16–20; Ex. 11; Ex. 7 at 182:18–183:8. Lexington County's Court Administrator agreed. Ex. 10 at 130:24–132:3. Pursuant to these unconstitutional practices, thousands of indigent people—including Plaintiffs Brown, Darby, Johnson, Palacios, Corder, Goodwin, and Wright—were arrested and incarcerated for nonpayment of court debt without receiving any of *Bearden*'s mandatory protections. In light of *Bearden*'s firmly rooted and well-known principles, the Chief and Associate Chief Judges' conduct is shocking.

Undisputed facts demonstrate that the Chief and Associate Chief Judges are liable under Section 1983 for violating Plaintiffs' and Class Members' Fourteenth Amendment rights (Claim One). Plaintiffs and Class Members seek entry of summary judgment, as well as awards of prospective declaratory and injunctive relief, for these *Bearden* violations.

B.    <u>The Chief and Associate Chief Judges are liable under Section 1983 for causing violations of Plaintiffs' and Class Members' Fourteenth Amendment rights.</u>

The Chief and Associate Chief Judges have caused Plaintiffs and Class Members to suffer constitutional injuries in two distinct but related ways: (1) by sanctioning, implementing, and failing to remediate uniform, unconstitutional policies and procedures for the collection of fines and fees; and (2) by failing to adequately supervise the other magistrate judges in Lexington County. *See supra* Argument Section I.

1.    *The Chief and Associate Chief Judges are liable in their roles as policymakers for sanctioning and implementing debt collection policies that caused Constitutional injuries.*

Individual policymakers can be held personally liable under Section 1983 for harms that result from their acts or omissions. *See, e.g.*, *Gordon*, 937 F.3d at 362 (person injured by unconstitutional policy can pursue damages against "official who created or enforced that policy"); *Taylor v. Mich. Dep'. of Corr.*, 69 F.3d 76, 81–82 (6th Cir. 1995) (officer liable for "abandoning the specific duties of his position," which included "adopting and implementing an operating procedure"); *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011) ("Under

§ 1983 . . . the extent of [an official's] liability as a supervisor is similar to that of a municipality that implements an unconstitutional policy."). As the Fourth Circuit explained in *Gordon*, failing to hold officials accountable for the harms caused by their act and omissions "would encourage . . . officials to turn a blind eye to the real-world consequences of their policymaking and permit them to escape liability for constitutional harms caused by their decisions." 937 F.3d at 362. What must be proven in all Section 1983 official-capacity lawsuits is that the defendant is the final policymaker for the government with respect to the act or omission being challenged. The official must be one who "speak[s] with final policymaking authority . . . concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

To demonstrate an official's personal liability as a policymaker, a plaintiff must show that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (finding sheriff personally liable under Section 1983 for "acquiescing" in clerk of court's unconstitutional jail policies); *see also Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987) (government official's policy must be "moving force" behind constitutional violation for Section 1983 liability). Where an official "advanc[es] a policy that requires subordinates to commit constitutional violations," Section 1983 liability is established "no matter what the required mental state, so long as the plaintiff's constitutional injury in fact occurs pursuant to that policy." *OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012).

The Tenth Circuit's analysis in *Dodds* is instructive. There, an action was brought on behalf of an arrestee who was "overdetain[ed]"—that is, incarcerated for longer than allowable under the constitution. *Dodds*, 614 F.3d at 1192. The plaintiff sued the sheriff of the jail, alleging the sheriff's failure to execute his policymaking responsibilities in a constitutional manner caused the plaintiff to be overdetained. *Id*. at 1190. The sheriff disagreed, arguing he was not

liable because he was merely acquiescing in a long-standing policy. *Id*. at 1190–91. In finding for the plaintiff, the Tenth Circuit explained that the sheriff was the final policymaker for the jail and that "[r]egardless of who first drafted the policies, [state] law charged Defendant as sheriff with the responsibilities of running the county jail and accepting bail from all arrestees" and "under [the sheriff's] watch," "the policies which caused Plaintiff's constitutional injury continued to operate." *Id.* at 1203. In *Dodds,* the Defendant's knowledge of the existence and operation of a policy that caused constitutional injury—and over which he had authority—was sufficient to establish liability. *Id.* at 1203–4.

The Chief and Associate Chief Judges' conduct meets the requirements of the *Dodds* test. First, like the sheriff in *Dodds*, final policymaking authority over summary court debt collection procedures in Lexington County is held by the Chief and Associate Chief Judges. *See, e.g.*, Ex. 2 ¶ 5; *see also* Ex. 3 ¶ 5. Thus, they are responsible for the effects of unconstitutional debt collection policies and procedures in Lexington County. The fact that Defendant Adams, as Chief Judge of the LCMC, initiated a recall of thousands of nonpayment bench warrants and implemented the Setoff Debt Program shows that she—like the Chief Judges before and after her—held final policymaking authority over these debt collection practices. *See* Ex. 17 (Defendant Adams directing the LCMC Court Administrator to "have all Lexington County Magistrate Court Bench Warrants temporarily recalled."); Ex. 5 at 209:16–24; Ex. 6 at 326:16–24, 352:23–353:7; Ex. 10 at 198:2–13; *see also* Ex. 25 (Defendant Adams asking magistrate judge to investigate implementation of SDP). Second, those policies and procedures caused countless systemic *Bearden* violations. Plaintiffs and thousands of Class Members were arrested and incarcerated for failure to pay fines and fees without ability-to-pay determinations to establish that nonpayment was willful. *See supra* SOF Parts I–II. Finally, the Chief and Associate Chief Judges were aware of, sanctioned, and implemented the debt collection practices at issue. Ex. 7 at 162:19–25, 165:2–14, 167:22–168:12; Ex. 5 at 158:19–159:2; *see also* Ex. 6 at 331:19–332:3. They understood and intended that these policies would result in jailing for nonpayment without a pre-deprivation hearing—thereby, establishing the requisite state of mind.

Like the sheriff in *Dodds*, the Chief and Associate Chief Judges allowed the policies and procedures at issue here to continue to operate for decades, in blatant violation of clearly established constitutional law. Thus, as the responsible policymakers, the Chief and Associate Chief Judges are liable for causing Plaintiffs' and Class Members' constitutional injuries.

2.      *The Chief and Associate Chief Judges are liable in their supervisory capacities for causing Bearden violations.*

The Chief and Associate Chief Judges are also liable for the *Bearden* violations suffered by Plaintiffs and Class Members based on an abdication of supervisory responsibilities. "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). To meet this standard, a plaintiff must show that the defendant had a supervisory relationship with the culpable actors and (1) that the defendant had actual or constructive knowledge that a subordinate was engaged in conduct posing "a pervasive and unreasonable risk of constitutional injury"; (2) that the defendant responded to the knowledge so inadequately as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was a causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014); *see also Foster v. Fisher*, 694 F. App'x 887, 889 (4th Cir. 2017) (applying *Wilkins* test to state chief judge).

A supervisory relationship can be established by, *inter alia*, (a) an overarching responsibility to maintain a lawful and safe system or to monitor conduct within that system; or (b) where statutes or administrative codes explicitly enumerate supervisory and policymaking responsibilities. *See*, *e.g.*, *Wilkins*, 751 F.3d at 228 (administrative director of hospital had non-delegable obligation "to provide a safe environment for patients"). "[S]tate statutes fixing the administrator's legal duties provide a useful guide in determining who had the responsibility and capability to end the offensive practices." *Slakan*, 737 F.2d at 373 (awarding damages against

prison administrators). In *Slakan*, a case brought against prison officials, the Fourth Circuit found that the statutory authority and responsibility to "implement policies governing the treatment of [incarcerated people]" and to exercise general "administrative control and direction" over the correctional facility convincingly established supervisory liability. *Id*. at 374; *see also Foster v. Fisher*, 2016 WL 900654, at *12 (W.D.N.C. Mar. 9, 2016), *aff'd*, 694 F. App'x 887 (4th Cir. 2017) (referencing statutes or regulations showing oversight duties or responsibilities as evidence of supervisory relationship).

The Chief and Associate Chief Judges' supervisory authority over the LCMC is established through the South Carolina Supreme Court orders assigning them supervisory and administrative duties, including the responsibility to monitor summary court judges to ensure that they act in accordance with the Constitution; to establish uniform procedures across summary courts, including debt collection procedures; to convene quarterly meetings of the summary court judges; and to report non-compliance of summary court judges to the SCCA. Exs. 2 & 3.

Defendants executed their assigned supervisory and administrative authority as the Chief and Associate Chief Judges in numerous ways. For example, Defendant Reinhart testified that his responsibilities as Chief Judge included, *inter alia*, setting the schedule for the Central Court, creating the weekend Bond Court schedule, supervising Lexington County's Chief Court Administrator, exercising general responsibility for the central courts and central court staff, and budgeting. Ex. 7 at 94:10–23. Defendant Adams, as Chief Judge, was also obligated to report instances of constitutional violations occurring in magistrate courts to the SCCA, supervised and coordinated magistrate judges in establishing new county-wide administrative procedures, set the agenda for quarterly magistrate meetings, and supervised all the central courts' staff and conducted their evaluations. *See, e.g.,* Ex. 6 at 278:17–279:5, 271:10–276:23, 344:6–10; *see id.* at 291:9–14 ("[t]here was a lot to do . . . meetings to go to and other staff to supervise"); Ex. 25. Thus, it is clear that the Chief and Associate Chief Judges possessed supervisory authority over the LCMC.

Once supervisory responsibility has been established, a plaintiff must establish that the conduct at issue presented a "pervasive and unreasonable risk of constitutional injury." *Wilkins*, 751 F.3d at 226. This prong requires "evidence that the conduct is widespread, or at least has [occurred] on several different occasions," and that the conduct "poses an unreasonable risk of harm of constitutional injury." *Id*. There must also be evidence that the supervisor had actual or constructive knowledge of the conduct. *Id.* "The prevalence of [a] practice itself [is] a circumstantial indication that administrators at all levels [know] and approve of [the practice]." *Slakan*, 737 F.2d at 375. It is undisputed that the Chief and Associate Chief Judges were aware of and sanctioned the policies and procedures that led to widespread and systemic arrest and jailing of people for nonpayment without a pre-deprivation hearing across Lexington County.

The second prong of *Wilkins* requires proof of "deliberate indifference" or "tacit authorization," *Wilkins*, 751 F.3d at 227, which can be shown by "a supervisor's continued inaction in the face of documented widespread abuses." *Slakan*, 737 F.2d at 373. The Chief and Associate Chief Judges were aware of the widespread practices at issue here. Ex. 10 at 130:24– 132:3; Ex. 5 at 159:12–23, 170:9–17, 215:16–20. Nonetheless, they failed to exercise their supervisory authority, laid out in the Supreme Court order, to intervene and prevent these abuses. For example, they did not report this practice to the SCCA, which might have resulted in remediation; indeed, even upon receiving the DOJ's "Dear Colleague" letter in 2016, Judge Reinhart failed to report to the SCCA that practices similar to those described in the letter were occurring throughout Lexington County. Ex. 7 at 162:19–25, 167:22–168:12, 165:2–14. Nor did they discuss ways to halt or alter these practices with summary court judges, *id.* at 165:16– 167:12, despite ongoing quarterly meetings to discuss other uniform policies and procedures, Ex. 3 ¶¶ 5, 7–8, 11–12, 17, 19; Ex. 6 at 271:10–276:23.

Further, the Chief and Associate Chief Judges were aware of the availability of the Setoff Debt Program as an alternative method of court debt collection as early as 2015, but they made no attempt to implement the program until late 2017. *See* Ex. 6 at 302:9–303:14; Ex. 24; Ex. 20. In other words, the Chief and Associate Chief Judges failed to take the necessary corrective

action available to them under their supervisory authority—action that would have prevented Plaintiffs and Class Members from being unconstitutionally arrested and incarcerated. Rather, the Chief and Associate Chief Judges knowingly allowed this practice to proceed unchecked for years. *See, e.g.*, Ex. 5 at 56:14–23, 159:12–23, 170:9–17, 215:16–20; Ex. 7 at 143:2–145:11; Ex. 10 at 80:5–12, 130:24–132:3, 131:7–15; Ex. 11. The Chief and Associate Chief Judges' inaction in the face of widespread and systemic practices resulting in *Bearden* violations establishes not just their tacit authorization of these unconstitutional policies and procedures but also their *explicit* authorization and deliberate indifference to the harm they caused.

The third prong of the *Wilkins* test requires a showing of causation between the supervisor's inaction and the constitutional injury suffered. "[P]roof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions." *Wilkins*, 751 F.3d at 226–27 (internal quotation marks and alterations omitted); *Slakan*, 737 F.2d at 376 (lack of administrative policy invited abuses); *Gordon*, 937 F.3d at 360 (failure to rescind guidelines could have caused harm). The Chief and Associate Chief Judges failed to take the necessary corrective action available to them under their supervisory authority to prevent Plaintiffs' and Class Members' constitutional injuries. Instead, as noted above, they sanctioned and implemented a mechanism for the collection of court debt that *caused* the injuries suffered by Plaintiffs and Class Members, that mechanism being the widespread policy and practice of using nonpayment bench warrants to arrest and jail people without *Bearden* hearings.

Thus, the Chief and Associate Chief Judges are liable in their policymaking and supervisory capacities for pervasive and widespread *Bearden* violations across Lexington County.

**IV.    Prospective declaratory and injunctive relief against the Chief and Associate Chief Judges is necessary to prevent future violations of the Sixth and Fourteenth Amendments (Claims One and Two).**

Plaintiffs Xavier Goodwin and Raymond Wright, Jr. bring Claims One and Two on behalf of themselves and the certified Class, seeking prospective declaratory and injunctive relief enjoining the offices of the Chief and Associate Chief Judges of Lexington County for Administrative Purposes from overseeing, sanctioning, or promoting a policy or standard operating procedure that allows for jailing for nonpayment of fines and fees without first: (1) conducting a judicial hearing to determine whether nonpayment was willful, as required by *Bearden v. Georgia*, and (2) appointing counsel, as required by the Sixth Amendment. This relief would enter against the current Chief and Associate Chief Judges, Defendants Johnson and Morgan, in their official capacities. Under the law and undisputed facts, the requested relief is appropriate.

It is well established that individuals may sue state officials to enjoin ongoing constitutional violations. *Ex parte Young*, 209 U.S. 123, 155–56 (1908). This right extends to acts that, although performed by judges, are fundamentally non-adjudicative in nature. 42 U.S.C. § 1983; *see also Forrester v. White*, 484 U.S. 219, 227 (1988); *Morrison v. Lipscomb*, 877 F.2d 463, 466 (6th Cir. 1989) (chief judge could be liable for ordering moratorium on issuance of writs of restitution because act arose from "delegated administrative authority"); *Ratte v. Corrigan*, 989 F. Supp. 2d 550, 559 (E.D. Mich. 2013) (judge could be liable for mass pre-signing of removal order forms because act was one of administrative policymaking).

Given the longstanding use of unconstitutional debt collection policies and procedures throughout Lexington County and the lack of any binding order preventing the Chief and Associate Chief Judges from reverting back to unconstitutional practices, such relief is necessary. The impropriety of Lexington County's debtors' prison scheme is not in dispute. Section 1983 authorizes the requested relief because the injunction will only run against the Chief and Associate Judges' non-adjudicative, policymaking and supervisory authority to establish post-sentencing debt collection procedures. Because the offices of the Chief and

Associate Chief Judge bear administrative responsibility for establishing and supervising debt collection procedures, Claims One and Two for prospective declaratory and injunctive relief are cognizable under Section 1983. The requested relief should be granted.

**V.  Plaintiffs are entitled to summary judgment and monetary damages on their Sixth and Fourteenth Amendment claims (Claims Four and Five).**

Plaintiffs are entitled to monetary damages against Defendants Reinhart and Adams in their individual capacities as administrators, policymakers, and supervisors (Claims Four and Five). As demonstrated *supra* in Parts II.B and III.A, Defendants Reinhart and Adams sanctioned and implemented the unconstitutional debt collection procedures that led to Plaintiffs being unlawfully incarcerated—without appointment of counsel and without any determination that their nonpayment was willful—for periods ranging from seven to sixty-three days, in violation of their Sixth and Fourteenth Amendment Rights. ECF No. 66-1 ¶¶ 3–7, 13–14 (Brown); ECF No. 66-2 ¶¶ 13–17, 26–27 (Darby); ECF No. 66-3 ¶¶ 19–20 (Palacios); ECF No. 66-4 ¶¶ 17–20 (Corder); ECF No. 66-5 ¶¶ 10–14 (Goodwin); Johnson Decl. ¶¶ 13–16; Wright Decl. ¶¶ 8–10. Plaintiffs suffered injuries as a result. Brown was jailed and separated from her children for nearly two months and lost her job as a result. ECF No. 66-1 ¶¶ 12, 15–16. Darby was jailed for twenty days, did not get prenatal care or sufficient food while in jail, and her incarceration caused her to lose her job and home. ECF No. 66-2 ¶¶ 23–25, 28–31. Johnson was jailed for fifty-five days, during which time she was separated from her children, lost all three part-time jobs she held before her arrest, and suffered emotional distress and headaches. Johnson Decl. ¶¶ 14, 17–20. Wright was jailed for seven days, during which he suffered severe intestinal bleeding. Wright Decl. ¶ 4–7. Palacios was jailed and separated from her children for twenty-one days. ECF No. 66-3 ¶¶ 12–18, 21–23. As a result, she lost her job and suffered emotional distress and ill health while she was incarcerated. *Id*. Corder was jailed for fifty-four days, and as a result, she lost her home and job. ECF No. 66-4 ¶¶ 17–21. Goodwin was jailed for sixty-three days, during which time he lost his home and the job he had held for thirteen years, was separated from his family, and suffered emotional distress and headaches. ECF No. 66-5 ¶¶ 9, 12, 15–18.

51

The law and the facts conclusively demonstrate liability for Plaintiffs' individual injuries here. Thus, Plaintiffs ask this Court to find that liability has been proven as a matter of law and to set a jury trial to determine the amounts of damages to which Plaintiffs are entitled. *See, e.g.*, *St. Jude Med., S.C., Inc. v. Biosense Webster, Inc.*, 994 F. Supp. 2d 1033, 1044 (D. Minn. 2014), *aff'd* in part, 818 F.3d 785 (8th Cir. 2016) (finding liability against defendant as a matter of law and leaving damages for determination at trial).

**VI.    Plaintiff Goodwin is entitled to summary judgment and prospective declaratory relief on his Sixth and Fourteenth Amendment claims against Defendant Adams, in her official capacity as Irmo Magistrate Judge (Claims Seven and Eight).**

Plaintiff Goodwin should be granted summary judgment for his claims under the Sixth and Fourteenth Amendments because he faces a real and immediate threat of future arrest and incarceration for his inability to pay fines and fees he owes the Irmo Magistrate Court. ECF No. 35-1 ¶¶ 18, 21–24; Ex. 1. The undisputed facts show that Goodwin has faced, and continues to face, a substantial and imminent risk of arrest and incarceration without being afforded his Sixth Amendment right to counsel. *See supra* Argument Section II. Prospective declaratory relief would also provide certainty and security regarding Plaintiff Goodwin's constitutional rights under the Fourteenth Amendment, preventing future *Bearden* violations. *See supra* Argument Section II. Absent relief, these risks are ongoing.

District courts "have great latitude in determining whether to assert jurisdiction over declaratory judgment actions." *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998). Generally, courts should entertain a declaratory judgment action when they find that declaratory relief: "(1) will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.* (internal quotation and citation omitted). Without a declaratory judgment, there is nothing to ensure that Defendant Adams will not reissue a nonpayment bench warrant against Goodwin requiring automatic arrest and incarceration without a *Bearden* hearing, and without providing him access to counsel.

This Court should exercise its broad discretion and provide Goodwin clarity and relief from uncertainty.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to grant their motion for summary judgment on the Sixth and Fourteenth Amendment claims and enter an order establishing Defendants' liability to Plaintiffs and the certified Class on Claims One and Two; establishing Defendant Adams's liability to Plaintiff Goodwin on Claims Seven and Eight; establishing Defendants' liability to Plaintiffs on Claims Four and Five; granting the requested prospective declaratory and injunctive relief on Claims One and Two; and granting the requested prospective declaratory relief on Claims Seven and Eight.

Date: April 11, 2022

Respectfully submitted,

By: /s/Allen Chaney
ALLEN CHANEY (Fed. Bar # 13181)
American Civil Liberties Union of South Carolina
P.O. Box 1668
Columbia, South Carolina 29202
Telephone: (843) 282-7953
Email: achaney@aclusc.org

TOBY J. MARSHALL, *Admitted Pro Hac Vice*
ERIC R. NUSSER, *Admitted Pro Hac Vice*
Terrell Marshall Law Group PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Email: tmarshall@terrellmarshall.com
Email: eric@terrellmarshall.com

AMREETA S. MATHAI, *Admitted Pro Hac Vice*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (202) 313-1625
Email: amathai@aclu.org

*Attorneys for Plaintiffs*