# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

## COLUMBIA DIVISION

| | | |
|---|---|---|
| Twanda Marshinda Brown, et al, | ) | Civil Action No. 3:17-1426-MBS |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **DEFENDANTS' MEMORANDUM IN IN** |
| | ) | **OPPOSITION TO PLAINTIFFS' MOTION** |
| Lexington County, South Carolina, et al., | ) | **FOR SUMMARY JUDGMENT** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

Table of Cases ........................................................................................................v

Introduction ...........................................................................................................1

Argument ...............................................................................................................3

1.  Plaintiffs' claims for prospective Sixth Amendment relief have been rendered moot by the 2017-2018 actions of Chief Justice Beatty and Court Administration ......................................................................................3

2.  Even if the issue has not been rendered moot, federalism principles preclude the Sixth Amendment relief sought by Plaintiffs.... ...............................4

3.  Plaintiffs have not shown that the complained-of actions resulted from administrative acts by Defendants Reinhart and Adams......................................10

    a.  The matters of which Plaintiffs complain did not result from "policies."...........................................................................................10

    b.  The matters of which Plaintiffs complain were the result of judicial acts, not administrative action......................................................................13

    c.  The Chief Magistrates had no power or authority to affect the judicial acts of the other Lexington County magistrates....... ...................14

        1.  Contrary to Plaintiffs' claims, which omit controlling language of the semi-annual Orders, those Orders do not impose a general "monitoring" requirement on Chief Magistrates…...……………16

        2.  The judicial actions of issuing bench warrants are not covered by the "revenue collection" provision of the semi-annual Orders…..18

        3.  Neither the "uniform procedures" paragraph nor any other provision of the semi-annual Orders confers authority on the Chief Magistrates to regulate judicial actions…………………………19

4.  The prospective relief sought by Plaintiffs against the official-capacity Magistrates based on *Bearden v. Georgia,* 461 U.S. 660 (1983) is barred for several different reasons..... ..........................................................................21

    a.  Mootness …………………………………………………………… .21

    b.  Absence of acts to enjoin (lack of redressability)………………………..22

        c.      Federalism concerns………………………………………………… 23

    5.      Plaintiffs have provided no factual or legal basis for their damage claims
            against the Magistrate Defendants.... ...................................................23

    6.      Plaintiff Goodwin's two individual claims for declaratory relief are now
            moot for reasons specific to his case.... ................................................29

Conclusion ....................................................................................................................29

**TABLE OF CASES**

| | |
|---|---|
| *Bairefoot v. City of Beaufort, S.C.,* 312 F. Supp. 3d 503 (D.S.C. 2018) | 4, 8 |
| *Bearden v. Georgia*, 461 U.S. 660 (1983) | 21, 23, 26 |
| *Bender v. Wisconsin*, No. 19-CV-29-WMC, 2019 WL 4466973 (W.D. Wis. Sept. 18, 2019) | 7-8 |
| *Bice v. Louisiana Pub. Def. Bd.*, 677 F.3d 712 (5th Cir. 2012) | 8 |
| *Brown v. Reinhart*, 760 Fed. Appx. 175 (4th Cir. 2019) | 26 |
| *Carnaby v. City of Houston*, 636 F.3d 183 (5th Cir. 2011) | 11 |
| *Church v. Missouri*, 2017 WL 3383301 (W.D. Mo. July 24, 2017) | 9 |
| *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) | 11 |
| *Dalton v. Barrett*, 2020 WL 420833 (W.D. Mo. Jan. 27, 2020) | 9 |
| *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983) | 23 |
| *Forrester v. White*, 484 U.S. 219 (1988) | 25, 26 |
| *Foster v. Fisher,* 694 F. App'x 887 (4th Cir. 2017) | 24 |
| *Gardner v. Luckey,* 500 F.2d 712 (5th Cir. 1974) | 6, 7 |
| *Luckey v. Miller*, 976 F.2d 673 (11th Cir. 1992) | 7 |
| *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) | 22 |
| *McCullough v. Finley*, 907 F.3d 1324 (11th Cir. 2018) | 26 |
| *Miranda v. Clark Cty., Nevada*, 319 F.3d 465 (9th Cir. 2003) | 4 |
| *Morrison v. Lipscomb*, 877 F.2d 463 (6th Cir. 1989) | 25 |
| *O'Shea v. Littleton*, 414 U.S. 488 (1974) | *passim* |
| *Ratte v. Corrigan*, 989 F. Supp. 2d 550 (E.D. Mich. 2013) | 26 |
| *Rodden v. Fauci*, No. 3:21-CV-317, 2021 WL 5545234 (S.D. Tex. Nov. 27, 2021) | 22 |
| *Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923) | 23 |
| *Samuels v. Mackell*, 401 U.S. 66 (1971) | 7-8 |
| *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994) | 24 |
| *Slakan v. Porter*, 737 F.2d 368 (4th Cir.1984) | 24 |
| *Wadkins v. Arnold*, 214 F.3d 535 (4th Cir. 2000) | 28 |
| *Washington v. Digital Equip. Corp.,* 968 F.2d 1213 (table), 1992 WL 167946 (4th Cir. 1992 | 6 |
| *Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122 (W.D. Wash. 2013) * | 4, 6, 8 |
| *Wilkins v. Montgomery*, 751 F.3d 214 (4th Cir. 2014) | 24 |
| *Yarls v. Bunton*, 231 F. Supp. 3d 128 (M.D. La. 2017) | |
| *Younger v. Harris,* 401 U.S. 37 (1971) | *passim* |

# INTRODUCTION

When this action was filed, Plaintiffs' counsel apparently believed that: (a) the arrest and incarceration of persons on bench warrants when they failed to pay fines and fees resulted from policies or standard operating procedures created at the county level in Lexington County and "enforced" by County's Chief Magistrates for administrative purposes; (b) the bench warrants were "automatically" issued without any exercise of judicial authority by a judge, and (c) the limited supervisory authority conferred generally on county chief magistrates for administrative purposes included the legal authority to direct other magistrates in the county how to exercise their judicial authority in deciding individual cases. Plaintiffs asserted that discovery was necessary for them to obtain facts relating to the above assertions on their part.

Later, after Chief Justice Beatty issued his September 15, 2017, Memorandum, which was accompanied soon thereafter by an extensive set of changes made by South Carolina Court Administration, Plaintiffs continued to assert that they needed discovery in order to find out the effect of those changes.[1] The Court agreed. A certain amount of informal discovery had already occurred during the mediation process, which ran from the latter part of 2018 until the middle of 2020. After that process ended in impasse, formal discovery took place, resulting in the production by Defendants of approximately 29,000 documents, and the depositions by Plaintiffs of all of the deponents they wished to take, which included most of the Defendants and their designees.

The result of that extensive discovery was to show that none of the above assertions by Plaintiffs had any foundation in fact. To the extent that, prior to 2018, there were arrests and

---

[1] The 2017-2018 changes had the secondary effect of greatly reducing the need for counsel for indigents who did not pay fines and fees. Because no one could be jailed unless counsel was present or the right to counsel was waived, the logical result was that few, if any, defendants in that situation were inclined to come into court with counsel when they could never be jailed as long as they never showed up with counsel present.

1

incarcerations on bench warrants for failure to pay fines in criminal and traffic cases, that practice was (a) not only not unique to Lexington County, but in fact was authorized statewide by South Carolina Court Administration: (b) not "automatic," because, as discovery revealed, a judge was involved in the judicial action of issuing each bench warrant, and (c) not within the administrative authority of the Chief Magistrates for Administrative Purposes either to create, enforce or stop, in part because the issuances of bench warrants were judicial acts, not within the purview of the limited administrative powers granted to county Chief Magistrate Judges. In addition, discovery has left no doubt that the prior practices stopped soon after the Beatty Memorandum was issued in September 2017, and have not resumed since then. These points have all been set forth in detail in Defendants' Memorandum in Support of Motion for Summary Judgment, ECF No.283-1.

Plaintiffs, in their Memorandum in Support of their Motion for Summary Judgment, ECF No. 284-1, have not disputed that the prior practice of arrests and incarcerations was authorized statewide. Nor have they disputed that the prior practices were stopped soon after the Beatty Memorandum was issued in September 2017. In fact, their Memorandum not only does not contend otherwise, it does not mention either of the above points at all.

By ignoring both the statewide authorization of the prior practices and the effect of the statewide actions that required that the prior practices be discontinued, Plaintiffs' Memorandum presents a glaringly incomplete version of the facts of this case. And because Plaintiffs ignore the state-level authorization for the actions of the Magistrates' Courts, they also fail to address how county-level Chief Magistrates could or should have prohibited other magistrates from following a practice that had Court Administration had permitted, using forms issued by Court Administration.

Perhaps not surprisingly, then, Plaintiffs have tended to shift their emphasis toward an effort to have the Court issue an order requiring near-universal indigent defense in magistrates' courts, even though the 2017-2018 changes ensured that absent counsel or a knowing waiver of the right to counsel, no person would be incarcerated, whether by way of a bench warrant or otherwise. Such relief is factually not warranted, but in any event, has never been ordered in a federal case where, as here, the defendants asserted federalism principles.

## ARGUMENT

1.    **Plaintiffs' claims for prospective Sixth Amendment relief have been rendered moot by the 2017-2018 actions of Chief Justice Beatty and Court Administration.**

In connection with their own Motion for Summary Judgment, Defendants have already pointed out why the 2017-2018 actions of Court Administration and Chief Justice Beatty have halted the practice of "arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees" in the absence of counsel or a knowing waiver of the right to counsel. ECF No. 283-1 at 22-27, 30-33.[2] In practice, at least in Lexington County, there have probably been few or no such incarcerations even if the person was represented by counsel. *See, e.g.,* ECF No. 283-11 (Adams Decl. ¶ 23: "[S]ince at least November 1, 2017, I am not aware that there have been <u>any</u> incarcerations at all of any persons solely for failure to pay a legal financial obligation." (Emphasis in original).[3]

---

[2] References herein to pages in both sides' Memoranda are to the original page numbers at the bottom of the documents, rather than to the ECF filing page numbers at the top of the filed documents.

[3] Plaintiffs cite a portion of the Adams deposition to the effect that "very few" of the recalled bench warrants were ever reissued, but Plaintiffs fail to mention that the ones that were reissued did not include failure to pay fines or fees, but rather involved "something that maybe had a victim involved or somebody had failed to appear in court and they were out on bond and they violated their bond, the -- that sort of thing. We -- I -- I <u>did not reissue any that [were] just because somebody didn't complete their payment of their fine, those kinds of things, those have not been</u>

Although mootness has been a primary issue in this case ever since the Beatty Memorandum was issued in September 2017, Plaintiffs' 53-page Memorandum literally does not even mention the word "moot." As a result, any further argument by Defendants will not be made until Defendants file a Reply Memorandum, assuming that Plaintiffs, in response to Defendants' Motion for Summary Judgment, attempt to show that these matters are <u>not</u> moot. For now, Defendants reiterate the points they previously made, ECF No. 283-1 at 30-33, to the effect that mootness is fatal any claim by Plaintiffs for prospective relief under the Sixth Amendment.

**2.      Even if the issue has not been rendered moot, federalism principles preclude the Sixth Amendment relief sought by Plaintiffs.**

Before examining Plaintiffs' Sixth Amendment claims in detail, it should be noted that (a) Plaintiffs' expert on Sixth Amendment issues has opined that the County should fund between 13 and 15.5 Public Defender attorney positions for Magistrates' Courts alone, *see* ECF No. 284-4 at ECF p. 25, and (b) the only authority Plaintiffs cite in support of their request for an order granting prospective relief for an alleged Sixth Amendment consists of one unappealed district court case. That case, *Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122, 1133 (W.D. Wash. 2013), in addition to being one of a kind, also did not involve the federalism issues that have resulted in denials of such prospective relief by all other federal courts that have considered the issue.[4] The only other cases cited by Plaintiffs are *Bairefoot v. City of Beaufort, S.C.,* 312 F. Supp. 3d 503 (D.S.C. 2018), an interlocutory decision that did not address remedial issues, and three state cases, all of which, by definition, did not involve issues of federalism.

---

<u>reissued and would not be at this point</u>." Adams Deposition excerpt, ECF No. 284-10 at 21 [214] (emphasis added).

[4] Plaintiffs also cite *Miranda v. Clark Cty., Nevada*, 319 F.3d 465, 471 (9th Cir. 2003), which affirmed the denial of a motion to dismiss a Sixth Amendment claim based on an alleged "deliberate pattern and policy of refusing to train lawyers for capital cases. . . ."  The case was later settled, and therefore never got beyond the motion to dismiss stage.

The mootness of Plaintiffs' claims should render it unlikely that the Court will need to consider the merits of Plaintiffs' legally-unsupported claim for prospective relief on their Sixth Amendment claim. But even if not moot, that claim is precluded by a unanimous body of federal caselaw declining to  order such relief where the defendants asserted federalism principles. Only a tiny portion of Plaintiffs' 53-page brief mentions the remedy they seek for alleged Sixth Amendment violations. That terse discussion consists primarily of the following two sentences, neither of which makes reference to the recommendation of Plaintiffs' own expert on this issue:

> Plaintiffs and Class Members ask the Court to order Lexington County to hire an independent consultant to determine the resources necessary to fulfill *Gideon's* promise in the LCMC and to take immediate steps to gain compliance with those recommendations. Until Lexington County can meet this constitutional requirement, Plaintiffs ask the Court to prohibit the LCMC from jailing any defendant for whom a public defender cannot be assigned.

ECF No. 284-1 at 39.

The relief requested in the second sentence, which would "prohibit the LCMC from jailing any defendant for whom a public defender cannot be assigned," is even farther afield. The "LCMC" (i.e., Plaintiffs' acronym for the magistrates' courts of Lexington County), assuming *arguendo* that it is even a legal entity, is not a defendant in this case. If Plaintiffs meant to refer to the two official-capacity magistrates, that is, the current Chief and Associate Chief, the relief they seek (prohibiting judges from jailing individuals) runs directly afoul of the express language of 42 U.S.C. § 1983, which provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." As discussed below, the applicable federal court decisions also decline to order even declaratory relief under these circumstances.

Decades ago, the Supreme Court made it clear that kind of relief sought by Plaintiffs in this case is unavailable in a federal forum. In *O'Shea v. Littleton*, 414 U.S. 488 (1974), the Court described the relief sought by the plaintiffs in that case as follows:

> What they seek is an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials. The order the Court of Appeals thought should be available if respondents proved their allegations would be operative only where permissible state prosecutions are pending against one or more of the beneficiaries of the injunction. . . . This seems to us nothing less than an <u>ongoing federal audit of state criminal proceedings</u> which would indirectly accomplish the kind of interference that *Younger v. Harris,* [401 U.S. 37 (1971)] *supra*, and related cases sought to prevent.

414 U.S. at 500 (emphasis added).[5] In the ensuing years, this principle, and usually this precise holding, has been applied in every federal case (excepting only *Wilbur, supra*) to reject relief where a federal plaintiff or class of plaintiffs has sought an order generally requiring a governmental defendant to make indigent defense services available.

The first such case was *Gardner v. Luckey*, 500 F.2d 712 (5th Cir. 1974). In that case, as here, the plaintiffs sought a comprehensive order supervising the provision of indigent defense services in state court prosecutions. As described in the Fifth Circuit's opinion, the plaintiffs in that case

> requested the District Court to declare that the Public Defenders' acts, policies, practices, pattern of conduct and custom violated their rights, and

---

[5] The court in this case previously denied some aspects of Defendants' 2017 Motion for Summary Judgment, and made certain holdings pertaining to *Younger*. 7/10/18 Order, ECF No. 107, at 13-15. Those holdings do not, however, constitute law of the case on the *Younger* issues. *See, e.g., Washington v. Digital Equip. Corp.,* 968 F.2d 1213 (table), 1992 WL 167946, at *7 (4th Cir. 1992)("[t]he determination not to grant summary judgment is not the kind of final judgment of an issue that requires application of the law of the case rule. A decision not to grant summary judgment does not resolve any factual or legal issue. . . ."). In any event, that Order was issued in the context of an undeveloped factual record, and did not address the effect of having a federal court assume broad supervisory powers over the availability of counsel in thousands of future magistrate court cases.

> to enjoin the Offices from further representation of indigents unless standards, specified in the complaint and alleged to represent minimum standards of constitutional effectiveness, were met. [Footnote omitted] They made inadequate funding and excessive caseloads a key claim in their suit. They requested a declaration that appointment of Public Defenders for any representation in excess of the Offices' capacity violated their rights. Also, they asked the District Court to declare the Offices' caseloads excessive, to specify how excessive they were, and to enjoin acceptance of overload cases.

500 F.2d at 713. Plaintiffs in the present case seek essentially the same relief, although they have not provided as much detail concerning the relief they seek.

The Fifth Circuit declined to grant any of the requested relief. After quoting the language from *O'Shea* quoted above, the Fifth Circuit held that

> It is clear from the face of their complaint that our appellants contemplate exactly the sort of intrusive and unworkable supervision of state judicial processes condemned in *O'Shea*. We hold that the District Court properly dismissed their suit. * * * [A]ppellants cannot get into federal court to make their sweeping challenge to the operation of the Florida Public Defender Offices.

500 F.2d at 715. In a subsequent case from the same circuit (by then the Eleventh Circuit), the court rejected an effort by the plaintiffs in that case to refine similar claims in the hope of not running afoul of the principles of *O'Shea. Luckey v. Miller*, 976 F.2d 673 (11th Cir. 1992). Specifically, while the plaintiffs in that case attempted to seek a declaratory judgment or a decree requiring defendants to use their "best efforts" as a way of avoiding the imposition of "ongoing review from the outside," that court declined to issue that relief, holding that "this Court does not believe that it can extricate itself from the [federal-state comity] problems of enforcing a decree of the nature sought so easily." 976 F.2d at 679 and 678 n. 6. To the same effect is *Bender v. Wisconsin*, No. 19-CV-29-WMC, 2019 WL 4466973, at *6 (W.D. Wis. Sept. 18, 2019), holding that "[f]ederalism concerns also caution against this court issuing plaintiffs' requested declaratory relief. *See Samuels v. Mackell*, 401 U.S. 66, 69 (1971) (extending *Younger* abstention to

declaratory actions and recognizing that "under ordinary circumstances the same considerations that require the withholding of injunctive relief will make declaratory relief equally inappropriate")."[6]

Although only a few similar requests have been made in more recent years, the ones that have been made have continued to fail when abstention principles were raised by the defendants in the cases.[7] As expressed in one of those cases,

> This Court does not have the remedial tools to resolve the [public defender] funding crisis. By all objective measures, there is a crisis in public defense funding in Louisiana. However, this does not mean that this federal district court, in a civil section 1983 class action, is the correct forum to remedy this serious systemic problem. At this point in time, it is a problem to be resolved by the State legislature. To the extent the federal judiciary has a role to play in passing judgment on the quality of representation by state public defenders, it must address those issues in post-conviction proceedings. Otherwise the judiciary would be interfering with state criminal proceedings and run afoul of the balance struck between federal and state courts. <u>Any declaratory judgment or injunction entered by this Court would inevitably lead it to become the overseer of the Orleans Parish criminal court system, a result explicitly condemned by the United States Supreme Court in *Younger* and *O'Shea*.</u>

*Yarls v. Bunton*, 231 F. Supp. 3d 128, 132 (M.D. La. 2017)(emphasis added). *Accord, Bender v. Wisconsin, supra*; *See also, Bice v. Louisiana Pub. Def. Bd.*, 677 F.3d 712 (5th Cir. 2012)(challenge to public defender fees).

---

[6] The Plaintiffs in *Bender* alleged that the defendants were "fail[ing] to provide constitutionally required, effective legal representation to indigent people accused of crimes for which there is a possibility of incarceration. . . ." 2019 WL 4466973, at *1.

[7] Again, in *Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122 (W.D. Wash. 2013), cited by Plaintiffs, the defendants did not raise the federalism defenses that have defeated the claims of plaintiffs in similar cases decided both before and after *Wilbur*. Nor did the municipalities appeal that adverse decision. *Wilbur* is accordingly an outlier. Judge Gergel cited *Wilbur* in the course of denying the municipalities' motion to dismiss in *Bairefoot v. City of Beaufort, S.C.*, 312 F. Supp. 3d 503 (D.S.C. 2018), but that case, later settled, had not reached a stage where the issue of remedy was before the court. Federalism issues were not raised in connection with that settlement.

So strong is the policy against the relief sought by Plaintiffs that one court even refused to approve a consent decree between the plaintiffs and members of the Missouri State Public Defender Commission, citing federalism concerns and also noting that "The parties have not explained how . . . as a practical matter such a consent decree applicable to so many indigents in the state criminal justice system could effectively be enforced." *Dalton v. Barrett*, 2020 WL 420833 at *5 (W.D. Mo. Jan. 27, 2020).[8]

Plaintiffs fail even to acknowledge, much less discuss, this solid body of legal precedent that goes against them. As a result, their presentation of the legal landscape for their claim is as incomplete as their presentation of the factual landscape. On p. 39 of their Memorandum, they cite several cases regarding broad federal remedial authority, but those holdings were not made in contexts where *Younger's* federalism principles were present. Their extended discussion of what would be adequate funding for magistrates' courts in Lexington County is therefore beside the point.

It should be noted that in some of the cited cases regarding the rejection of prospective relief on Sixth Amendment claims, the defendant public authorities nevertheless took other remedial actions that ultimately led to the settlement and dismissal of the cases. In the present case, the same end result was reached because of the actions of Chief Justice Beatty eliminating the situation complained of in this case, that is the uncounseled arrest and incarceration of indigent people for nonpayment of magistrate court fines and fees, the only context in which the Sixth Amendment claims have been made. *See* ECF 283-1 at 32-33. The Sixth Amendment prospective

---

[8] Plaintiffs in this case previously relied on an earlier decision in *Dalton v. Barrett,* when it was styled as *Church v. Missouri*, 2017 WL 3383301 (W.D. Mo. July 24, 2017). *See, e.g.,* ECF No. 66 at 43 n. 57, where the case was included along with the state cases Plaintiffs continue to cite. After the court's refusal to approve the parties' proposed consent decree, Plaintiffs have silently omitted their citation to that case.

relief Plaintiffs sought at the time of the filing of this action was effectively provided once the 2017-2018 changes were implemented. To the extent Plaintiffs may claim otherwise, any such as-yet unpresented claims will be addressed at the reply brief stage.

**3.    Plaintiffs have not shown that the complained-of actions resulted from administrative acts by Defendants Reinhart and Adams.**

The entire foundation of Plaintiffs' case against the Magistrate Defendants, whether for prospective relief or for damages, is their assertion that the harms to Plaintiffs "result from the exercise of administrative authority" by the Magistrate Defendants. *See, e.g.,* SAC at 33, Heading 3 (capitalization omitted). They contend that they were arrested and jailed as "the result of deliberate decisions, actions, omissions, and longstanding policies, practices, customs, and standard operating procedures <u>established</u>, overseen, and sanctioned" by Defendants Reinhart, and Adams, among others. SAC, ECF No. 48 at 7, ¶ 12 (emphasis added).

Having alleged the existence of such policies or similarly-described actions, it was Plaintiffs' burden to show that (a) "policies" or failing that, standard operating procedures or practices, actually existed, (b) the practices were administrative in nature, rather than judicial, and (c) the judicial actions of the county magistrates were within the Chief Magistrates' power to control. As set forth below, Plaintiffs have failed to meet their burden to prove any of these essential factual and legal elements of their claims.

**a.    The matters of which Plaintiffs complain did not result from "policies."**

Plaintiffs agree that "the extent of [an official's] liability as a supervisor is similar to that of a municipality that implements an unconstitutional policy." ECF No. 284-1 at 43-44, quoting

*Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011).[9] The word "policy" in this context "generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" . . . unless evidence be adduced which proves that the [claimed inadequacies of the alleged policy] resulted from conscious choice. . . ." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) [footnote omitted]. *Tuttle* further held that "proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved." *Id.* at 824.

Plaintiffs cannot show even this first element that they are required to prove. They cannot show that that the alleged "policies" had their origin in the conscious choice of some particular policymaker. Instead, they now describe the complained-of acts as the result of "standard operating procedure" that had been in place "for decades," but they do not attempt to describe the policies' origins. ECF No. 284-1 at 10. They also do not attempt to show that the alleged "standard operating procedure" "can be attributed to a . . . policymaker." *Tuttle, supra.*

Nor can Plaintiffs show even that any procedures were "standard." They point to some samplings from case files in 2017 indicating that prior to the 2017-2018 changes, some people who did not pay fines were arrested on bench warrants and subsequently incarcerated. ECF No. 284-1 at 13. That sample showing, based on short periods of time in 2017, does not indicate the total number of persons with suspended jail sentences who were delinquent on their legal financial obligations, even during those sample periods. Nor does that limited showing indicate the

---

[9] The ultimate outcome of *Carnaby* was that a grant of summary judgment for the defendant was affirmed because, as here, there was "no evidence that [he] established any sort of policy. . . ." , 636 F.3d at 189.

percentage of persons who did not meet payment obligations and for whom bench warrants were issued and then actually served. In addition to those failure, Plaintiffs make no effort to show the percentages of defaulting defendants who actually were incarcerated on bench warrants. All that Plaintiffs have shown is that at least some of the nine Lexington County Magistrates, during the course of a sample period, issued bench warrants for an unknown percentage of the people who did not pay outstanding fines, and that another unknown percentage of the persons some of those persons named in bench warrants were incarcerated. Defendants do not deny that this sometimes occurred, but there is no evidence at all to show that these actions were "standard," that is, routinely followed in some large percentage of cases.[10] Nor have Plaintiffs cited any evidence that would provide any indication that these individualized judicial decisions were the result of "conscious choice," in the sense of the Lexington County Magistrate Defendants creating a top-down, generally-applicable, policy.[11]

To the contrary, Magistrates Adams and Reinhart have both stated in their Declarations that for at least as long as they have been magistrates, there has never existed such a thing as the "Default Payment Policy" or the "Trial in Absentia" Policy, whether written or unwritten, formal or informal. Adams Declaration, ECF No. 283-11, ¶¶ 25, 26; Reinhart Declaration, ECF No. 283-

---

[10] The phrase "Standard operating procedure" is defined as "established or prescribed methods to be followed routinely for the performance of designated operations or in designated situations." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/standard%20operating%20procedure. Accessed 3 May. 2022.

[11] Plaintiffs' failure of proof is not aided by their reference to the fact that "[n]early 6,000 bench warrants, spanning almost four decades, were recalled," ECF No. 284-1 at 14, because, as Plaintiffs themselves point out, the recall directive applied to "all Lexington County Magistrate Court Bench Warrants." *Id.* citing Plaintiffs' Ex. 17. Bench warrants can be issued for reasons other than failure to pay fines and fees, as indicated in n. 3, *supra*. There is no indication that Plaintiffs have reviewed the recalled bench warrants in order to determine how many of them involved failures to pay outstanding fines. Moreover, the existence of so many unserved bench warrants indicates that even when a bench warrant was issued, actual service of the bench warrants, and any incarceration that may have followed, were both far from inevitable.

10 , ¶¶ 6, 7. The magistrates further state that "While it is obvious that similar decisions were often reached by Lexington County Magistrates in cases where the pertinent facts were similar, those decisions were the result of the exercise of judicial authority in each individual case, and not the result of any direction from either the Chief Judge for Administrative Purposes of the Summary Courts in Lexington County or Associate Chief Judge for Administrative Purposes of the Summary Courts in Lexington County." Adams Declaration, ECF No. 283-11, ¶ 28 ; Reinhart Declaration, ECF No. 283-10 , ¶ 9.[12] Plaintiffs' frequent use of the terms "Default Payment Policy" or "Trial in Absentia Policy" therefore is simply not an accurate use of the term "policy." Those misleading labels, made up by Plaintiffs' counsel, have no support in fact, and should be deleted from the lexicon of this case.

> **b.    The matters of which Plaintiffs complain were the result of judicial acts, not administrative action.**

Having failed even to argue that any of the Magistrate Defendants actually created the alleged "policies" of which Plaintiffs complain, Plaintiffs nevertheless now claim that the Magistrate Defendants should not have permitted the other magistrates to continue either those nonexistent "policies" or the alleged standard operating procedures that had been authorized statewide by Court Administration. This is simply an absurd position. First of all, the complained-of arrests and incarcerations were implemented by the use of forms promulgated by Court Administration. The forms specifically provided for arrests and incarcerations when payments were not made, as Defendants have discussed, ECF No. 283-1 at 12, 16-20. The forms do not suggest that an additional hearing was necessary before incarceration took place, and indeed

---

[12] As already discussed several times, Court Administration provided forms which until the 2017-2018 changes, provided the administrative vehicles for the complained-of judicial acts.

provide just the opposite.[13] Secondly, the complained-of arrests and incarcerations did not result from any "administrative" policy or practice, but instead resulted from case-by-case decisions of the nine individual county magistrates, both in connection with the original convictions and with the decisions to issue bench warrants. *Id.* at 19. Finally, Plaintiffs' central assertion that there was a "practice of <u>automatically</u> issuing nonpayment bench warrants. . . ," *see, e.g.,* ECF No. 284-1 at 9 (Heading II)(emphasis added), is unfounded in fact. It flies in the face of undisputed evidence in the record that bench warrants were <u>not</u> issued "automatically," but rather were issued only after a review of each case by a magistrate, followed by the judicial act of issuing a bench warrant. The process was described in detail in Defendants' opening Memorandum, ECF No. 283-1 at 19-20.[14]

        c.    T**he Chief Magistrates had no power or authority to affect the judicial acts of the other Lexington County magistrates.**

Even though Plaintiffs cannot show that policies existed, or that Plaintiffs were harmed by any action that could be termed "administrative," they nevertheless have embarked on a search of the semi-annual Orders designating Chief Magistrates for something that might support their claims that Chief Magistrates were given some authority over the judicial acts of the county magistrates. That search for authority has failed completely. There is nothing in the prescribed

---

[13] One example is the now-discontinued version of Form MC15, which provided in part that "Failure to appear as directed or failure to comply with the terms set forth in this payment schedule will result in a BENCH WARRANT/COMMITMENT being issued for my arrest. . . ." *See, .e.g.,* ECF No. 283-2 at 5. This form equated the issuance of a bench warrant with a jail commitment, and Court Administration later acknowledged that the former bench warrant forms themselves (Form MC2) "had the sentences on them and many courts and jails were using them as commitment orders." ECF No. 283-16 at 3 [p. SCCA-000002].

[14] Plaintiffs mischaracterize the context of the deposition testimony by asserting that "Defendant Adams testified that the practice of <u>automatically</u> issuing nonpayment bench warrants was so common and widespread. . .," etc. ECF No. 284-1 at 14 (emphasis added. The cited testimony might support a conclusion that the practice was not unusual, to some unstated degree, but it had nothing to do with whether bench warrants were "automatically" issued, which would have conflicted with the undisputed evidence that a judge reviewed each case before issuing a bench warrant.

duties of the Chief Magistrates that vested them with any authority to direct the other county magistrates to exercise their judicial power in any particular fashion.

Before reviewing the semi-annual Orders, it is worth noting once again that it would be absurd for the Chief Magistrates to have issued an "administrative" order that not only directed magistrates how to exercise their judicial authority in deciding cases, but also would require county Chief Magistrates (prior to the 2017-2018 changes) to prohibit arrests and incarcerations that at the time were expressly permitted by Court Administration via Forms MC2 and MC15. Plaintiffs' counsel, although well aware of the magistrates' use of those state-sanctioned forms,[15] have so far presented their argument as if those Court Administration forms simply did not exist.

An example of one of the semi-annual Orders of the Chief Justice is before the Court as ECF No. 284-14, the January 2017 version.[16] The duties set forth in those Orders are typical of what one might expect to see regarding administrative functions of a court system, including such matters as financial proceedings, meetings, case assignment policies, hours of operation, etc. Those administrative responsibilities are comparable to those of state <u>circuit</u> court Chief Administrative Judges, as currently set forth in Order No. 2019-06-28-02, Duties of Circuit Court Chief Judges for Administrative Purposes. Exhibit 2, attached. In both instances, the kinds of duties listed as "administrative" are of a completely different nature than the actual adjudication of cases.

---

[15] *See, e.g.,* Ex. 1 (Reinhart deposition) at 143, where Magistrate Reinhart testified that at the time he was chief judge, "We did exactly what the forms from court administration allowed us to do."

[16] Defendants previously referenced that version of the semi-annual Order at "Exhibit 9," ECF No. 283-1 at 13 n. 10 and at 15. There is a Defendants' Exhibit 9, but it is a different document. However, the same document is before the Court as a Plaintiffs' exhibit, ECF No. 284-14.

1.     **Contrary to Plaintiffs' claims, which omit controlling language of the semi-annual Orders, those Orders do not impose a general "monitoring" requirement on Chief Magistrates.**

Plaintiffs first assert that the Chief Magistrates "are obligated to monitor all magistrate judges to ensure that the constitutional and statutory rights of indigent defendants are upheld." ECF No. 284-1 at 16, citing Paragraph 5 of the June 28, 2017 semi-annual Order, Plaintiffs' Ex. 3. That supposed duty is based on a truncated and misleading quote by Plaintiffs of the language of the semi-annual orders. As incompletely quoted by Plaintiffs, the Chiefs and Associate Chiefs are required to

> Monitor all summary court judges within the county to ensure . . . the constitutional and statutory rights of defendants and victims are being upheld[.]

ECF No. 284-1 at 15 (the same misleading quote is paraphrased on the following page, p. 16). In fact, however, that language did not express a general monitoring rule, but instead only applied to a September 19, 2007 Order (not to be confused with the Beatty Memorandum of September 15, 2017, ten years later) that by its terms applied only to "bond hearing procedures and detention facility issues arising in magistrate and municipal courts." Ex. 3, attached. Plaintiffs, however, selectively omit this limiting language. The omitted parts of Plaintiffs' quote are highlighted below, using the ECF No. 284-8, Plaintiffs' Exhibit 3, the June 28, 2017 version:

> 5.     Monitor all summary court judges within the county to ensure **compliance with the above-referenced Order dated September 19, 2007** [outlining certain bond procedures]**. The monitoring shall include, but shall not be limited to, ensuring that: bond hearings are being conducted twice daily**; the constitutional and statutory rights of defendants and victims are being upheld; **bonds are neither excessive nor limited to cash only; and no irregular practices, as outlined in the above-referenced Order, are occurring.**

*Id.* at 5, ¶ 5. Thus, Plaintiffs can only assert the existence of a general monitoring duty by truncating beyond recognition the language they claim to be the source of that supposed requirement.

16

In any event, even if the Chief Judges had been given the broad monitoring authority that Plaintiffs mistakenly see, that authority would not impose a duty that would render Chief Administrative Judges liable for damages if other judges did not follow the law. But as far as can be discerned, with the exception of the claims of the Plaintiffs in this case, no one has ever suggested that a chief federal district judge, or indeed <u>any</u> judge, state or federal, with administrative duties should be subject to claims for injunctive relief or damages whenever a class of litigants attempts to claim that decisions in the given district were consistently in error on some point of law. The unique rule asserted by Plaintiffs would require a chief administrative judge of any court to be a guarantor, upon pain of damages, that the other judges of the same status do not violate anyone's constitutional rights. Obviously, in neither the federal system nor its state magistrate court counterpart would a chief judge presume to direct judges how to decide cases, and specifically how to sentence criminal defendants or enforce unsatisfied sentences. Such matters are beyond the scope of what is meant by "administrative" actions of judges with administrative powers.[17] Simply put, cases are not decided by administrative actions or policies within the duties of chief judges, but by judicial actions taken on a case-by-case basis.

---

[17] The only formal remedy in the state court system for a hypothetical case of a rogue judge who openly refused to follow the law, for instance, by ignoring *Miranda v. Arizona,* would be for the judge to be reported to the Commission on Judicial Conduct pursuant to SCACR 502, Rule 7. Rule 7 provides for various grounds for discipline. SCACR Rule 502, Rule 17(b) provides that the Supreme Court may order an interim suspension upon "receipt of sufficient evidence demonstrating that a judge poses a substantial threat of serious harm to the public or to the administration of justice. . . ." Anyone, including litigants, lawyers, other judges, or simply members of the public, can report a judge to the Commission on Judicial Conduct. However, there is no reference to the Code of Judicial Conduct in the semi-annual Orders appointing Chief Magistrates.

2.    **The judicial actions of issuing bench warrants are not covered by the "revenue collection" provision of the semi-annual Orders.**

Plaintiffs next attempt to find some support for their claims in the paragraph of the semi-annual orders which provides that Chief Magistrates shall "Establish within the county a procedure with all summary court judges and appropriate public officials to ensure that court generated revenues are collected, distributed and reported in an appropriate and timely manner." *See* ECF No. 284-1 at 17-18, citing the June 28, 2017, semi-annual Order, ECF No. 284-8 at 6, ¶ 17.

Plaintiffs argue that they were harmed by "uniform debt collection policies and procedures overseen by the Chief and Associate Chief Judges. . . ." ECF No. 284-1 at 39.  But that provision is located in a listing of administrative duties that does not purport to set forth substantive principles for judicial decisionmaking. Ed Lewis, the Magistrate Court Administrator, testified that under that provision, he was directed to deal with such matters as payment by coin, debit or credit cards, certified checks, etc. Pls.' Ex. 7 at 81:25–87:25. Those matters, to which might be added such matters as the locations where payments could be made, and the employees who could accept the payments, arise only after court-generated revenues have been collected.

Nothing in the context of the quoted paragraph suggests that the Chief Magistrates could direct other magistrates how to exercise their judicial discretion when there is a need for additional enforcement when a fine is unpaid. Plaintiffs attempt to describe those judicial actions for enforcement of unpaid fines as mere "debt collection practices," a phrase that appears many times in Plaintiffs' Memorandum in Support of their Motion for Summary Judgment. However, no amount of repetition of this misplaced description can turn the judicial enforcement process taken to collect such unpaid fines, into a ministerial "debt collection" process.

The Setoff Debt Program is an optional method created by S.C. Ann. § 12-56-10, et seq., for collecting a variety of delinquent debts, including court fines, by setting off those debts from any state income tax refunds due the debtor. § 12-56-50. But even after the Lexington County Magistrates' Courts began using the Setoff Debt Program in 2018, the decision whether to refer a case involving unpaid debt to that program was itself a judicial act, as is shown, for instance, in the case of Plaintiff Goodwin. Exhibit 4, attached.

Plaintiffs inexplicably appear to be arguing in effect that when then-Chief Magistrate Adams authorized the implementation of the Setoff Debt Program in Lexington County in 2018, that action by her proved that a Chief Magistrate could control the sentencing decisions of individual judges. ECF No. 284-1 at 45. But Judge Adams testified in her deposition the Setoff Debt Program was implemented in Lexington County "so our judges would have an _option_ of doing that if -- if it was what they choose. I can't make any magistrate do that with their cases. . . ." (Emphasis added.) Plaintiffs cite no legal authority that would indicate otherwise.

> **3.  Neither the "uniform procedures" paragraph nor any other provision of the semi-annual Orders confers authority on the Chief Magistrates to regulate judicial actions.**

Plaintiffs also claim that the November 2017 act of recalling Lexington County bench warrants is indicative of a power by the Chief Magistrate to set policies that cover individual adjudications. ECF No. 284-1 at 45. Once again, this contention is supported only by a selective and incomplete reference to the record. First, the decision to recall the outstanding bench warrants was made collectively. Def. Ex. 11, ECF No. 283-10 at 4 (Adams Declaration), ¶ 16; ECF No. 284-10 at 19 [209] ("I relayed that [a conversation she had with Chief Justice Beatty about recalling outstanding bench warrants] to the -- to the judges and we all sort of decided that we needed to have them recalled."). Secondly, the recall was made specifically for the purpose of having each

individual magistrate conduct an individualized review of each bench warrant. Ex. C to Def. Ex. 11, ECF No. 283-10 at 13 ("Please have all Lexington County Magistrate Court Bench Warrants temporarily recalled <u>for review by each Judge</u>.")(emphasis added). Far from being an action that controlled the exercise of discretion by each individual magistrate, the function of the collectively agreed-upon recall directive was to enable a review and exercise of discretion by each individual magistrate.

Plaintiffs' other citations to the semi-annual Orders also fail to show that Chief Magistrates had any duties whose breach would render them liable to convicted persons. As listed in Plaintiffs' Memorandum in Support, ECF No. 284-1 at 15, those other provisions included such matters as the requirement of having "quarterly meetings . . . to formulate uniform procedures, coordination of budget planning, case assignments, and designations of hours of operation. None of these details of administration have anything to do with directing other magistrates how to exercise their judicial discretion in ordering enforcement steps for instances in which fines have not been paid.[18] Still other instances listed by Plaintiffs on pp. 17-18 of their Memorandum are also limited to purely administrative functions, such as inclement weather policies, courtroom media policies, providing for how to contact a magistrate for emergencies on holidays and weekends, etc. Plaintiffs also note

---

[18] Plaintiffs paraphrase § 17 of the January 3, 2017 semi-annual order is another example of a misleadingly-incomplete quote. Plaintiffs refer to that paragraph only as containing a reference to "Report[ing] to the SCCA "any significant or repetitive non-compliance" by magistrate judges concerning the provisions of the order. . . ." ECF No. 284-1 at 15. In fact, however, what that paragraph actually provides is that the authority of Chief Magistrates includes authority to "17 Report to the Office of Court Administration any significant or repetitive non-compliance by any summary court judge in the county concerning the <u>Chief Judge's execution of the provisions of this Order</u>." (Emphasis added.) In other words, that authority to report non-compliance is not only limited to the administrative matters in the semi-annual Orders, but also is further limited to reporting only failures of other judges to comply with the administrative acts of the Chief Judges in the counties, effectively restating that kind of noncompliance to be reported is noncompliance with merely administrative matters.

that in 2019, Judge Adams set up a procedure to screen defendants in bond court for public defender eligibility. ECF No. 284-1 at 19. However, that would not have assisted any of the Plaintiffs in this case, because the context of the deposition testimony makes it clear that such screening was done for persons whose cases had not yet reached the Magistrates' Court for the first time, not for persons who had been convicted and had failed to pay outstanding fines. ECF No. 284-11 at 36. Plaintiffs also make a reference to a 2020 staff-level memorandum to Traffic Court employees about bringing bench warrant arrestees to bond court within 24 hours of arrest. ECF No. 284-1 at 19. In 2020, however, bench warrants were no longer being issued for nonpayment of fines and fees, so the referenced situation in 2020 would only have involved bench warrants that called for the defendant to be brought before the court, i.e., a different kind of bench warrant from the kind issued prior to the 2017-2018 changes, and of which Plaintiffs complain.

    **4.**    **The prospective relief sought by Plaintiffs against the official-capacity Magistrates based on *Bearden v. Georgia*, 461 U.S. 660 (1983) is barred for several different reasons.**

In this claim, Plaintiffs seek prospective relief "enjoining the offices of the Chief and Associate Chief Judges of Lexington County for Administrative Purposes from overseeing, sanctioning, or promoting a policy or standard operating procedure that allows for jailing for nonpayment of fines and fees without first: (1) conducting a judicial hearing to determine whether nonpayment was willful, as required by *Bearden v. Georgia*. . . ." ECF No. 284-1 at 50. The Court does not need to determine whether complained-of actions complied with *Bearden,* because this relief should be denied for other reasons, most of which have already been discussed.

    **a.**    **Mootness.**

First, for the reasons already set forth in Heading 1 above in connection with Plaintiffs' Sixth Amendment claim, Plaintiffs' request for prospective relief regarding their Fourteenth

Amendment claim has been rendered moot by the 2007-2008 changes. The complained-of practice is no longer occurring, nor is there any likelihood that it will recur in the future. Again, Plaintiffs do not mention mootness at all, so any further treatment of this issue by Defendants will be made in Defendants' forthcoming Reply regarding their own Motion for Summary Judgment.

        **b.**        **Absence of acts to enjoin (lack of redressability).**

Secondly, while mootness alone should be a sufficient reason to reject this request for prospective relief, it also should be denied because, as discussed above in detail, Plaintiffs have never shown the existence of a policy or a standard operating procedure for the Court to order the Chief Magistrates to refrain from "overseeing, sanctioning, or promoting." And even such policies or procedures did exist, Plaintiffs are actually asking the Court to order the Chief Magistrates to require the other magistrates to exercise their judicial authority in a certain way, when the Chief Magistrates do not have the authority to do so. As a result, and leaving aside that the supposed future injury is no longer occurring, the relief sought by Plaintiffs would not redress their injuries, because "[t]o obtain injunctive relief, a plaintiff must ask for that relief against a party who can redress her claim." *Rodden v. Fauci*, No. 3:21-CV-317, 2021 WL 5545234, at *3 (S.D. Tex. Nov. 27, 2021), citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 568 (1992). Here, if any Lexington County magistrate ever resumes the now-ended practices of which Plaintiffs complain, they might only do so if the Chief Justice were to revoke the 2017-2018 changes. If that were to occur, it would be "th[e] result [of] the independent action of some third party not before the court." *Lujan, supra*, 504 U.S. at 560. That action would only be redressable, if redressable at all, by an order directed to someone other than county chief magistrates, with any such order raising federalism concerns as discussed elsewhere.

### c.    Federalism concerns.

Finally, Plaintiffs have cited no authority whatsoever that would support a grant of declaratory or injunctive relief in connection with the manner in which sentences are enforced. As with their Sixth Amendment claims, the relief they seek would result in "an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris* . . . and related cases sought to prevent. *O'Shea v. Littleton, supra,* 414 U.S. at 500.

### 5.    Plaintiffs have provided no factual or legal basis for their damage claims against the Magistrate Defendants.

Defendants have already pointed out a number of reasons why Plaintiffs' damage claims against the Magistrate Defendants are without merit. These include the indisputable fact, again completely ignored by Plaintiffs, that South Carolina Court Administration had long authorized the practice of incarcerating persons on bench warrants when they failed to pay outstanding criminal fines.[19] Further, Court Administration formalized and institutionalized that practice years ago by issuing forms that provided for the summary courts to do just that. *See* Defendants' Memorandum in Support of Motion for Summary Judgment, ECF No. 283-1 at 12, 16-20. Thus, even if the magistrates with administrative responsibilities had the authority to tell other magistrates how to adjudicate cases, which as already discussed, they did not, those chief magistrates could not have been expected to prohibit other magistrates from following a practice that had Court Administration had permitted, using forms issued by Court Administration.

---

[19] Defendants, in support of their Motion for Summary Judgment, also cited qualified immunity and the *Rooker-Feldman* doctrine, either one of which is dispositive of Plaintiffs' damage claims. Defendants will address in their forthcoming Reply Memorandum any arguments made by Plaintiffs on those issues. None of the defenses pertaining to the damage claims require the court to make a determination of whether the actions taken in Plaintiffs' cases contravened *Bearden.*

Plaintiffs' counsel, although well aware of the magistrates' use of the state-sanctioned MC2 form, *see* n. 13, *supra,* have so far attempted to present their argument as if those Court Administration forms did not exist.

Plaintiffs have tried to fit their damage claims into the mold of the three-pronged "supervisory liability" template set forth in such cases as *Shaw v. Stroud*, 13 F.3d 791.(4th Cir. 1994).[20] However, before those three factors can be considered, a plaintiff first needs to show that the defendant possessed supervisory authority in the first place, with regard to the matters in issue. *See, e.g., Foster v. Fisher,* 694 F. App'x 887, 889 (4th Cir. 2017)(finding no supervisory liability where a trial court judge of general jurisdiction had no supervisory responsibility over the actions of a summary court judge); *Wilkins v. Montgomery*, 751 F.3d 214, 228 (4th Cir. 2014)(summary judgment for defendant affirmed because, among other things, defendant did not have supervision over the kinds of actions that were alleged to have caused harm). Plaintiffs do not contend otherwise, noting that "a plaintiff must show that the defendant had a supervisory relationship" with the actors alleged to have been culpable. ECF No. 284-1 at 46. Again, however, Plaintiffs cite no case in which a chief judge with administrative responsibilities over his or her peers ever has been held liable in damages for any actions of other judges, much less held liable for judicial actions of other judges with coequal judicial responsibilities.[21] Plaintiffs attempt to argue that the

---

[20] Under the familiar tests set forth in *Shaw*, the plaintiff must show "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." 13 F.3d at 799.

[21] Two of the three Fourth Circuit cases cited by Plaintiffs in this regard, *Foster v. Fisher, supra,* and *Wilkins v. Montgomery*, *supra,* held that a supervisory relationship did <u>not</u> exist. In the third case, *Slakan v. Porter*, 737 F.2d 368 (4th Cir.1984), the correctional officials held liable were all in the executive chain of command with responsibility for the operations of state prisons.

semi-annual Orders of the Chief Justice setting forth the duties of the county Chief Judges for Administrative Purposes for each county serve as a source for actionable administrative authority. As already discussed above, however, those semi-annual Orders do not confer such authority on the Chief Magistrates. At pp. 43-44 of their Memorandum, Plaintiffs cite several cases, none involving judges, in connection with possible liability based on the enforcement of policies, but in all of those cases, policies and supervisory authority were actually shown to have existed, which is not the situation here.

Plaintiffs cite only three cases involving situations where certain acts that were performed by judges were held to be fundamentally non-adjudicative in nature. ECF No. 284-1 at 50. As far as Defendants' counsel are aware, those three cases comprise the only one that so hold. All three, however, involved facts that were completely different from those in the present case.

The first such case, *Forrester v. White*, 484 U.S. 219 (1988), involved a judge's decision to dismiss a subordinate court employee. That decision, which pertained to employment rather than a judicial act, was held to be an action in an administrative capacity. Next, in *Morrison v. Lipscomb*, 877 F.2d 463 (6th Cir. 1989), the chief administrative judge of a judicial district declared a districtwide moratorium on the issuance of writs of restitution during the holiday period from December 15, 1986 through January 2, 1987. The Sixth Circuit held that that action was administrative and not judicial. In the course of that holding, the court explained that the case did "not [involve] an adjudication between parties," but instead was "a general order, not connected to any particular litigation." 877 F.2d at 466. In addition, "[t]he order did not alter the rights and liabilities of any parties but, rather, instructed court personnel on how to process the petitions made to the court." *Id.*

Discovery in the present case has proven that there has never been a comparable "general order," nor indeed, any court order at all. In the present case, of course, the magistrates' actions in the Plaintiffs' individual cases <u>did</u> involve adjudications. Discovery has verified the existence of the possible scenario predicted by Judge Wilkinson in this case, *Brown v. Reinhart*, 760 Fed. Appx. 175, 181 (4th Cir. 2019), that is, the possibility that "policies affecting outside parties in court proceedings are much more likely to be judicial. They are not, after all, 'acts that simply happen to have been done by judges.'" (quoting *Forrester, supra*). Judge Wilkinson also noted that such policies might not exist at all, which has also proven to be the case here.

The only other case cited by Plaintiffs is a district court case, *Ratte v. Corrigan*, 989 F. Supp. 2d 550 (E.D. Mich. 2013), where a state court judge signed blank juvenile commitment orders which were later filled in by lay staff and then issued without the judge ever conducting a review of the facts of any particular case. As discussed above, however, precisely the opposite happened here—bench warrants were not issued until a judge had reviewed each case.[22]

Finally, Plaintiffs claim that the Magistrate Defendants "were on notice that these policies and procedures are contrary to longstanding Supreme Court precedent and South Carolina law." ECF No. 284-1 at 11-12. Plaintiffs cite certain general provisions of the South Carolina Summary Court Judges Bench Book in support of that assertion, but they cite no reference to *Bearden v. Georgia* in the Bench Book. As far as can be discerned, the Bench Book contains no such reference to *Bearden*. Plaintiffs also cite their Exhibit 13, a March 14, 2016 "Dear Colleague" letter from the United States Department of Justice. However, once again Plaintiffs selectively and

---

[22] In *McCullough v. Finley*, 907 F.3d 1324 (11th Cir. 2018), the district court believed, as do Plaintiffs here, that because the plaintiffs did not challenge any individual rulings of a judicial defendant, that was an "important nuance." *Id.* at 1332. The Eleventh Circuit rejected that view, holding that the challenged acts were protected by judicial immunity because they involved judicial orders in pending cases. *Id.*

26

misleadingly quote their one of their own exhibits. They make no reference to the March 16, 2016, cover email from Rosalyn Frierson, then the Director of Court Administration, through which the magistrates received the DOJ "Dear Colleague" letter. ECF No. 284-18 at 2.[23] That email was also sent to then-Chief Justice Costa Pleicones. (The Chief Justice appoints the Director of Court Administration.)

In that email, Ms. Frierson did not suggest in any way that the magistrates were doing something that needed correcting. She merely stated the following:

> The CCI/COSCA National Task Force on Fines, Fees and Bail Practices, co-chaired by the Chief Justice of Ohio, Maureen O'Connor and Kentucky State Court Administrator Laurie Dudgeon, convened Monday in Washington, DC for its first meeting. Many of the issues raised by DOJ <u>will be addressed by this Task Force with recommendations to be provided at a later date.</u> As a note, I have been appointed to serve on the Task Force and <u>I welcome any suggestions or comments to be considered in the recommendations.</u>

ECF No. 284-18 at 2 (emphases added). Unsurprisingly, then, Judge Reinhart understood that email from Ms. Frierson to indicate that Court Administration was not suggesting a need for immediate action in March 2016:

12 And they are convened for its first
13 meeting, and it says [quoting the cover email]: Many of the issues raised by
14 the DOJ -- which would be in all the attachments,
15 right -- will be addressed by this task force with
16 recommendations to be provided at a later date.
17 And then she puts as a note, she was
18 actually a member of this task force and welcomed
19 any suggestions or comments to be considered for
20 the recommendations. And at the time, she was the
21 director of court administration. <u>So basically</u>

---

[23] Ms. Frierson was an attorney who had been the Director of Court Administration from 1998 until 2017. She once served as President of the Conference of State Court Administrators, and is now a Family Court judge. *See* https://www.sccourts.org/familyCourt/displayfcjudge.cfm?judgeid=4187 (visited 5/4/22).

<u>22 she's telling us she'll get back to us</u>.
23 Q. So, if I'm understanding that
24 correctly, because court administration didn't
25 order you to change anything, you didn't consider
[167]
1 changing anything?
2 MR. WOODINGTON: Object to the form.
3 THE WITNESS: No, sir. <u>Court</u>
<u>4 administration regulates how we do business.</u>

Ex. 1, attached at 166-67 (emphases added). That email, of course, was sent more than a year prior to the filing of this case. Defendants have already cited a Fourth Circuit case holding that "It would be plainly unreasonable to rule that . . . lay officers must at their own risk secondguess the legal assessments of trained lawyers." ECF No. 283-1 at 51, quoting *Wadkins v. Arnold*, 214 F.3d 535, 543 (4th Cir. 2000). Ms. Frierson's email did not provide Defendants Adams and Reinhart, neither of whom were lawyers, with any reason to believe that immediate action was required by any South Carolina magistrate, much less with any reason to believe that they as Chief Magistrates were now suddenly vested with authority to remedy a situation that Court Administration was not taking any immediate steps to remedy.

Plaintiffs make little or no attempt to develop an argument that the Magistrate Defendants should be held liable for damages for alleged Sixth Amendment violations asserted in their Claim Five. If such a claim is actually being made, it should be rejected for the reasons set forth herein, including the Magistrate Defendants' absence of authority over judicial decisions regarding right to counsel, the fact that decisions about whether to advise about counsel and to appoint counsel are judicial acts, and also for the reasons set forth in Defendants' opening Memorandum, ECF No. 283-1 at 35-44, including waiver and the inability to show causation that would give rise to a damage claim because of the absence of appointed counsel.

**6.    Plaintiff Goodwin's two individual claims for declaratory relief are now moot for reasons specific to his case.**

Lastly, Plaintiffs argue that Claims Seven and Eight, the individual (i.e., non-class) claims of Plaintiff Goodwin for declaratory relief against Magistrate Adams remain alive. They assert that Plaintiff Goodwin "still faces a substantial and immediate risk of arrest and incarceration without being afforded his Sixth Amendment right to counsel." ECF No. 284-1 at 52. These statements, like so many others, can only be made by ignoring the 2017-2018 changes. More importantly, though, Goodwin's case pending magistrate court case was recently resolved. On March 25, 2022, Magistrate Brian N. Buck, to whom the case was reassigned, issued a summons to Mr. Goodwin to appear on April 20, 2022. Ex. 4 (Lewis Declaration of May 6, 2022, with attached case history report for Goodwin). After he failed to appear on that date, Magistrate Buck ordered that his case be sent to the Setoff Debt program. *Id.* Any previous concern of Plaintiffs, however unrealistic it may have been, that Goodwin would actually be arrested and incarcerated, has now been eliminated. Again, this resolution of Claims Seven and Eight, which are individual to Goodwin only, does not affect the class action claims, which are Claims One, Two and Three. *See* 3/5/21 Order, ECF No. 327, at 2-3.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that Plaintiffs' Motion for Summary Judgment should be denied, Defendants' Motion for Summary Judgment should be granted, and this action dismissed.

Respectfully submitted,

DAVIDSON, WREN & DEMASTERS, P.A.

*s/ Kenneth P. Woodington*
William H. Davidson, II, Fed. I.D. No. 425
Kenneth P. Woodington, Fed. I.D. No. 4741

DAVIDSON, WREN & DEMASTERS, P.A.
Post Office Box 8568
Columbia, SC 29202-8568
Telephone: (803) 806-8222
Facsimile: (803) 806-8855
E-mail: kwoodington@dml-law.com

ATTORNEYS for Defendants

Columbia, South Carolina

May 9, 2022