# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

# COLUMBIA DIVISION

| | | |
|---|---|---|
| Twanda Marshinda Brown, et al, | ) | Civil Action No. 3:17-1426-MBS |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **DEFENDANTS' REPLY MEMORANDUM** |
| | ) | **IN SUPPORT OF DEFENDANTS'** |
| Lexington County, South Carolina, et al., | ) | **MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

# TABLE OF CONTENTS

Table of Cases ............................................................................................................................

Introduction ...........................................................................................................................1

Summary of Briefs on Dispositive Motions ........................................................................2

Argument ...............................................................................................................................6

    1.    Plaintiffs' prospective relief claims (Claims One, Two and Three) are moot, and Plaintiffs have not shown any reason to believe that Defendants are not complying with the 2017-2018 changes, or that the Chief Justice or Court Administration will revoke those changes.... ...............................................6

        a.    Plaintiffs' argument that the 2017-2018 changes "lack permanence."....................................................................................7

        b.    Plaintiffs' argument that the 2017-2018 changes are "nonbinding."... ........................................................................10

        c.    Plaintiffs' argument that the Beatty Memorandum is "limited in scope" and does not mention *Bearden v. Georgia*.... ...............................11

    2.    Plaintiffs' arguments pertaining to *Younger v. Harris* and *O'Shea v. Littleton* need not be reached in view of the mootness of their claims for prospective relief, but in any event lack merit.... ...............................11

        a.    Plaintiffs' arguments based on law of the case are misplaced... ..............12

        b.    Plaintiffs cite no authority in which a federal court has ordered the kind of prospective relief they seek when federalism was at issue. .........14

    3.    Plaintiffs' arguments relating to the *Rooker-Feldman* doctrine fail both procedurally and substantively.............................................................17

        a.    Plaintiffs' procedural arguments on *Rooker -Feldman* (law of the case) are inapplicable to the Orders on which they rely..........................17

        b.    Plaintiffs' substantive arguments regarding *Rooker-Feldman* are based on immaterial distinctions.... ........................................18

    4.    Plaintiffs are not entitled to damages from Lexington County.... ........................20

    5.    Plaintiffs are not entitled to damages from the Magistrate Defendants.... ..........23

6.     Plaintiffs are not entitled to damages from Sheriff Koon.... ...............................27

7.     Plaintiffs' view of qualified immunity would require the Magistrate Defendants to have prohibited what Court Administration permitted, in addition to the Magistrate Defendants lacking any authority to so act... .............29

Conclusion .........................................................................................................................30

## TABLE OF CASES

| | |
|---|---|
| *Allstate Ins. Co. v. W. Virginia State Bar*, 233 F.3d 813 (4th Cir. 2000) | 19 |
| *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180 (4th Cir. 2021) | 9 |
| *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505 (4th Cir.2003). | 13 |
| *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998), | 27 |
| *Bairefoot v. City of Beaufort, South Carolina*, 312 F.Supp.3d 503 (D.S.C. 2018), | 6, 17, 23 |
| *Bearden v. Georgia*, 461 U.S. 660 (1983) | *passim* |
| *Brewington v. Bedsole*, No. 91-120-CIV-3-H, 1993 WL 819885 (E.D.N.C. May 14, 1993) | 21 |
| *Brooks v. Vassar*, 462 F.3d 341 (4th Cir. 2006) | 9, 10 |
| *Brucker v. City of Doraville*, No. 1:18-CV-02375-RWS, 2019 WL 3557893 (N.D. Ga. Apr. 1, 2019)( | 20 |
| *Campbell v. Florian*, 972 F.3d 385 (4th Cir. 2020), as amended (Aug. 28, 2020) | 27 |
| *Campbell v. Johnson*, 586 F.3d 835 (11th Cir. 2009) | 27 |
| *Ceparano v. Southampton Just. Ct.*, 404 F. App'x 537 (2d Cir. 2011) | 25-26 |
| *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982) | 9 |
| *Davis v. Hall*, 375 F.3d 703 (8th Cir. 2004) | 27 |
| *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) | *passim* |
| *Farrar v. Hobby*, 506 U.S. 103 (1992) | 22 |
| *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102 (4th Cir. 2021), | 23 |
| *Forrester v. White*, 484 U.S. 219 (1988) | 26 |
| *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135 (2d Cir. 1994) | 23 |
| *Hays v. Town of Gauley Bridge*, WV, No. CIV.A. 2:09-1272, 2011 WL 1229797 (S.D.W. Va. Mar. 29, 2011), aff'd sub nom. *Hays v. Town of Gauley Bridge, W. Va.*, 474 F. App'x 930 (4th Cir. 2012) | 21 |
| *Heicklen v. Toala*, No. 08 CIV. 2457(JGK), 2010 WL 565426 (S.D.N.Y. Feb. 18, 2010)( | 18 |
| *Johnson v. Jessup*, 381 F. Supp. 3d 619 (M.D.N.C. 2019) | 19 |
| *Larsgard v. Straub*, No. CV-13-00638-TUC-DCB, 2019 WL 669788 (D. Ariz. Feb. 19, 2019) | 21 |
| *Liberty Mut. Fire Ins. Co. v. J.T. Walker Indus., Inc.*, 835 F. Supp. 2d 104 (D.S.C. 2011) | 13 |
| *Luckey v. Miller*, 976 F.2d 673 (11th Cir. 1992 | 16 |
| *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423 (1982) | 8 |
| *Morrison v. Lipscomb*, 877 F.2d 463 (6th Cir. 1989) | 26 |
| *O'Shea v. Littleton*, 414 U.S. 488 (1974) | *passim* |
| *Pastene v. Sprouse*, No. CIV.A. 0:09-1390-PMD, 2010 WL 1344971 (D.S.C. Mar. 30, 2010), aff'd, 393 F. App'x 119 (4th Cir. 2010 | 24 |
| *Porter v. Clarke*, 852 F.3d 358 (4th Cir. 2017) | 6, 9, 10 |
| *Powers v. Hamilton Cnty. Pub. Def. Comm'n,* 501 F.3d 592 (6th Cir. 2007) | 19-20 |
| *Ratte v. Corrigan*, 989 F. Supp. 2d 550 (E.D. Mich. 2013) | 26 |

| | |
|---|---:|
| *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) | *passim* |
| *Simon v. City of New York*, 893 F.3d 83 (2d Cir. 2018) | 27 |
| *TFWS, Inc. v. Franchot*, 572 F.3d 186 (4th Cir. 2009) | 13 |
| *Thana v. Bd. of License Comm'r for Charles Cnty.*, 827 F.3d 314 (4th Cir. 2016) | 19 |
| *Thomas v. Haslam*, 329 F. Supp. 3d 475, 507 (M.D. Tenn. 2018), *vacated on other grounds, Thomas v. Lee*, 776 F. App'x 910 (6th Cir. 2019) | 19 |
| *Wall v. Wade*, 741 F.3d 492 (4th Cir. 2014), | 10 |
| *Washington v. Digital Equip. Corp.*, 968 F.2d 1213 (table), 1992 WL 167946, at *7 (4th Cir. 1992) | 13 |
| *Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005) | 19 |
| *Whirl v. Kern*, 407 F.2d 781 (5th Cir. 1968) | 27-28 |
| *Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122 (W.D. Wash. 2013), | 5, 15 |
| *Wilson v. Montano*, 715 F.3d 847 (10th Cir. 2013) | 27 |
| *Wilson v. Prince George's Cnty., Maryland*, 893 F.3d 213 (4th Cir. 2018) | 29 |
| *Yarls v. Bunton*, 231 F. Supp. 3d 128 (M.D. La. 2017), | 16 |
| *Younger v. Harris,* 401 U.S. 37 (1971) | *passim* |
| *Zeigler v. New York*, 948 F. Supp. 2d 271 (N.D.N.Y. 2013) | 26 |

## INTRODUCTION

Now that briefing of the dispositive motions in this case is substantially complete, several things stand out. First, to the extent that criminal defendants in Lexington County and elsewhere in South Carolina were being incarcerated prior to late 2017 without ability-to-pay hearings following their arrests on bench warrants, Plaintiffs do not and cannot dispute that such actions are no longer happening. Thus, to the extent there may have been a problem in the past, it has been fixed by the Chief Justice and Court Administration. Although Plaintiffs purport to question the "permanence" or the "binding nature" of those changes, Plaintiffs do not contend that the changes have left something undone or that they are not being complied with. Plaintiffs have therefore not shown a present need for prospective relief.

Secondly, and with regard to the damage claims, even if the absence of ability-to-pay hearings or the absence of counsel could have rendered Plaintiffs' incarcerations invalid as a matter of criminal law or procedure, any such invalidity would not automatically translate into civil liability, especially when the damage claims are made against judges. Plaintiffs continue to try to label the Magistrate Defendants' actions or inactions as "administrative," but there is no factual or legal support for that strained characterization. Plaintiffs also cite no authority holding a judge with administrative authority liable for the judicial actions of other judges. Nor is there any basis for a damage claim against the County or the Sheriff.

The Magistrate Defendants do not dispute that at times prior to the 2017-2018 changes, magistrates in Lexington County (and elsewhere) often issued bench warrants that ordered nonpaying criminal defendants to be taken to jail, to remain there until they either served their previously-suspended sentences or until they paid their fines. That practice, which occurred frequently, but not "automatically" (as Plaintiffs allege), is precisely what the operative portion of

1

the former SCCA MC2 forms authorized in each Plaintiff's case.[1] What the Magistrate Defendants do dispute, however, is that their limited administrative powers as Chief Magistrates conferred on them the authority to control the judicial acts of county magistrates. By its nature, such authority was outside the scope of those limited administrative responsibilities.

## SUMMARY OF BRIEFS ON DISPOSITIVE MOTIONS

In view of the many claims and defenses raised in this case, Defendants offer the following topical summary of the primary issues discussed in previous briefs, including a summary of the matters discussed in the present Reply Memorandum. The parties apparently agree that there are no disputed issues of material fact regarding liability issues. *See* ECF No. 290 at 5.

Prospective relief:

1.     Defendants moved for summary judgment on all prospective relief claims, citing mootness resulting from the 2017-2018 changes and the federalism bar to the requested relief in a federal case. ECF No. 283, 283-1.

2.     Plaintiffs also moved for summary judgment on their prospective relief claims, but literally did not mention mootness and barely mentioned the 2017-2018 changes that changed the legal landscape of this case. Plaintiffs also appear to have abandoned their long-asserted claim that the Magistrates were not complying with the 2017-2018 changes, thereby conceding the point. ECF No. 284, 284-1.

3.     In the present Reply, Defendants note that Plaintiffs have set forth no cogent reason to believe that Chief Justice Beatty would order any retrenchment from the 2017-2018 changes. In

---

[1] As will be seen, Plaintiffs argue that certain alternative language on the MC2 form warrants, which was neither signed nor operative in any of their cases, required that the defendant be brought before the magistrate. The weakness of Plaintiffs' arguments regarding the MC2 form is shown by their reliance on the part of the form that did not apply in their cases.

addition, there is no authority for granting the kind of prospective relief they seek when federalism issues were raised. Plaintiffs' efforts to rely on procedural bars such as law of the case are without legal support, and also are not supported by the holdings of the prior Orders on which they rely.

Damage claims against Lexington County.

1.     Defendants moved for summary judgment on the damage claims against Lexington County, noting that there was no legal support for a claim of damages from a governmental entity for alleged underfunding of indigent counsel services. ECF No. 283-1 at 43-44; Defendants also pointed out there was no proof of causation of harm to Plaintiffs as a result of the alleged underfunding. ECF No. 283-1 at 44-45.

2.     Plaintiffs have stated in passing in their Memorandum in Opposition, ECF No. 290 at 31 that they moved for summary judgment on this issue, but their Memorandum in Support of their Motion for Summary Judgment, ECF No. 284-1, contains no argument on the point. They do, however, argue the point in in opposition to Defendants' Motion for Summary Judgment. ECF No. 290 at 30-36.

3.     In the present Reply, Defendants point out that Plaintiffs cite no on-point authority supporting a Sixth Amendment damage claim under the facts of this case. Defendants also point out that Plaintiffs have not even attempted to show a causal connection between alleged underfunding of counsel and their incarcerations.

Damage claims against the Magistrate Defendants:

1.     Defendants moved for summary judgment on the damage claims against the Magistrate Defendants for several reasons, including: (a) Plaintiffs' incarcerations resulted from judicial, rather than administrative acts, ECF No. 283-1 at 35-37; (b) the limited administrative authority of the Magistrate Defendants did not empower them to control the judicial acts of the other

magistrates; ECF No. 283-1 at 37-38; ECF No. 289 at 16-20 (c) the bench warrants issued in the cases of the named Plaintiffs were South Carolina Court Administration forms providing for commitment to jail upon nonpayment of fines or fees, ECF No. 283-1 at 16-18, 38; (d) most of the named Plaintiffs waived any claim they may have had to damages by failing to appear at pertinent stages of their cases; ECF No. 283-1 at 39-43 (e) Plaintiffs' damage claims are also barred by qualified immunity and by the *Rooker-Feldman* doctrine. ECF No. 283-1 at 35-43; 48-54.

2.      Plaintiffs also moved for summary judgment on the damage claims against the Magistrate Defendants, relying primarily on a nonexistent monitoring duty based only on a misleading, incompletely-quoted excerpt from the Chief Justice's semi-annual Orders. Plaintiffs also rely on other purely administrative and ministerial duties listed in those Orders, none of which authorize a chief administrative judge to have any role in how the other judges decide individual cases before them. ECF No. 284-1 at 15-19, 39-49. Plaintiffs' argument on this issue failed to mention that the bench warrants were issued using forms provided by Court Administration.

3.      In this Reply, Defendants reiterate, among other things, that the bench warrants ordering the incarcerations of Plaintiffs were judicial acts, and as a result were outside the range of powers of Chief Magistrates for Administrative Purposes.

Damage claims against Sheriff Koon:

1.      Defendant Koon moved for summary judgment on the damage claims against him, noting that he was required by law to execute the bench warrants by their terms, and had no other duty which was breached. ECF No. 283-1 at

2.      Plaintiffs, by their own admission, did not move for summary judgment on their damage claim against Defendant Koon. ECF No. 290 at 37 n. 8. Plaintiffs nevertheless argue that they are entitled to summary judgment on those claims. They cite many cases, none of which are factually

in point. ECF No. 290 at 36-43. Also, Plaintiffs' argument relies heavily on the unused alternative language in the bench warrants, rather than the operative language in those bench warrants. ECF No. 290 at 3, 37, 39

3.      In the present reply, Defendant Koon reiterates the points previously made and addresses the inapposite cases cited by Plaintiffs as well as the inapplicability of the unused language in the bench warrants, on which Plaintiffs rely.

<u>Cases cited by Plaintiffs.</u>

Because Plaintiffs cite many cases that merely state broad principles or that apply to materially different factual situations, it is also useful at this point to summarize briefly the absence of factually-applicable cases among those many citations. All forms of relief sought by Plaintiffs are essentially unprecedented :

1.      <u>Authority for granting declaratory or injunctive relief in federal court that would require state or local governing bodies to provide indigent counsel</u>—**None**, other than the *Wilbur* case, where federalism issues were not presented.[2]

2.      <u>Authority for damages for administrative acts by administrative judges where the alleged harm was the result of indisputably-judicial acts</u>:--**None**.[3]

---

[2] As predicted by Defendants, ECF No. 283-1 at 34 n. 19, Plaintiffs frequently cite *Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122 (W.D. Wash. 2013), but they never mention the absence of federalism issues in that removed case. At times, Plaintiffs misleadingly preface their cites to *Wilbur*, a case both unique and inapposite, with *"see, e.g.,"* or "for example." ECF No. 284-1 at 39 ("*See, e.g., Wilbur*, 989 F. Supp. 2d at 1334–37); ECF No. 290 at 17 ("For example, in *Wilbur v. City of Mount Vernon . . .*").

[3] At ECF No. 290 at 27-28 Plaintiffs cite three Texas district court cases, none of which involved a damage claim against a judicial officer.

3.     <u>Authority awarding damages against governing bodies for "underfunding" of indigent counsel</u>: **None**.[4]

4.     <u>Authority awarding damages against law enforcement for complying with the literal terms of a facially-valid bench warrant</u>: **None**.

## ARGUMENT

1.     **Plaintiffs' prospective relief claims (Claims One, Two and Three) are moot, and Plaintiffs have not shown any reason to believe that Defendants are not complying with the 2017-2018 changes, or that the Chief Justice or Court Administration will revoke those changes.**

Plaintiffs have finally acknowledged that mootness is an issue in this case. Their argument, however, would compare the Chief Justice of South Carolina to "a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." ECF No. 290 at 5, quoting *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017).

The Court permitted Plaintiffs to engage in extensive document discovery, referring to the existence of "questions of fact . . . as to whether the state Supreme Court's guidance had indeed eradicated" the practices complained of in this litigation. 7/24/21 Order, ECF No. 255 at 6. In Defendants' opening Memorandum, Defendants pointed out that "[t]he answer to that question is that the practices complained of have indeed been eradicated." ECF No. 283-1 at 30. Plaintiffs attempt to dismiss this statement as a "bald assertion," ECF No. 290 at 7, 11, but Defendants devoted six pages of their opening Memorandum to a detailed discussion of the proof of the eradication of the prior practices, including lengthy deposition quotes, regarding the post-Beatty

---

[4] The preliminary rulings denying early dispositive motions in this case and *Bairefoot v. City of Beaufort, South Carolina*, 312 F.Supp.3d 503 (D.S.C. 2018), declined to dismiss damage claims at early stages of the cases, but the *Bairefoot* case never resulted in any kind of a damage award (and obviously, that has not happened in this case, either).

Memorandum practices in enforcing failures to pay legal financial obligations. ECF No. 283-1 at 22-27. That entire discussion can be summarized with one quotation from Magistrate Adams' previously-filed declaration:

> 23. To the best of my knowledge, since at least as early as November 1, 2017, no Lexington County Magistrate has ordered any person to be incarcerated on a bench warrant for failure to pay a legal financial obligation (such as a court-ordered fine or fee) unless the defendant was represented by counsel or knowingly waived such representation. In fact, since at least November 1, 2017, I am not aware that there have been <u>any</u> incarcerations at all of any persons solely for failure to pay a legal financial obligation.

Adams Declaration, ECF No. 283-11 at 4-5, ¶ 23 (emphasis in original).

The response of Plaintiffs' counsel, after reviewing tens of thousands of documents and taking nine depositions, is to say nothing on the subject of whether the complained-of practices are still occurring, thereby conceding that such eradication has indeed taken place. Plaintiffs have now shifted ground toward three other arguments, addressed below, suggesting without foundation that the 2017-2018 changes might not last, or might not continue to be followed even if they did remain in place.

### a.     Plaintiffs' argument that the 2017-2018 changes "lack permanence."

Again, Plaintiffs refuse to admit that their extensive discovery produced <u>no</u> evidence that the complained-of practices continued for more than a short time (at most) after the Beatty Memorandum They will only say that "even if Defendants obeyed the SCCA's new guidance promulgated after the filing of this lawsuit [which is apparently a tacit admission], these changes lack the permanence sufficient to moot Plaintiffs' claims." ECF No. 290 at 8.

Plaintiffs purport to believe that the 2017-2018 changes "lack permanence" because the Lexington County Magistrates might "revert to the challenged practices. . . ." ECF No. 290 at 11. However, the guarantee against the Magistrates not so "reverting" is found in their desire not to be

suspended from office and removed from the bench, as previously discussed, ECF No. 289 at 17 n.17 and in Heading (1)(b) below. Practically speaking, the Magistrates have no option to "revert" unless they want to cease being judges.

Plaintiffs do not say what might it take for them to regard the 2017-2018 changes as having sufficient "permanence." Perhaps they seek some kind of statement or action by Chief Justice Beatty binding himself not to withdraw the 2017-2018 changes after this litigation is over. This would stem from Plaintiffs' view that the Chief Justice of South Carolina should be viewed as a "manipulative litigant." Plaintiffs argue (without mentioning the Chief Justice) that "Defendants cannot point to <u>anything</u> in the new procedures or forms promulgated by the SCCA suggestive of permanence." ECF No. 260 at 8-9 (emphasis in original).

It is difficult to imagine a larger insult to federal-state judicial comity than the idea of requiring a state's Chief Justice to affirm to a federal court that his actions were sincere and that he is not a mere "manipulative litigant." The Supreme Court has often counseled against such disrespect for state courts. *See, e.g., Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 431 (1982) "[m]inimal respect for the state processes, of course, precludes any <u>presumption</u> that the state courts will not safeguard federal constitutional rights")(emphasis in original). Plaintiffs, however, are effectively asking this Court to presume that the Chief Justice will retreat from his 2017-2018 commitments at the first available opportunity.[5]

As Defendants have already pointed out, ECF No. 283-1 at 32 n. 18, and as Plaintiffs have ignored, actions of state courts that are of a legislative or policymaking nature have been held to

---

[5] Plaintiffs try to imply that the persons who might revert to prior practices are the Magistrate Defendants, but the real target of Plaintiffs' concerns about retrenchment, whether they acknowledge it or not, is the Chief Justice. No magistrate is going to risk forfeiting office by defying the specific directives found in the 2017-2018 changes.

moot a case without even the need for extended discussion; *see* cases cited in that footnote. In the analogous context of statutory enactments, well-settled law holds that a claim of mootness will be rejected "[o]nly if reenactment is not merely <u>possible</u> but appears <u>probable</u>. . . ." *Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006)(emphases added).[6]

Plaintiffs dismissively refer to the 2017-2018 changes as amounting to nothing but "[a] nonbinding reminder about legal precedent and a few updated forms from the SCCA." ECF No. 290 at 16. But Plaintiffs are well aware of the 67-page Court Administration 2017 PowerPoint presentation, ECF No. 283-16 at 7-74 and the detailed March 14, 2018 SCCA Memorandum detailing the changes. *id.* at 75-82. The PowerPoint presentation was made to over 400 summary court judges at the November 1, 2017,  Summary Court Judges Mandatory Program and then repeated at six additional summary court judges' training sessions between March and August 2018. *Id.* at 1. There were approximately 13 new forms issued during the course of the 2017-2018 changes. *Id.* at 2.

Instead of *Porter v. Clarke, supra,* (the "manipulative defendant" case) on which Plaintiffs place so much reliance, this case more closely resembles *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 188 (4th Cir. 2021). There, the Fourth Circuit held *Porter* inapplicable where there was "no whiff of any of the opportunism, on the part of the defendant, that typically supports invocations of mootness exceptions where voluntary cessation of the challenged conduct is at issue." Here, too, there is not the slightest hint of "opportunism" on the part of South Carolina's Chief Justice. The 2017-2018 changes reflect an intense, detailed and comprehensive

---

[6] The paradigm example of a completely opposite set of facts is to be found in *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982). There, the defendant city had repealed the challenged language in an ordinance, but actually announced its intention of reenacting precisely the same provision if the District Court's judgment were to be vacated as moot. 455 U.S. at 289 n. 11.

effort to make thoroughgoing changes to practices that were occurring statewide. Court Administration has made clear its view and that of the Chief Justice that compliance with the 2017-2018 changes is necessary to comply with constitutional requirements. For example, the detailed instructions provide that "If after trial, Defendant has a jail sentence suspended upon payment of fine and Defendant does not pay the fine, the court <u>must</u> perform *Bearden v. Georgia*, 461 U.S. 660 (1983) analysis." ECF No. 283-16 at 81 (emphasis added).

This extensive reform effort by Chief Justice Beatty cannot be compared to facile, possibly cynical, changes of positions by "manipulative defendants."[7] Given this level of commitment by the Chief Justice and Court Administration to the 2017-2018 changes, Plaintiffs cannot show that a reversion to past practice is remotely close to "probable." *Brooks v. Vassar, supra.* The 2017-2018 changes have therefore mooted Plaintiffs' claims for prospective relief.

> **b.    Plaintiffs' argument that the 2017-2018 changes are "nonbinding."**

Plaintiffs do not explain what they mean by "nonbinding," a term they use to characterize the Beatty Memorandum and Court Administration's forms. Nor do they offer any suggestion about what else should be in a set of directives from the Chief Justice in order to make it sufficiently "binding" so as to satisfy Plaintiffs.

Defendants have already called attention to the formal enforcement mechanism to be used in those rare situations which a judge willfully refuses to follow the law. This includes reporting judicial misconduct to the Commission on Judicial Conduct, which in turn raises the possibility of an interim suspension upon "receipt of sufficient evidence demonstrating that a judge poses a

---

[7] *Porter* and *Wall v. Wade,* 741 F.3d 492, 497 (4th Cir. 2014), cited in *Porter,* both involved easily-changeable decisions by state correctional executives. There was nothing in those cases comparable to the Chief Justice's level of commitment to the 2017-2018 changes, and in terms of federal-state comity, those governmental defendants were a number of rungs down the ladder from a state's chief justice.

substantial threat of serious harm to the public or to the administration of justice. . . ." ECF No. 289 at 17, n. 17, quoting SCACR Rule 502, Rule 17(b). A willful failure to follow clear precedent or a detailed SCCA directive could presumably subject a judge to such a suspension. More likely, however, if a judge were to make it known that he or she did not intend to follow Court Administration directives, a mere word of warning from Court Administration would presumably be enough to put an end to such a practice, because such a warning from either the Chief Justice or Court Administration would carry the threat of a likely suspension or removal from office. This entire "rogue judge" scenario is far-fetched in any event.

> ### c.    Plaintiffs' argument that the Beatty Memorandum is "limited in scope" and does not mention *Bearden v. Georgia.* ECF No. 290 at 7.

Plaintiffs' "limited in scope" contention is that the Beatty "Memorandum addresses "only Sixth Amendment deficiencies and cites long established Supreme Court precedents concerning the right to counsel, but it makes <u>no</u> reference to *Bearden*. . . ." ECF No. 290 at 7 (emphasis in original). This is literally true, but false in substance. While the Beatty Memorandum itself does not mention *Bearden,* the November 1, 2017 PowerPoint presentation of Renee Lipson of Court Administration does contain many references to *Bearden*, including details as to how summary court judges should effectuate compliance with *Bearden* going forward. ECF Nos. 283-16 at 70, 71, 72, 73 and 80. Plaintiffs simply ignore the inconvenient fact of the many references to *Bearden* in Court Administration's many presentations.

> ### 2.    Plaintiffs' arguments pertaining to *Younger v. Harris* and *O'Shea v. Littleton* need not be reached in view of the mootness of their claims for prospective relief, but in any event lack merit.

The Court only need consider other defenses to Plaintiffs' prospective relief claims if the Court finds that those claims are not moot. Otherwise, the prospective relief claims can be dismissed. If the Court elects to consider the merits of the prospective relief claims, Defendants

reiterate that if prospective relief were to be granted, such relief would conflict with the unanimous body of caselaw holding to the contrary when federalism defenses have been asserted.

**a       Plaintiffs' arguments based on law of the case are misplaced.**

Plaintiffs' first line of attack on the federalism defenses is nonsubstantive: they argue that this Court's Orders of March 28, 2018 and July 12, 2018, ECF Nos. 87 and 107, establish law of the case. That doctrine does not apply to those Orders, the first of which denied, without prejudice, Defendants' Motions for Summary Judgment, and the second of which declined to reconsider the first (the second Order also had the effect of denying summary judgment on issues that were not addressed in the first Order).

By way of background, on August 18, 2017, Defendants moved for partial summary judgment with regard to Plaintiffs' prospective relief claims. ECF No. 29. In that motion, Defendants' contention related to *Younger v. Harris,* 401 U.S. 37 (1971), was made only in connection the criminal case of Plaintiff Goodwin. His case was the only one still pending by August 2017. *See* ECF No. 29-1 at 6-7. In an Order dated March 29, 2018, the Court held that "Defendants' motion for partial summary judgment as to declaratory and injunctive relief is DENIED without prejudice, ECF No. 29." ECF No. 84 at 29. That Order did not expressly rule on the *Younger* issue raised by Defendants, who then moved for reconsideration of that issue and others. ECF No. 87. By Order dated July 10, 2018, the court noted that Defendants' *Younger* argument was based on the fact that "the claims of that one remaining Plaintiff [Goodwin], who still had (and has) a criminal action pending against him are barred by the principles of *Younger v. Harris*, 401 U.S. 37 (1971)." 7/10/18 Order, ECF No. 107 at 4-5, quoting ECF No. 87-1 at 1. The Court declined to apply *Younger*, ECF No. 107 at 13-15, but that decision was reached only in the context of whether *Younger* applied to bar declaratory or injunctive relief in Goodwin's then-

12

pending case, That case was recently resolved, however, when the magistrate to whom it was reassigned sent it to the Setoff Debt Program. *See* ECF No. 289 at 29. The effect of the July 10, 2008 Order was to deny reconsideration of a prior Order denying without prejudice Defendants' partial motion for summary judgment that applied only to Goodwin's then-pending case.

Given that the prior Orders were issued in the context of denying summary judgment, and without prejudice at that, it is unclear why Plaintiffs even seek to argue law of the case. None of the cases cited by Plaintiffs in support of their "law of the case" argument arose in the context of the prior Order being one that denied summary judgment, as detailed in the footnote.[8] Defendants have previously cited *Washington v. Digital Equip. Corp.*, 968 F.2d 1213 (table), 1992 WL 167946, at *7 (4th Cir. 1992) for the hornbook law principle that "[t]he determination not to grant summary judgment is not the kind of final judgment of an issue that requires application of the law of the case rule. A decision not to grant summary judgment does not resolve any factual or legal issue. . . . ." ECF No. 289 at 6 n.5. In addition, as this court has held in another case, "[a] district court 'retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted.'" *Liberty Mut. Fire Ins. Co. v. J.T. Walker Indus., Inc.*, 835 F. Supp. 2d 104, 106–07 (D.S.C. 2011), quoting *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir.2003). This claim by Plaintiffs is therefore simply frivolous.

---

[8] Plaintiffs primarily rely on *TFWS, Inc. v. Franchot*, 572 F.3d 186 (4th Cir. 2009), ECF No. 290 at 12, but that case involved a binding prior appellate decision. None of the other cases they cite involved denials of summary judgment.

### b.    Plaintiffs cite no authority in which a federal court has ordered the kind of prospective relief they seek when federalism was at issue.

At the risk of being overly repetitive, Defendants would again note that there is literally <u>no</u> federal legal authority that supports any of their claims for prospective relief where federalism was an issue. Defendants have previously discussed this absence of authority in some detail. ECF No. 289 at 4-10.[9]

Further deferring their discussion of the merits of the federalism claims, Plaintiffs first argue that Defendants' federalism arguments are "untimely." ECF No. 290 at 15-16. However, that assertion could only apply to Plaintiff Goodwin's now-resolved case, the only instance, prior to its recent resolution, of a currently-pending state proceeding to which *Younger* would literally apply. Plaintiffs cite cases in which the defendant sought abstention in a federal case after a still-active state proceeding had been pending for some time. ECF No. 290 at 15-16. Those cases are obviously inapposite here, because there is no longer a currently-pending state proceeding.

Instead, Defendants' references to *Younger* have arisen from the Supreme Court's application of *Younger's* principles in *O'Shea v. Littleton,* 414 U.S. 488 (1974), and its progeny in the context of indigent defense. Specifically, in addressing the need to abstain from interference in an entire class of future criminal cases, *O'Shea* held as follows:

> What [plaintiffs] seek is an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of <u>future</u> state criminal trials. The order the Court of Appeals thought should be available if respondents proved their allegations would be operative only where permissible state prosecutions are pending against one or more of the beneficiaries of the injunction. Apparently the order would

---

[9] Defendants previously discussed this issue briefly in their opening Memorandum, not knowing precisely what prospective relief Plaintiffs would seek. Plaintiffs still have not been very precise in describing what it is they actually seek. Notably, they have never openly adopted (but neither have they disavowed) their expert's recommendation that Lexington County should employ 13-15.5 public defender attorneys for use in the magistrates' courts alone. *See* ECF No. 289 at 4, citing Plaintiffs' expert report.

> contemplate interruption of state proceedings to adjudicate assertions of noncompliance by petitioners. This seems to us nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris, supra*, and related cases sought to prevent.

414 U.S.at 500 (1974)(emphasis added). In other words, *O'Shea* held that the kind of relief sought there, while not necessarily involving a prohibited injunction of a pending state proceeding, would nevertheless result in "the kind of interference" that *Younger* and other cases sought to prevent.

Again, Plaintiffs describe the relief they seek only briefly and vaguely, as follows:

> As to the County's failure to adequately fund indigent defense (Claim Two), Plaintiffs are asking the Court to order the County to hire an independent consultant to determine the resources necessary to fulfill *Gideon's* promise in the LCMC and to take immediate steps to gain compliance with those recommendations.

ECF No. 290 at 16 (reiterating the same request made in ECF No. 284-1 at 49). Plaintiffs cite no case (other than *Wilbur*) in which such an order has ever been entered.

This appears to be a "stealth" request that avoids any discussion of its ramifications. If the court were to order that such an "independent" consultant be hired (possibly Plaintiff's expert, the person who opined that there should be 13-15.5 public defender positions in Lexington County Magistrate Courts), Plaintiffs would presumably ask the court to turn that person's recommendation into an order. If such an order required the County to fund, say, even 6 or 7 public defender positions in the Lexington County Magistrates' Courts, the question naturally arises as to what would happen if the positions went unfilled, either because the Public Defender could not find that many attorneys to hire, or for some other reason. It seems inevitable that criminal defendants in the Magistrates' Courts would then claim Sixth Amendment violations, citing noncompliance with this Court's order. However, the county magistrates would not be bound by an order directing the County to fund indigent defense lawyers, so would not be prevented from proceeding with cases regardless of whether the requisite amount of indigent defense lawyers were

15

available or not. The result would be that there could be a very real chance of a conflict between this court and the state courts.

As in *Luckey v. Miller*, 976 F.2d 673 (11th Cir. 1992) and several other cases cited by Defendants, the relief Plaintiffs seek is nothing more than an attempt to finesse their way around the holding of *O'Shea.* In *Luckey,* the court declined even to require that the state actors simply use their best efforts to comply with the Constitution. In *Yarls v. Bunton*, 231 F. Supp. 3d 128, 136 (M.D. La. 2017), the court similarly declined to order any relief regarding the indigent defense system, citing a number of possible future scenarios that would raise federalism concerns, such as "What would happen if inconsistent [state and federal] orders were issued?" The end result is that no federal court has ever issued any order implicating such federalism concerns when those concerns were raised by the defendants.

Finally, it must be said again that the relief Plaintiffs sought when they filed this case, that is, prospective relief requiring the provision of  counsel in cases where a criminal defendant faces incarceration for failure to pay outstanding fines, is no longer necessary. There is no evidence that such cases are still occurring. If they were to occur, the 2017-2018 changes provide in no uncertain terms that there will be  no incarcerations absent counsel. ECF No. 283-16 at SCCA-000076 ("Remedy for Nonpayment [--]Not imprisonment! No issuance of a bench warrant or rule to show cause!"). If Plaintiffs are actually seeking by stealth to have the court order funding for counsel in any broader context (such as may be implied in the language "fulfill[ing]  *Gideon's* promise in the LCMC"),  such a request would be outside the scope of the issues presented in this case. In any event, it has not been developed with any specificity in any brief filed by Plaintiffs. Defendants have previously so noted, ECF No. 281-1 at 32-33 (prospective relief against the County was limited to future cases involving only the "arrest and incarceration of indigent people for

nonpayment of magistrate court fines and fees," quoting Second Amended Complaint at 120 (Prayer for Relief, second bullet point).[10]

### 3. Plaintiffs' arguments relating to the *Rooker-Feldman* doctrine fail both procedurally and substantively.

#### a. Plaintiffs' procedural arguments on *Rooker -Feldman* (law of the case) are inapplicable to the Orders on which they rely.

Plaintiffs' first argument for not applying the principles of the *Rooker-Feldman* doctrine is that law of the case has been established by the same 2018 Orders referenced above, denying summary judgment on a damage claim made by Lexington County alone.[11] As already discussed, orders of that nature do no establish law of the case. In any event, the only point actually decided by this Court with regard to *Rooker-Feldman* in its July 12, 2018 Order was whether *Rooker-Feldman* barred the damage claim against Lexington County. *See* ECF Nos. 88 and 88-1. In rejecting Lexington County's motion, the Court relied on the Order denying a motion to dismiss in *Bairefoot v. City of Beaufort, South Carolina*, 312 F.Supp.3d 503 (D.S.C. 2018). However, *Bairefoot* only involved alleged underfunding of indigent defense by the two defendant municipalities, contrary to a state legislative proviso requiring municipalities that elected to have a municipal court to provide adequate funds for representation of indigent defendants. *Id.* at 507, citing Act No. 91, 2015 S.C. Acts 429, 884 (2015). This Court, in turn, referred to reasoning in *Bairefoot,* which as this Court noted, "addressed the relationship between the *Rooker-Feldma*n doctrine, *Heck*, and claims based on underfunding of the public defender system." ECF No. 107

---

[10] With regard to prospective relief addressed to the Magistrate Defendants, Defendants have discussed this at  ECF No. 289 at 21-23. Plaintiffs appear to have abandoned any claim for prospective relief against Sheriff Koon.

[11] The dispositive portions of the first of the two Orders, ECF No. 84, issued March 28, 2018, did not refer to *Rooker-Feldman*. Nor did any Defendant other than Lexington County request reconsideration of the denial of summary judgment regarding the damage claim. *See generally,* ECF No. 87-1.

at 16. While the damage claims against Lexington County are barred for other reasons, it cannot be disputed that this Court previously (and preliminarily) opined on *Rooker-Feldman* only in the context of denying summary judgment on the underfunding claim against the county, and not in connection with the damage claims against Defendants Reinhart, Adams or Koon.

> **b.    Plaintiffs' substantive arguments regarding *Rooker-Feldman* are based on immaterial distinctions.**

As Defendants have previously pointed out, the issue in a *Rooker-Feldman* case is whether the harm for which damages are sought was caused by "the state court's decision itself," that is, the decision to issue bench warrants without providing for *Bearden*-type hearings (if not by the convictions themselves as well). Defendants contended, and continue to contend, that "[i]t is difficult to see how a favorable ruling for Plaintiffs on their damage claims could be reached without effectively concluding 'that the [state] court judgment [i.e., the issuance of a bench warrant in each case] was erroneously entered.'" ECF No. 283-1 at 53 (emphasis added), citing and quoting several cases. To those cases may be added *Heicklen v. Toala*, No. 08 CIV. 2457(JGK), 2010 WL 565426, at *7 (S.D.N.Y. Feb. 18, 2010)(even if a federal suit containing motion to quash state court bench warrant had involved correct parties, it would have implicated *Rooker-Feldman,* because it involved the review and rejection of  a state court decision that the state-court losing party claims has caused that party injury).

Plaintiffs say little or nothing that directly responds to the logic of the previously-cited cases. They argue that *Reaves v. S.C. DSS*, No. 4:08-cv-576-TLW-TER, 2008 WL 5115026 (D.S.C. Dec. 3, 2008) does not apply because "federal courts regularly undertake reviews of warrants issued by state magistrates" without regard for *Rooker-Feldman.* ECF No. 290 at 21. They cite only cases involving arrest warrants or search warrants, all of which are pre-judgment events. They also make the straw man argument that they "do not allege that the mere issuance of

18

nonpayment bench warrants caused their constitutional injuries. . . . " ECF No. 290 at 21 (emphasis added). They do not dispute, however, that the bench warrants were the mechanism that caused them to be incarcerated. Indeed, that is what their claims are based on.[12]

Plaintiffs attempt to fit their "administrative action" assertion into the *Rooker-Feldman* analysis as well. ECF No. 290 at 20-21. That is a futile effort. One case they cite, *Thana v. Bd. of License Comm'r for Charles Cnty.*, 827 F.3d 314 (4th Cir. 2016), involved a state administrative proceeding (liquor license revocation). Plaintiffs quote a general statement from the other case, *Allstate Ins. Co. v. W. Virginia State Bar*, 233 F.3d 813 (4th Cir. 2000), but that case actually held that the challenged action of the West Virginia State Bar Committee on Unlawful Practice was a judicial action.

Plaintiffs then string together a number of citations to inapposite cases. ECF No. 290 at 20. Their irrelevance is shown by the following short summaries: *Washington v. Wilmore*, 407 F.3d 274, 280 (4th Cir. 2005)(claim of injury rested not on the state court judgment itself, but rather on the alleged violation of plaintiff's constitutional rights by a state police detective); *Johnson v. Jessup*, 381 F. Supp. 3d 619, 626 (M.D.N.C. 2019)(DMV decision to revoke Plaintiffs' driver's licenses for failure to pay a court-ordered fine would not imply that the state court should not have imposed the fine or cost in the first place);[13] *Powers v. Hamilton Cnty. Pub. Def. Comm'n,* 501 F.3d 592, 606 (6th Cir. 2007)(no deprivation of rights by the state-court judgment, but rather by

---

[12] Plaintiffs also make the irrelevant assertion that their original convictions would still be valid, ECF No. 290 at 22, but Defendants did not argue otherwise. Plaintiffs also claim that "a finding in Plaintiffs' favor is not tantamount to a reversal of any . . . bench warrant," *id.*, but they can only make that claim by first arguing the untenable point that the bench warrants did not command that the person be incarcerated when in fact they did. *See* Headings 5 and 6 herein.

[13] Another case cited elsewhere by Plaintiffs ECF No. 260 at 22, *Thomas v. Haslam*, 329 F. Supp. 3d 475, 507 (M.D. Tenn. 2018), *vacated on other grounds, Thomas v. Lee*, 776 F. App'x 910 (6th Cir. 2019) is essentially the same in that it involved a challenge to DMV drivers' license revocations.

the Public Defender's conduct in failing to ask for an indigency hearing as a prerequisite to his

incarceration); *Brucker v. City of Doraville*, No. 1:18-CV-02375-RWS, 2019 WL 3557893 (N.D.

Ga. Apr. 1, 2019)(claims that ticketing officers were incentivized to issue tickets, and similar other

claims, "[did] not ask the Court to find that the municipal court made an incorrect legal ruling").[14]

### 4.     Plaintiffs are not entitled to damages from Lexington County.

Defendants moved for summary judgement on the issue of damages under the Sixth

Amendment. Because of uncertainty whether Plaintiffs would even persist in pressing a damage

claim on this basis, Defendants pointed out that "Plaintiffs have never in this litigation cited a

single case in which a local governing body has been held liable for actual damages when it was

claimed that there had been a violation of the Sixth Amendment right to counsel. Nor are defense

counsel aware of a case that so holds." ECF No. 283-1 at 43. Defendants also pointed out that

Plaintiffs could not show causation. Specifically, Defendants noted that "[i]n order to prevail on

this claim, Plaintiffs would need to show not only that they were actually harmed as a result of not

having counsel, but also that the reason for their not having counsel was the absence of an adequate

number of indigent defense attorneys." *Id.* at 44. [15]

Plaintiffs' Memorandum in Support of their Motion for Summary Judgment did not contain

an argument that Lexington County should be held liable in damages under the Sixth Amendment.

The only reference to Claim Five, the Sixth Amendment damage claim, in that 53-page

---

[14] Plaintiffs also attempt to argue that they only challenge "post-sentencing debt collection policies and procedures," and that as a result, this action falls within the "independent claim" exception to *Rooker-Feldman*. ECF No. 290 at 34. This erroneous attempt to turn the judicial act of issuing bench warrants into mere "collection practices" has been discussed elsewhere. ECF No. 289 at 18, and at p. 25 herein.

[15] In light of Plaintiffs' failure even to mention, much less argue, a Sixth Amendment damage claim against Lexington County, it is difficult to see how Plaintiffs can claim that they listed "reasons set forth in Plaintiffs' affirmative motion for summary judgment" on this issue. ECF No. 290 at 31.

memorandum is found near the very end of it, in p. 51, where Plaintiffs mention only that "Plaintiffs are entitled to monetary damages against Defendants <u>Reinhart and Adams</u> in their individual capacities as administrators, policymakers, and supervisors (Claims Four and Five)." (Emphasis added.) There is no reference to a Sixth Amendment damage claim against Lexington County there or anywhere else.

In any event, the issue of Plaintiffs' Sixth Amendment damage claim against Lexington County is before the Court, because Defendants moved for summary judgment in their favor with regard to that claims. Defendants correctly pointed out that "Plaintiffs have never in this litigation cited a single case in which a local governing body has been held liable for actual damages when it was claimed that there had been a violation of the Sixth Amendment right to counsel." ECF No. 283-1 at 43. Plaintiffs in response cite a few cases in which a governmental body has been held liable in a Sixth Amendment claim for damages other contexts, none of which have anything to do with underfunding of indigent counsel by a local governing body. ECF No. 290 at 32-33.[16] None of those cases controvert Defendants' broader point, which is that there is no precedent for damage relief under anything resembling the facts of this case.

On the key element of causation, that is, how the alleged underfunding of indigent defense led to damage to Plaintiffs, Plaintiffs have made no argument at all. They claim that if Lexington

---

[16] *Hays v. Town of Gauley Bridge*, WV, No. CIV.A. 2:09-1272, 2011 WL 1229797, at *1 (S.D.W. Va. Mar. 29, 2011), aff'd sub nom. *Hays v. Town of Gauley Bridge, W. Va.*, 474 F. App'x 930 (4th Cir. 2012)(allegation that town had a custom and policy that resulted in the deprivation of plaintiff's Sixth Amendment right to a public trial); *Brewington v. Bedsole*, No. 91-120-CIV-3-H, 1993 WL 819885 (E.D.N.C. May 14, 1993)(in an at-will employment discharge case, plaintiff "arguably" stated a Sixth Amendment claim against sheriff for filing an erroneous report of separation claim after plaintiff sought the advice of counsel); *Larsgard v. Straub*, No. CV-13-00638-TUC-DCB, 2019 WL 669788 (D. Ariz. Feb. 19, 2019)(allegation that Arizona Department of Corrections violated Sixth Amendment by denying plaintiff any private telephone calls with his attorney).

County had funded some unspecified number of indigent defense counsel, such counsel could have been made available at the time each named Plaintiff arrived at the Detention Center once arrested on a bench warrant. Plaintiffs then claim that Lexington County's "underfunding" of indigent defense led to the "direct and predictable result that Plaintiffs would not be afforded counsel after their arrest for nonpayment of fines and fees." ECF No. 290 at 35. However, Plaintiffs do not assert, even indirectly, how the presence of counsel might have made a difference if counsel had been available at the times of their arrests. Instead, they merely presume harm, rather than trying to make the necessary showing of actual causation of harm.

Instead, Plaintiffs focus on the injuries they claim, leaping over the need to show a causal connection between the alleged "underfunding" and those injuries. In so doing, they overlook the principle that "damages awarded in a § 1983 action must always be designed to compensate injuries caused by the [constitutional] deprivation." *Farrar v. Hobby*, 506 U.S. 103, 115 (1992)(emphasis added). They apparently would have the court presume that the named Plaintiffs could show that their failures to make timely payments were not willful, and that having a lawyer present would have reduced or prevented their incarceration. However, it is Plaintiffs' burden to prove what would have happened if counsel had been present, and they do not even address that point. Nor does it seem possible that such a point is capable of being proven, first, because the evidence that would be presented to the magistrate is unknown and untested, and secondly, because even the most skilled counsel could fail to persuade a court that a given defendant should not be incarcerated for failure to pay a criminal fine. Nor can it presumed that any or all of the named Plaintiffs would have availed themselves of counsel. All told, then, Plaintiffs have failed to show how Lexington County, or indeed any of the Defendants, should be held liable for damages, whether compensatory or nominal, on the Sixth Amendment claim.

Finally, with specific reference to nominal damages, Defendants cited *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 116 (4th Cir. 2021), which held that where, as here, "there is absolutely no specific mention in the Complaint of nominal damages," a Complaint will not be read as asserting a claim for nominal damages. ECF No. 283-1 at 44 n. 26. Plaintiffs argue otherwise, ECF No. 33-34 n. 7, but cite no case that actually addressed this issue. Moreover, in *Foodbuy*, the Fourth Circuit cited and quoted *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 141 (2d Cir. 1994), where an unpled claim for nominal damages was rejected even though the case involved a claim of a constitutional violation. In any event, Plaintiffs have not shown that funding decisions by Lexington County were the reason why counsel was not provided to Plaintiffs once they were arrested on bench warrants. [17] The Lexington County Public Defender testified that as of the date of his deposition, May 14, 2021, he had never declined to represent anyone because of "caseload or overload." Exhibit 1, Madsen deposition at 156.

### 5.    Plaintiffs are not entitled to damages from the Magistrate Defendants.

Plaintiffs have argued ever since this case was filed that they were incarcerated as a result of "administrative policies or practices" that render the Magistrate Defendants liable for the bench warrants issued by other magistrates. *See, e.g.,* ECF No. 284-1 at 12. However, Plaintiffs' review of tens of thousands of documents, as well as the semi-annual Orders appointing Chief Magistrates and setting forth their duties, has turned up nothing that would support Plaintiffs' claims.

It is time for the analysis of this case to return to basics. It cannot be seriously argued that the issuance of a bench warrant is anything other than a judicial act. *See, e.g., Ceparano v. Southampton Just. Ct.,* 404 F. App'x 537, 539 (2d Cir. 2011)(authorizing of bench warrant was

---

[17] In *Bairefoot, supra,* by contrast, it was alleged that the two municipalities had not provided <u>any</u> indigent defense funding at all for the municipal courts they had created. Judge Gergel in that nonfinal order did not consider the implications of the absence of a request for nominal damages.

"clearly a judicial act that entitles the Southampton Justice Court judge to absolute immunity"); *Pastene v. Sprouse*, No. CIV.A. 0:09-1390-PMD, 2010 WL 1344971, at *3 (D.S.C. Mar. 30, 2010), aff'd, 393 F. App'x 119 (4th Cir. 2010)(county magistrate's issuance[s] of bench warrants were judicial acts, as they were acts normally performed by a judges sitting in a similar judicial capacity").

Plaintiffs' extensive discovery was apparently undertaken in the hope of finding evidence that the Magistrate Defendants "created" the alleged policies of which Plaintiffs have complained.[18] No such evidence was found, because the practice of incarcerating persons on bench warrants for unpaid fines (after their jail sentences had been suspended) was authorized by statewide bench warrant forms dating back long before the events in this case.[19]

Plaintiffs' only other hope of succeeding on their damage claims was to locate something in the administrative powers of the Chief Magistrates, delineated in the Chief Justice's semi-annual Orders, that gave the Chief Magistrates authority to direct the other county magistrates how to exercise their judicial authority in any fashion, whether in regard to the issuance of bench warrants or anything else. Not surprisingly, in light of the limited nature of the administrative powers conferred, there is nothing in those semi-annual Orders that would support Plaintiffs' assertions, particularly when the purported administrative authority would require the chief magistrates somehow to prohibit the other magistrates from executing forms (MC2 and MC15) promulgated by South Carolina Court Administration). Nor did Plaintiffs locate anything else in the semi-annual

---

[18] *See, e.g.,* Plaintiffs' Objections to Report and Recommendations, ECF No. 80 at 2 ("Plaintiffs' claims against the individual Defendants challenge only administrative actions concerning the <u>creation</u> and enforcement of county-wide procedures that result in the automatic [sic] arrest and incarceration of indigent people without court hearings." (Emphasis added.

[19] Plaintiffs apparently do not challenge the longstanding and statewide nature of the former practice of incarcerating people on bench warrants for nonpayment in certain cases.

Orders listing administrative powers. Given that absence of evidence, it is specious for Plaintiffs to assert glibly that "there is no dispute that Defendants Reinhart and Adams were responsible for overseeing and sanctioning the policies giving rise to this standard operating procedure." ECF No. 290 at 23. Defendants have vigorously and repeatedly shown otherwise.

Defendants have already explained why the semi-annual Orders did not confer a monitoring duty on the Chief Magistrates, except in the instance of one limited area (regarding certain bond court procedures) not applicable here, and which is misleadingly and incompletely quoted by Plaintiffs. ECF No. 289 at 16.[20] Defendants have also already explained why the judicial action of issuing bench warrants to enforce unpaid fines was of a different nature from the described administrative and ministerial responsibility to ensure that "court-generated revenues are collected, distributed and reported in an appropriate and timely manner." ECF No. 284-8 at 6, ¶ 17. ECF No. 289 at 18-19. In fact, the Orders do not use the term "debt collection."

Defendants would additionally note that Magistrate Adams, when asked at her deposition what she did to comply with that provision about "court-generated revenues," answered that the pertinent procedures she followed were complying with the Chief Justice's Financial Accounting Order (a detailed 2007 Order attached as Exhibit 2), submitting the necessary information to the county within established deadlines, and reviewing any financial discrepancies. Ex. 3 at 94-95. In other words, the Chief Magistrates' duties regarding revenue collection procedures were limited to typical details of financial administration, rather than anything involving decisions made in the course of adjudicating cases.

---

[20] In their second Memorandum, Plaintiffs again allude to this inaccurately-quoted duty to monitor, ECF No. 290 at 50.

Nor the did the adoption of the Setoff Debt Program as a sentencing option have the effect of requiring any magistrate to use that option, even though the 2017-2018 changes removed the former option of issuing incarceration bench warrants. Finally, Defendants have pointed out at length why none of the other administrative powers listed in the semi-annual Orders in this case extend to authorizing the Chief Magistrates to direct the exercise of judicial authority by other magistrates. ECF No. 289 at 19-21.

In their Memorandum in Opposition, ECF No. 290 at 43-50, Plaintiffs rehash their discussion of the three cases they habitually cite in support of their assertions concerning administrative actions by judges: *Forrester v. White*, 484 U.S. 219 (1988), *Morrison v. Lipscomb*, 877 F.2d 463 (6th Cir. 1989), and *Ratte v. Corrigan*, 989 F. Supp. 2d 550 (E.D. Mich. 2013). Defendants have already pointed out that none of these resemble the facts of this case in any way. ECF No. 289 at 25-26. Plaintiffs add one other district court case, *Zeigler v. New York*, 948 F. Supp. 2d 271 (N.D.N.Y. 2013), but that case involved a judge's administration of a list of attorneys who could be appointed as indigent defense counsel, not the appointment of counsel in specific cases. The other cases cited by Plaintiffs at pp. 43-51 are even less on point.

Plaintiffs do make one new argument, claiming that nothing done by Court Administration provided the Magistrate Defendants with any reason to issue the kinds of nonpayment bench warrants they issued. ECF No. 290 at 24-26. However, in connection with the damage claims against the Magistrate Defendants, Plaintiffs have made no answer at all to the Magistrate Defendants' contention that the clear language of former Form MC2 specifically provided that the warrant orders law enforcement, upon service of the warrant, "to receive the said defendant and to safely keep [the defendant] until he/she shall be thereof discharged by due course of law." Such argument as Plaintiffs do make with regard to that language is based on alternative language in the

MC2 form that was not used in any of the cases of the names Plaintiffs. They make that unfounded argument only with reference to Sheriff Koon. ECF No. 290 at 37-43. Defendants address that argument in Heading 6 below. Plaintiffs' also make virtually no reference to former Form MC15, which equated the issuance of a bench warrant with a jail commitment.

### 6.    Plaintiffs are not entitled to damages from Sheriff Koon.

Almost five years after this case was filed, Plaintiffs introduce a new concept into the case—"overdetention." *See generally* ECF No. 290 at 38-43. This belated concept does not fit the facts of this case, because the term "overdetention" is generally used to refer to detaining someone after a specified release date. Thus, for instance, one of the primary cases cited by Plaintiffs defines the issue as "the right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009). The sole Fourth Circuit case cited by Plaintiffs, *Campbell v. Florian*, 972 F.3d 385, 391 (4th Cir. 2020), as amended (Aug. 28, 2020), similarly involved the computation of a release date. Plaintiffs rely heavily on *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998), which did involve a bench warrant, but the terms of the warrant specifically instructed the sheriff to "attach Walter Alfred Armstrong ... and he safely keep, so that <u>you have his body before the Judge of the Allen Circuit Court of Allen County, Indiana</u>, FORTHWITH, to answer a contempt in not obeying the order of this Court as commanded at the 1994 Term of said Court." (Emphasis added). In other words, the sheriff was to take the plaintiff to the judge, and to do it "forthwith."[21]

---

[21] Other cases cited by Plaintiffs, ECF No. 290 at 38-42 are equally far afield factually. For instance, *Campbell v. Johnson*, 586 F.3d 835 (11th Cir. 2009) involved an alleged refusal to release the defendant on bail after the court approved a property bond; *Wilson v. Montano*, 715 F.3d 847 (10th Cir. 2013)(warden's policy of holding citizens without court orders); *Simon v. City of New York*, 893 F.3d 83, 96 (2d Cir. 2018)(warrant explicitly directed the executing officers to arrest Simon and bring her before the court at 10:00 a.m. on a specific date); *Davis v. Hall*, 375 F.3d 703 (8th Cir. 2004)(inmate alleged prolonged incarceration after he was ordered released); *Whirl v.*

In the present case, however, the MC2 warrant form ordered and authorized law enforcement "to take and convey [the criminal defendant] to the common jail. The keeper of said jail is hereby commanded to receive the said defendant and to safely keep until he/she shall be thereof discharged by due course of law. . . ." Plaintiffs purport to find ambiguity in that language, but they make no effort to show why that language was in fact ambiguous, other than by repeating conclusory statements to that effect. The plain language of the phrase means, as Judge Adams agreed in her deposition, that "due course of law is essentially an order that an individual will be arrested and retained in -- in custody unless and until they satisfy either the monetary amount that they've got to pay or . . . . the period of incarceration on the bench warrant[.]" Exhibit 3 at 169. Judge Adams also confirmed her understanding that "an individual arrested on a bench warrant with this phrase doesn't need to be brought back before the court under this language[.]" *Id.* at 170.[22] Apparently, Plaintiffs' only reason for arguing that the language of the MC 2 form is ambiguous is that the form also contains an alternative provision which was not actually the language adopted by the magistrates in any of the cases of the seven named Plaintiffs, as explained in more detail in the footnote.[23]

---

*Kern*, 407 F.2d 781 (5th Cir. 1968) (plaintiff was detained in jail almost nine months after dismissal of indictments against him because of a failure to properly process dismissal).

[22] Sheriff Koon testified to the same effect, i.e., that that language meant that the defendant would be kept in jail until he paid the fine or served the listed sentence. Exhibit 4, Koon deposition at 69: 8-18.

[23] In a seriously misleading statement concerning the plain facts of record, Plaintiffs cite several times to an alternative provision of Form MC 2 as "expressly command[ing] the arrestee be "brought before [the court]" to be dealt with according to the law." This misleading statement is repeated three times, ECF No. 290 at 3, 37, 39, quoting a blank Form MC 2 that appears at ECF No. 283-16 at 112. The reason this misstates the facts is that no judge signed that part of the form in any of the bench warrants issued for the seven named Plaintiffs. Instead, all seven Plaintiffs were arrested pursuant to the "take and convey . . . to the common jail" part of the bench warrant form. ECF No. 283-2 at 3; 283-3 at 3; 283-4 at 5; 283-5 at 6; 283-6 at 2; 283-7 at 3; and 283-8 at 8. Judge Adams testified that the alternative language quoted by Plaintiffs only applied in

Defendants have previously pointed out that the reason the Sheriff's Department kept arrested individuals in jail was that the bench warrants commanded the Department to do so. The procedures followed by the Sheriff's Department were not the result of policies created by Sheriff Koon, who had no authority other than ensure that the warrants were executed according to their terms. *See* ECF No. 283-1 at 46. Nothing in the host of inapposite cases cited by Plaintiffs provides any support for their claims that under the facts of these cases, the Sheriff was required to do anything other than to arrest and incarcerate the named Plaintiffs as ordered by the plain and unambiguous language of the bench warrants.

### 7.     Plaintiffs' view of qualified immunity would require the Magistrate Defendants to have prohibited what Court Administration permitted, in addition to the Magistrate Defendants lacking any authority to so act.

If the issue of qualified immunity even needs to be reached, Defendants would note that Plaintiffs fail to address how inferior judicial officials, not trained as attorneys, should be held liable in damages for actions that legally-trained judges and judicial branch officials at South Carolina Court Administration not only did not prohibit, but indeed authorized via the MC2 and MC15 forms. Plaintiffs argue that the Bench Book "commands that "all magistrates and municipal judges must strictly heed to the provisions of the [state and federal] Constitutions," ECF No. 290 at 24, but that is a model of the "high level of generality" which cannot show that a point has been clearly established. *Wilson v. Prince George's Cnty., Maryland*, 893 F.3d 213, 221 (4th Cir. 2018) Plaintiffs also argue that "[n]othing in the MC2 bench warrant form or the Bench Book <u>required</u> the jailing of debtors without constitutionally required pre-deprivation hearings., ECF No. 290 at 25 (emphasis added), but the language of the form clearly authorized incarceration and made no

---

situations where the bench warrant was to be served outside of the jurisdiction in which it was issued. Ex. 3 at 147-148.

mention of a need for an ability-to-pay hearing. Plaintiffs cite no reference to *Bearden* in the Bench Book, and Defendants are likewise not aware of any such reference. Finally, Defendants have already pointed out that the Court Administration email forwarding the 2016 DOJ "Dear Colleague" letter contained no suggestion that there was any imminent need for judges to change their judicial actions, much less for judges with administrative responsibilities to undertake to tell other judges to decide cases in a certain way when that had never been part of those administrative responsibilities. ECF No. 289 at 26-28.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that their Motion for Summary Judgment should be granted, Plaintiffs' Motion for Summary Judgment should be denied and this action dismissed.

Defendants join with Plaintiffs in requesting oral argument on these motions.

Respectfully submitted,

DAVIDSON, WREN & DEMASTERS, P.A.

*s/ Kenneth P. Woodington*
William H. Davidson, II, Fed. I.D. No. 425
Kenneth P. Woodington, Fed. I.D. No. 4741

DAVIDSON, WREN & DEMASTERS, P.A.
Post Office Box 8568
Columbia, SC 29202-8568
Telephone: (803) 806-8222
Facsimile: (803) 806-8855
E-mail: kwoodington@dml-law.com

ATTORNEYS for Defendants

Columbia, South Carolina

May 23, 2022