IN IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

TWANDA MARSHINDA BROWN;                  )     C/A No.: 3:17-1426-SAL
SASHA MONIQUE DARBY;                     )
CAYESHIA CASHEL JOHNSON;                 )
AMY MARIE PALACIOS;                      )
NORA ANN CORDER; and                     )
XAVIER LARRY GOODWIN and                 )
RAYMOND WRIGHT, JR., on behalf of        )
themselves and all others similarly situated, )
                                         )
              Plaintiffs,                )
                                         )
    vs.                                  )
                                         )
LEXINGTON    COUNTY,    SOUTH            )
CAROLINA; GARY REINHART, in his          )
individual capacity; REBECCA ADAMS, in   )
her individual capacity and in her official )
capacity as the Judge of the Irmo Magistrate )     OPINION & ORDER
Court; MATTHEW A. JOHNSON, in his        )
official capacity as the Chief Judge for )
Administrative Purposes of the Summary   )
Courts in Lexington County; GARY S.      )
MORGAN, in his official capacity as the  )
Associate Chief Judge for Administrative )
Purposes of the Summary Courts in        )
Lexington County; and BRYAN KOON, in     )
his official capacity as the Lexington County )
Sheriff,                                 )
                                         )
              Defendants.                )
                                         )
                                         )
                                         )
                                         )
                                         )
_____)

1

This matter is before the court on cross motions for summary judgment filed by Plaintiffs, ECF No. 284, and Defendants, ECF No. 283, as well as a renewed motion to intervene filed by Marie Assa'ad-Faltas ("Assa'ad-Faltas"), ECF No. 295. For the reasons that follow, the court denies Plaintiffs' motion for summary judgment and grants in part and denies in part Defendants' motion for summary judgment, dismissing all claims except Plaintiffs' claims for violations of their Sixth Amendment rights brought against Lexington County, South Carolina ("Lexington County"). The court also denies Assa'ad-Faltas' renewed motion to intervene.

## BACKGROUND

### I.     Procedural History

Plaintiffs, indigent individuals who were arrested and incarcerated in Lexington County for failing to pay fines and fees to the magistrate courts, brought this suit over five years ago. In the last five years, the parties have engaged in over two years of mediation as well as protracted discovery. Relevant to the resolution of the currently pending motions, the following summary of the procedural history of this case is provided.

Twanda Marshinda Brown ("Brown"), Sasha Monique Darby ("Darby"), Cayeshia Cashel Johnson ("Johnson"), Amy Marie Palacios ("Palacios"), Nora Ann Corder ("Corder"), Xavier Larry Goodwin ("Goodwin"), and Raymond Wright, Jr. ("Wright") (collectively "Plaintiffs"), initiated this action in 2017 on behalf of themselves and all others similarly situated after they were separately arrested and incarcerated for a period of time ranging from seven to 63 days for failure to pay magistrate court fees and fines. They proceed now against Lexington County and the following officers of the Lexington County Magistrate Courts ("LCMC"): Gary Reinhart

("Reinhart"),[1] Rebecca Adams ("Adams"),[2] Matthew A. Johnson ("Johnson"), and Gary S. Morgan ("Morgan"),[3] as well as Bryan Koon ("Koon"),[4] (collectively, "Defendants")[5] on a Second Amended Complaint that asserts violations of their rights under the Fourteenth, Sixth, and Fourth Amendments of the United States Constitution, pursuant to 42 U.S.C. § 1983. [ECF No. 48]. Plaintiffs allege as follows:

> Indigent people who lack the financial means to pay the full amount of fines and fees owed to Lexington County magistrate courts are routinely arrested and incarcerated for weeks and months at a time without being afforded a pre-deprivation ability-to-pay hearing, notice of the right to request counsel, or the assistance of a court-appointed attorney to help defend against incarceration.

*Id.* ¶12.

---

[1] Reinhart served as the Chief Judge for Administrative Purposes of the Summary Courts in Lexington County ("Chief Judge") from January 1, 2005, to July 1, 2017. [ECF No. 284-12 at 24:23–25:14; ECF . 284-13, ECF No. 284-14]. Reinhart currently serves as an at-large magistrate, a position he has held throughout his tenure with the LCMC. [ECF No. 284-12 at 19:19–20:11, 24:16–22].

[2] Adams served as Chief Judge from July 1, 2017, to July 1, 2021, and as the Associate Chief Judge for Administrative Purposes of the Summary Courts in Lexington County ("Associate Chief Judge") from January 1, 2014, to July 1, 2017. [ECF No. 284-8, ECF No. 284-9, ECF No. 284-10 at 24:6–25:8]. Adams currently serves as a Magistrate Judge on the Irmo Magistrate Court, a position she has held throughout her tenure with the LCMC. [ECF No. 284-10 at 24:6–25:8; ECF No. 284-11 at 270:25–271:5].

[3] Johnson and Morgan currently administer the LCMC as, respectively, the Chief and Associate Chief Judge. [ECF No. 284-7, ECF No. 277, ECF No. 278].

[4] Koon serves as the elected Lexington County Sheriff, the Chief Law Enforcement Office of the Lexington County Sheriff Department, and the Chief Administrator of the Detention Center. [ECF No. 48 ¶ 31].

[5] Plaintiffs also brought claims against Robert Madsen ("Madsen"), the Circuit Public Defender for the Eleventh Judicial Circuit in South Carolina that includes Lexington County. [ECF No. 48 ¶ 32]. Madsen was dismissed from this case pursuant to a stipulation of dismissal without prejudice filed by Plaintiffs. [ECF No. 100].

The Second Amended Complaint asserts eight causes of action, the first three of which are brought by Goodwin and Wright on behalf of themselves and members of the Class for declaratory and injunctive relief ("Class Claims"), with the remaining claims brought by some or all the Plaintiffs individually.[6]

More specifically, Plaintiffs' causes of actions can be divided into three groups. First, Plaintiffs allege violations of their Due Process and Equal Protection rights guaranteed by the Fourteenth Amendment. This group includes Plaintiff's first claim ("Claim One"), "Incarceration Without Pre-deprivation Ability-to-Pay Hearing," a class claim brought against Johnson, Morgan, and Koon in their official capacities; their fourth claim ("Claim Four"), an individual claim brough by Plaintiffs against Reinhart, Adams, and Koon, in their individual capacities for damages; and their seventh claim ("Claim Seven"), an individual claim brought by Goodwin against Adams in her official capacity for declaratory relief.

Second, Plaintiffs allege violations of their Sixth Amendment Rights. This group includes Plaintiff's second claim ("Claim Two") for "Failure to Afford Assistance of Counsel," a class claim brought against Lexington County as well as Johnson, Morgan, and Koon, in their official capacities; their fifth claim ("Claim Five"), an individual claim brought by Plaintiffs against Lexington County, as well as Reinhart and Adams in their individual capacities seeking damages; and their eighth claim ("Claim Eight"), an individual claim brought by Goodwin against Adams in her official capacity for declaratory relief.

---

[6] As to Plaintiffs' Class Claims, these claims seek declaratory and injunctive relief and name as Defendants the Chief and Associate Chief Judges in their official capacities that were in office at the time Plaintiffs filed their Second Amended Complaint. [ECF No. 48]. The court has substituted, as to these Defendants and pursuant to Fed. R. Civ. P. 25(d), the current Chief and Associate Chief Judges. [*See* ECF Nos. 277, 278].

Finally, Plaintiffs allege violations of their Fourth Amendment rights, including Plaintiff's third claim ("Claim Three") for unconstitutional and unreasonable seizure, a class claim brought against Johnson, Morgan, and Koon, in their official capacities, and Plaintiffs' sixth claim ("Claim Six"), an individual claim brought by Brown, Darby, and Wright against Reinhart, Adams, and Koon, in their individual capacities, for damages.

In August and October 2017, Defendants filed a motion for partial summary judgment concerning Plaintiffs' claims for declaratory and injunctive relief and a motion for summary judgment on Plaintiffs' damages claims. [ECF Nos. 29, 50]. The court referred this matter to the Magistrate Judge for pretrial handling, and the Magistrate Judge issued a report and recommendation in which she recommended in part that the court grant the motion for partial summary judgment as to declaratory and injunctive relief and grant in part and deny in part the motion for summary judgment as to damages, on the basis that the claims for declaratory and injunctive relief were moot and two types of immunity applied to the individual Defendants. [ECF No. 74].

The court agreed with objections filed by Plaintiffs that issues of material facts existed, declined to adopt the report and recommendation and, in part, denied Defendants' motion for partial summary judgment as to declaratory and injunctive relief as well as Defendants' motion for summary judgment concerning damages. [ECF No. 84]. Thereafter, the court denied Defendants' motion for reconsideration. [ECF No. 107].[7]

---

[7] Adams, Koon, and Reinhart appealed the court's ruling concerning immunity with respect to damages to the Fourth Circuit Court of Appeals. *See Brown v. Reinhart*, 760 Fed. App'x. 175 (4th Cir. 2019) ("*Brown*"). The Fourth Circuit dismissed the appeal for lack of jurisdiction. *Id.* The court discusses *Brown* in more detail below.

Throughout this case, Plaintiffs have multiple times moved for class certification. On March 5, 2021, the court granted Plaintiffs' latest motion for class certification, certifying the following class: "All indigent people who currently owe, or in the future will owe, fines, fees, court costs, assessments, or restitution in cases handled by Lexington County magistrate courts." [ECF No. 227 at 22, ECF No. 186 at 2].

On April 11, 2022, both Defendants and Plaintiffs filed their instant motions for summary judgment. [ECF Nos. 283, 284].[8] The parties filed corresponding responses on May 9, 2022, and replies on May 23, 2022. [ECF Nos. 289, 290, 292, 293]. Assa'ad-Faltas filed her currently pending renewed motion to intervene on June 16, 2022. [ECF No. 295].[9] Both Plaintiffs and Defendants have filed responses in opposition to Assa'ad-Faltas' motion. [ECF Nos. 302, 304].

On June 29, 2022, proceedings were held before the Honorable District Court Judge Margaret B. Seymour concerning Plaintiffs and Defendants' cross motions for summary judgment. [ECF No. 297]. Following this hearing, both Plaintiffs and Defendants filed letters with the court. [ECF Nos. 303, 305]. On August 5, 2022, the instant case was reassigned to the undersigned. All pending motions have been fully briefed and are ripe for consideration by this court.

## II.     Relevant Undisputed Facts

### A.     Individual Plaintiffs' Incarcerations

#### 1.     Twanda Marshinda Brown

---

[8] Although Plaintiffs' motion for summary judgment is not captioned as a motion for partial summary judgment, Plaintiffs do not move for summary judgment as to their Fourth Amendment Claims; Claims Three and Six; their claims against Koon; or their Sixth Amendment Claim (Claim Five) for damages against Lexington County. [*See* ECF No. 284].

[9] Assa'ad-Faltas has previously and unsuccessfully moved to intervene in the present suit. [ECF Nos. 156, 166].

Brown is a single working mother. [ECF No. 66-1 ¶¶ 1–2]. In April 2016, the Irmo Magistrate Court sentenced Brown to pay $2,337.50 in fines and fees for traffic tickets or serve ninety days in jail. [ECF No. 29-2 ¶ 3a; ECF No. 66-1 ¶ 3]. Brown was unable to pay the amount owed in full, and she was placed on a payment plan ordering her to make $100 monthly payments despite her informing the court she could not afford this. [ECF No. 66-1 ¶¶ 4–5]. The court— without assessing her ability to pay—sentenced her and placed her on the payment plan. *Id.* Brown was able to make the initial payments, but no payments were made after October 4, 2016. [ECF No. 66-1 ¶ 8; ECF No. 29-2 ¶ 3a].

On February 18, 2017, Brown was arrested and jailed at the Lexington County Detention Center. [ECF No. 66-1 ¶¶ 10–11]. There, she was served with a nonpayment bench warrant ordering her to pay $1,907.63 in fines or serve ninety days in jail. [ECF No. 66-1 ¶¶ 10–11; ECF No. 283-3 at 3–4 (bench warrant)]. Unable to pay the fines, she was jailed for fifty-seven days, the minimum amount of time required with credits for good behavior. [ECF No. 66-1 ¶ 12; ECF No. 29-2 ¶ 3a.] While jailed, Brown was separated from her children, and she lost her job. [ECF No. 66-1 ¶¶ 12, 15–16]. Upon release, Brown had difficulty finding new employment. *Id.* ¶ 17.

2.    Sasha Monique Darby

Darby is a single working mother who suffers from Post-Traumatic Stress Disorder. [ECF No. 66-2 ¶¶ 1–3]. On August 23, 2016, Darby appeared without counsel in Irmo Magistrate Court and was convicted of assault and battery in the third degree. *Id.* ¶¶ 10–16. The court imposed $1,000 in fines and fees, but Darby was unable to pay the full amount at sentencing. *Id.* ¶¶ 17–19. She was placed on a plan requiring $150 monthly payments without any assessment of her ability to pay, even though this was beyond what she said she could afford. *Id.* After making some of the payments, Darby was unable to pay more. [ECF No. 66-2 ¶¶ 21–22; ECF No. 21-8 ¶ 8].

On March 28, 2017, Darby, who was pregnant at the time, was arrested and taken to the Detention Center. [ECF No. 66-2 ¶¶ 23–25; ECF No. 29-2 ¶ 3d].[10] There, she was served with a nonpayment bench warrant ordering her to pay $680 or spend twenty days in jail. [ECF No. 66-2 ¶¶ 23–25; ECF No. 283-4 at 5–6 (bench warrant)]. Unable to pay, she was jailed for twenty days. [ECF No. 66-2 ¶¶ 23–25; ECF No. 29-2 ¶ 3d]. She did not get sufficient food or medical care for her pregnancy while in jail, and she missed her first prenatal doctor's appointment. [ECF No. 66-2 ¶¶ 28–30]. Her incarceration caused her to lose her job and home. *Id.*

3.     Raymond Wright, Jr.

Wright, a class representative in this case, [ECF No. 227 at 22], is disabled and unemployed. [ECF No. 35-2 ¶¶ 1, 6]. In July 2016, Wright appeared in the Central Traffic Court and pleaded guilty to driving under a suspended license ("DUS"), first offense ("DUS-1"). *Id.* ¶¶ 3–4. He was sentenced to pay $666.93 in fines and fees. [ECF No. 35-2; ECF No. 29-2 ¶ 3f]. The judge asked Wright if he could pay in full, and Wright explained that he could not. [ECF No. 35-2 ¶¶ 4–5]. The judge ordered him to pay $50 monthly without any assessment on his ability to pay. *Id.* The judge told Wright that he would be arrested and jailed if he did not make the monthly payments. *Id.* Wright faced difficulty making the $50 monthly payments. *Id.* ¶¶ 6–7. After five payments, he was unable to pay any more. *Id.*

On April 19, 2017, after receiving a letter from the court, Wright appeared in the Central Traffic Court for a show cause hearing. [ECF No. 35-2 ¶ 8; ECF No. 29-2 ¶ 3f]. Wright explained to the judge that he was unable to pay due to financial hardship. [ECF No. 35-2 ¶¶ 9–11]. The

---

[10] Prior to Darby's arrest, a Magistrate Judge with the Irmo Magistrate Court issued a Rule to Show Cause wherein Darby was notified of a hearing to determine whether she should be held in contempt of court and a bench warrant be issued for her arrest. [ECF No. 283-4 at 3]. Darby failed to appear at the hearing.

judge told Wright that he would be jailed unless he paid $416.93 in full within ten days. *Id.* The judge did not ask him about his ability to pay and refused to see the bills and other documents Wright brought to court to show he was unable to pay. *Id.* Wright asked the judge if he could make partial payments, but the judge informed him that the court would only accept payment in full. *Id.* ¶¶ 12–13. Wright was unable to pay $416.93 by April 29, 2017. *Id.*

On July 25, 2017, Wright was arrested pursuant to a nonpayment bench warrant. [ECF No. 284-2 ¶ 2, ECF No. 283-2 at 3 (bench warrant)].[11] Because he could not pay $416.93 at booking, he was jailed. [ECF No. 284-2 ¶ 3]. While incarcerated, Wright suffered intestinal bleeding. *Id.* ¶ 4. He was taken to the Lexington Medical Center where he received medical treatment while handcuffed and chained to his hospital bed. *Id.* ¶ 5. He was incarcerated for seven days. *Id.* ¶ 7. Wright was never taken to Bond Court or any magistrate court in Lexington County for an ability-to-pay hearing for his fines and fees, either before or after being booked into jail. *Id.* ¶ 8. No one offered to connect him with an attorney. *Id.* ¶ 9.

Brown, Darby, and Wright, following their appearances in court, signed a "Scheduled Time Payment Agreement" on a form promulgated by the South Carolina Court Administration ("SCCA"), Form MC 15. [*See* ECF No. 283-2 at 5, ECF No. 283-3 at 5, ECF No. 283-4 at 4]. Each form contained information about the conviction and fine, along with the schedule for the payments, by date and amount. Near the bottom of each form was the following language:

> I certify that all the foregoing information is true and I fully understand and accept the conditions of this payment schedule. Failure to appear as directed or failure to comply with the terms set forth in this payment schedule will result in a BENCH WARRANT/COMMITMENT being issued for my arrest and denial of any future requests for a scheduled time payment.

---

[11] The bench warrant indicates that Wright was told at the show cause hearing to make a payment of $100.00 by April 28, 2017. [*See* ECF No. 283-2 at 3].

*See id.*

4. Cayeshia Cashel Johnson

Johnson is a single working mother. [ECF No. 284-3 ¶ 1]. In August 2016, Johnson was ticketed for five traffic offenses and one misdemeanor offense in Lexington County, three hours away from her home in Myrtle Beach, South Carolina. [ECF No. 284-3 ¶¶ 3, 5; ECF No. 29-2 ¶ 3c]. The tickets required her to appear in the Central Traffic Court on September 22, 2016. [ECF No. 29-2 ¶ 3c]. Before her hearing, Johnson called to inform the court she could not secure transportation to the courthouse on that date. [ECF No. 284-3 ¶ 7]. Nonetheless, Johnson was tried in absentia, convicted, and sentenced to $1,287.50 in fines or eighty days in jail. [ECF No. 29-2 ¶ 3c]. Four days later, the court issued a nonpayment bench warrant ordering her arrest and jailing. [ECF No. 29-2 ¶ 3c; ECF No. 283-5 at 6 (bench warrant)].

On February 13, 2017, Johnson was arrested during a traffic stop in Myrtle Beach and transported to the Lexington County Detention Center. [ECF No. 284-3 ¶¶ 11–13]. In jail, she was served the nonpayment bench warrant. *Id.* This was the first notice Johnson received that she had been tried in absentia. *Id.* Johnson was unable to pay $1,287.50, so she was jailed for fifty-five days with good time credit. [ECF No. 284-3 ¶ 14; ECF No. 29-2 ¶ 3c]. During her two months in jail, Johnson was separated from her children, lost all three part-time jobs she held before her arrest, and suffered emotional distress and severe headaches. [ECF No. 284-3 ¶¶ 17–19].

5. Amy Marie Palacios

Palacios is a single working mother. [ECF No. 66-3 ¶ 1]. In October 2016, Palacios was ticketed for DUS-1 and was required to appear in the Central Traffic Court on November 10, 2016. *Id.* ¶ 5. Before her hearing, Palacios called the court to say she could not appear on that date due to a work conflict and submitted an affidavit to that effect from her employer. *Id.* ¶¶ 6–10. Despite

this, Palacios was tried in her absence, convicted, and sentenced to $647.50 in fines or thirty days in jail. [ECF No. 29-2 ¶ 3b]. Five days later, the court issued a nonpayment bench warrant ordering her arrest and jailing. [ECF No. 29-2 ¶ 3b; ECF No. 283-7 at 3 (bench warrant)].

On February 25, 2017, Palacios was arrested during a traffic stop pursuant to that warrant. [ECF No. 66-3 ¶¶ 12–17]. This was the first notice Palacios received that she had been tried in absentia. *Id.* Palacios was unable to pay $647.50, so she was jailed for twenty-one days with good time credit. [ECF No. 66-3 ¶ 18; ECF No. 29-2 ¶ 3b]. While in jail, Palacios was separated from her children, lost her job, and suffered emotional distress and ill health without access to proper medical care. [ECF No. 66-3 ¶¶ 21–23].

6.     Nora Ann Corder

Corder received three traffic tickets during a stop in January 2017. [ECF No. 66-4 ¶ 7]. Corder appeared in the Lexington Magistrate Court on three separate dates between February and April 2017 to answer for the tickets, but her case was continued each time. *Id.* ¶ 12. Corder was directed to return to court again on May 17, 2017, but she could not appear on this date due to lack of transportation. *Id.* ¶¶ 13–14. On May 17, 2017, Corder was tried in absentia, convicted, and sentenced to $1,320 in fines or ninety days in jail. [ECF No. 29-2 ¶ 3e]. She found out about her sentence after she called the court herself. [ECF No. 66-4 ¶¶ 15–17].

Around this time, Corder was facing eviction from her home because she could not afford to pay her rent. *Id.* ¶¶ 18–19. On May 26, 2017, she went to the court to file forms in defense of her eviction proceeding. *Id.* Corder was arrested at the courthouse pursuant to a nonpayment bench warrant. [ECF No. 66-4 ¶ 19; ECF No. 29-2 ¶ 3e, ECF No. 283-8 at 8, 9, 13, 14, 18, 19 (bench warrant)]. She was unable to pay $1,320, so she was jailed for 54 days with good time credit. [ECF

No. 66-4 ¶¶ 17–20; ECF No. 29-2 ¶ 3e]. As a result, Corder lost her home and her job. [ECF No. 66-4 ¶ 21].

7.    Xavier Larry Goodwin

Goodwin, a class representative in this case, ECF No. 227 at 22, is an indigent man and the principal provider for six dependents. [ECF No. 35-1 ¶¶ 1–2; ECF No. 66-5 ¶ 1]. In July 2016, Goodwin was ticketed for five traffic offenses and directed to appear in the Central Traffic Court on August 9, 2016. [ECF No. 66-5 ¶¶ 3–4]. He informed the court that he could not appear that date due to work. *Id.* ¶ 5. On August 9, 2016, Goodwin was tried in absentia, convicted, and sentenced to $1,710 in fines or ninety days in jail. [ECF No. 21-18]. The next day, the court issued a nonpayment bench warrant for Goodwin's arrest and jailing. [ECF No. 283-6 at 5 (bench warrant)].

On February 2, 2017, Goodwin was ticketed for DUS, 3rd offense ("DUS-3"), and arrested pursuant to a nonpayment bench warrant issued after his conviction on August 9, 2016. [ECF No. 66-5 ¶¶ 7–8]. In jail, he was served with the nonpayment bench warrant, his first notice that he had been tried in absentia for the July 2016 tickets. [ECF No. 66-5 ¶¶ 7–8]. Goodwin was unable to pay $1,710, so he was incarcerated for sixty-three days with good time credit. [ECF No. 66-5 ¶¶ 9, 12; ECF No. 29-2 ¶ 3g]. Although Goodwin was taken to Bond Court the day after his arrest for the new DUS-3 ticket, the judge did not address his incarceration on a nonpayment bench warrant and did not inquire into his ability to pay the $1,710. [ECF No. 66-5 ¶ 10]. While he was incarcerated, Goodwin lost his home and the job he had held for thirteen years, was separated from his family, and suffered emotional distress and headaches. *Id.* ¶¶ 15–18.

On April 4, 2017, while Goodwin was still in jail, he was transported to the Irmo Magistrate Court for a hearing in front of Adams on his DUS-3 ticket. [ECF No. 66-5 ¶ 14, ECF No. 35-1 ¶¶

6, ECF No. 283-6 at 10]. Goodwin pleaded guilty to DUS-3 and was sentenced to ninety days in jail and the payment of $2,100 in fines and fees, with credit for time served on his jail sentence. [ECF No. 35-1 ¶¶ 7–9]. Adams, without any assessment of his ability to pay, directed Goodwin to return to court and set up a payment plan within thirty days of his release from jail. *Id.* ¶ 10. Adams also informed Goodwin he would be arrested and incarcerated again if he failed to set up a payment plan. *Id.* On May 5, 2017, Goodwin went back to the Irmo Magistrate Court to establish the payment plan, which required him to make $100 monthly payments, despite his explanation that he had just been released from jail and did not yet have a job. *Id.* ¶¶ 14–16.

After his release from jail, Goodwin remains indigent and still owes fines and fees to the Irmo Magistrate Court for his DUS-3 offense. *Id.* ¶¶ 18, 21–24. Goodwin and his family do not have a home and continue to face great difficulty paying for even basic necessities. *Id.* ¶ 18. Goodwin also owes fines, fees, and court costs for other traffic court charges and more than $10,000 in past due child support. *Id.* ¶ 19. Despite his best efforts, Goodwin remains unable to make payments on his court debt. *Id.* ¶¶ 20–24. He currently has an outstanding balance of $2,163 for his DUS-3 offense. *Id.*

On March 25, 2022, Magistrate Brian N. Buck, to whom Goodwin's case was reassigned, issued a summons to Goodwin to appear on April 20, 2022. [ECF No. 289-4 ¶¶ 3–5]. After he failed to appear on that date, Magistrate Buck ordered that his case be sent to the Setoff Debt Program, *id.*, a program discussed more by the court below.

In sum, through various mechanisms, Plaintiffs were found guilty of committing various low-level offenses and sentenced to jail terms suspended on the payment of fines. Plaintiffs at some point failed to pay the relevant fines, were arrested on nonpayment bench warrants, and

incarcerated. Plaintiffs' incarcerations occurred without *Bearden* hearings[12] and without either notice of the right to request counsel or the assistance of court appointed counsel.[13]

B.    Organization of the LCMC

Beginning in 1973 with the adoption of Article V of the Constitution of South Carolina, the judicial power of the State has been "vested in a unified judicial system, which shall include a Supreme Court, a Court of Appeals, a Circuit Court, and such other courts of uniform jurisdiction as may be provided for by general law." S.C. Constitution, Article V, § 1. Article V, Section 4, vests certain powers in the Chief Justice and the Supreme Court, providing in pertinent part as follows:

> The Chief Justice of the Supreme Court shall be the administrative head of the unified judicial system. He shall appoint an administrator of the courts and such assistants as he deems necessary to aid in the administration of the courts of the State. The Chief Justice shall set the terms of any court and shall have the power to assign any judge to sit in any court within the unified judicial system. . . . The Supreme Court shall make rules governing the administration of all the courts of the State. Subject to the statutory law, the Supreme Court shall make rules governing the practice and procedure in all such courts. . .

---

[12] As discussed more below, the Supreme Court has long held that a state cannot "impose a fine as a sentence and then automatically convert it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." *Bearden v. Georgia*, 461 U.S. 660, 667 (1983) (citing *Tate v. Short*, 401 U.S. 395, 398 (1971)). A court is required to hold a hearing consider the following factors: (1) the debtor's income and assets (i.e., ability to pay); (2) the debtor's efforts to secure resources to pay; and (3) the existence and adequacy of alternative punishments to incarceration for those who made reasonable efforts and still could not afford to pay. *Id.* at 672.

[13] Although Defendants have put forth evidence concerning select Plaintiffs' criminal histories, arguing "[t]his information about Plaintiffs' prior history is relevant to show their familiarity with the criminal justice system," ECF No. 283-1 at 15, none of the evidence put forth by Defendants indicate that in prior relevant criminal proceedings Plaintiffs were, for example, informed of their right to counsel or experienced proceedings that were different in a relevant way compared to the cases at issue here.

Prior to the adoption of Article V, no official, judicial or otherwise, had authority to administer the court system. The legislature had created numerous local courts which were described as a "local, factionalized court system" that ceased to exist following the enactment of the present Article V. *Cort Indus. Corp. v. Swirl, Inc.*, 213 S.E.2d 445, 446 (S.C. 1975).

Article V also contains a provision for the magistrates' courts[14] and mandates that "[t]he Governor, by and with the advice and consent of the Senate, shall appoint a number of magistrates for each county as provided by law." Article V, § 26. Article VIII, Section 14 provides that the "[g]eneral law provisions applicable to certain matters shall not be set aside," including:

> (4) the structure for the administration of the State's judicial system . . . .
>
> (6) the structure and the administration of any governmental service or function, responsibility for which rests with the State government or which requires statewide uniformity.

C.     LCMC Chief and Associate Chief Judges' Authority

Under Article V, Section 4 of the South Carolina Constitution, the South Carolina Supreme Court Chief Justice ("Chief Justice") is responsible for appointing the Chief and Associate Chief Judges for Administrative Purposes of the Summary Courts in each county ("Chief and Associate Chief Judges"). The Chief Justice makes these appointments through orders issued twice yearly that grant the Chief and Associate Chief Judges administrative authority to make certain policies

---

[14] Not long after Article V was enacted, the Supreme Court of South Carolina held that "magisterial courts are vested with judicial power and are, therefore, a part of the State's uniform judicial system." *State ex rel. McLeod v. Crowe*, 249 S.E.2d 772, 775 (S.C. 1978). The court also held that "Sections 1 and 23 [now § 26] of Article V require that the jurisdiction of magistrates be uniform throughout the State. Such uniformity can only be accomplished through legislation which grants all magistrates uniform countywide jurisdiction." *Id.* at 776. In 1981, the Supreme Court of South Carolina further reaffirmed the principle of statewide uniformity in judicial matters, holding that Article VIII, §§ 14(4) and (6), of the Constitution of South Carolina, "effectively with[drew] administration of the State judicial system from the field of local concern." *Douglas v. McLeod*, 282 S.E.2d 604, 606 (S.C. 1981).

and provide certain supervision over magistrate courts ("Delegation Orders"). [*See, e.g.*, ECF No. 284-7 (order dated December 30, 2021), ECF No. 284-8 (order dated June 28, 2017)]. This includes administrative authority to:

> Monitor all summary court judges within [Lexington County] to ensure compliance with the above-referenced Order dated September 19, 2007 [outlining certain bond procedures].[15] The monitoring shall include, but shall not be limited to, ensuring that: bond hearings are being conducted twice daily; the constitutional and statutory rights of defendants and victims are being upheld; bonds are neither excessive nor limited to cash only; and no irregular practices, as outlined in the above- referenced Order, are occurring;

> Establish within [Lexington County] a procedure with all summary court judges and appropriate public officials to ensure that court-generated revenues are collected, distributed, and reported in an appropriate and timely manner;

> Call a meeting, at least on a quarterly basis, of all summary court judges in [Lexington County] to formulate uniform procedures in the [Lexington County] summary court system";

> Report to the [SCCA] any significant or repetitive non-compliance by any summary court judge in the county concerning the Chief Judge's execution of the provisions of this Order;

> Coordinate the planning of budgets for the magistrates in [Lexington County,] with those magistrates' input, and appear before the county governing body to present and justify the budget request;

> Provide for the orderly assignments of any case within the jurisdiction . . . to any magistrate of [Lexington County]; and

> Designate the hours of operation of each magistrate's court office.

[ECF No. 284-7 ¶¶ 5, 7, 8, 11, 12, 17, 19, *see also* ECF No. 284-8 (same)].  These orders additionally provide that:

> No order issued by the Chief Judge under the authority of this Order shall be effective unless the order is filed with the Office of South Carolina Court

---

[15] On September 19, the Chief Justice issued an order outlining certain bond procedures including requiring certain availability to conduct bond hearings and requiring the Chief Judges to coordinate the availability. [*See* ECF No. 289-3].

Administration and approved for consistency with statewide administrative policies.

*See id.*

In her transition to Chief Judge in 2017, Adams "read the order so [that she] knew those responsibilities." [ECF No. 284-11 at 291:24–292:4]. And in Johnson's transition to Chief Judge following Adams, she advised him to "read the [order appointing Chief Judges]" and to keep attendance of judges who do not come to the quarterly meetings "because it clearly states in the order that it's mandatory that all the judges participate in that quarterly meeting." *Id.* at 271:10–276:23.

Adams testified that she was thankful to step down from her position as Chief Judge, further testifying as follows:

> Well, it takes a lot of time. I have a pretty busy office that I run. If you're the chief magistrate you get pulled into other things. You know, you have to deal with the budget for all the magistrates. So you have to attend county council meetings and there may be reports, or, you know, if something's not going right at the detention center then – you know, you're sort of like the contact point for other department heads in Lexington County. And you have to supervise – we have district offices and those judges in those district offices supervise their own staff but the chief magistrate supervises the staff for all the central courts and do their evaluations.

> And, you know, to me it's – I always said it's kind of like being a mom, but you can't use timeouts. You know, you might get complaints about judges but there's really nothing I could do except bring it to their attention and hope that they would start court on time or whatever the complaints might be.

> It's just sort of a lot of headache and just, you know, extra time and responsibility, but you really, you know, sort of like you really can't – can't do with a lot about what's going on. You don't have that much authority really. It's frustrating.

[ECF No. 284-11 at 278:17–279:18; *see also* ECF No. 284-12 at 94:10–23 (Reinhart testifying that as Chief Judge he "set the central court schedules, created the weekend bond court schedule,

supervised . . . Ed Lewis[16] . . . [and was] ultimately . . . responsible for the central courts and central court staff, serv[ing] as a liaison for the magistrate's court to Lexington County – like, to do the budget and run my courts at the same time.")].

During the relevant time period, the Chief and Associate Chief Judges in Lexington County promulgated and implemented numerous policies and procedures to oversee administrative operations in the LCMC. [*See, e.g.*, ECF No. 284-12 at 81:25–87:25 (Reinhart directing Lewis to draft payment policy to "only support and provide greater detail to the Supreme Court order"); ECF No. 284-35 (same); ECF No. 284-31 (coordinating with Sheriff's Department on a procedure for discharges to Bond Court); ECF No. 284-32 (coordinating development and implementation uniform civil procedures for filing civil actions for the benefit of the public); ECF No. 284-33 (inclement weather policy); ECF No. 284-34 (courtroom media policy); ECF No. 284-36 (discussing emergency restraining order procedure for holidays and weekends)]. In 2019, for example, Adams, as Chief Judge, created a procedure to screen defendants in Bond Court for public defender eligibility. [ECF No. 284-11 at 366:18–368:5 ("So we were trying – the magistrates, we were trying to come up with ways that would just make the process better"); ECF No. 284-37 at 3; ECF No. 284-38; ECF No. 284-39 at 120:1–17, 154:6–19 ("[S]he called me up and told me we are going to do this . . . . I told her we were on board. And so she set a date, and we went through.").[17]

Reinhart has submitted a declaration, stating in part as follows:

---

[16] Edward Lewis ("Lewis") is and has been the Chief Court Administrator for the LCMC since 2005. [ECF No. 283-9 ¶ 2].

[17] As to a procedure to bring a defendant either back to the traffic court or to the Bond Court within 24 hours of being served with a bench warrant, such a procedure was not in place in 2017, but Lewis testified he could think of no reason why it could not have been implemented in January 2017. [ECF No. 284-26 at 242:8–246:22, *see also* ECF No. 284-40 at 5].

> [T]here is nothing that provides authority for the Chief Judge for Administrative
> Purposes of the Summary Courts in Lexington County or Associate Chief Judge for
> Administrative Purposes of the Summary Courts in Lexington County to create or
> implement policies that would affect the exercise of judicial authority by
> magistrates in individual cases . . . . [N]one of those listed responsibilities have ever
> been understood by me or any other Chief Judge in Lexington County (or as far as
> I know, by any Chief Judge) as authorizing the Chief or Associate Chief to adopt
> specific rules of decision or rules of procedure to govern the determination of
> individual cases.

[ECF No. 283-10 ¶¶ 12, 15; *see also id.* ¶ 16 ("Chief Judges or Associate Chief Judges could not have advised, much less ordered, magistrates to ignore or not to use the former Forms MC 2 and MC 15. Nor could Chief Judges or Associate Chief Judges have advised, much less ordered, county magistrates to ignore or not to use the 2018 forms that replaced those two forms.")].

> D.    Magistrate Judges are Required to Uphold the Constitution

South Carolina magistrate judges take the same judicial oath of office as every other member of the South Carolina Unified Judicial System. Within that oath is the promise to "preserve, protect and defend the Constitution . . . of the United States." S.C. App. Ct. R. 502.1. The South Carolina Summary Court Judges Bench Book ("Bench Book"), which is promulgated by the SCCA (or "court administration") and used to train magistrate judges, states:

> The Constitution of the United States and South Carolina are the fundamental law
> of our judicial system. All other laws, regardless of their source, must not conflict
> with the U.S. Constitution; and all state laws, regulations, and ordinances must not
> conflict with the S.C. Constitution. All magistrates and municipal judges must
> strictly heed the provisions of the Constitutions.

*See* S.C. Judicial Dep't, Summary Court Judges Benchbook, "General," ch. C § 1, "The Constitution," https://www.sccourts.org/summaryCourtBenchBook/ displaychapter.cfm?chapter=GeneralC#C1 (last visited August 20, 2022).[18]

---

[18] A court may take judicial notice of factual information located in postings on government websites. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (finding that court may "properly take judicial notice of matters of public record").

All South Carolina magistrate judges, although not required to be attorneys, are required to attend a two-week training and pass an exam, based on the contents of the Bench Book, before they can hear cases. [*See* ECF No. 284-11 at 313:15–315:2 ("[W]e rely on [the bench book] to do just about anything . . . . And in our initial training we go through that entire bench book and then have to take exams on it."); ECF No. 284-12 at 129:20–131:22]. The Bench Book contains information and directives on, among other things, state and federal statutes and case law, court rules, and judicial orders handed down by the SCCA. [ECF No. 284-17].

E.      LCMC Bench Warrants

As relevant here, South Carolina law provides as follows:

> In any offense carrying a fine or imprisonment, the judge or magistrate hearing the case shall, upon a decision of guilty of the accused being determined and it being established that he is indigent at that time, set up a reasonable payment schedule for the payment of such fine, taking into consideration the income, dependents and necessities of life of the individual. Such payments shall be made to the magistrate or clerk of court as the case may be until such fine is paid in full. Failure to comply with the payment schedule shall constitute contempt of court; however, imprisonment for contempt may not exceed the amount of time of the original sentence, and where part of the fine has been paid the imprisonment cannot exceed the remaining pro rata portion of the sentence.

> No person found to be indigent shall be imprisoned because of inability to pay the fine in full at the time of conviction.

> Entitlement to free counsel shall not be determinative as to defendant's indigency.

S.C. Code Ann. § 17-25-350.

The Bench Book provides as follows concerning bench warrants:

> A bench warrant, regardless of its form, however, may not be used to initiate a criminal action. It is a form of process to be used to bring a defendant back before a particular court on a particular charge for a specific purpose after the court has acquired jurisdiction over the defendant on that particular charge by virtue of a previously served proper charging paper.

[ECF No. 284-17, *see also* ECF No. 284-19 (South Carolina Office of Attorney General ("SCAG") advising Koon's predecessor, on May 23, 1980, that a bench warrant "should not be considered as authority to incarcerate an individual for the purpose of serving any sentence of imprisonment imposed by a magistrate")].

On March 16, 2016, Rosalyn W. Frierson ("Frierson"), court administrator for the South Carolina Judicial Department and a member of the CCJ/COSCA National Task Force on Fines, Fees and Bail Practices ("Task Force"), forwarded a letter to the South Carolina Magistrate Judges, stating as follows:

> I forward the attached letters regarding fines, fees and bail practices at the request of the Department of Justice [("DOJ")] . . . . Many of the issues raised by DOJ will be addressed by this Task Force with recommendations to be provided at a later date. As a note, I have been appointed to serve on the Task Force and I welcome any suggestions or commends to be considered in the recommendations.

[ECF No. 284-18 at 2]. The forwarded documents from the DOJ emphasize that due process and equal protection principles require that "[c]ourts must not incarcerate a person for nonpayment of fines and fees without first conducting an indigency determination and establishing that failure to pay was willful," further stating that "Courts must provide meaningful notice and, in appropriate cases, counsel, when enforcing fines and fees." *Id.* at 6.

Reinhart read the DOJ letter at the time it was sent and testified as follows:

> Q:      I guess my – my overall question is when you read the case law and the scenarios and the facts that were set forth in this – this memo – or the dear colleague letter attached, you know, to the e-mail, did you see any similarities at all between the way Lexington County Magistrate Courts were imposing on collecting fines and fees and some of the problematic behavior that was described in the letter attached to the e-mail?
> A:      I see how it was being done statewide – well, actually, nationally – but, yeah.
> Q:      But it was also occurring in Lexington County Magistrate Court as well?
> A:      As well as every other county in the state . . . .

[ECF No. 284-12 at 162:19–25, 167:22–168:12]. Reinhart further testified that he did nothing as Chief Judge to change administrative policies or practices in the LCMC to deviate from these unconstitutional practices. *Id.* at 165:2–14. He did not discuss the letter with anyone else in the LCMC or the SCCA, nor did he conduct any research on any of the U.S. Supreme Court cases cited in the letter. *Id.* at 165:16–167:12. Instead, Reinhart testified that based on the email from Frierson stating recommendations would be forthcoming, and because "[c]ourt administration regulates how we do business," Reinhart did not act. *Id.* at 165:2–167:12.

F.     Challenged Magistrate Judges' Practices

Lewis testified that in cases where a defendant appeared in court in the LCMC system, and was convicted via guilty plea or trial, and where a magistrate judge assigned a scheduled payment plan that a defendant failed to complete, physical copies of the schedule time agreements were kept in file drawers in the offices of each magistrate. [ECF No. 283-12 at 77:4–18]. Those files were periodically reviewed by each judge's staff. *Id.* If that review revealed that the person "ha[d] not made a payment or had any correspondence with our court for maybe many weeks or many months," the staff person "would take the case files to the magistrate to let the magistrate determine what the next step would be." *Id.* at 77:16–18. At that point, and on a case-by-case basis, the magistrate might "deem that the individual should be ruled back in a rule to show cause hearing to discuss an alternate payment plan." *Id.* at 77:24–78:2.[19] Alternatively, the magistrate might decide simply to issue a bench warrant.[20] As Lewis testified, "if the magistrate decided that a bench warrant should be issued, [staff] would prepare the bench warrant on behalf of the magistrate." *Id.*

---

[19] Defendants argue this is what happened, for instance, in the case of Darby and Wright. [ECF No. 283-1 at 25].

[20] Defendants argue this is what happened, for instance, in the case of Brown. [ECF No. 283-1 at 25].

at 34:15–17. The bench warrant was physically signed in ink by the magistrate and then physically

transferred to the Warrant Division of the Lexington County Sheriff's Department. *Id.* at 34:19–

35:2.

In the instances where the individual Plaintiffs did not appear, were tried in their absence,

and accordingly not given payment plans, the physical records were kept in a different drawer for

"guilty, not paid" cases, but "those types of – of records would be reviewed by the court." *Id.* at

80:20–23.

Adams testified as follows concerning the relevant practices of Magistrate Judges:

> We were trained that if a defendant was out on bond and obviously part of their
> bond restriction is to appear in court on their court date and if they did not come to
> court then we could issue a bench warrant for them failing to appear for court. Then
> also we – and – and this just wasn't Lexington County, I mean, the – you know,
> obviously we all are friends with magistrates around the state and – and, to my
> knowledge, we all had always done this, we would – if a defendant failed to come
> to court, we could try them in their absence if – if we need – if we had documents
> that they had received – received proper notice to be in court. We had bench warrant
> forms where we could try them in their absence and sentence them and issue a
> bench warrant for that and it would be, for instance, ten days jail or pay a fine, you
> know, ten days in jail or whatever.

[ECF No. 284-10 at 56:6–23; *see also id.* at 170:9–19 (testifying this practice was "widespread

and routine" as long as the defendant had "notice of their court date"); ECF No. 284-11 at 340:13–

341:7 ("Q. And did you do anything to monitor compliance with *Bearden* in your courts? A. Well,

in my own individual court, I just don't think I was taught that and understood that. After Chief

Beatty's instructions then that changed because we knew.")].[21]

Reinhart testified as follows:

---

[21] As discussed more below, on September 15, 2017, South Carolina Supreme Court Chief Justice
Donald W. Beatty issued a memorandum concerning some of the challenged Magistrate Judges'
practices. [*See* ECF No. 40-1].

Q:    Do you believe that not providing a person with a hearing to conduct an indigency determination or to consider alternatives to incarceration after their arrest is constitutional? . . . . On a nonpayment bench warrant.

A:    Again, it's – they would receive that hearing on the front end when they agreed to the time payment schedule.

Q:    Do you believe that they should have gotten a hearing after their arrest, before their incarceration for any reason?

A:    I believe our new procedures require – would require it. But actually now that would never happen under our new procedures.

Q:    At the time that you were chief judge?

A:    We did exactly what the forms from court administration allowed us to do.

Q:    . . . . When you [were] chief judge, did you believe that not providing a person arrested on the bench warrant issue[d] for failure to pay fines and fees, not having a hearing after their arrest complied with the constitution?

A:    Complied with the rules that we were given to follow at that time because the – again, they were told on the front end when they signed the time payment agreement, it was clear that if they failed to meet those requirements, that a bench warrant or a commitment would follow.

Q:    But you agree that regardless of the reason why a person arrested on a failure to pay bench warrant didn't get a hearing, the fact is that they didn't get a hearing after their arrest?

A:    They did not get a hearing after their arrest. No, sir.

Q:    And is there – is there a reason why in Lexington County a person didn't get a hearing after their arrest on a nonpayment bench warrant? And when I say a reason, is there a statute or an order or a policy that states that?

A:    Not a policy . . . No. The only thing that's there, again, is the time payment schedule where they waive their right to a hearing by agreeing to it and saying that – where it said a bench – bench warrant would happen. And I believe it also said that there would be no hearing. That form was changed by Judge Beatty in the new procedure.

[ECF No. 284-12 at 143:2–145:11 (objections omitted), *see also id.* at 148:11–17 (Reinhart testifying that a person arrested for nonpayment of fines and fees "weren't prevented access" to a public defender, in response to being asked whether such a person was provided access to a public defender)].

Lewis testified as follows:

Q:    [I]t's I believe undisputed that in June of 2017 people charged with crimes and convicted with crimes in Lexington County Magistrate Court were being arrested and incarcerated after bench warrants issued for nonpayment of fines and fees imposed in those cases. Is – is it your understanding that that was occurring in 2017?

A:    Yes.

Q:    Okay. And I believe it's undisputed that – that those people were typically taken to the detention center and not brought before a magistrate court judge but instead were held in the detention center for the period of time stated on the warrant unless they were able to pay the full amount of the fines and fees owed. Is that your understanding as well?

A:    Yes.

Q:    Okay. And the same is true with respect to people who were tried in absentia, they were being picked up on bench warrants, held in detention center without being brought before a magistrate court judge unless they were able to pay their fines and fees in full and that was the only way they'd get released otherwise they had to serve the full sentence. Is that your understanding as well?

A:    Only for jailable offenses

. . . . .

Q:    Does the Lexington County Magistrate Court system have any policies in place to ensure that magistrate judges are complying with the US constitution?

A:    Not to my knowledge.

[ECF No. 284-15 at 80:5–12, 130:24–132:3, 133:21–134:2 (citations omitted)].[22]

Reinhart has also submitted a declaration, stating in part as follows:

While Lexington County Magistrates, in the exercise of their judicial discretion, often followed similar sentencing and sentence-enforcement practices in cases where the pertinent facts were similar, those decisions were the result of the exercise of judicial authority in each individual case, and not the result of any direction from either the Chief Judge for Administrative Purposes of the Summary Courts in Lexington County or Associate Chief Judge for Administrative Purposes of the Summary Courts in Lexington County.

County magistrates never "automatically" issued bench warrants for the commitment of a person to jail in situations where a legal financial obligation had not been timely paid. Each case of nonpayment was reviewed by each magistrate on an individual case-by-case basis. Depending on each judge's decision in each individual case, the defendant might have received a letter from the court, or an Order to Show Cause. Another alternative was that a bench warrant may have been issued.

Even in cases where a bench warrant was issued, I and other judges would at times recall the bench warrant if a defendant got in touch with the court and showed that payment had been made, or if the defendant provided other information indicating

---

[22] Plaintiffs have dubbed these actions taken by the judges in LCMC as actions taken pursuant to two unwritten administrative policies and practices, the "Default Payment Policy" and the "Trial in Absentia Policy." [*See, e.g.*, ECF No. 284-1 at 20–21].

that the person would be likely to make the necessary payments without the need
for the bench warrant to remain in effect.

[ECF No. 283-10 ¶¶ 9–11; *see also* ECF No. 283-11 ¶ 28].

All of the bench warrants issued with respect to the named Plaintiffs used a statewide form

created by SCCA, promulgated in approximately 2007 and still in effect in 2016 and 2017, and

identified as the "MC 2" (Magistrate Court 2).  An example of this form is as follows:

STATE OF SOUTH CAROLINA )
COUNTY OF LEXINGTON )

**BENCH WARRANT**
5102P0384414

)
)
)

Case Number
5102P0384414

)

To any Lawful Constable or Officer:

WHEREAS: One Raymond Wright Jr on July 26, 2016 was convicted in this court of: DUS / Driving under suspension, license not suspended for DUI - 1st offense with sentence imposed/balance due of $666.93 Fine or Jail Time in the amount of 30 Days to run consecutively with any and all other sentences.

The Defendant was set up on monthly scheduled time payments and failed to comply with the order of this court. The defendant was scheduled for a Rule to Show Cause hearing on April 19, 2017 at 10am. The defendant failed to comply with judge's orders to make a payment of $100.00 by April 28, 2017 resulting in the issuance of this warrant. The new sentence is to be a fine of $416.93 or 10 days in Jail to run consecutively with any and all other sentences.

This order is to command you to take and convey him/her to the common jail. The keeper of said jail is hereby commanded to receive the said defendant and to safely keep until he/she shall be thereof discharged by due course of law; and for so doing, this shall be your good and sufficient warrant.

Witness: The due execution of this warrant on May 2, 2017.

Judge Arthur Myers
Traffic Court
139 East Main Street, Suite A
Lexington, SC 29072

This Bench Warrant is CERTIFIED FOR SERVICE in the ☐ County / ☐ Municipality of

_____ . The defendant is to be arrested and brought before me to be dealt with according to the law.

Signature of Judge          Date

27

[*See* ECF No. 283-11 ¶¶ 6, 10; ECF No. 283-2 at 3; ECF No. 283-3 at 3–4; ECF No. 283-4 at 5–6; ECF No. 283-5 at 6; ECF No. 283-6 at 5; ECF No. 283-7 at 3; ECF No. 283-8 at 8, 9, 13, 14, 18, 19; *see also* ECF No. 283-6 at 2–4 (MC 2 form used in Richland County)].[23]

The record indicates the MC 2 is no longer being used, but, during the relevant time period, these forms were made available by SCCA, were "mandated for use by Magistrates' Courts throughout the State," and "reflected the practice in magistrates' courts throughout the State as it already existed at the time." [*See, e.g.*, ECF No. 283-11 ¶¶ 6, 10–11, 13].

Adams has submitted a declaration stating in part as follows:

> At all times pertinent to the present case, and to the best of my recollection, whenever I permitted the defendant to enter into a Scheduled Time Payment plan, the plan was entered using Court Administration Form MC 15, which provided in part as follows:
>
> "I certify that all the foregoing information is true and I fully understand and accept the conditions of this payment schedule. Failure to appear as directed or failure to comply with the terms set forth in this payment schedule will result in a BENCH WARRANT/COMMITMENT being issued for my arrest and denial of any future requests for a scheduled time payment . . . ."

*Id.* ¶ 9.[24]

G.    The Setoff Debt Program

In July 2017, shortly after this lawsuit was filed, Adams and Lewis began discussing the option of implementing the "Setoff Debt Program" ("SDP") in the LCMC. As described by Lewis in an email to Adams:

---

[23] Form MC 2, and related forms, were later changed to direct a defendant to be brought before the court. [*See* ECF No. 283-16 at 3–4, 94–99].

[24] Form MC 15 was later changed to eliminate the "BENCH WARRANT/COMMITMENT" language. [*See* ECF No. 283-17 (bearing the inaccurate revision date of October 2014)]. The revised form now reads "Failure to appear as directed or failure to comply with the terms set forth in this payment schedule may result in the balance being referred to the Department of Revenue/Set Off Debt or Converted to a Civil Judgment." *See id.*

> This is a program that will allow our courts to collect outstanding money by having it taken out of an individual's tax return. I will prepare an email for you to send out to all Judges ordering them to inventory their outstanding Bench Warrants, NRVC's and STP files . . . .

[ECF No. 284-25 at 3]. As testified by Lewis:

> Basically when an individual fails to follow through with their scheduled time payment or if they fail to pay the court on a uniformed traffic ticket, at the end of the – once a year we would then migrate that information into a setoff debt system that goes to the state, the state can then attached that to their tax filing and deduct that from the tax filing.

[ECF No. 284-15 at 24:6–15, 48:8–15 (testifying that eventually Adams suggested implementation of this program); ECF No. 284-10 at 107:8–108:3 (Adams testifying that the SDP was a program suggested by the Chief Justice that she eventually made available "as an option" to the magistrate judges); ECF No. 284-26 at 261:7–21 (Lewis testifying that other Lexington departments used this program); ECF No. 284-27 (stating the LCMC will begin participating in the SDP in 2019)]. There was nothing preventing the Chief and Associate Chief Judges from implementing this program before 2017; ECF No. 284-11 at 302:9–303:14, 306:10–13; ECF No. 284-28 (Adams in an email stating "Chief Justice Beatty has recommended that we use the offset Debt program . . . [as] one of the tools he has suggested for us to use to collect fines, restitution, etc. in lieu of always using bench warrants for noncompliance to our sentences . . . . We [] talked about this for years but never took any action . . . ."); ECF No. 284-29].[25]

As Chief Judge, Adams directed Lewis and other court staff to look into the program. [ECF No. 284-11 at 294:7–295:3, 352:8–10 ("Q. Did you ask Ed Lewis and Carlie Woods to head that up? A. Yes."); *see also* ECF No. 284-30 (Adams asking another Magistrate Judge to investigate implementation of SDP). Adams organized staff and allocated work in relation to the optional SDP

---

[25] As to the current administration of this program, Lewis testified that the LCMC sends cases with overdue court debts to the SDP annually. [ECF No. 293-2 at 24:6–15].

so that the LCMC could handle its operations. [ECF No. 284-11 at 352:23–353:7 ("[E]ach district office, I mean, each judge had – they decided whether or not they wanted to participate . . . .")]. She also appointed the hearing officer for the SDP, who bears responsibility for handling protests from debtors participating in the program. *Id.* at 354:4–20.

H.     LCMC Practices After September 15, 2017

On September 15, 2017, Chief Justice Donald W. Beatty issued a memorandum titled "Sentencing Unrepresented Defendants to Imprisonment" ("Beatty Memorandum"), that provided the following:

> It has continually come to my attention that defendants, who are neither represented by counsel nor have waived counsel, are being sentenced to imprisonment. This is a clear violation of the Sixth Amendment right to counsel and numerous opinions of the Supreme Court of the United States. All defendants facing criminal charges in your courts that carry the possibility of imprisonment must be informed of their right to counsel and, if indigent, their right to court-appointed counsel prior to proceeding with trial. Absent a waiver of counsel, or the appointment of counsel for an indigent defendant, summary court judges **shall not** impose a sentence of jail time, and are limited to imposing a sentence of a fine only for those defendants, if convicted. When imposing a fine, consideration should be given to a defendant's ability to pay. If a fine is imposed, an unrepresented defendant should be advised of the amount of the fine and when the fine must be paid. This directive would also apply to those defendants who fail to appear at trial and are tried in their absence.
>
> I am mindful of the constraints that you face in your courts, but these principles of due process to all defendants who come before you cannot be abridged.

[ECF No. 40-1 (emphasis in original) (citing U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; S.C. Const. art. I, § 14; *Argersinger v. Hamlin*, 407 U.S. 25 (1972); *Scott v. Illinois*, 440 U.S. 367 (1979); *Alabama v. Shelton*, 535 U.S. 654 (2002); *Faretta v. California*, 422 U.S. 806, 835 (1975))].[26]

---

[26] The Beatty Memorandum was issued after Plaintiffs filed the instant lawsuit on June 1, 2017. [*See* ECF No. 1].

Some LCMC Magistrate Judges reacted by commenting on the "mess" they believed the Beatty Memorandum caused. [*See* ECF No. 284-20]. Adams testified during the annual mandatory program for summary court judges held in November 2017 ("2017 Mandatory Meeting"), a room full of magistrate judges "erupted" in surprise upon learning that these practices were unconstitutional, and Justice Beatty "had to calm everybody down and tell [them] to pay attention." [ECF No. 284-10 at 158:19–159:2; *see also* ECF No. 284-11 at 331:19–332:3 ("Q. Do you remember anything that was particularly confusing to the judges . . . [?] A. It kind of all was. I mean, those were some major changes and a lot of us have been judges for . . . 15 years or more.")]. Staff members within the LCMC also reacted with confusion. [ECF No. 284-21].

At the 2017 Mandatory Meeting, Renee Lipson ("Lipson") provided a 67-page SCCA 2017 PowerPoint presentation. [ECF No. 283-16 at 1, 7–74]. The PowerPoint presentation was given to over 400 summary court judges at the 2017 Mandatory Meeting and then repeated at six additional summary court judges' training sessions between March and August 2018. *Id.* at 1. Additionally, there were approximately thirteen new forms issued by the SCCA during the course of the 2017–2018 changes. *Id.* at 2.

While the 2017 Mandatory Meeting was ongoing, Adams directed Lewis to coordinate with Lexington County Sheriff's Department to "have all Lexington County Magistrate Court Bench Warrants temporarily recalled." [ECF No. 284-22 at 3; ECF No. 284-10 at 209:16–24 ("All of the magistrates were together at the mandatory meeting and . . . outstanding bench warrants was not directly covered in Renee's presentation so I asked a question and based on that answer I related that to the – to the judges and we all sort of decided that we needed to have them recalled"); ECF No. 284-11 at 326:16–24; ECF No. 284-15 at 198:2–13]. In an email in which Captain Mark W. Joyner of the Sheriff's Department asks whether the changes to bench warrants "affect

31

[magistrate bench warrants] state wide or just [in Lexington County]," Lewis responds, "I cannot speak on behalf of other counties." [ECF No. 284-23, *see also* ECF No. 284-24].

Nearly 6,000 bench warrants, spanning almost four decades, were recalled by the LCMC. [ECF No. 284-16; ECF No. 284-10 at 215:15–23; ECF No. 284-12 at 182:15–183:8]. Of these, 1,118 bench warrants were from Irmo Magistrate Court, where Adams is the only Magistrate Judge. [ECF No. 284-16 ("Lexington 463, Irmo 1,118, Batesburg 104, Swansea 537, Oak Grove 199, Cayce 408"). Adams testified that as a whole, "very few" bench warrants were reissued after an evaluation of their constitutionality, further testifying that as to those that were reissued, they involved

> something that maybe had a victim involved or somebody had failed to appear in court and they were out on bond and they violated their bond, the – that sort of thing. We – I – I did not reissue any that [were] just because somebody didn't complete their payment of their fine, those kinds of things, those have not been reissued and would not be at this point.

[ECF No. 284-10 at 213:20–214:10].

On November 9, 2017, Adams, who was serving as Chief Judge at the time, sent the following email:

> I know this is late notice. But . . . . . I would like for as many of us as possible to meet Thursday morning at 8:30. I know this is early to meet and late notice, but if you can rearrange your schedule to be there it would be great. I just want us to discuss these new procedures and make sure we all understand the memo and information. Also, maybe a little brainstorming and discussion to make sure we all understand the process we are required to follow now from the Chief Justice and the Court Administration. Judge Morgan is working on streamlining the information and I think Carlie and Colleen [staff members] are looking at this as well. Hopefully all of us have had a chance to study these new guidelines from the Court Administration and we will be ready to discuss.

[ECF No. 283-11 at 18].

On March 14, 2018, the SCCA also provided a memorandum to South Carolina Magistrate Judges detailing the changes implicated by the issuance of the Beatty Memorandum. [ECF No. 283-16 at 75–82]. This memorandum provided in part as follows:

> If you want to incarcerate a Defendant in one of the above situations, he must be rescheduled and informed of his right to counsel. No [trial in absentia] unless Defendant has waived counsel by conduct or affirmative waiver.
>
>  . . . .
>
> Policy underlying the Chief Justice's September 15, 2017 memo is to keep people out of jail unless their right to counsel is honored or waived.

*Id.* at 77–78. As further stated by Lispon, several previous forms, including Form MC 2, were "removed from the system," meaning that their use was being discontinued. *Id.* at 1. Lipson noted that "[t]hese bench warrants had the sentences on them and many courts and jails were using them as commitment orders." *Id.* at 2.

Regarding the bench warrants used to arrest Plaintiffs in this case, following the Beatty Memorandum, Koon testified "we don't see those bench warrants anymore, so [there's] no need to address policy for something that we don't deal with anymore." [ECF No. 283-15 at 45:16–46:24; *see also* [ECF No. 283-14 at 64:11–65:7, ECF No. 283-12 at 202:22–203:5; ECF No. 283-13 at 125:20–126:12].[27]

I.      Funding at the Public Defender System in the LCMC[28]

The public defender system in South Carolina is a "county-based system," whereby counties are grouped within the state's sixteen judicial circuits. S.C. Comm'n on Indigent Def.

---

[27] In the summary judgment hearing held by the court on June 29, 2022, the parties agreed that as of that time LCMC's relevant practices were constitutional following the issuance of the Beatty Memorandum and the LCMC and SCCA response thereafter.

[28] The evidence concerning the funding of the public defender system in the LCMC is put forth by Plaintiffs but not disputed by Defendants.

("SCCID"), SCCID Public Defenders, https://sccid.sc.gov/about-us/circuit-public-defenders (last visited August 20, 2022). The South Carolina Indigent Defense Act of 2007 requires each county to appropriate annual funding for indigent defense at no less than the amount it provided the immediate previous fiscal year. *See id.*; S.C. Code Ann. § 17-3-550. Madsen, a formerly named defendant in this action, is the Public Defender for the Eleventh Judicial Circuit of South Carolina, which includes the Lexington County Public Defender's Office ("LCPDO"). [ECF No. 284-39 at 8:22–9:6]. Under the Indigent Defense Act, circuit public defenders must "enter into an agreement with the appropriate county within the judicial circuit to administer the funds provided" for indigent defense in that county. S.C. Code Ann. § 17-3-560. The Act also provides that "the circuit public defender in each judicial circuit may maintain offices and employ . . . staff as necessary to provide adequate and meaningful representation of indigent clients within the counties." S.C. Code Ann. § 17-3-540(A). "These employees are employees of the administering county. . . . All personnel costs . . . must be paid by the administering county, but must be reimbursed to the administering county from operational funds provided to the circuit public defender office from county and state appropriated funds." S.C. Code Ann. § 17-3-540(B).

On June 30, 2009, Madsen entered into an "Intergovernmental Agreement" with Lexington County, which provides in part as follows:

- "The Public Defender shall comply with all Lexington County budget and financial policies, procedures, and ordinances";

- "The Public Defender agrees to follow the policies and procedures adopted by [Lexington] County for the purpose of processing applications for employment and extending offers of employment";

- "[Lexington] County shall fund the Public Defender Department in it[s] annual budget process as it does with County departments";

- "If there are insufficient funds in the P.D. Fund in [Lexington] County's sole discretion, the County may terminate employee positions and make any other cuts that are necessary";

- "All State funds shall be deposited into the [Lexington] County bank account or accounts created for the Public Defender. The Public Defender shall account for all state funds that it receives and shall direct that all state funds be deposited into the [Lexington] County P.D. Fund"; and

- "All funds from other counties within the Eleventh Judicial Circuit shall be deposited with Lexington County. The Public Defender shall be responsible for obtaining written agreements with such counties that are satisfactory to [Lexington] County."

[ECF No. 284-41 ¶¶ 4, 6, 8–11]. This operative agreement is the only one that has been in place between Lexington County and the Eleventh Circuit Public Defender since 2009. [ECF No. 284-39 at 29:19–30:1].

The LCPDO serves the magistrate, general sessions, and family courts within Lexington County. *Id.* at 14:10–15. Funding for the LCPDO comes from two sources: the state and Lexington County. *Id.* at 34:8–22. State funding is largely determined by Lexington County's population according to the 2010 census, but funding from Lexington County is based solely on budgeting decisions made by the Lexington County Council. *Id.* at 47:12–50:3, 169:24–171:5. Lexington County has never audited the LCPDO to determine whether it was "appropriately staffed for the public defense needs of all Lexington County court systems." [ECF No. 284-39 at 39:9–24; *see also* ECF No. 284-63 at 75:8–76:10]. Discussions about appropriate staffing for Lexington County's public defense needs have only come up through Lexington County's budget process, which requires Madsen to apply to Lexington County Council for funding each year. [ECF No. 284-39 at 39:9–24 ("Q. So no one's come to you affirmatively to just have that discussion; it only comes up when you're making budget requests for additional staffing? A. Correct."); *see also id.* at 47:12–50:3].

Madsen lacks discretion to hire new staff as necessary to provide adequate and meaningful representation of indigent clients within the counties. *Id.* at 8:22–9:6, 51:22–52:15. Randolph Poston, the Finance Director of Lexington County, testified that Lexington County Council is the final decisionmaker when it came to amounts appropriated for Lexington County's various departments. [ECF No. 284-63 at 41:16–43:18]. Any funding Lexington County allocates for public defense is generally tied to a specific employment position and if the request by Madsen is not approved, "that position is not created" at all. [ECF No. 284-39 at 51:22–52:15; *see also* ECF No. 284-63 at 145:14–22]. This leads to staffing shortages, Madsen says, and "it takes longer to get cases resolved[,] which results in people sitting in jail longer." [ECF No. 284-39 at 78:19–23].

Lexington County has historically funded, and continues to fund, indigent defense at a fraction of the funding that other South Carolina counties with similar populations provide and at a fraction of what it spends to fund its Solicitor's Office. [ECF No. 284-42 at 4, 7]. Madsen has repeatedly made funding increase requests to Lexington County Council for nearly all of the past twelve years, but the Council has denied or substantially reduced amounts allocated for nearly all of these requests. [ECF No. 284-39 at 55:3–56:16].

In 2010, for example, Madsen asked Lexington County to increase its funding for the LCPDO from $286,500 to $500,000. [ECF No. 284-43 (Madsen's 2010 letter to County); ECF No. 284-44 (Office of Indigent Defense Chart showing total County funding for 2009 to 2010)]. In doing so, he pointed out his office handles 70% of all General Sessions cases and almost all juvenile criminal cases in Lexington County but receives only 11.3% of the funding Lexington County provides for the Solicitor's Office. [ECF No. 284-43]. He also informed Lexington County it had only increased funding for the LCPDO by 0.018% over the previous seven years, despite a 100% increase in the number of adult clients his office had seen during that same period. *Id.*

That same year, Madsen provided the Council with a chart compiled by the state Office of Indigent Defense, showing county contributions for their public defenders' offices across the state. [ECF No. 284-43, ECF No. 284-44]. Madsen noted that even if Lexington County approved the "substantial" increase he requested, it would still be much smaller than the funding provided by other counties. [ECF No. 284-43]. Madsen informed the Council that the caseloads of the attorneys in the Public Defender's Office already "greatly exceed[ed]" the maximum set by the American Bar Association ("ABA"). *Id.*

Lexington County denied his request for additional funding. [*See* ECF No. 284-45 (Madsen's 2011 letter stating Lexington County's funding increase over previous eight years was still only 0.018%, indicating no increase was provided in 2010).] Madsen thereafter had to lay off some of his attorneys, necessarily leaving the remaining attorneys with even greater caseloads. [ECF No. 284-39 at 85:17–86:4]. Despite the economic recession at that time affecting Lexington County and its agencies more broadly, the LCPDO was the only County agency that year to lay off attorneys to cover its funding shortfall. *See id.*

In 2011, Madsen requested an increase in funding to $627,597, again citing Lexington County's disparate funding in comparison to other counties and the Solicitor's Office. [ECF No. 284-45]. Madsen noted that Lexington County ranked 37th out of 46 counties in per capita funding of public defenders' offices. [ECF No. 284-45, *see also* ECF No. 46]. He emphasized that due to the historical lack of funding which left him with minimal staff, another year without increased funding would force him to let go of attorneys and lead to a "catastrophic" effect on Lexington County's jail population. [ECF No. 284-45].

Lexington County only granted $386,500 in public defense funding, nearly $242,000 less than Madsen's request. [ECF No. 284-47 at 12]. Madsen was forced to lay off two additional

employees. [ECF No. 284-48 (2012 letter indicating Madsen "had to layoff [sic] two employees . . . severely hinder[ing] [their] ability to provide appropriate representation for [their] clients")].

In 2012, Madsen requested an increase in funding to $620,410. *Id.* Madsen informed the Council that despite the funding increase from the prior year, the LCPDO's budget was still just 15% of the funding the Solicitor's Office received. *Id.* Madsen again provided the Council with a chart showing that, even with the previous year's increase, Lexington County ranked 36th out of 46 counties in per capita funding of their indigent defense systems. [ECF No. 284-48, *see also* ECF No. 284-49]. Madsen also provided Lexington County with a report from the Office of Indigent Defense showing Lexington County had the highest average caseload per attorney out of the sixteen judicial circuits in the state—more than double the ABA standard. [ECF No. 284-48, ECF No. 284-50, ECF No. 284-51]. The Council denied his request entirely. [ECF No. 284-52 (indicating budget of $386,500, the same as in the previous year)].

In 2013, Madsen requested a funding increase to $514,806. *Id.* As part of this increase, Madsen asked Lexington County to fund two new attorney positions, one to practice in the Magistrate Courts and the other to practice in Family Court representing juveniles, because "neither area has received the Constitutionally mandated representation or attention they deserve." [ECF No. 284-52; *see also* ECF No. 284-39 at 62:8–64:15]. The Council approved nearly all the funds Madsen requested, allocating $514,306. [ECF No. 284-39 at 62:8–64:15 (Madsen indicting this was the first time a public defender was available to Magistrate Court defendants)].

In 2014, Madsen requested a substantially smaller budget increase of $26,990 to cover County-mandated pay raises. [ECF No. 284-53]. Lexington County denied Madsen's request. [ECF No. 284-53; *see also* ECF No. 284-39 at 70:12–72:24]. In 2015, Madsen requested the same increase of $26,990 which was again denied. [ECF No. 284-39 at 72:25–73:3; ECF No. 284-53].

In 2016, Madsen asked for an increase of $29,626 to cover County-mandated pay raises and $188,905 to fund three new attorney positions. [ECF No. 284-54; *see also* ECF No. 284-39 at 79:4–21]. Madsen informed the Council that he needed these new positions because the LCPDO had seen General Sessions caseloads increase by more than 600 new clients per year, which equaled the caseload of four attorneys under the ABA standard of 150 felony cases per attorney annually. [ECF No. 284-54]. Madsen went on to say these increases had caused problems with the current infrastructure, causing significant increases in the jail population and the length of time to resolve cases. *Id.* Lexington County approved the small funding increase for County-mandated pay raises but denied Madsen's request for three new attorney positions entirely. [ECF No. 284-39 at 79:4–21].

In 2017, Madsen did not request a funding increase, and Lexington County allocated the same amount as in 2016. [ECF No. 284-55, ECF No. 284-56 at 3].

In February 2018, during the first budget request cycle after Plaintiffs filed this lawsuit, Madsen asked for $1,129,538, more than double the budget approved in 2017. [ECF No. 284-57]. When asked why this request was so much higher than previous years, Madsen testified it was partly a reaction to being sued for not asking for enough money from Lexington County. [ECF No. 284-39 at 89:15–90:2].[29] When asked whether he thought his request was an appropriate amount for what the LCPDO needed to provide services to indigent people in Lexington County courts, Madsen answered:

> Well, I would say . . . that number was even low, but I thought that [it] was potentially relatively realistic and palatable. Like I said, if I go in and ask for $5 million, I know that I am just going to get laughed out of there, and it's – they just would not consider that realistic, even if that's what we needed to do our job. And

---

[29] As stated above, Madsen was originally named as a defendant in this lawsuit but claims against him were voluntarily dismissed by Plaintiffs.

so, like I said, I'm trying to kind of toe that line a little bit to what I think is potentially palatable and to kind of move the funding in our office forward.

*Id.* at 91:1–11.

Madsen again told the Council that Lexington County had historically underfunded the LCPDO and that it was currently receiving only 19% of the funding the Solicitor's Office received. [ECF No. 284-57]. He reiterated, as with prior years, that the substantial increase was necessary to bring the office in parity with similarly populated counties. *Id.* As part of the funding request, Madsen asked Lexington County to create three new attorney positions, one of which would become the second attorney available to represent indigent defendants in the LCMC. [ECF No. 284-57, ECF No. 284-64 at 4]. Lexington County Council denied Madsen's request for increased funding. [ECF No. 284-39 at 95:18–96:11].

In 2019, Madsen asked Lexington County to increase indigent defense funding from $543,932 to $1,024,531, with yet another reminder that Lexington County had historically underfunded the LCPDO relative to similarly populated counties and the Solicitor's Office. [ECF No. 284-58]. As part of the funding increase, Madsen again asked Lexington County to create three new attorney positions. *Id.* Lexington County granted a total of $785,614. [ECF No. 284-39 at 124:4–18]. As a result, Madsen was only able to hire one attorney to be split between the Magistrate and Family Courts. [ECF No. 284-39 at 124:4–18, ECF No. 284-4 at 26 ("A second public defender [for the LCMC] began September 23, 2019.")].

In 2020, Madsen asked for a funding increase to $920,390 and the addition of an investigator for the LCPDO. [ECF No. 284-59]. Lexington County denied his request, and the

investigator position was not created. [ECF No. 284-39 at 125:1–16]. In 2021, Madsen asked for another funding increase to $1,229,198, which was also denied in full. [ECF No. 284-60].[30]

Lexington County provides roughly half the amount of funding for public defender services provided by the comparably populated South Carolina counties of York and Horry. [ECF No. 284-4 at 39].[31] For fiscal year 2017, Lexington County allocated only $543,932 for public defender services. *Id.* at 38. York and Horry Counties allocate $1,353,465 and $1,092,214, respectively. [ECF No. 66-6 at 8]. For fiscal year 2020, Madsen requested $1,129,538 in funding—but only received $785,614—which is 24% of the funding Lexington County provided to the Solicitor's Office that same year. [ECF No. 284-4 at 38]. According to Madsen, public defense funding in Lexington County is still "not . . . equal to other counties [of similar] size." [ECF No. 284-39 at 53:8–16 ("[A]t the last census we [had] 260,000 residents. Aiken County [had] 160,000 residents . . . . They get $1.9 million from their county, and we're [$785,000] and change.")].[32]

---

[30] Plaintiffs have put forth evidence from their expert, Edward C. Monahan ("Monahan"), that "Lexington County is substantially underfunding the public defender office" compared both to similarly populated counties statewide and to the funding Lexington County provides to the Solicitor's Office. [ECF No. 284-4 at 8, 38]. Monahan found that "[g]iven the comparisons to other South Carolina counties, the data is clear that the [LCPDO] is underfunded . . . mean[ing] that the [LCPDO] is not receiving the minimally adequate financial resources to provide meaningful representation to all eligible clients in [the LCMC]." *Id.* at 38.

[31] According to 2020 U.S. Census estimates, Lexington County has a population of 293,991, while York County has a slightly smaller population of 282,090 and Horry County has a slightly larger population of 351,029. U.S. Census Bureau, Lexington County, S.C., QuickFacts, https://www.census.gov/quickfacts/fact/table/horrycountysouthcarolina,yorkcountysouthcarolina, Lexingtoncountysouthcarolina/POP010220#POP010220 (last visited August 17, 2022).

[32] Plaintiffs have put forth calculations from Monahan estimating that between 6,107 and 6,980 of the cases pending in the LCMC in 2019 involved indigent defendants facing incarceration as a possible sentence. [ECF No. 284-4 at 24]. But only 795 cases involved a public defender—an appointment rate of 9%—which is substantially lower than the 70% appointment rate in Lexington County General Sessions Court. *Id.* From this, Monahan estimated there were approximately 5,312 to 6,185 cases where indigent defendants were prosecuted in the LCMC without the assistance of counsel on charges carrying incarceration as a possible outcome. *Id.* Monahan also concluded that

There are currently only two public defenders assigned to represent all indigent defendants in cases handled by the LCMC, though funding has recently been made available for a third. [ECF No. 284-26 at 337:14–338:3]. In 2013, when Lexington County provided funding for its first public defender to represent indigent defendants in the LCMC, that public defender's caseload quickly exceeded the ABA standard of 400 misdemeanor cases annually. [ECF No. 284-61 at 10, ECF No. 284-4 at 29]. And in 2019, when Lexington County provided funding for a second, part-time public defender in the LCMC, both public defenders had average caseloads that exceeded the ABA maximum within the first year. [ECF No. 284-62 at 8]. Madsen testified that the two public defenders are still over the ABA standard. [ECF No. 284-39 at 129:19–130:7]. In 2020, these two public defenders handled "over 1,300 cases" combined. *Id.* at 130:13–15.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. American Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party makes this threshold demonstration, the non-moving party may not rest upon mere allegations or denials averred in the pleading, but rather must, by affidavits or other

---

this 9% appointment rate "result[s] in 91% of [LCMC] cases prosecuted with the defendant not being afforded a lawyer," pointing to a "tragic picture of the pattern and practice of systemic denials of constitutional rights in [the LCMC]." [ECF No. 284-4 at 43; *see also* ECF No. 284-39 at 127:15–25 ("Q. Do you have any reason to dispute the [9% appointment rate] that he put in his report . . . ? A. No.")].

means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56; *see also Celotex Corp.*, 477 U.S. at 323. A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). A litigant is unable to "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1996).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citing *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). "[T]he court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id.* (citing *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

## ANALYSIS & DISCUSSION

A civil action brought pursuant to 42 U.S.C. § 1983 provides a means to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States, but the statute is not, itself, a source of substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). "Section 1983 imposes liability on any person who, under the color of state law,

deprives another person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Doe v. Kidd*, 501 F.3d 348, 355 (4th Cir. 2007) (citing 42 U.S.C. § 1983). "Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).

To establish causation under 42 U.S.C. § 1983, a plaintiff must show an "affirmative causal link" between acts or omissions of the culpable actor and the constitutional injury. *Slakan v. Porter*, 737 F.2d 368, 376 (4th Cir. 1984). Causation can be established in a variety of ways, including by evidence that the defendant violated the constitution through direct intervention, *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 735 (4th Cir. 2013), by implementing or failing to remediate an unconstitutional policy, *Gordon v. Schilling*, 937 F.3d 348, 360 (4th Cir. 2019), or by failing to adequately train or supervise a subordinate officer, *Shaw v. Stroud*, 13 F.3d 791, 800 (4th Cir. 1994). Additionally, a local governmental entity can be held liable as a person under 42 U.S.C. § 1983 when its "policy or custom" is the "moving force of the constitutional violation." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

As stated above, Plaintiffs argue Defendants, acting under color of state law, have violated their Fourteenth (Claims One, Four, and Seven), Sixth (Claims Two, Five, and Eight), and Fourth Amendment rights (Claims Three and Six). Before turning to these claims, however, the court must address Defendants' preliminary arguments as to mootness, abstention, and immunity, and waiver.

## I.     Preliminary Issues

### A.     Mootness as to Plaintiffs' Claims for Prospective Relief

As previously discussed by this court, ECF No. 84 at 27, "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Telco Commc'n, Inc. v. Carbaugh*, 885 F.2d 1225, 1230 (4th Cir. 1989) (citations omitted). "There is, however, a well-recognized exception to the mootness doctrine holding that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Porter v. Clark*, 852 F.3d 358, 364 (4th Cir. 2017) (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). This "exception 'traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Id.* (citing *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)).

To assert voluntary cessation, a defendant must show that "'it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. (TOC) Servs., Inc.*, 528 U.S. 167, 190 (2000); *see also Telco*, 885 F.2d at 1231 (recognizing that "[j]urisdiction, however, may abate if there is no reasonable expectation that the alleged violation will recur and 'interim events have completely and irrevocably eradicated the effects of the alleged violation'") (citations omitted)).

The Fourth Circuit's opinion in *Wall v. Wade*, 741 F.3d 492 (4th Cir. 2014), is instructive. In that case, the court reviewed the application of a state prison's policy conditioning an inmate's request for a religious accommodation on his possession of physical indicia of faith. *Id.* at 494. In support of prison's position that the questioned policy had been abandoned, defendants offered a new policy via a memorandum by the relevant department of corrections' chief of corrections operations. *Id.* at 496. The Fourth Circuit held as follows:

> We have no difficulty concluding that the defendants failed to meet their "heavy burden" of establishing that it is "absolutely clear" the 2010 Ramadan policy will

not be reinstated. Unsubstantiated assurances in their appellate brief aside, the defendants have failed to put forth even a single piece of evidence establishing that the practice of requiring physical indicia of faith has been terminated once and for all. The September 13, 2011 memorandum describing VDOC's purported change in policy . . . also fails to establish that VDOC will not reinstate the policy following completion of this lawsuit. We have previously held that when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot. *Town of Nags Head v. Toloczko*, 728 F.3d 391, 395 n. 3 (4th Cir. 2013); *Pashby v. Delia*, 709 F.3d 307, 316 (4th Cir. 2013); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001). Nothing in the memo suggests that VDOC is actually barred—or even considers itself barred—from reinstating the 2010 Ramadan policy should it so choose. To the contrary, the fact that at least three separate policies have been utilized at ROSP since 2009 indicates some degree of doubt that the new policy will remain in place for long.

*Id.* at 497 (select citations omitted).

Here, the court is unconvinced that Defendants have met their "heavy burden" of establishing that Plaintiffs' claims for prospective relief have been rendered moot by, as argued by Defendants, the issuance of the Beatty Memorandum as well as actions taken thereafter by the SCCA.

First, the Beatty Memorandum is limited in scope and nonbinding in application and does not address all aspects of the conduct challenged by Plaintiffs in that it does not specifically reference the Fourteenth Amendment, only the Sixth Amendment. *See* [ECF No. 40-1.] Nor does it directly address *Bearden* or the type of hearing required by *Bearden*, stating only "[w]hen imposing a fine, consideration should be given to a defendant's ability to pay." *Id.*

Second, although the abandonment of the previously used SCCA forms and substitution of new forms indicates a more permanent change to policy than that found in *Wade*, as does the presentation made by Lipson at the 2017 Mandatory Meeting, ECF No. 283-16 at 81 (indicating direction was given that "[i]f after trial, Defendant has a jail sentence suspended upon payment of fine and Defendant does not pay the fine, the court must perform [a] *Bearden* . . . analysis"), as correctly pointed out by Plaintiffs, just as easily as these new policies and forms were adopted,

they could be repealed or superseded. [ECF No. 290 at 22]. There is simply no evidence in record of the requisite permanence of change required to find Plaintiffs' claim moot under voluntary cessation case law. *See, e.g.*, *6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393, 407 (4th Cir. 2019) ("Promulgating new forms may well have been the right thing to do in accordance with state law . . . . [But] [t]he mootness doctrine ordinarily does not extend to situations where a party quits its offending conduct partway through litigation." (citing *Friends of the Earth, Inc.*, 528 U.S at 189–94))).

Finally, as the Fourth Circuit recognized, Defendants undermine their mootness arguments when they deny the wrongfulness of their prior conduct. *See, e.g.*, *Porter*, 852 F.3d at 365 (denying mootness in part because defendants repeatedly declined to explicitly acknowledge prior existence of unconstitutional conditions of confinement or to offer explicit guarantees not to revert to constitutionally deficient conditions).[33]

Defendants rely on *United States v. Jones*, 136 F.3d 342 (4th Cir. 1998), to argue otherwise. *Jones* involved an appeal of a district court's order enjoining the Citadel, a state-supported military college, from resuming its male-only admission policy. *Id.* at 343–44, 346. The Fourth Circuit vacated the district court's order granting injunctive relief, finding the grant of relief moot because defendants had "pointed to powerful evidence that 'there is no reasonable likelihood that the wrong will be repeated.'" *Id.* at 348–49 (citation omitted).

---

[33] Defendants argue, in attempting to distinguish both *Wade* and *Porter*, that these cases "involved easily-changeable decisions by state correctional executives" that had "nothing . . . comparable to the Chief Justice's level of commitment to the 2017–2018 changes, and in terms of federal-state comity, those governmental defendants were a number of rungs down the ladder from a state's chief justice." [ECF No. 292 at 15 n.7]. However, in *Wade*, the Fourth Circuit, without providing a caveat concerning title, has instructed that "bald assertions of a defendant—whether governmental or private—that it will not resume a challenged policy fail to satisfy any burden of showing that a claim is moot." 741 F.3d at 498.

The type of evidence presented in *Jones* is not present here. First, the Citadel adopted a coeducation policy "immediately after" the Supreme Court's decision in *United States v. Virginia*, 518 U.S. 515 (1996), holding that Virginia Military Institute's male-only admissions policy was unconstitutional. *Jones*, 136 F.3d at 345–48. Second, the Citadel "manifested" its intention to not revert to the male-only admissions policy when it subsequently "negotiated and agreed to a consent decree with the [United States] government, to which it [was] now legally bound." *Id.* at 348; *c.f. Feldman v. Pro Football, Inc.*, 419 F. App'x 381, 387–89 (4th Cir. 2011) (denying mootness argument because defendants had not "made an affirmative showing that the continuation of their alleged ADA violations [was] 'nearly impossible'" (citing *Lyons P'Ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001))).

Defendants additionally cite *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 187 (4th Cir. 2021). In determining mootness in that case, the Fourth Circuit noted there was no "reasonable expectation that the same complaining party will be subjected to the same action again," where there "is no whiff of any of the opportunism, on the part of the defendant, that typically supports invocations of mootness exceptions where voluntary cessation of the challenged conduct is at issue." The Fourth Circuit then explained that the Office of Special Counsel withdrew the relevant guidance "not with the aim of avoiding judgment in court, but in response to the outcome of the presidential election" in that after

> Donald Trump was no longer a candidate for public office, it made no sense for OSC to maintain guidance that hinged on the fact that he was. Under these conditions, the unreasonableness of expecting the challenged conduct to recur is "absolutely clear" . . . .

*Id.* at 188. (citations omitted).[34]

---

[34] Cases cited by Defendants as to legislative immunity are inapplicable here where the record does not indicate that Justice Beatty issued an order applicable to the challenged practices. *See*

For the reasons already discussed, the present record does not indicate this level of clarity.[35]

Accordingly, the court denies Defendants' motion for summary judgment based on the issue of mootness.

B.    *Younger* Abstention as to Plaintiffs' Claims for Prospective Relief

As previously noted by this court, ECF No. 107 at 13, in *Younger v. Harris*, 401 U.S. 37 (1971), "the Supreme Court detailed 'our national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances.'" *Nivens v. Gilchrist*, 444 F.3d 237, 241 (4th Cir. 2006) (citing *Younger*, 401 U.S. at 41). As the Fourth Circuit explained, "the *Younger* doctrine is anchored in a 'belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'" *Id.* As to this issue, the Fourth Circuit's recent opinion in *Jonathan R. by Dixon v. Just.*, 41 F.4th 316 (4th Cir. 2022), is instructive.[36]

---

*Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006) ("When a legislature amends or repeals a statute, a case challenging the prior law can become moot 'even where re-enactment of the statute at issue is within the power of the legislature.' Only if reenactment is not merely possible but appears probable may we find the harm to be 'capable of repetition, yet evading review' and hold that the case is not moot.") (citations omitted)); *Gallas v. Supreme Ct. of Pennsylvania*, 211 F.3d 760, 776–77 (3d Cir. 2000) (holding an order issued by the Pennsylvania Supreme Court was "substantively and procedurally legislative" and subject to legislative immunity). The record reveals such an order could have been issued where Justice Beatty issued an order mandating the use of some of the new SCCA documents, but as to the new SCCA orders relevant to this case, Justice Beatty issued only an administrative order stating they were approved for use. [*See* ECF No. 283-16 at 84–89, 100–101].

[35] The court also rejects as insufficient Defendants' argument, submitted without evidentiary support, that "[a] willful failure to follow clear precedent or a detailed SCCA directive could presumably subject a judge to a . . . suspension." [*See* ECF No. 292 at 16].

[36] *Dixon* was issued on July 20, 2022, after the parties had completed briefing on the currently pending cross motions for summary judgment.

In *Dixon*, thousands of West Virginia's foster children brought a challenge to the State's administration of child welfare services, complaining in part of "beleaguered city employees trying their best to provide necessities while plagued with unmanageable caseloads, staff shortages, and budgetary constraints," arguing their constitutional and statutory rights had been violated— including their Due Process rights. *Id.* at 320. The court described the system at issue, noting that while the Department of Health and Human Resources ("DHHR") maintains responsibility for planning and delivering the care to the foster children, state circuit courts supervise the DHHR via "quarterly status reviews." *Id.* The foster children sought numerous forms of relief, including increases in staffing and "a neutral monitor to oversee the Department's compliance with district-court orders." *Id.* at 323.

The district court dismissed the case, in part, based on *Younger* abstention. The Fourth Circuit reversed, discussing at length *Younger* and its progeny including the impact of the Supreme Court's decision in *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013), and summarizing the current test to be applied as follows:

> Having surveyed dozens of cases, the Court could now map out *Younger's* heartland: "criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 78, 134 S.Ct. 584 (cleaned up) (citations omitted). Unanimously, the Court held those three categories "define *Younger's* scope," for capping abstention to those "exceptional circumstances" appropriately harmonized the comity interest *Younger* originally espoused with the federal courts' "obligation" to adjudicate federal questions. *Id.* at 77–78, 134 S.Ct. 584 (citation omitted).

> *Sprint* thus recast the earlier cases. Rather than establish anew in each case whether federal proceedings threaten important state interests or may interfere with state proceedings or whether litigants could have easily raised their federal claims in those state proceedings—the so-called *Middlesex* factors—*Sprint* directs courts to a rule of thumb: if the case falls into one of the three settled categories, courts should go on to determine if federal involvement will in fact put comity at risk, but if the case does not, courts need go no further, they can properly entertain their federal-question jurisdiction without worrying about stepping on state toes.

*Dixon*, 41 F.4th at 328–29.

Here, as pointed out by Plaintiffs, although Defendants have invoked *Younger* multiple times throughout this case, they fail to make any argument that this case falls into one of the three settled categories. [ECF No. 290 at 29–30, *see also* ECF No. 35 at 30–36, ECF No. 107 at 13–15 (this court's July 10, 2018 order holding that *Younger* abstention did not apply)].[37] Instead, Defendants argue that the prospective relief that Plaintiffs seek is barred by the Supreme Court's decision in *O'Shea v. Littleton*, where plaintiffs sued the State's Attorney, his investigator, and the police commissioner, seeking to enjoin, in part, the practice of officials setting bond without regard to the facts of individual cases and as punishment. The Supreme Court dismissed the complaint because it requested "an ongoing federal audit of state [court] proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris* . . . sought to prevent" that would lead to "continuous or piecemeal interruptions of the state proceedings" and require "the continuous supervision by the federal court." 414 U.S. 488, 500–501 (1974).

---

[37] The parties dispute whether this holding is the law of the case and binding on the parties regarding their currently pending motions. The court's previous holdings, in denying motions for summary judgment, do not constitute law of the case on the *Younger* issues. *See, e.g., Washington v. Digital Equip. Corp.*, No. 91-1217, 1992 WL 167946 (4th Cir. July 21, 1992) ("The determination not to grant summary judgment is not the kind of final judgment of an issue that requires application of the law of the case rule. A decision not to grant summary judgment does not resolve any factual or legal issue. . . .") (emphasis in original)); *see also, e.g., Fred Segal, LLC v. CormackHill, LP*, 821 F. App'x 783, 786 (9th Cir. 2020) ("[T]he denial of a summary judgment motion is never law of the case because factual development of the case is still ongoing." (citing *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc))). Also, "[a] district court 'retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted.'" *Liberty Mut. Fire Ins. Co. v. J.T. Walker Indus., Inc.*, 835 F. Supp. 2d 104, 106–07 (D.S.C. 2011) (citing *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003)).

Relying on *O'Shea*, Defendants argue that if the court were to grant the relief sought by Plaintiffs, "a very real chance of conflict between this court and the states courts" could result, where "[Lexington County] magistrates would not be bound by an order directing the County to fund indigent defense lawyers, so [they] would not be prevented from proceeding with cases regardless of whether the requisite amount of indigent defense lawyers were available or not." [ECF No. 292 at 20–21].

> Plaintiffs respond that this case is unlike *O'Shea* because:
>
> As to Lexington County's failure to adequately fund indigent defense (Claim Two), Plaintiffs are asking the Court to order Lexington County to hire an independent consultant to determine the resources necessary to fulfill *Gideon's* promise in the LCMC and to take immediate steps to gain compliance with those recommendations. ECF No. 284-1 at 49. This is not a request to oversee ongoing trial proceedings; rather, Plaintiffs seek injunctive relief to help identify measures necessary to bring Lexington County into compliance with Sixth Amendment guarantees.

[ECF No. 290 at 30–31, *see also* ECF No. 284-1 at 49 ("Until Lexington County can meet this constitutional requirement, Plaintiffs ask the Court to prohibit the LCMC from jailing any defendant for whom a public defender cannot be assigned.")].[38] In support of their position, Plaintiffs rely on *Wilbur v. City of Mount Vernon*, 989 F. Supp. 2d 1122, 1137 (W.D. Wash. 2013). In that case, the court held municipalities liable under 42 U.S.C. § 1983 for operating a public defense system with "systemic flaws that deprive indigent criminal defendants of their Sixth Amendment right to the assistance of counsel." *Id.* at 1131. The court found that because of

---

[38] As noted by Defendants, Plaintiffs' expert has recommended that Lexington County should employ 13–15.5 public defender attorneys for use in the magistrates' court. [ECF No. 289 at 8]. However, Plaintiffs have not requested the implementation of this recommendation, and, in the summary judgment hearing held by the court on June 29, 2022, Plaintiffs' counsel indicated that the relief sought against Lexington County is limited to an independent consultant determining only how many additional public defenders are need in LCMC, that number being reported back to the court and the court issuing an order as to that number.

"deliberate choices of City officials charged with the administration of the public defense system," the defendant cities made "[i]ntentional choices . . . while negotiating the public defender contracts and allocating funds to the public defender system." *Id.* at 1132. The court further observed that "[l]egislative and monitoring decisions made by the policymaking authorities of the Cities ensured that any defects in the public defense system would go undetected or could be easily ignored." *Id.* It found the cities liable due to "the combination of contracting, funding, legislating, and monitoring decisions made by the[ir] policymaking authorities," which led to the systematic deprivation of indigent defendants' rights guaranteed by the Sixth Amendment. *Id.* at 1133. The court held as follows:

> The Court is sensitive to the Cities' interests in controlling the manner in which they perform their core functions, including the provision of services and the allocation of scarce resources. Having chosen to operate a municipal court system, however, defendants are obligated to comply with the dictates of the Sixth Amendment, and the Court will "not shrink from [its] obligation to enforce the constitutional rights of all persons." *Brown v. Plata*, —— U.S. ——, 131 S.Ct. 1910, 1928, 179 L.Ed.2d 969 (2011) . . . . The Cities shall hire one part-time Public Defense Supervisor [to determine that public defenders' actions are constitutionally compliant].

*Id.* at 1134–37.[329]

Plaintiffs additionally rely on *Tucker v. City of Montgomery Board of Commissioners*, 410 F. Supp. 494, 506–08 (M.D. Ala. 1976), where plaintiffs brought class action claims under 42 U.S.C. § 1983 alleging in part that the City of Montgomery and its municipal judges (called "recorders") had failed to furnish counsel to indigent people in violation of the Supreme Court's holding in *Argersinger*. Specifically, the plaintiffs alleged that they and other indigent people were denied court-appointed counsel because the city failed to make adequate counsel available. *Id.* at

---

[39] As noted by Defendants, the court in *Wilbur* did not address federalism concerns or discuss *Younger*, *O'Shea*, or other related cases.

506–07. The court agreed and held the plaintiffs were "entitled to an injunction requiring that the practice of failing to furnish prompt and effective counsel to those persons entitled to it under *Argersinger* be promptly terminated." *Id.* at 507. The court ordered the mayor and chief municipal judge to file a plan within 30 days setting forth:

> [The] means and methods for furnishing counsel; means to make known to accused persons that if they are indigent they are entitled to appointed counsel; means to determine the indigency or nonindigency of persons who desire appointed counsel; means to record for each accused person the existence and the name of counsel if retained, the request or absence of request for appointed counsel if there is no retained counsel, the result of a determination of indigency or nonindigency for each person requesting appointed counsel, and the name of counsel where appointed.

*Id.* at 507–08. The court reasoned that such relief was not foreclosed by the *Gardner* court's[430] refusal "to establish minimum standards of constitutional effectiveness for representation of indigents . . . . [because] [t]he thrust of the *Gardner* complaint was the quality of representation rendered indigent defendants by public defenders," whereas *Tucker* focused on the availability of representation after defendants were arrested. *Id.* at 508 n.19.[41] The court held that where the availability of indigent defense is at issue, "equitable relief can be fashioned which guarantees protection of the right to counsel." *Id.*; *see also Johnson v. Solomon*, 484 F. Supp. 278, 294–95 (D. Md. 1979) (rejecting comity and abstention arguments under *Younger* and *O'Shea*, granting injunctive relief to the class, and ordering defendants, including a circuit court judge, to "file a plan with the Court outlining the means through which the right to counsel will be implemented" within thirty days) (citing *Tucker*, 410 F. Supp. at 507–08); *Gilliard v. Carson*, 348 F. Supp. 757, 762 (M.D. Fla. 1972) (holding that injunctive relief prohibiting prosecution of arrestees without

---

[40] The *Gardner* opinion is discussed more below.

[41] The court in *Tucker* did consider both *Younger* and *O'Shea* but rejected defendants' arguments about comity and federalism concerns before ordering the requested relief. 410 F. Supp. at 501.

providing access to counsel "is fully consistent with the views of comity and federalism expressed

in . . . [*Younger*] and companion cases").[42]

In *Dixon*, the Fourth Circuit also addressed arguments concerning *O'Shea* as follows:

> Even so, West Virginia protests, the federal relief Plaintiffs seek—particularly the appointment of the monitor—will occasion "an ongoing federal audit of" the state periodic hearings, à la *O'Shea* . . . . But *O'Shea* does not resemble this case in any way that matters. There, plaintiffs complained that various judicial and prosecutorial officials colluded to curtail their civil rights, and the only two defendants before the Supreme Court were a magistrate and a county circuit judge. 414 U.S. at 500, 94 S.Ct. 669. So right from the start we observe that any relief in *O'Shea* would necessarily run against the courts. But even setting that difference aside, what troubled the Court most in *O'Shea* was "how compliance might be enforced if the beneficiaries of the injunction were to charge that it had been disobeyed." *Id.* at 501, 94 S.Ct. 669. Plaintiffs complained that officials set bond in criminal cases without regard to the facts of individual cases and as punishment and that state courts imposed higher sentences on African American citizens. *Id.* at 492, 94 S.Ct. 669. And the only way the Court believed it could change those practices was by "controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials"—which would require both an "interruption of state proceedings" and "an ongoing federal audit of" them. *Id.* at 500, 94 S.Ct. 669. None of that is true here. The district court can offer meaningful relief solely by monitoring executive action.

> This case instead resembles *Gerstein*, which challenged Florida's practice of detaining defendants before trial on a prosecutor's information alone, without judicial determination of probable cause. 420 U.S. at 105–06, 95 S.Ct. 854. As the Court explained, any injunction in that case would not be "addressed to a state proceeding and therefore would not interfere with the criminal prosecutions themselves." *Moore*, 442 U.S. at 431, 99 S.Ct. 2371 (discussing *Gerstein*, 420 U.S. at 108 n.9, 95 S.Ct. 854). And so it is here.

*Dixon*, 41 F.4th at 334.

The relief sought by Plaintiffs as to Claim Two against Lexington County, when compared

to the relief sought by plaintiffs in *Dixon* against DHHS, directs denial of Defendants' motion for

summary judgment as to the issue of abstention, notwithstanding that *Dixon* was decided on a

---

[42] Plaintiffs also cite *Miranda v. Clark Cty., Nevada*, 319 F.3d 465, 471 (9th Cir. 2003), which affirmed the denial of a motion to dismiss a Sixth Amendment claim based on an alleged "deliberate pattern and policy of refusing to train lawyers for capital cases. . . ."

motion to dismiss.[43] As emphasized by the Fourth Circuit, "Plaintiffs do not challenge any state statutes or any state-court judgments. They object only to Department practices that have allegedly resulted in severe delays, inadequate care, and outright abuse on grounds that they violate the Due Process Clause . . . ." 41 F.4th at 323. Here, too, Plaintiffs do not challenge any state statutes or any state-court judgments but only object to Lexington County's practices of underfunding that have resulted in violations of Plaintiffs' Sixth Amendment right to counsel. The Fourth Circuit also notes:

> In this case, principles of federalism not only do not preclude federal intervention, they compel it. Plaintiffs bring federal claims, and federal courts "are obliged to decide" them in all but "exceptional" circumstances. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72, 73, 134 S.Ct. 584, 187 L.Ed.2d 505 (2013) (citation omitted). And this case presents none of those circumstances.

41 F.4th at 321. Here, too, this case presents none of those circumstances—including those outlined in *O'Shea*—for the same reasons presented in *Dixon*. Plaintiffs seek an injunction as to Lexington County concerning hiring an expert to determine how many additional public defenders need to be hired to align the public defenders' program with the mandates of the Constitution.

---

[43] The relief sought by the plaintiffs in *Dixon*, in full, is as follows:

> For their one General Class, Plaintiffs seek, among others: increases in staffing so that caseloads do not exceed fifteen children per case worker, development of detailed plans for recruiting foster homes, and prompt submissions of individualized case plans to the appropriate state court. also propose three subclasses, to reflect foster populations they believe require more nuanced reform: a Kinship Subclass for children placed with relatives who lack resources and general know-how of raising children with developmental difficulties, an ADA Subclass for children with physical and mental disabilities, and an Aging-Out Subclass for children approaching adulthood and in need of special transition planning. Plaintiffs also request a neutral monitor to oversee the Department's compliance with district-court orders.

41 F.4th at 323.

The numerous cases cited by Defendants do not counsel a different conclusion. Although the cases cited address problems similar to those addressed here—lack of constitutionally adequate representation for indigent people in various criminal justice systems—the relief sought in most, if not all, of those cases is categorically different then the relief sought by Plaintiffs in the instant case.[44] For example, in *Gardner v. Luckey*, plaintiffs brought a class action lawsuit seeking declaratory and injunctive relief against the Florida Public Defender Offices. 500 F.2d 712, 713 (5th Cir. 1974). The relief sought included the requirement that an attorney from the offices "consult with the accused indigent within 48 hours of arrest, to advise him of all his rights, to explore all possible defenses, to refrain from withdrawing except upon permission of the court and after first advising the indigent of the right to appeal." *Id.* at 713 n.2. Citing *O'Shea*, the court found the requested relief "intrusive and unworkable." *Id.* at 715. Here, however, Plaintiffs do not seek relief similar to the relief sought in *Gardner* or *O'Shea*. Instead, Plaintiffs seek relief aimed at addressing Lexington County's significant underfunding of indigent defense. *See also Luckey v. Miller*, 976 F.2d 673, 678 (11th Cir. 1992) (granting motion to dismiss and rejecting plaintiffs' arguments that a "best efforts" decree does not offend *O'Shea* where plaintiffs sought a decree directing Georgia to create an indigent defense system that, in part, "furnishes adequate services and experts," including furnishing counsel, and to "monitor the implementation of those standards"). *Yarls v. Bunton*, 231 F.Supp.3d 128 (M.D. La. 2017), is similarly distinguishable. There, individuals who had been arrested in Orleans Parish and put on a waiting list for representation by a public defender brought a class action against two officials, one of whom was tasked with "administering Louisiana's public defense system" and another who headed the

---

[44] To the extent the out-of-circuit cases cited by Defendants include those where plaintiffs sought relief similar to that sought here, the court is bound and persuaded by the Fourth Circuit's opinion in *Dixon*.

Orleans Public Defenders, an office within that system. *Id.* at 130. As a preliminary matter, the court noted that it faced significant difficulties in "discerning the extent of its remedial authority" because, unlike this case, "the parties [were] not concretely adverse." *Id.* at 131. Ultimately, though, the court concluded that it lacked the "tools" necessary to address delays in criminal prosecutions. *Id.* at 132. Central to this decision was the determination that the parties were inviting the court to violate comity and federalism principles by "interfering with state criminal proceedings" and "encroaching upon the role of the state judges in individual prosecutions," where the injunction sought "requires the Defendants to 'implement a plan' to provide the class with competent counsel." *Id.* at 132, 136–37.

As explained above, these concerns are not present here and, as in *Tucker*, but not cases cited by Defendants, Plaintiffs are concerned with the availability, not the quality, of representation, a much less intrusive and more workable request. *See also Bender v. Wisconsin*, No. 19-CV-29-WMC, 2019 WL 4466973, at *1, 5, (W.D. Wis. Sept. 18, 2019) (granting motion to dismiss "[f]or reasons of comity and deference to the State of Wisconsin's administration of justice," where plaintiffs allege Wisconsin is failing to provide "constitutionally required, effective legal representation to indigent people accused of crimes for which there is a possibility of incarceration" and where "plaintiffs seek broad equitable relief" including enjoining "the State from continuing to violate the rights of indigent defendants by providing constitutionally deficient representation" and requiring "the State to propose, for this Court's approval and monitoring, a plan to develop and implement a statewide system of public defense"); *Dalton v. Barrett*, No. 2:17-CV-04057-NKL, 2020 WL 420833, at *5 (W.D. Mo. Jan. 27, 2020) (declining to enter proposed consent judgment that in part contained an unworkable "caseload capacity standard" that mandates the Missouri Public Defenders office to "not accept any additional cases and . . . not process any

further indigence applications, until an appropriately experienced public defender with a caseload that falls under the cap becomes available").

Defendants repeatedly argue that the declaratory and injunctive relief sought by Plaintiffs is unprecedented. However, when the Constitution is violated trial courts have "virtually boundless discretion in crafting remedies." *Missouri v. Jenkins*, 515 U.S. 70, 124–25 (1995) (Thomas, J., concurring); *accord N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 239 (4th Cir. 2016). Additionally, Defendants offer no case law supporting the proposition that because the relief sought has not been provided by courts previously, *Younger* abstention via *O'Shea* or otherwise applies. Finally, although Plaintiffs may seek certain equitable relief, the propriety, nature, and extent of equitable relief available is addressed below.

For these reasons, the court concludes that Plaintiffs' claims for declaratory and injunctive relief are not barred by the *Younger* abstention doctrine as to Plaintiffs' claim for prospective relief against Lexington City.

As to the prospective relief that Plaintiffs seek against the Chief and Associate Chief Judges, as well as Adams specifically, the court finds this relief is indeed that which is contemplated by *O'Shea* in that it "would necessarily run against the court" and "contemplates controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials." *Dixon*, 41 F. 4th at 334 (citing *O'Shea*, 414 U.S. at 500).

The relief sought as to these Defendants is as follows:

As to the Chief and Associate Chief Judges (Claims One and Two), Plaintiffs are asking the Court to enjoin these administrative offices from overseeing, sanctioning, or promoting a debt collection policy or standard operating procedure that allows for jailing for nonpayment of fines and fees without first: (1) conducting a judicial hearing to determine whether nonpayment was willful, as required by *Bearden*, and (2) appointing counsel, as required by the Sixth Amendment. *See* ECF No. 284-1 at 51–61. As to Defendant Adams, in her official capacity as Irmo Magistrate Judge (Claims Seven and Eight), Plaintiff Goodwin seeks only a

prospective declaratory judgment that it would violate his constitutional rights to arrest and incarcerate him for nonpayment of the fines and fees he owes to Irmo Magistrate Court without being afforded a pre-deprivation hearing and the right to counsel. *Id.* at 61–63. Again, this relief would not call for either continuous and piecemeal interruptions of individual state court proceedings or continuous supervision by this Court or any other federal court.

[ECF No. 290 at 30–31].

Here, in effect, Plaintiffs seek to enjoin the Chief and Associate Chief Justices in their alleged administrative capacities over other Magistrate Judges, as well as Adams, in her official capacity as a Magistrate Judge, to uphold the Constitution in the oversight of and during the adjudication of future state criminal cases. As stated, such an order "would necessarily run against the court" and "contemplates controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials," *Dixon*, 41 F. 4th 316 (citing *O'Shea*, 414 U.S. at 500), notwithstanding Plaintiffs' argument that, for example, the requested *Bearden* "hearings would occur after arrests for nonpayment and not interfere with prior prosecutions." [ECF No. 293 at 12].[45]

The court declines to so order, based on *Younger*, *O'Shea*, and related progeny. *See, e.g., Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 816 (1976) ("Finally, abstention is appropriate where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purposes of restraining state criminal proceedings . . . ."); *Suggs v. Brannon*, 804 F.2d 274, 279 (4th Cir. 1986) ("The court orders, which the appellants seek to enjoin, are incident to pending prosecutions. Entry of such an injunction would require the district court to direct and monitor part of the state proceedings . . . . The district court did not err

---

[45] Additionally, as discussed below in conjunction with the parties' arguments concerning judicial immunity, the court finds that Plaintiffs have failed to establish that the Chief and Associate Chief Judges oversee, sanction, or promote the relevant policies or practices.

by denying injunctive relief against future searches and seizures. To enter such a decree the court would have to determine whether the searches and seizures conducted by the police were illegal. An injunction could be predicated only on the premise that the police were acting unlawfully. But this would intrude upon the pending state prosecutions where the appellants can question the constitutionality of the searches and seizures. Intrusion of this nature has long been forbidden." (citing *O'Shea*, 414 U.S. 488))).[46]

In sum, Defendants' motion for summary judgment is granted as to Plaintiffs' claims for prospective relief as found in Claims One, Two, Seven, and Eight, except as to Plaintiffs' claim for prospective relief against Lexington County as found in Claim Two.[47]

C.    Judicial Immunity

It is well established that judges have absolute immunity from claims arising out of their judicial actions. *Mireless v. Waco*, 502 U.S. 9, 11–12 (1991); *Chu v. Griffith*, 771 F.2d 79, 81 (4th Cir. 1985). However, judicial immunity does not protect "administrative, legislative, or executive

---

[46] Plaintiffs additionally argue the court should reject Defendants' *Younger* arguments as untimely. Plaintiffs cite *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929 (1975), wherein the court held that *Younger's* abstention rule governs when the federal litigation is "in an embryonic stage and no contested matter [has] been decided." Defendants reply that Plaintiffs' "assertion could only apply to Plaintiff Goodwin's now-resolved case, the only instance, prior to its recent resolution, of a currently-pending state proceeding to which *Younger* would literally apply," arguing that cases cited by Plaintiffs "are obviously inapposite here, because there is no longer a currently-pending state proceeding." [ECF No. 292 at 19]. Because Defendants' *Younger* arguments are grounded in *O'Shea*, and no argument has been made that such arguments cannot be raised at this time, nor is the court aware of precedent so holding, the court declines to find Defendants' relevant arguments are untimely.

[47] In briefing, Plaintiffs do not argue, nor mention, any request for prospective relief against Koon. [*See* ECF No. 292 at 22 n.10 ("Plaintiffs appear to have abandoned any claim for prospective relief against Sherriff Koon.")]. Accordingly, the court grants Defendants' motion for summary judgment as to Plaintiffs' claim for prospective relief as to Koon, Claims One and Two.

functions that judges may on occasion be assigned by law to perform." *Forrester v. White*, 484 U.S. 219, 227 (1988).

There are few cases holding that a judge's action is administrative, and not judicial, and therefore no immunity attaches. *Forrester* involved a judge's decision to dismiss a subordinate court employee. That decision, which pertained to employment rather than a judicial act, was held to be an action in an administrative capacity, and in so holding, the Supreme Court noted that "[a]dministrative decisions, even though they may be essential to the very functioning of the courts, have not similarly been regarded as judicial acts." *Id.* at 228.

In *Morrison v. Lipscomb*, the plaintiff was a landlord attempting to retrieve some of his rental properties from allegedly delinquent tenants. 877 F.2d 463, 464 (6th Cir. 1989). The plaintiff was involved in multiple litigations and thereafter sued the presiding judges in addition to another judge who, purportedly acting in his capacity as chief judge, declared a moratorium on the issuance of writs of restitution "in observance of the holiday season," apparently a traditional practice of the court. *Id.* at 464. As to the judge issuing the moratorium, the court found the act to be administrative and that

> judicial immunity does not apply. Any time an action taken by a judge is not an adjudication between parties, it is less likely that the act is a judicial one. Shakoor's moratorium was a general order, not connected to any particular litigation. The order did not alter the rights and liabilities of any parties but, rather, instructed court personnel on how to process the petitions made to the court. This case differs from an adjudication in that a litigant offended by a judicial act can, in the vast majority of cases, appeal the court's decision to a higher court; here, no direct appeal is available, making the absence of judicial liability far less reasonable.

*Id.* at 466.

Finally, in *Ratte v. Corrigan*, 989 F. Supp. 2d 550, 560 (E.D. Mich. 2013), a state court judge signed blank juvenile commitment orders which were later filled in by lay staff and then issued without the judge ever conducting a review of the facts of any particular case. As held by

the court, "[a]t the time the form of order was signed by Hartsfield, there were no parties before the court nor were there any active child custody proceedings. Her actions therefore could not have been 'judicial acts.'" *Id.*

In this case, as stated above, certain Defendants previously filed an interlocutory appeal concerning judicial immunity which was denied by the Fourth Circuit for lack of jurisdiction in that this court "did not conclusively determine the disputed question." *Brown*, 760 F. App'x at 179. The Fourth Circuit framed the relevant inquiry, to be determined post-discovery if not thereafter, as follows:

> . . . the district court correctly determined that whether Defendants are immune from suit is a fact-intensive inquiry that will turn on the record as it develops at least through discovery. Here, whether the Defendants are entitled to judicial or quasi-judicial immunity depends upon the scope of conduct carried out by the Defendants in their administrative capacities and whether such conduct included the oversight and enforcement of unwritten policies . . . . Plaintiffs are not suing Defendants with respect to individual judicial determinations, e.g., denials of bond or incarceration orders. In fact, as both parties acknowledge, Plaintiffs declined to sue the individual judges who sentenced them . . . . Instead, Plaintiffs allege that Defendants, acting in their administrative capacities, oversaw and enforced policies and practices that violated Plaintiffs' constitutional rights. Specifically, they allege that by order of the Supreme Court of South Carolina, the Chief Justice delegated significant administrative authority to Defendants Reinhart and Adams as Chief Judge and Associate Chief Judge for Administrative Purposes of the Lexington County Summary Courts, including the responsibility to establish and oversee countywide procedures to ensure the collection of court-generated revenues, and to administer Lexington County's Bond Court. Exercising their administrative authority to control magistrate court dockets, schedules, and hours of operation, Defendants are alleged to have excluded hearings to determine people's ability to pay fees and fines.

*Id.* at 179–80.

Plaintiffs now argue as follows concerning this issue:

> Plaintiffs are suing Defendants Reinhart and Adams for actions taken in their administrative, policymaking, and supervisory roles, in overseeing and sanctioning unconstitutional county-wide debt collection policies and procedures . . . . Plaintiffs have demonstrated that the challenged debt collection policies and procedures did exist, that their constitutional injuries were caused by the policies, and that

Defendants Reinhart and Adams sanctioned these unconstitutional policies during their respective tenures as Chief and Associate Chief Judges . . . . Reinhart and Adams were assigned the administrative duty and responsibility for establishing a procedure for collecting court debt in the LCMC. These debt collection policies were not related to any particular litigation or individualized adjudication—rather, they were broadly applicable and were the longstanding standard operating procedure for handling nonpayment of court debt in the LCMC. Defendant Adams further illustrated the administrative nature of overseeing debt collection policies and procedures when she implemented the SDP.

[ECF No. 293 at 32–33 (citations omitted), *see also* ECF No. 290 at 57–65].

Plaintiffs describe the challenged actions more specifically as follows:

Under the Default Payment Policy, indigent people who pleaded guilty or were otherwise convicted in the LCMC—but could not pay the full amount of fines and fees imposed at sentencing—were placed on payment plans without consideration of their ability to pay, income, or financial situation. When indigent people could not afford to keep up with their payment plans, they were arrested and incarcerated without a pre-deprivation ability-to-pay hearing to determine whether the nonpayment was willful. Moreover, they were not given an opportunity to speak with a public defender.

Under the Trial in Absentia Policy, indigent people who failed to appear in the LCMC for a traffic or other misdemeanor charge—regardless of the reason for nonappearance—were automatically tried in absentia, convicted, and sentenced to jail time suspended on payment of fines and fees. Typically, within a week of the sentence being imposed, a nonpayment bench warrant was automatically issued, requiring arrest and jailing without a hearing to determine whether nonpayment was willful . . . . When a person was arrested on one of these warrants, they were not taken before a judge or provided an opportunity to speak with a public defender.

[ECF No. 284-1 at 20–21 (citations omitted)].

Taking the record in the light most favorable to Plaintiffs, Plaintiffs have put forth evidence of a widespread practice at the LCMC wherein nonpayment bench warrants were routinely issued resulting in Plaintiffs' and others' incarceration without *Bearden* hearings, advisement of the right to counsel, or assistance of court-appointed counsel.

Plaintiffs have also put forth evidence indicating that these practices were "automatic," supporting Plaintiffs' position that the challenged actions were administrative in nature. It is

undisputed that the relevant bench warrants were issued utilizing a form issued by the SCCA.[48] Although Defendants have put forth competing evidence that the incarceration of Plaintiffs and those similarly situated followed "an individualized judicial decision" from the magistrate judges *see, e.g.*, ECF No. 283-1 at 22, this evidence only creates a factual dispute with Plaintiffs' evidence that the process was more akin to an "automatic" issuance of bench warrants leading to an "automatic" incarceration. [*See, e.g.*, ECF No. 284-1 at 20].[49]

The fatal flaw in Plaintiffs' case as to this issue, however, is that nowhere in the record is there an indication that Adams or Reinhart maintained, directed, oversaw, enforced, perpetuated, or sanctioned any type of policy or practice relevant to this dispute, including the Lexington County-wide practices that allegedly violated Plaintiffs' Sixth and Fourteenth Amendment

---

[48] As testified by Reinhart, "[w]e did exactly what the forms from court administration allowed us to do." [ECF No. 284-12 at 143:23–24, *see also* ECF No. 292 at 6–7 ("That practice, which occurred frequently, but not 'automatically' (as Plaintiffs allege), is precisely what the operative portion of the former SCCA MC 2 forms authorized in each Plaintiff's case")].

[49] As stated, Defendants argue repeatedly that the complained of acts were independent judicial decisions, with Lewis testifying that in some instances, following nonpayment, some Magistrate Judges issued an order for a show cause hearing "to discuss an alternate payment plan." [ECF No. 77:24–78-2]. However, applicable evidence in this case as to named Plaintiffs indicate no Magistrate Judge discussed alternate payment plans, even where a show cause hearing was held as to Wright, and Defendants offer no evidence of a specific instance where a Magistrate Judge exercised judicial discretion to discuss alternate payment plans. There is tension among Defendants' arguments that (1) Magistrate Judges cannot revert to prior practices because they no longer have access to the relevant forms, made above in connection with Defendants' arguments concerning mootness, (2) Magistrate Judges made individualized assessments in issuing the nonpayment bench warrants via the forms at issue, and (3) the forms at issue provided for incarceration without a hearing. The evidence indicates Magistrate Judges exercised their alleged discretion the same way using forms that allegedly provided for only one outcome—incarceration without a *Bearden* hearing.

rights.[50] Instead, the undisputed record reveals that the Chief Justice and the South Carolina Supreme Court itself, including the SCCA, retained, and did not delegate, the relevant authority concerning these practices. *See, e.g., Robinson v. McBride*, C/A No. 3:13-352-CMC-TER, 2013 WL 2099491, at *4 (D.S.C. Apr. 12, 2013) ("Under the current version of Article V, Section 1, the Supreme Court of South Carolina retains the sole authority to supervise the state's magistrate's courts, municipal courts, and circuit courts.") (citations omitted)), *report and recommendation adopted*, 2013 WL 2099707 (D.S.C. May 14, 2013), *aff'd*, 540 F. App'x 212 (4th Cir. 2013).

Plaintiffs argue otherwise:

As Chief and Associate Chief Judges for Administrative Purposes, Defendants Reinhart and Adams were directly responsible, by order of the Chief Justice of the South Carolina Supreme Court, for establishing uniform debt collection policies in the LCMC. During their respective tenures as Chief Judges, Reinhart and Adams maintained the Default Payment Policy and Trial in Absentia Policy despite: (1) knowledge that those practices were unconstitutional; (2) authority to implement new debt collection policies; and (3) knowledge that constitutional alternatives were available.

[ECF No. 290 at 15].

The record does not support these assertions. At most, Adams and Reinhart were tasked via Delegation Orders with establishing "within Lexington County a procedure with all summary court judges and appropriate public officials to ensure that court-generated revenues are collected, distributed, and reported in an appropriate and timely manner." [ECF 284-8 at 5]. This is not the same as being tasked with establishing uniform debt collection policies. In the summary judgment hearing held by the court on June 29, 2022, Defendants' counsel represented that due to the LCMC's adoption of the Chief Justice's 2007 detailed financial accounting order, the Delegation

---

[50] As correctly argued by Plaintiffs, "[w]hat must be proven in all Section 1983 official-capacity lawsuits is that the defendant is the final policymaker for the government with respect to the actor or omission being challenged." [ECF No. 284-1 at 54].

Orders concerning revenue collection and how to handle it administratively were rendered somewhat superfluous, and the record, particularly taken in conjunction with the direction provided in the Delegation Orders and the Chief Justice's 2007 order, support this assertion. [*See also* ECF No. 284-35 (Lewis in an email confirming "[a]ll of our offices follow the S.C. Supreme Court Magistrate Financial Accounting Order . . . . Once again our policy would only support and provide great detail to the Supreme Court Order."); ECF No. 292-2 (2007 order directing "each magistrate court of this State shall comply with the following financial recordkeeping standards"); *see also* ECF No. 284-12 at 81:25–87:25].

Adams testified, and Plaintiffs have not refuted this or the above evidence, that as Chief Judge, she established a procedure "to ensure that court-generated revenues are collected, distributed, and reported in an appropriate and timely manner," in that

> We all have to comply the chief justice's financial order and there is – one of our deputy court administration – court administrators, she is sort of a guru in the financial things and so at my direction she makes sure that all of the district courts as well as the central courts submit all that information to Lexington County on the deadlines that they are supposed to have it. And then I believe – I can't remember how often then the chief magistrate is to review those – some of those documents, like a sample of them.

[ECF No. 292-3 at 94:14–95:20].

Additionally, Adams and Reinhart did not "maintain" the practices, or the policies as dubbed by Plaintiffs, at issue. Instead, the record shows that the Magistrate Judges in the LCMC, for years, consistently but individually, ordered the incarceration of indigent defendants without *Bearden* hearings, advisement of the right to counsel, or provision of the assistance of court-appointed counsel, in violation of those defendants' constitutional rights. The record additionally shows that it was the province of the Chief Justice, who, in issuing the Beatty Memorandum did

address the relevant issues, and the SCCA, who, thereafter, changed the relevant forms, to create and enforce the necessary constitutional change.

Plaintiffs' evidence that Adams or Reinhart could have created and promulgated policy to ameliorate the situation, as Adams did regarding the SDP, does not change this conclusion. Although Plaintiffs put forth evidence concerning Adams' work to implement the SDP, the record shows this program was offered as an option to Magistrate Judges and was not mandatory. [*See, e.g.*, ECF No. 290-5 at 359:7–15 (Adams testifying that "each individual magistrate had to make that decision for their courts," as to whether they would use the SDP)].

Evidence also indicates that it was the Chief Justice who recommended the program to Adams as one way of answering the call he made in the Beatty Memorandum, indicating the SDP did not originate with Adams nor wholly replace the unconstitutional actions in question. [*See* ECF No. 284-28 ("Chief Justice Beatty has recommended that we use the offset Debt program as well as the Court Administration. With the Chief Justice's new 'memo' this is one of the tools he has suggested for us to use to collect fines, restitution, etc. in lieu of always using bench warrants for non compliance to our sentences."); *see also* ECF No. 293-2 at 39:4–41:25 (Lewis testifying that if an individual's state tax refund is insufficient to garnish the entire amount of the court debt owed, the individual continues to owe fines and fees to the LCMC, in that "[t]he individual would receive a letter . . . indicating . . . [a] balance owed to the court. At that time if – if they wish to pay it, they could . . . . If not, it would be loaded back into the setoff debt grid for the [remainder of the debt]")].

Adams' work with SDP does not carry the heavy weight that Plaintiffs' attribute to it. [*See* ECF No. 290 at 38 (Plaintiffs arguing "[t]he record plainly shows that Defendants Reinhart and Adams had authority to prevent Plaintiffs' injuries . . . Reinhart and Adams had the authority as

Chief Judges to replace the unconstitutional scheme with the [SDP] or other debt collection mechanisms")]. Although evidence indicates she could have implemented the SDP scheme earlier, evidence does not indicate the scheme was mandatory or that it is a full remedy for the constitutional violations at issue here.[51]

Additionally, Plaintiffs' evidence that Magistrate Judges take an oath to uphold the Constitution, that the Bench Book instructs that bench warrants are to be used only to bring a defendant back before a particular court, and the "Dear Colleague" letter circulated by the SCCA from the DOJ all support Plaintiffs' position that Adams and Reinhart, as well as all the Magistrate Judges in the LCMC, should have known their practices violated the Constitution. But this evidence does not speak to whether Adams and Reinhart were acting, or failing to act, "[p]ursuant to their delegated administrative authority." [*See* ECF No. 290 at 61 (Plaintiffs arguing that pursuant to this delegation, "Reinhart and Adams . . . sanctioned the unconstitutional debt collection practices for years.")]. Instead, the record shows that the Chief Justice and the SCCA retained the authority at issue.

Plaintiffs also argue that the November 2017 act of recalling Lexington County bench warrants is indicative of the power by the Chief Magistrate to set the relevant policies. [ECF No. 284-1 at 45]. However, the decision to recall the outstanding bench warrants was made

---

[51] Although Lewis testified that certain other unconstitutional practices could have been ameliorated prior to the issuance of the *Beatty* Memorandum, *see, e.g.*, ECF No. 284-26 at 242:8–246:22 (Lewis testifying that he could think of no reason why the procedure of bringing a defendant either back to the traffic court or to the Bond Court within 24 hours of being served with a bench warrant could not have been instituted prior to 2017), Lewis did not testify that the Chief or Associate Chief Judges had the authority to implement such a policy for LCMC. [*See also* ECF No. 283-10 ¶ 16 (Reinhart attesting that the "Chief Judges or Associate Chief Judges could not have advised, much less ordered, magistrates to ignore or not to use the former Forms MC 2 and MC 15.")].

collectively. [ECF No. 283-11 ¶ 16; ECF No. 284-10 at 209:16–24]. Secondly, evidence indicates the recall was made for the purpose of having each individual magistrate conduct an individualized review of each bench warrant. [ECF No. 283-11 at 13 ("Please have all Lexington County Magistrate Court Bench Warrants temporarily recalled for review by each Judge.")].

Cases cited by Plaintiffs in support of their position do not require a different conclusion where the authority of the defendants in those cases was undisputed. *Dodds v. Richardson*, 614 F.3d 1185, 1190, 1203 (10th Cir. 2010) (finding a sheriff liable for violating the Fourteenth Amendment rights of the plaintiff concerning a posting preset bail policy in effect in the jail where "Oklahoma law charged Defendant as sheriff with the responsibilities of running Lexington County jail and accepting bail from all arrestees not charged with death-penalty eligible crimes" and where the court found the sheriff to be the final policymaker for the jail); *Gordon*, 937 F.3d at 360 (head prison doctor liable as policymaker for failing to remediate pre-existing deliberately indifferent policy).

Plaintiffs point to additional delegations of authority to the Chief and Associate Chief Judges via Delegations Orders, provided in full context as follows:

> Monitor all summary court judges within Lexington County <u>to ensure compliance with the above-referenced Order dated September 19, 2007 [outlining certain bond procedures]. The monitoring shall include, but shall not be limited to, ensuring that: bond hearings are being conducted twice daily;</u> the constitutional and statutory rights of defendants and victims are being upheld; <u>bonds are neither excessive nor limited to cash only; and no irregular practices, as outlined in the above- referenced Order, are occurring</u> . . . .[52]

> Call a meeting, at least on a quarterly basis, of all summary court judges in Lexington County to formulate uniform procedures in Lexington County summary court system. Require that all summary court judges, who have court bank accounts, bring to the quarterly meetings documentary proof of

---

[52] Plaintiffs, in briefing, repeatedly fail to quote the entirety of this section of the Delegation Orders, omitting the underlined portions included above. [*See, e.g.*, ECF No. 284-1 at 25].

all monthly reconciliations of those bank accounts since the previous
quarterly meeting. A minimum of one municipal judge from each
municipality within Lexington County shall be required to attend these
meetings . . . .[53]

Designate the hours of operation of each magistrate's court office in
Lexington County, and designate the hours during which each magistrate
shall be present in the office, based upon the number of hours fixed for each
magistrate by Lexington County governing body . . . .

Report to the [SCCA] any significant or repetitive non-compliance by any
summary court judge in Lexington County concerning the Chief Judge's
execution of the provisions of this Order . . . .

[*See* ECF 284-8 at 5–6, ECF No. 290 at 60–61].

Here, the challenged conduct did not occur in the context of bond hearings,[54] nor do

Plaintiffs argue how the other referenced delegations of authority are currently implicated.

Although Plaintiffs argue that "Defendants are liable for their failure to monitor the LCMC and

report non-compliance with the constitution to the SCCA," the only support offered by Plaintiffs

that this duty was "expressly assigned to the Chief and Associate Chief Judges by the Chief Justice

of the South Carolina Supreme Court" refers to first point above.  *See* ECF No. 290 at 64 (citing

ECF 284-8 ¶ 5; ECF No. 284-11 at 340:13-23.).   Requiring monitoring in the context of bond

---

[53] To the extent that Plaintiffs argue the provision directing the Chief and Associate Chief Judges
to call a quarterly meeting to formulate uniform procedures provides the necessary and relevant
delegation of authority, the court disagrees. This provision concerns the authority to hold a meeting
wherein the Magistrate Judges would formulate uniform procedures and does not provide the Chief
and Associate Chief Judges unilateral authority to formulate uniform procedures.

[54] Plaintiffs argue otherwise in that "[b]ond court is not only for setting bail" and, instead, "it is
the place where individuals are first seen by a judge following arrest," and "the failure to bring
new arrestees back before a judge is undoubtably a failure of "bond hearing procedures and
detention facility issues arising in magistrate and municipal courts." [ECF No. 293 at 26–27
(citations omitted)]. The court rejects this strained reading of the Delegation Orders where those
orders delegate to the Chief and Associate Chief Judges the responsibility to monitor compliance
with certain bond procedures and where the constitutionality of bond procedures is not at issue in
this case. [*See, e.g.,* ECF No. 289-3].

procedures and the following testimony from Adams, taken in context, does not support Plaintiffs'

argument that the Chief and Associate Chief Judges were delegated the relevant authority,

particularly given what the Delegation Orders provide, as already discussed:

> Q:      And is it one of the responsibilities – we looked at the [Delegation Orders] earlier and it has a lot of responsibilities on it. It's one of the responsibilities of the chief judge to ensure that the courts that they oversee are complying with the constitution; is that correct?
>
> A:      That's what the order says.[55]
>
> Q:      So compliance with a *Bearden* hearing would be part of compliance with the constitution, correct?
>
> A:      Yes.
>
> Q:      Okay. And did you do anything to monitor compliance with *Bearden* in your courts?
>
> A:      Well, in my own individual court, I just don't think I was taught that and understood that. After Chief Beatty's instructions then that changed because then we knew. As far as me monitoring, I can tell you what I do in my own court, but there's probably five or six, sometimes seven other courts – magistrate courts going on in Lexington County every day and I don't – although that's what that order says, I have no idea how I would ever make sure what every judge was doing. And more importantly, if I saw that they weren't, then the only thing I could do is report them to [SCCA], which I did once when a complaint was brought to me. But y'all just don't understand that that role is administrative
>
> . . . .
>
> But of all the judges know that I have no authority over them. I mean, I can tell them to do anything and they can do it or not do it. It all goes back to what [the SCCA] and Chief Justice tell us. If it's something as serious as violating somebody's constitutional rights or not holding a *Bearden* hearing when they needed to, then I probably would not even try to handle that. I would probably go directly to [SCCA].

[ECF No. 284-11 at 340:9–344:10)), ECF No. 283-11 ¶ 33 (Adams attesting "Chief Judges or

Associate Chief Judges do not have authority to create or enforce county-specific policies that

contradict statewide policies or practices set forth by Court Administration. As a result, Chief

Judges or Associate Chief Judges could not order other county magistrates not to use forms

---

[55] The court does not appear to have before it the section of Adams deposition wherein the Delegation Orders were discussed concerning monitoring. [*See* ECF No. 250-4, 283-13, 284-10, 284-11, 290-5, 292-3 at 94:10–95:20 (discussing Delegation Orders as to court-generated revenues), 293-3].

promulgated by Court Administration for use by magistrates. Specifically, Chief Judges or Associate Chief Judges could not have advised, much less ordered, magistrates to ignore or not to use the former Forms MC 2 and MC 15. Nor could Chief Judges or Associate Chief Judges have advised, much less ordered, county magistrates to ignore or not to use the 2018 forms that replaced those two forms.")].

Although Plaintiffs may be correct that "[m]onitoring compliance and reporting non-compliance to a state agency are not 'paradigmatic judicial acts,'" *id.* (citing *Forrester*, 484 U.S. at 22), there is no evidence on record that the Chief and Associate Chief Judges were delegated the authority to generally monitor other Magistrate Judges in the LCMC for constitutional violations.[56]

Evidence submitted by Plaintiffs is insufficient to show that the Chief Justice delegated the relevant administrative authority to Reinhart and Adams to sanction, implement, or fail to remediate the relevant unconstitutional policies or procedures nor does the evidence submitted show that Reinhart or Adams had the necessary supervisory relationship over the other Magistrate Judges in the LCMC. *See, e.g., Foster v. Fisher*, 694 F. App'x 887, 889 (4th Cir. 2017) (finding no supervisory liability where a trial court judge of general jurisdiction had no supervisory responsibility over the actions of a summary court judge); *Wilkins v. Montgomery*, 751 F.3d 214, 228 (4th Cir. 2014) (summary judgment for defendant affirmed because, among other things, defendant did not have supervision over the kinds of actions that were alleged to have caused harm).

---

[56] Although Plaintiffs highlight the supervisory and administrative authority held by the Chief and Associate Chief Judges, *see, e.g.*, ECF No. 284-1 at 57, that the Chief and Associate Chief Judges had some authority does not compel the conclusion that they had the relevant authority at issue in this case.

Accordingly, the court finds that Reinhart and Adams are entitled to judicial immunity as to Plaintiffs' claims against them in their individual capacities, Claims Four and Five.[57]

D.     Waiver

Defendants argue that some of the Plaintiffs who failed to appear in court have thereby waived their damages claims, but Plaintiffs do not challenge those proceedings, nor their underlying convictions or sentences. *See* [ECF No. 290 at 40]. Instead, Plaintiffs challenge the constitutional violations—the lack of a Bearden hearing or assistance of council—occurring *after* their conviction, sentence, and arrest on a nonpayment bench warrant but *prior to* their incarceration. *See, e.g., Bearden*, 461 U.S. at 672 ("court[s] must inquire into the reasons for the failure to pay" before incarcerating people for nonpayment).

The court agrees with Plaintiffs that the burden is on the government to conduct the required inquiry before incarceration, regardless of whether the person owing the debt previously failed to appear or did appear but failed to assert their indigence. *See, e.g., De Luna v. Hidalgo Cnty., Tex.*, 853 F. Supp. 2d 623, 648 (S.D. Tex. 2012) ("[T]he absence of any inquiry into a defendant's indigency unless the defendant 'raises' it of his or her own accord does not provide the process due."); *Cain v. City of New Orleans*, C/A No. 15-4479, 2016 WL 2962912, at *5 (E.D. La. May 23, 2016) ("No court has held that indigent debtors are required to initiate proceedings to request a modification of their financial obligations or otherwise risk imprisonment for nonpayment."); *West v. City of Santa Fe, Texas*, C/A No. 3:16-0309, 2018 WL 4047115, at *9 (S.D. Tex. Aug. 16, 2018) ("To allow [the government] to detain an individual—even just overnight— without providing an ability to pay hearing beforehand would, in effect, often result

---

[57] Given this conclusion, it is unnecessary to address Defendants' additional argument that Reinhart and Adams are entitled to qualified immunity and that the *Rooker-Feldman* doctrine bars Plaintiffs' damages claims against these defendants. [*See* ECF No. 283-1 at 54–60].

in individuals being jailed solely because they cannot afford to pay the fine. That is something the Supreme Court has expressly held is not permitted." (citing *Bearden*, 461 U.S. at 667–68)), *report and recommendation adopted*, 2018 WL 5276264 (S.D. Tex. Sept. 19, 2018); *Doe v. Angelina Cnty., Texas*, 733 F. Supp. 245, 253 (E.D. Tex. 1990) ("Self-evidently, a party cannot fail to appear if no provision is made for such a proceeding under these circumstances.").

Accordingly, the court declines to find that the relevant Plaintiffs have waived any claim for failure to appear in this context.

## II.     Plaintiffs' Fourteenth, Sixth, and Fourth Amendment Claims

The court addresses Plaintiffs' remaining Fourteenth Amendment claim, Plaintiffs' Claim Four for damages, brought against Koon in his individual capacity,[58] as well as Plaintiffs' remaining Sixth Amendment claims: Claim Two, asserted against Lexington County for declaratory and injunctive relief, and Claim Five, asserted against Lexington County for damages,[59] before turning to Plaintiffs' Fourth Amendment Claims: Claims Three and Six.

### A.     Fourteenth Amendment Claim

The Supreme Court has long held that a state cannot "impose a fine as a sentence and then automatically convert it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." *Bearden*, 461 U.S. at 667 (citing *Tate*, 401 U.S. at 395). To prevent this injustice, the Fourteenth Amendment requires that, before a court imposes a jail sentence for

---

[58] As stated above, the court finds that Plaintiffs' Claims One and Seven are barred by *Younger*, *O'Shea*, and related progeny, and Plaintiffs' Claim Four for damages asserted against Reinhart and Adams is barred by judicial immunity.

[59] As stated above, the court finds that Plaintiffs' Claim Two against Johnson, Morgan, and Koon, in their official capacities, and Claim Seven, against Adams in her official capacity, are barred by *Younger*, *O'Shea*, and related progeny and Plaintiffs' Claim Five, brought against Reinhart and Adams in their individual capacities for damages barred by judicial immunity.

an individual's failure to pay court fines or fees, it must conduct a meaningful inquiry into the individual's reasons for failing to pay. *Alkire v. Irving*, 330 F.3d 802, 816 (6th Cir. 2003) (citing *Bearden*, 461 U.S. at 672). At that hearing, the court must consider the following factors: (1) the debtor's income and assets (i.e., ability to pay); (2) the debtor's efforts to secure resources to pay; and (3) the existence and adequacy of alternative punishments to incarceration for those who made reasonable efforts and still could not afford to pay. *Bearden*, 461 U.S. at 672. The Fourteenth Amendment's prohibition on jailing indigent people is well established in both the Fourth Circuit and the South Carolina Supreme Court. *See, e.g., Alexander v. Johnson*, 742 F.2d 117, 126 (4th Cir. 1984) (applying *Bearden* to probation violations); *Dangerfield v. State*, 656 S.E.2d 352 (S.C. 2008) (requiring notice and hearing to determine whether defendant's nonpayment of restitution was willful).

Plaintiffs argue as to this claim against Koon, that the Lexington County Sheriff's Department ("LCSD") under the direction of Koon, "maintained a policy of holding individuals in jail after their arrest, rather than returning them to court," causing "Plaintiffs and Class Members to experience prolonged and unconstitutional deprivations of liberty in violation of clearly established law." [ECF No. 290 at 50]. In support of summary judgment, Koon argues he cannot be held liable in this instance in that he and his office were executing facially valid bench warrants as required by state law. [ECF No. 283-1 at 51–52].

Plaintiffs disagree, and the crux of their argument rests on whether the bench warrants at issue in this case (all on the MC 2 form) are ambiguous. Plaintiffs have put forth evidence that bench warrants are, according to the SCCA, solely issued in order to return a defendant to a given court, and that the SCCA at one point in time informed the LCSD of this. [*See* ECF No. 284-19 (SCAG's office advising Koon's predecessor that a bench warrant "should not be considered as

authority to incarcerate an individual for the purpose of serving any sentence of imprisonment imposed by a magistrate")]. Plaintiffs argue that against this backdrop, and because the bench warrants are ambiguous on their face, Koon had the responsibility to ensure execution of the bench warrants comported with clearly established law. [*See* ECF No. 290 at 54–55 (citing *Simon v. City of New York*, 893 F.3d 83, 96 (2d Cir. 2018) ("If the plain text of the warrant were not enough, the statutory backdrop against which the defendants acted confirms that the warrant required Simon's production to court at the scheduled time."); *Miller v. Kennebec Cnty.*, 219 F.3d 8, 11 (1st Cir. 2000) (finding warrant's language unambiguous and officer's failure to bring arrestee before a court unreasonable); *Davis v. Hall*, 375 F.3d 703, 716 (8th Cir. 2004) (noting that "many circuits recognize the necessity of investigation under certain circumstances" in overdetention cases); *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968) ("[U]nlike his prisoner, the jailer has the means, the freedom, and the duty to make necessary inquiries. While not a surety for the legal correctness of a prisoner's commitment, he is most certainly under an obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release.") (citations omitted)].

The court finds, however, that the bench warrants at issue are not ambiguous. The MC 2 form at issue provides both of the following:

> This order is to command you to take and convey him/her to the common jail. The keeper of said jail is hereby commanded to receive the said defendant and to safely keep until he/she shall be thereof discharged by due course of law; and for so doing, this shall be your good and sufficient warrant.
>
> . . . .
>
> The defendant is to be arrested and brought before me to be dealt with according to the law. [Place for Signature of Judge].

[*See, e.g.,* ECF No. 283-2 at 3].

Although Plaintiffs argue that having both instructions on this form creates ambiguity, the undisputed testimony provides otherwise. Adams testified, and Plaintiffs' have put forth no evidence in dispute, that the second instruction applied only in a situation where authority needed to be given to an officer in a different county to transfer the arrestee. [*See* ECF No. 292-3 at 147:7–148:21]. Additionally, no judge signed that part of the form in any of the bench warrants issued for the seven named Plaintiffs. Instead, all seven Plaintiffs were arrested pursuant to the "take and convey . . . to the common jail" part of the bench warrant form. [*See* ECF No. 283-2 at 3; ECF No. 283-3 at 3–4; ECF No. 283-4 at 5–6; ECF No. 283-5 at 6; ECF No. 283-6 at 5; ECF No. 283-7 at 3; ECF No. 283-8 at 8, 9, 13, 14, 18, 19].[60]

Additionally, Adams in her deposition agreed that the bench-warrant phrase "until discharged by due course of law" is "essentially an order that an individual will be arrested and retained in – in custody unless and until they satisfy either the monetary amount that they've got to pay or . . . the period of incarceration on the bench warrant[.]" [ECF No. 292-3 at 169:4–170:4]. Adams also confirmed her understanding that "an individual arrested on a bench warrant with this phrase doesn't need to be brought back before the court under this language[.]" *Id.* at 169:4–170:4; *see also* [ECF No. 292-4 at 69:8–18 (Koon testifying the same)].

Plaintiffs have put forth no evidence to rebut Defendants' evidence that the MC 2 form at issue provided for two options, and the latter option was not used nor applicable in Plaintiffs' cases. Plaintiffs have put forth no argument or case law that, where the bench warrant at issue is

---

[60] Two of the bench warrants in the record concerning Plaintiffs only include the "take and convey . . . to the common jail" option, further undercutting Plaintiffs' argument as to ambiguity as to these warrants. [*See* ECF No. 283-5 at 6, ECF No. 283-6 at 5].

unambiguous, like in the instant case, Koon and his office were required to conduct further inquiry.[61]

Instead, the record shows that S.C. Code Ann. § 23-15-40 requires the "sheriff or his regular deputy [to] serve, execute and return every process, rule, order or notice issued by any court of record in this State," and makes him subject to contempt of court for failure to do so. Further, S.C. R. Crim. P. 30(c) provides that "[i]t is the continuing duty of the sheriff, and of other appropriate law enforcement agencies in Lexington County, to make every reasonable effort to serve bench warrants." [*See also* ECF No. 283-18 (LCSD policy 3.50 providing "It is the policy of the LCSD to execute warrants and serve civil process in accordance with South Carolina State Laws.")].[62]

Accordingly, the undersigned grants Defendants' motion for summary judgment as to this claim.

B.    Sixth Amendment Claims

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. As *Gideon v. Wainwright*

---

[61] Plaintiffs argue Koon "was deliberately indifferent to Plaintiffs' and Class Members' unlawful overdetention," ECF No. 290 at 56, but, as discussed above, Plaintiffs have failed to offer evidence that Koon had a subjective knowledge of a risk of serious harm where the MC 2 forms at issue are not ambiguous on their face, and there is no indication Koon knew of the SCCA's instruction in the Bench Book or to his predecessor concerning bench warrants. *See id.* at 55 (citing *Alcocer v. Mills*, 906 F.3d 944, 953 (11th Cir. 2018) (holding that to establish deliberate indifference, a plaintiff must show (1) that the defendant had "subjective knowledge of a risk of serious harm"; (2) that the defendant "disregarded that risk"; and (3) that the disregard was by "conduct that is more than mere negligence")).

[62] Plaintiffs rely on *Armstrong v. Squadrito*, 152 F.3d 564, 567 (7th Cir. 1998); however, *Armstrong* is distinguishable in that both Indiana law and the warrant at issue directed the sheriff to convey the defendant to a judge, which the sheriff in *Armstrong* failed to do.

established almost six decades ago, the Sixth Amendment requires access to counsel for every criminal defendant who faces the possibility of incarceration; and if the defendant is indigent, counsel must be appointed free of charge. 372 U.S. 335 (1963). The right to counsel extends to all criminal proceedings that involve incarceration, whether for felonies or misdemeanors. *Argersinger*, 407 U.S. at 36–37 (actual incarceration); *Scott*, 440 U.S. at 373–74 (same); *Shelton*, 535 U.S. at 674 (suspended incarceration). It applies with equal force to defendants prosecuted in municipal and magistrate courts. *See Wilbur*, 989 F. Supp. 2d at 1134 ("Having chosen to operate a municipal court system . . . defendants are obligated to comply with . . . the Sixth Amendment."); *Tucker v. State*, 394 P.3d 54, 62–63 (Idaho 2017) ("[I]t is the State's obligation to provide constitutionally adequate public defense at critical stages of the prosecution.").

A criminal defendant's right to counsel attaches at their initial appearance, *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 199 (2008), and extends to all critical stages of the criminal prosecution. *United States v. Cronic*, 466 U.S. 648, 654–56 (1984); *see also Avery v. Alabama*, 308 U.S. 444, 446 (1940). Critical stages include certain arraignments, *Hamilton v. Alabama*, 368 U.S. 52, 53–54 (1961); *White v. Maryland*, 373 U.S. 59, 60 (1963); preliminary hearings, *Coleman v. Alabama*, 399 U.S. 1, 9–10 (1970); plea negotiations, *Lafler v. Cooper*, 566 U.S. 156, 163 (2012); and when the incarceration portion of a suspended sentence is enforced against a defendant, *Argersinger*, 407 U.S. at 36–37; *Shelton*, 535 U.S. at 673–74. If a defendant is denied the actual assistance of counsel at any critical stage, there can be no conclusion other than that representation was not provided. *Cronic*, 466 U.S. at 659. In short, "[l]awyers in criminal cases 'are necessities, not luxuries.'" *Id.* at 653 (citing *Gideon*, 372 U.S. at 344).

      1.      Claim Two Against Lexington County for Prospective Relief

As discussed above, the court rejects Defendants' argument that Claim Two against Lexington County is subject to *Younger* abstention via *O'Shea*. However, the court agrees with Defendants that the specific relief sought by Plaintiffs against Lexington County is unclear. [*See* ECF No. 289 at 11 (arguing Plaintiffs have "not provided as much detail concerning the relief they seek)].

It appears clear that, at a minimum, Plaintiffs seek an order for placement of an independent consultant to determine how many additional public defenders are needed in the LCMC, in the context, as stated in Plaintiffs' operative amended complaint, where indigent people "face incarceration for nonpayment of magistrate court fines and fees." [ECF No. 48 at 120–21]. More specifically, the relevant prayer for relief as to Lexington County seeks:

> A declaration that Defendant[] Lexington County [is] violating Class members' Sixth Amendment right to counsel by routinely and systematically depriving indigent people of the right to court-appointed counsel *when they face incarceration for nonpayment of magistrate court fines and fees*, including through the failure to adequately fund indigent defense in Lexington County magistrate courts and the failure to assign public defenders to staff magistrate courts proceedings . . . .

> An order and judgment permanently enjoining . . . Lexington County . . . from enforcing the above-described unconstitutional policies and practices.

*See id.* (emphasis added).

However, in a letter submitted to the court following the summary judgment hearing held by the court on June 29, 2022, Plaintiffs' counsel represented to the court as follows:

> The relief requested in Plaintiffs' SAC includes: "[a]n order and judgment permanently enjoining . . . Lexington County . . . from enforcing the above-described unconstitutional policies and practices." ECF. No. 48 at 121 (Prayer for Relief). Those "above described policies and practices" include claims of system-wide underfunding of indigent defense in the Lexington County Magistrate Courts and subsequent denial of counsel at all critical stages. *See, e.g.*, ECF No. 48 ¶ 63 ("[N]o public defender is present in court, or otherwise available for appointment, to represent an indigent person when a Lexington County magistrate court conducts critical proceedings in which the Sixth Amendment affords a right to counsel"); *see generally id.* ¶¶ 47–79 (discussing Lexington County's failure to provide adequate

> funding for its public defense system in the Magistrate *Courts as a whole*). These
> allegations are tied directly to Claim 2, which asserts Sixth Amendment violations
> arising from both the failure to provide counsel at pre-deprivation hearings *and*
> Lexington County's overall "failure to provide public defense to indigent people
> facing actual or suspended incarceration sentences in traffic and criminal cases
> handled by Lexington County magistrate courts[.]" ECF. No. 48 ¶ 471.

[ECF No. 303 at 2 (emphasis in original)]. Plaintiffs, in this letter, do not argue or cite supporting

case law in support of their position.

Unsurprisingly, Defendants filed a response letter, arguing Plaintiffs' position in their letter

goes "far beyond any previous discussion in Plaintiffs' briefings with regard to the relief sought in

Claim 2 against Lexington County."   [ECF No. 305.]   Defendants argue the relief sought is

inconsistent with the position taken by Plaintiffs previously, untimely, and unmeritorious for

multiple reasons—including as to issues of standing, class representation, and federalism. [ECF

No. 305].

As instructed by the Fourth Circuit, should this "court determine that certain specific relief

would overstep *Younger's* bounds, it can always reject it to secure our comity interests." *Dixon*,

41 F.4th at 334 (citing *O'Shea*, 414 U.S. at 510 (Douglas, J., dissenting) (proposing courts "cross

the bridge of remedies only when the precise contours of the problem have been established after

a trial")).

For the reasons previously stated, Defendants' motion for summary judgment as to this

claim is denied where the court has rejected Defendants' abstention argument. Additionally,

although Plaintiffs have put forth undisputed evidence that Lexington County has underfunded its

public defendants' program, Plaintiffs' motion for summary judgment as to this claim is also

denied where, here, the parties dispute the precise scope of the problem asserted and where the

record is not clear as to the precise relief that Plaintiffs seek or are entitled.

2.    Claim Five Against Lexington County for Damages

As discussed above, a local governmental entity can be held liable as a person under 42 U.S.C. § 1983 when its "policy or custom" is the "moving force of the constitutional violation." *Monell*, 436 U.S. 658, 694 (1978).  The "policy or custom for which a municipality may be held liable can arise . . . through the decisions of a person with final policymaking authority," or "through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (citing *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)). *Monell* liability applies even where there is only "a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion). "Relying on this precedent, [the Fourth Circuit] has held that '[a] government policy or custom need not have received formal approval through the municipality's official decisionmaking channels to subject the municipality to liability.'" *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 554 (4th Cir. 2018) (citing *Riddick v. Sch. Bd.*, 238 F.3d 518, 522 (4th Cir. 2000)).

In determining municipal liability under 42 U.S.C. § 1983, courts look to "whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 (1997). The identification of which local "official has final policymaking authority" is a legal question to be determined by state law. *Starbuck*, 28 F.4th at 533 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). To answer this question, the Fourth Circuit looks to "the relevant legal materials, including state and local positive law, as well as the custom or usage having the force of law." *Hunter*, 897 F.3d at 555 (citing *Riddick*, 238 F.3d at 523).

Plaintiffs argue, and Defendants do not dispute, that under both South Carolina law and the "custom or usage having the force of law," the final policymaker on funding decisions for indigent defense in Lexington County is the Lexington County Council. *See Hunter*, 897 F.3d at 555 (citations omitted); *see also* S.C. Code Ann. § 4-9-310 ("[T]he responsibility for policy making and administration of county government shall be vested in the county council . . . ."); S.C. Code Ann. § 4-9-140 ("County council shall adopt annually and prior to the beginning of the fiscal year operating and capital budgets for the operation of county government . . . ."); S.C. Code Ann. § 4-9-25 ("All counties of the State . . . have authority to enact regulations, resolutions, and ordinances, not inconsistent with the Constitution and general law of this State . . . . The powers of a county must be liberally construed in favor of the county . . . .").

Plaintiffs have put forth undisputed evidence that although the LCPDO is overseen by Madsen (the Public Defender for the Eleventh Judicial Circuit of South Carolina), funding for the LCPDO comes from two sources: the State of South Carolina Commission on Indigent Defense and Lexington County. The State determines funding based primarily on Lexington County's population, following the same formula used for all 46 counties. Funding from Lexington County, on the other hand, is based solely on budgeting decisions made by the Lexington County Council. Despite his role as the Eleventh Judicial Circuit Defender, Madsen does not have any discretion to create a new attorney position even if he feels it is necessary. Only Lexington County Council and the County Administrator have that power.

In *Hunter*, the Fourth Circuit found that the Town Manager was a final municipal policymaker for purposes of 42 U.S.C. § 1983, as authority over the town's employment decisions was delegated without constraint and "hold[ing] otherwise would insulate the Town from liability in virtually every case—a result contrary to the principles underlying Section 1983." 897 F.3d at

558. Municipal liability is even clearer here because Lexington County Council never delegated such authority to Madsen. To the contrary, because public defense funding allocated by Lexington County is generally tied to a specific employment position, Lexington County Council is the sole final decisionmaker when it comes to the creation of new attorney positions for the LCPDO. To hold otherwise would mean that Lexington County had no policymakers with respect to the funding of indigent defense in the LCMC, and "such a conclusion would sanction and encourage egregious attempts by local governments to insulate themselves from liability for unconstitutional policies . . . . This cannot be so." *Id.* at 558 (citations omitted).

As final policymakers, the Lexington County Council has chosen to systematically underfund public defense needs for indigent defendants in the LCMC for nearly a decade. This reflects "a deliberate choice to follow a course of action" amongst "various alternatives." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). As argued by Plaintiffs, and not disputed by Defendants:

> By consistently denying Madsen's budget requests, the Council has chosen a course of action that results in chronic underfunding of indigent defense within Lexington County. In so doing, Lexington County has abdicated its statutory obligation to provide for public defense within Lexington County under the Indigent Defense Act. *See* S.C. Code Ann. §§ 17-3-550, 560. And it has done this despite the clear provisions of the Intergovernmental Agreement between the Eleventh Circuit Public Defender and Lexington County, which grants Lexington County—not Madsen—the sole authority over budget and financial policies, employment procedures, and employee benefits.

[ECF No. 284-1 at 45].

Here, the undisputed evidence, put forth by Plaintiffs, indicates that Lexington County has engaged in policies, procedures, and customs that cause systemic deficiencies in funding, staffing,

and assignment of cases to public defenders with the result that indigent people in the LCMC are deprived of court-appointed counsel.[63]

Defendants argue, notwithstanding, that this claim should be dismissed in that, "[w]ith regard to the damage claim based on alleged 'underfunding' of indigent defense, Plaintiffs cannot show that such 'underfunding' led to their being convicted without counsel." [ECF No. 283-1 at 50, *see also id.* ("In order to prevail on this claim, Plaintiffs would need to show . . . that they were actually harmed as a result of not having counsel . . . .")].

In response, Plaintiffs do not directly address Defendants' argument, arguing instead, in part, as follows:

> Plaintiffs' allegations in Claim Five only concern events that occurred *after* Plaintiffs' post-conviction arrests. And it is undisputed that after their arrests, Plaintiffs were not afforded access to counsel to defend against their incarceration. It is also undisputed that there was only one public defender assigned to the LCMC at the time Plaintiffs were arrested and incarcerated, and she already had a caseload that exceeded the ABA standard. It is further undisputed that Lexington County controls the creation and funding of all positions in the Lexington County Public Defender's Office, and that Lexington County denied Robert Madsen's requests for an increase in funding for indigent defense in six out of the seven years preceding

---

[63] In the summary judgment hearing held by the court on June 29, 2022, Defendants' counsel was asked if Defendants' position was that Lexington County adequately funded the LCMC to address the issues raised by Plaintiffs. Counsel responded that because of the Beatty Memorandum, and the LCMC response to it thereafter, the problems that Plaintiffs argue require more legal representation have been eliminated. [*See also* ECF No. 289 at 5 n.1 (Defendants arguing without evidentiary support that "[t]he 2017-2018 changes had the secondary effect of greatly reducing the need for counsel for indigents who did not pay fines and fees. Because no one could be jailed unless counsel was present or the right to counsel was waived, the logical result was that few, if any, defendants in that situation were inclined to come into court with counsel when they could never be jailed as long as they never showed up with counsel present.")]. These arguments do not address Plaintiffs' evidence as to the underfunding of the public defenders' program. Defendants additionally put forth evidence from Madsen who testified that the Lexington County Public Defenders Office has never turned down representation in the LCMC when appointed by a magistrate due to "caseload or overload." [ECF No. 292-1 at 156:5–25]. However, the court does not have before it any context for this testimony, for example, as to how often Magistrate Judges appointed defendants a public defender from Madsen's office. This evidence also does not address Plaintiffs' evidence as to the underfunding of the public defenders' program.

> Plaintiffs' arrests and incarceration. The culmination of Lexington County's deliberate choices to underfund indigent defense created a direct and predictable result that Plaintiffs would not be afforded counsel after their arrest for nonpayment of fines and fees.

[*See* ECF No. 290 at 48–49 (emphasis in original, citations omitted); *see also* ECF No. 292 at 27 (Defendants arguing in response that "Plaintiffs do not assert, even indirectly, how the presence of counsel might have made a difference if counsel had been available at the times of their arrests")].

The Supreme Court has instructed that "damages awarded in a § 1983 action must always be designed to compensate injuries caused by the [constitutional] deprivation." *Farrar v. Hobby*, 506 U.S. 103, 115 (1992) (citations omitted)). This court's order in *Bairefoot v. City of Beaufort, S.C.*, 312 F. Supp. 3d 503 (D.S.C. 2018), is instructive. In *Bairefoot*, as in the instant case, the ACLU brought a putative 42 U.S.C. § 1983 class action, alleging violations of their Sixth and Fourteenth Amendment rights stemming from their incarcerations following criminal proceedings in a city's municipal court system, which did not provide counsel for indigent defendants. The city moved to dismiss the action. The court denied the city's motion, holding in part that the city's failure to provide counsel for indigent criminal defendants was actionable under 42 U.S.C. § 1983. In addressing arguments similar to those brought by Defendants' here as to causation, the court held as follows:

> Defendants also argue that even if damages are recoverable "in theory," they cannot show their alleged damages arising from incarceration were actually caused by the deprivation of counsel, because Plaintiffs cannot show that they would have avoided incarceration but for the absence of counsel. A structural error like denial of counsel does not require a showing of prejudice when reviewing a criminal conviction for legal error, but some actual harm must be shown to establish liability for compensatory damages. But the alleged deprivation of counsel certainly suffices to support a claim for nominal damages. *See Via v. Cliff*, 470 F.2d 271, 275 (3d Cir. 1972) (holding a plaintiff "can maintain this cause of action" under § 1983 for infringement of his right to counsel "without alleging or proving prejudice to his defense at trial by the alleged actual infringements"). The proper measure of damages in the event Plaintiffs are unable to show the alleged constitutional

violations caused prejudice to their defenses in their criminal cases is not an issue
before this Court at this time.

*Id.* at 512 (select citations omitted).[64]

Here, Plaintiffs have failed to put forth evidence of the relevant affirmative causal link to support a claim for compensatory damages. Notwithstanding, and as indicated in *Bairefoot*, Plaintiffs' evidence could be sufficient to support a claim for nominal damages. Defendants disagree, arguing entitlement to nominal damages is precluded where, as here, "'there is absolutely no specific mention in the Complaint of nominal damages.'"[65] [ECF No. 283-1 at 50 n.26 (citing *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 116 (4th Cir. 2021) (holding in the context of a claim for breach of contract, a boilerplate request for further relief that the court deems proper "does not preserve a nominal damages claim when 'there is absolutely no specific mention in the Complaint of nominal damages'")); ECF No. 292 at 28].

---

[64] Defendants here, like defendants in *Bairefoot*, invoke a distinguishable out-of-circuit case for the proposition that a state official cannot be held liable for a state court defendant's failure to receive counsel because "Texas law [like South Carolina law] makes only state court judges responsible for appointing attorneys for indigent criminal defendants.'" [ECF No. 283-1 at 49–50 (alteration in original) (citing *Hamill v. Wright*, 870 F.2d 1032, 1037 (5th Cir. 1989))]. But as *Bairefoot* already recognized, *Hamill* does not apply to the provision of indigent defense in South Carolina because the laws of Texas are different from those in South Carolina: "Texas law makes only state court judges responsible for appointing attorneys for indigent criminal defendants. South Carolina law, however, clearly makes municipalities responsible for providing for indigent defense in municipal courts." 312 F. Supp. 3d at 510 (internal citation omitted) (citing *Hamill*, 870 F.2d at 1037). The court further rejected the city's assertion that the unconstitutional consequences of their decisions were unforeseeable because it was ultimately the judges' responsibility to appoint counsel, reasoning: "A counterfactual hypothesis that the municipal judges appointed by Defendants might have intervened to prevent an ongoing constitutional violation known to Defendants does not make the violation unforeseeable." *Id.* at 512 (citing *Malley v. Briggs*, 475 U.S. 335, 345–46 (1986)).

[65] Plaintiffs do not request nominal damages in their operative complaint but do request compensatory damages and "any such other and further relief as the Court may deem just and proper." [ECF No. 48 at 121].

However, *Foodbuy* does not address the context currently at issue, a constitutional violation where claims have been brought pursuant to 42 U.S.C. § 1983. In such a context, the Supreme Court has held that where due process violations occur, nominal damages are damages awarded by default until the plaintiff establishes entitlement to another type of damages. *See Carey*, 435 U.S. at 266 (because the right to due process "is 'absolute,'" its denial is "actionable for nominal damages without proof actual injury"); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800 (2021) ("Nominal damages are not a consolation prize for the plaintiff who pleads, but fails to prove, compensatory damages. They are instead the damages awarded by default until the plaintiff establishes entitlement to some other form of damages . . . ."); *Farrar*, 506 U.S. at 112 ("*Carey* obligates a court to award nominal damages when a plaintiff establishes the violation of his right to procedural due process but cannot prove actual injury."); *Segarra v. McDade*, 706 F.2d 1301, 1308 (4th Cir. 1983) (Murnaghan, J. concurring in part and dissenting in part) ("A plaintiff in a § 1983 action no doubt is entitled to an award of nominal damages if he or she prevails and if the complaint seeks monetary damages.") (citing *Carey v. Piphus*, 435 U.S. 247 (1978)); *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (holding pro se prisoner's "broad requests for just, proper, and equitable relief — construed in the proper light — encompass compensatory and nominal damages"); *Kane v. Lewis*, 675 F. App'x 254, 257–58 (4th Cir. 2017) (directing "entry of nominal damages" for plaintiff's victory on a constitutional violation claim brought pursuant to 42 U.S.C. § 1983 where plaintiff "sought only compensatory damages"); *see also* A*lpha Painting & Constr. Co., Inc. v. Delaware River Port Auth. of Pennsylvania New Jersey*, 822 F. App'x 61, 68 (3d Cir. 2020) ("It is true that, at least in certain circumstances, 'it is not necessary to allege

nominal damages' for a court to grant such relief." (citing *Allah v. Al-Hafeez*, 226 F.3d 247, 251 (3d Cir. 2000))).[66]

Based on the case law above, the court holds nominal damages are available to Plaintiffs.[67]

To the extent that Defendants argue that Plaintiffs' damages claim against Lexington County is barred by the *Rooker-Feldman* doctrine, as noted by Defendants, this court has previously declined to apply *Rooker-Feldman*, ECF No. 107 at 16–17, in connection with Plaintiffs' claim against Lexington County "based on underfunding of the public defender system," *id.* at 7. Citing *Bairefoot*, this court decided at that time "that neither *Heck* nor the *Rooker-Feldman* doctrine would bar the plaintiffs' claims under § 1983, because these claims are independent of their state court judgment and seek only 'to force two South Carolina municipalities to comply with the Constitution's requirement to provide counsel for indigent defendants appearing in criminal courts created and managed by those municipalities.'" *Id.* at 16. Defendants have failed to offer any argument or case law indicating the court should revisit this holding. [*See* ECF No. 292 at 22–25].

As stated by the Fourth Circuit, in holding the *Rooker-Feldman* doctrine was not a bar to the plaintiff's claims under 42 U.S.C. § 1983:

> Washington challenges not his conviction but rather one aspect of the means by which that conviction was achieved. *Cf. Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202 (4th Cir.1997) (distinguishing between "actions seeking review of the state court decisions themselves and those cases challenging the constitutionality of the process by which the state court decisions resulted"). Put

---

[66] This case stands in contrast to those where a complaint's prayer for relief did not specifically request nominal damages and where plaintiffs attempted to assert such damages "late in the day" to avoid mootness. *See, e.g., Harris v. Univ. of Massachusetts Lowell*, No. 21-1770, 2022 WL 3095254, at *4 (1st Cir. Aug. 4, 2022) (collecting cases).

[67] Given the court's holding above, it is unnecessary to address Defendants' alternative argument concerning compensatory damages that there is no case law in support of the compensatory damages sought by Plaintiffs. [*See, e.g.,* ECF No. 292 at 25].

differently, Washington's claim of injury rests not on the state court judgment itself, but rather on the alleged violation of his constitutional rights by Wilmore.

*Washington v. Wilmore*, 407 F.3d 274, 280 (4th Cir. 2005).

Accordingly, the court denies Defendants' motion for summary judgment as to this claim.[68]

C.     Fourth Amendment Claims

As stated above, Plaintiffs do not move for summary judgment on their claims asserting violations of their Fourth Amendment rights. Additionally, Plaintiffs do not address Defendants' substantive argument concerning Claim Six, *see* ECF No. 283-1 at 52–54, but represent in briefing that they concede Claims Three and Six, both brought under the Fourth Amendment, as to Koon. [*See* ECF No. 290 at 52 n.9]. All Plaintiffs in this case were arrested pursuant to a facially valid arrest warrant, and generally such an arrest will not give rise to a Fourth Amendment claim. *See, e.g.*, *Martin v. Newton*, C/A No. 3:19-00806-SAL, 2020 WL 4333563, at *1 (D.S.C. July 28, 2020 (granting summary judgment as to plaintiff's Fourth Amendment claim where plaintiff was arrested pursuant to a facially valid bench warrant) (citing *Porterfield v. Lott*, 156 F.3d 563, 568 (4th Cir. 1998) ("[A] public official cannot be charged with false arrest when he arrests a defendant pursuant to a facially valid warrant.") (citation omitted)).

To the extent that Plaintiffs' Claims Three and Six continue to be asserted, Defendants' motion for summary judgment as to these claims is granted.

III.     **Remaining Motions**

The court now addresses Assa'ad-Faltas' Renewed Motion to Intervene[69]

---

[68] As stated above, Plaintiffs have not moved for summary judgment as to Plaintiffs' Claim Five for damages asserted in part against Lexington County for violation of Plaintiffs' Sixth Amendment rights. [*See* ECF No. 284-1 at 61–62].

[69] The full title of Assa'ad-Faltas' Renewed Motion to Intervene is as follows:

Rule 24(a) of the Federal Rules of Civil Procedure, which governs intervention as a matter of right, provides that the court must allow an individual to intervene who is "given an unconditional right to intervene by a federal statute . . . or claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). To show that he or she has an interest in the litigation, a party seeking to intervene "must meet all four of the following requirements: (1) the application to intervene must be timely; (2) the applicant must have an interest in the subject matter of the underlying action; (3) the denial of the motion to intervene would impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the existing parties to the litigation." *Houston Gen. Ins. Co. v. Moore*, 193 F.3d 838, 839 (4th Cir. 1999). Rule 24(b), which governs permissive intervention, provides that an individual may intervene if he or she "is given a conditional right to intervene by a federal statute . . . or has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b).

As with her previously filed motion to intervene, *see* ECF Nos. 144, 156, Assa'ad-Faltas has not cited a federal statute providing her a right to intervene. Regarding Rule 24(a), Assa'ad-Faltas also has not shown that she has an interest in the subject matter of the litigation, that the

---

Marie Assa'ad-Faltas, MD, MPH's RENEWED Motion to Intervene And to be declared a State-wide Class Representative to be appointed counsel if necessary for the Purpose of Obtaining State-wide Moratorium on Short-term Incarcerations Until the Covid-19 Risk is Contained and Until a Study is Conducted On the Corrective and Retributive Value, if Any, of Short-term incarcerations COMBINED WITH Proposed Intervenor's Motion for Electronic Filing and Receiving.

[ECF No. 295].

denial of her motion to intervene would impair or impede her ability to protect her interests, and

that her interests are not adequately represented by the class members. Assa'ad-Faltas does not

have an interest in the matter because the putative class of Plaintiffs only bring allegations

concerning the Lexington County Magistrate Court system, and Assa'ad-Faltas references only

the Alvin S. Glenn Detention Center, located in Richland County, South Carolina. [ECF No. 295].

As argued by Plaintiffs:

> Dr. Assa'ad-Faltas has not indicated that she is in danger of being incarcerated in
> the Lexington County Detention Center. Rather, the Supreme Court of South
> Carolina ordered that she serve a suspended sentence of ten days at the Alvin S.
> Glenn Detention Center in Richland County. Furthermore, Dr. Assa'ad-Faltas has
> not alleged that she currently owes or is in imminent danger of owing any fines,
> fees, court costs, assessments, or restitution. Instead, her suspended sentence is due
> to "contemptuous conduct" related to her noncompliance with the South Carolina
> Supreme Court's prior order prohibiting Dr. Assa'ad-Faltas from contacting
> employees of the state's "Unified Judicial System" by email. ECF No. 295-3 at 6,
> 9. Simply put, Dr. Assa'ad-Faltas does not fit within the definition of the certified
> class: she does not allege that she owes, or in the future will owe, any fines, fees,
> court costs, assessments, or restitution in Lexington County magistrate courts. *See*
> ECF No. 295.

[ECF No. 302 at 4]. Regarding Rule 24(b), Assa'ad-Faltas has not shown that her claim presents

a common question of law or fact. Unlike the Plaintiffs in this matter, Assa'ad-Faltas' claims center

on the risk of contracting COVID-19 while incarcerated in a South Carolina short-term detention

facility, the appropriateness of short-term detention, and conditions specific to the Richland

County detention facility. [*See* ECF No. 295].

Because Assa'ad-Faltas as not met the requirements for intervention as set forth in Rule 24

of the Federal Rules of Civil Procedure, the court denies her renewed motion to intervene.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment, ECF No. 284, is **DENIED** and Defendants' motion for summary judgment is **DENIED IN PART** and **GRANTED IN PART**, ECF No. 283. The court denies both motions for summary judgment as to Plaintiffs' Claim Two for prospective relief against Lexington County alleging violations of Plaintiffs' Sixth Amendment rights. The court denies Defendants' motion as to Plaintiffs' Claim Five for nominal damages against Lexington County alleging violations of Plaintiffs' Sixth Amendment rights. All other claims are dismissed. Additionally, Assa'ad-Faltas' renewed motion to intervene, ECF No. 295, is **DENIED**.

    **IT IS SO ORDERED.**

                                                          /s/Sherri A. Lydon
August 22, 2022                                           Sherri A. Lydon
Columbia, South Carolina                                 United States District Judge